MUEHLBAUER LAW OFFICE, LTD.
Andrew R. Muehlbauer, Esq.
Nevada Bar No. 10161
7915 West Sahara Ave., Suite 104
Las Vegas, Nevada 89117
Telephone: (702) 330-4505
Facsimile: (702) 825-0141
Email: andrew@mlolegal.com

GLANCY PRONGAY & MURRAY LLP
Robert V. Prongay
Natalie S. Pang (admitted *pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com
Email: npang@glancylaw.com

*Counsel for Lead Plaintiff Daniel E. Sieggreen*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| DANIEL E. SIEGGREEN, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>LIVE VENTURES INCORPORATED, JON ISAAC, and VIRLAND A. JOHNSON,<br><br>Defendants. | Case No. 2:21-cv-01517-CDS-EJY<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><br><br>JURY DEMAND |

# TABLE OF CONTENTS

I.     NATURE OF THE ACTION AND OVERVIEW ............................................1

II.    JURISDICTION AND VENUE .................................................................7

III.   PARTIES AND RELEVANT NON-PARTIES .............................................8

       A.     Plaintiff ...............................................................................8

       B.     Defendants ..........................................................................8

       C.     Relevant Non-Parties .........................................................10

IV.    SUBSTANTIVE ALLEGATIONS ..........................................................11

       A.     Background Of Live's Business ...........................................11

       B.     Live Engages In A Scheme To Fraudulently Boost Live's FY 2016 Financial
              Results And Profit Off Of Live's Artificially Inflated Share Price ......................12

       C.     SeekingAlpha's Report Partially Reveals The Truth ............................16

       D.     Live And JOI/ARCA Engineer The Sale Of ApplianceSmart To Boost Both
              Parties' Financial Results .........................................................20

       E.     Live Restates Its Financial Results For The Quarters Ended December 31, 2016,
              March 31, 2017, And June 30, 2017....................................................24

       F.     Live Cannot Come Up With Financing For The ApplianceSmart Acquisition And
              Defendants And JOI/ARCA Engineer An Amendment To The SPA ...................26

       G.     Live Discloses That The SEC Has Commenced An Investigation And Live's Stock
              Price Falls Again .....................................................................27

       H.     Throughout The Class Period, Live Falsely Reported Isaac's Compensation For
              Fiscal Years 2016-2018 ..............................................................28

       I.     Live Continues To Face Setbacks For The Rest Of The Class Period .................29

       J.     The End Of The Class Period: The SEC Files A Complaint Against Defendants,
              JOI/ARCA, And Kingston, And Live's Stock Price Further Plummets ...............36

       K.     After The Class Period, The Risks Of Defendants' Fraud Continues To
              Materialize ...........................................................................37

V.     DEFENDANTS' DISCLOSURE OBLIGATIONS UNDER ITEMS 303 AND 105 OF
       REGULATION S-K ...........................................................................37

i

VI.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
      DURING THE CLASS PERIOD ........................................................41

VII.  CLASS ACTION ALLEGATIONS ....................................................58

VIII. LOSS CAUSATION .........................................................................60

IX.   ADDITIONAL SCIENTER ALLEGATIONS ....................................61

X.    APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET
      DOCTRINE)...............................................................................65

XI.   NO SAFE HARBOR .......................................................................67

XII.  CAUSES OF ACTION......................................................................68

XIII. PRAYER FOR RELIEF ...................................................................75

XIV.  DEMAND FOR A TRIAL BY JURY................................................75

Lead Plaintiff Daniel E. Sieggreen ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Live Ventures Incorporated ("Live" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Live; (c) review and analysis of analyst reports regarding the Company; and (d) review of other publicly available information concerning Live, including transcripts of Live's investor calls. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION AND OVERVIEW

1. This is a class action on behalf of persons and entities that purchased or otherwise acquired Live securities between December 28, 2016 and August 3, 2021, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants[1] under the Securities Exchange Act of 1934 (the "Exchange Act").

2. Live is a Nevada-based holding company. After years of racking up losses, and lacking an executable business model, Live faced being delisted from the Nasdaq and bankruptcy. Then, father and son duo, Tony Isaac and Jon Isaac, Canadian citizens residing in Las Vegas, joined Live's board of directors. Jon Isaac became President and Chief Executive Officer ("CEO") of Live in January 2012 at age 28. Tony Isaac remained as a director of Live and became the CEO of a company named JanOne Inc. ("JOI/ARCA"), which is focused on recycling and selling appliances.

3. Live's business focused on providing online marketing solutions for businesses

---

[1] Live, Jon Isaac ("Isaac"), and Virland Johnson ("Johnson") are collectively referred to as the "Defendants."

until fiscal year 2015, when Live claimed to begin a "strategic shift" to focus on acquiring profitable businesses across different industries and changed its name from LiveDeal, Inc. to Live Ventures, Inc. In mid-2015 and late 2016, Live acquired two companies, the former was focused on carpet manufacturing, the latter was focused on selling vintage collectibles. In connection with these acquisitions, Live's debts skyrocketed. By the start of the Class Period on December 28, 2016, Live's debts had increased from $15.9 million in September 2016 to over $75 million.

4. Defendants came up with some ideas to boost Live's share price in the runup to the announcement of Live's financial results for fiscal year ("FY") 2016, which ended on September 30, 2016. Live was required to file its Form 10-K for FY 2016 with the SEC on December 29, 2016.

5. On November 30, 2016, Live entered an agreement with a stock promoter and also started to negotiate an amendment to an agreement it had with Novalk Apps S.A.S. ("Novalk"). Isaac's close personal friend, Juan Yunis ("Yunis"), a Colombian citizen residing in Colombia, was the CEO of Novalk. Live and Novalk had entered an agreement in October 2014 for the purchase of software from Novalk for $1.5 million in cash. As of November 30, 2016, Live had not purchased any software from Novalk under the parties' agreement.

6. On or about December 19, 2016, Live and Novalk executed an amendment to the software agreement, such that instead of the $1.5 million purchase price in cash, the price would be changed to 350,000 of Live's shares, calculated using Live's stock price as of September 15, 2016, when the price was $1.67 per share (the "Novalk Amendment"). Defendants backdated the amendment to the agreement to September 15, 2016, which would allow Live to recognize $915,500 of "other income" for the fiscal year ended September 30, 2016, thus increasing Live's pre-tax income for the year significantly, by 20%.

7. On or about December 23, 2016, Isaac emailed Live's board of directors and stated that he had decided to lock up all of his shares (owned through Isaac Capital Group, of which he was the sole member) for five years, noting that this action would lower Live's outstanding share count from approximately 2.8 million to 2 million shares, which would in turn, increase Live's

earnings per share from $6.33 to $8.92. Isaac stated that this action would be disclosed in Live's Form 10-K for fiscal year 2016.

8.    On December 27, 2016, after close of market, Live's paid stock promoters sent out several alerts touting Live and Live's impending announcement of its FY 2016 financial results.

9.    On December 28, 2016, at 7:00 a.m. EST, Live issued a press release announcing its ***"most successful year in the Company's history … representing earnings per share (EPS) of $8.92."*** That same day, Isaac instructed Live's brokerage to sell up to 20,000 shares if the share price "went busurk [sic]", with 10,000 to be sold if the stock price hit between $36 and $38 per share, and to sell another 10,000 if the stock price hit between $40 and $42 per share. Throughout the day, the brokerage account for another of Yunis's businesses named Kingston Diversified Holdings, LLC, which Isaac had access to, was accessed repeatedly, and used to place 28 "good till cancel" limit orders for the sale of up to 10,674 of Live's shares. Had these various transactions been executed, Defendants would have realized gross proceeds of over $1.1 million.

10.    Live's stock price reacted to all the hype, increasing to nearly $35 per share on the morning of December 28. However, Live's stock price did not increase enough to trigger the sales Isaac had instructed Live's brokerage to make that day.

11.    Live filed its FY 2016 Form 10-K with the SEC on December 29, 2016. In contrast to the representations in Live's December 28, 2016 press release, Live's 2016 Form 10-K stated that Live's earnings per share was $6.33 and that the number of Live's outstanding shares was approximately 2.8 million. Defendants did not provide an explanation for this discrepancy.

12.    On January 6, 2017, SeekingAlpha published a report about Live. SeekingAlpha reported, among other things, that Live's December 28, 2016 press release claiming that the Company had achieved earnings per share of $8.92 in 2016 was ***"WRONG and is inconsistent with Live Ventures' SEC filings."*** SeekingAlpha also reported that Live had spent substantial amounts of money on stock promotions.

13.    On this news, Live's share price dropped $2.62, or 12.7%, to close at $18.05 on January 6, 2017.

14. On January 9, 2017, Defendants issued a press release vehemently and falsely denying that they had engaged in any paid promotional activity—stating that if Live had done so, "our Company, its officers, and directors would have sold shares." Defendants of course did not disclose that they had attempted to sell thousands of shares following the hype generated by their paid stock promotions and December 28, 2016 press release.

15. At the end of 2017, Live and JOI/ARCA engaged in a scheme that would help both parties address significant financial issues that they were facing at the time. JOI/ARCA had sold some real property at a gain during its fiscal year and was facing a large tax liability. Live was facing a major tax hit that would result in it having an unprofitable quarter. Live and JOI/ARCA came up with a plan: Live would buy ApplianceSmart, which was a subsidiary of JOI/ARCA and the parties would claim December 30, 2017 as the effective date of the acquisition. Under the agreement, JOI/ARCA would sell 100% of ApplianceSmart's stock to Live in exchange for $6.5 million in cash (the "stock purchase agreement" or "SPA").

16. However, as of December 30, 2017, ApplianceSmart was still subject to the terms of a credit agreement, which required the lender's written approval prior to the sale of any of ApplianceSmart's assets and under which the lender had possession of ApplianceSmart's stock certificate. In other words, the SPA was not and could not be effective as of December 30, 2017.

17. Claiming the effective date of the SPA as December 30, 2017 allowed Live to falsely claim in its financial results for the quarter ended December 31, 2017, "other income" in the amount of $3,773,486, which thus enabled Live to report a positive net income for the quarter in what otherwise would have been an unprofitable quarter.

18. Then, Live was unable to come up with the financing for the ApplianceSmart acquisition. Defendants and JOI/ARCA came up with the scheme to amend the SPA and claim that Live had paid JOI/ARCA $2.6 million as part of the purchase amount by March 31, 2018, and that Live had subsequently delivered to JOI/ARCA a promissory note in the original principal amount. In fact, at the time of Defendants' representations, and contrary to their representation, no amount of money had been paid to JOI/ARCA for the purchase of ApplianceSmart.

19. Throughout the Class Period, Defendants also made materially false and misleading statements regarding Isaac's compensation. Live claimed that it had paid Isaac $162,000 for fiscal years 2016 through 2018 in "other compensation", when in fact, Live had paid Isaac $315,000 in "other compensation" during that period, or approximately 94% more than the disclosed amount.

20. On February 14, 2018, Live announced that it was no longer in compliance with the terms of one of its loans—a loan for $30 million that it had taken out in connection with its acquisition of the vintage products business in late 2016. That same day, after close of market, Live also disclosed that its financial results for the quarters ended December 31, 2016, March 31, 2017, and June 30, 2017 could no longer be relied upon due to various errors and that the financial statements would be restated. When Live filed its restated financial statements for the quarters ended December 31, 2016, March 31, 2017, and June 30, 2017, Live revealed that it had materially overstated its net cash provided by operations by $1.8 million for each of those quarters. Live also revealed that it had materially overstated Live's debts maturing in the next fiscal year; for example, Live's originally reported financial results for the quarter ended December 31, 2016 stated that this figure was $6,226,454 and the restated figure was more than three times greater at $20,505,143.

21. On this news, Live's share price dropped by $2.44 per share, or **15.5%,** to close at $13.29 per share on February 15, 2018.

22. On August 14, 2018, after close of market, Defendants disclosed that on February 21, 2018, they had received a subpoena and a letter from the SEC, which stated that the SEC was conducting an investigation. Defendants disclosed that the subpoena requested documents and information concerning, among other things, the restatement of Live's financial statements for the quarterly periods ended December 31, 2016, March 31, 2017, and June 30, 2017, and its acquisitions in mid-2015 and late 2016, and its acquisition of ApplianceSmart, as well as its change in auditors. Defendants did not disclose which change in auditors the SEC had inquired about— at this point in the Class Period, Live was on its third auditor. In May 2017, Live had "dismissed Anton & Chia, LLP" and replaced them with BDO USA, LLP; on January 29, 2018, BDO USA,

LLP had "informed Live [] that it will not stand for re-election for the audit of the Company's consolidated financial statements." Live engaged SingerLewak LLP as its auditor following BDO USA, LLP's departure.

23.     On this news, Live's share price dropped by $1.33 per share, or 11.7%, to close at $10.02 on August 15, 2018.

24.     Live changed auditors again in October 2018.  Defendants disclosed that on October 12, 2018, SingerLewak LLP had "informed Live [] that it resigned as the Company's independent public accounting firm."  Live engaged WSRP, LLC as its auditor thereafter, making WSRP, LLC Live's fourth independent accounting firm during the Class Period.

25.     On February 13, 2019, Defendants disclosed that on October 1, 2018, Live had received a letter from the SEC requesting information regarding a potential violation of Section 13(a) of the Securities Exchange Act of 1934, as amended, based on the timing of the Form 8-K Live had filed on February 14, 2018, which had disclosed that Live's quarterly financial statements for the periods ended December 31, 2016, March 31, 2017, and June 30, 2017 should no longer be relied upon.

26.     On August 14, 2020, Live filed a Form 8-K with the SEC, announcing that its financial statements for the quarterly periods ended December 31, 2019 and March 31, 2020 should no longer be relied upon and would be restated.

27.     On October 9, 2020, Live filed a Form 8-K with the SEC, which disclosed that on October 7, 2020, Live had received a "Wells Notice" from the SEC, which informed Live that the SEC had made a preliminary determination to recommend that the SEC file an enforcement action against Live.

28.     For each fiscal year of the Class Period, Defendants admitted that Live lacked effective internal control over financial reporting and claimed that they were attempting to remediate the material weaknesses in Live's internal control over financial reporting.

29.     On August 3, 2021, the SEC issued a press release announcing that it had filed a complaint against Defendants, JOI/ARCA, and Kingston Diversified Holdings LLC in the United

States District Court for the District of Nevada (the "SEC Complaint"). The SEC Complaint alleged that Isaac and Live had engaged in three distinct fraudulent schemes and made materially false and misleading statements that omitted material information. The first scheme consisted of Isaac's attempts to boost Live's FY 2016 earnings and then profit from the resulting spike in Live's stock price by, *inter alia*, engineering and then backdating the amendment of the Novalk Agreement, and by converting his shares to a newly created Series B Preferred Stock so that Live could boast of higher earnings per share. The second scheme consisted of Live and JOI/ARCA engineering the ApplianceSmart transaction and misrepresenting its effective date to boost Live's quarterly earnings and help JOI/ARCA avoid a major tax hit. The third scheme consisted of Live's materially understating the amounts of Isaac's compensation for fiscal years 2016-2018. The SEC Complaint detailed various emails by and between the defendants, which demonstrated that not only did Defendants mislead Live's investors, but Defendants also repeatedly misled Live's accountants and the Financial Industry Regulatory Authority.

30. On this news, Live's stock price dropped $29.08, or *46%*, to close at $33.50 on August 4, 2021, on unusually heavy volume. On August 4, 2021, Defendants issued a press release, denying the SEC's allegations. Live's stock price continued to decline by $7.74 per share, or *23%,* over the next four consecutive trading sessions, to close at $25,76 per share on August 10, 2021.

31. After the end of the Class Period, Live and its Chief Financial Officer decided to "cease all of [their] employment-based relationships"; the Company's fourth auditor of the Class Period, WSRP, LLC, had "opted not to seek re-appointment as the Company's auditor[,]" and Live attempted unsuccessfully to dismiss the SEC's complaint.

## II.    JURISDICTION AND VENUE

32. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rules 10b-5, 10b-5(a), and 10b-5(c) promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

33. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

34. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are in this District.

35. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES AND RELEVANT NON-PARTIES

### A. Plaintiff

36. Plaintiff Daniel E. Sieggreen, as set forth in the previously-filed certification (ECF No. 1-2) incorporated by reference herein, purchased Live securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

### B. Defendants

37. Defendant Live is incorporated under the laws of Nevada with its principal executive offices located in Las Vegas, Nevada. Live's principal offices are located at 325 E. Warm Springs Road, Suite 102, Las Vegas, Nevada 89119. Live's common stock trades on the NASDAQ Stock Exchange ("NASDAQ") under the ticker symbol "LIVE." Live's fiscal year starts on October 1 and ends on September 30 of the following year.

38. Defendant Jon Isaac ("Isaac") was the Company's CEO at all relevant times. Isaac served as a director of Live since December 2011 and became President and CEO of Live in January 2012. He was also the Company's Chief Financial Officer ("CFO") from February 2013

to January 2017.  Isaac studied Economics and Finance at the University of Ottawa.  Isaac is the President and sole member of Isaac Capital Group LLC ("ICG").  Throughout the Class Period, ICG was the beneficial owner of between 43.1% and 49.5% of Live's outstanding shares of common stock.  Thus, Isaac had significant influence over all of Live's business and operations.

39.  Defendant Virland A. Johnson ("Johnson") has been the Company's CFO since January 2017.  Johnson joined the Company in November 2016 as a consultant.  Johnson was Sr. Director of Revenue for JDA Software for six years prior to joining the Company, where he was responsible for revenue recognition determination, sales and contract support while acting as a subject matter expert.  Prior to joining JDA, Johnson provided leadership and strategic direction while serving in C-Level executive roles in public and privately held companies such as Cultural Experiences Abroad, Inc., Fender Musical Instruments Corp., Triumph Group, Inc., Unitech Industries, Inc. and Younger Brothers Group, Inc.  Johnson has more than 25 years of experience in the areas of process improvement, complex debt financings, SEC and financial reporting, turn-arounds, corporate restructuring, global finance, merger and acquisitions and returning companies to profitability and enhancing shareholder value.   Johnson holds a Bachelor's degree in Accountancy from Arizona State University and is a certified public accountant in Arizona.

40.  Defendants Isaac and Johnson (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

41. Defendant JanOne Inc. ("JOI/ARCA") is a Nevada corporation, formerly known as Appliance Recycling Centers of America, Inc. JOI/ARCA's securities are registered with the SEC under Section 12(b) of the Exchange Act and are listed on the NASDAQ under the ticker symbol "JAN." Tony Isaac, Jon Isaac's father, is the CEO of JOI/ARCA. Johnson has served as the CFO of JOI/ARCA since August 2017. JOI/ARCA and Live also share the same in-house legal counsel. JOI/ARCA purports to be in the business of recycling and selling household appliances. ApplianceSmart was a wholly-owned subsidiary of JOI/ARCA until 2018. Jon Isaac has a beneficial ownership of 8.6% of JOI/ARCA's outstanding capital stock.

**C. Relevant Non-Parties**

42. Juan Yunis ("Yunis") is a Colombian citizen residing in Barranquilla, Colombia. Yunis and Isaac are close personal friends who vacation together. Since at least October 2014, Yunis has been the CEO of Novalk Apps S.A.S. ("Novalk"), a Colombian corporation that is heavily involved with Live. At various times during the Class Period, funds from Novalk's or Yunis's bank accounts were wired to Isaac's personal bank account, including on September 17, 2018, in the amount of $128,781.564, and on December 14, 2018, in the amount of $500,000. In October 2014, Novalk entered into an agreement whereby Live would purchase software from Novalk for either: (a) $1.5 million in cash, (b) 800,000 shares of Live stock, (c) a combination of cash and stock to be determined within six months of closing, or (d) if Novalk failed to elect within six months, then the manner of payment would be determined by Live (the "Novalk Agreement"). However, between October 2014 and November 30, 2016, Live did not make any payment to Novalk under the terms of the agreement.

43. Kingston Diversified Holdings, LLC ("Kingston") is a Delaware limited liability company, which is not registered with the SEC. The sole member of Kingston since December 2016 is Yunis. Kingston's addresses of record are primarily the addresses of offices and private mailboxes maintained by Isaac. In or around November 2016, Isaac obtained electronic access to Kingston's brokerage account, and during the Class Period, Isaac transferred $242,000 from Kingston.

44.     Antonios "Tony" Isaac ("Tony Isaac") is Jon Isaac's father and is a Canadian citizen residing in Las Vegas, Nevada.  Since December 2011, Tony Isaac has been a board member of Live.  At all relevant times, Tony Isaac was the CEO of JOI/ARCA.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Background Of Live's Business

45.     Live, formerly known as Nuclear Corporation of New Mexico, is a holding company for various types of businesses and is incorporated under the laws of the state of Nevada.

46.     For years, Live struggled financially, operating at a loss and with no executable business model.  In fiscal year 2011, the Company reported only $4 million in net revenues and a net loss of $5.5 million.  Live was on the brink of being delisted from the NASDAQ and filing for bankruptcy.

47.     Then, in December 2011, the Isaacs joined Live's board of directors.  In January 2012, Isaac became Live's CEO and President—Isaac was 28 years old at the time.

48.     Until 2015, Live focused its business on providing online marketing solutions for small and medium business.  In fiscal year 2015, Live claimed to commence "a strategic shift" to become a "diversified holding company", focused on acquiring "profitable companies in various industries that have demonstrated a strong history of earnings power."

49.     Live's primary business is generated by its LiveDeal.com platform and its interests in Marquis Industries, Inc. ("Marquis"), and Vintage Stock, V-Stock, Movie Trading Company and EntertainMart ("Vintage Stock").  LiveDeal.com is a website that Live launched in late 2013, which connects restaurants with consumers and also sells various consumer products, such as kitchen and dining products, and children's toys.  Marquis is a carpet and yarn manufacturer which Live acquired an 80% interest of in July 2015.  Vintage Stock sells vintage and pre-owned toys, music products and other collectibles at brick-and-mortar stores.  Live acquired 100% of Vintage Stock in November 2016.

50.     In connection with Live's acquisitions of Marquis and Vintage Stock, by the start of the Class Period, Live debts had increased exponentially.  Between September 2016 and

December 2016, Live's debts increased by about $60 million—from $15,886,186 to $75,042,413. Although Live's revenue increased during this time, its growth in debts far surpassed and extinguished any growth in revenue that the Company experienced. In connection with the Vintage Stock acquisition, for example, Live owed one lender $30 million, owed another lender $12 million, and owed $10 million to the sellers of Vintage Stock.

**B.     Live Engages In A Scheme To Fraudulently Boost Live's FY 2016 Financial Results And Profit Off Of Live's Artificially Inflated Share Price**

51.     In an effort to boost Live's FY 2016 financial results for the year ended September 30, 2016 (which Live was required to report to the SEC on December 29, 2016), inflate Live's share price, and then profit off of sales of Live's shares at the artificially inflated price, Defendants engaged in a scheme to amend the Novalk Agreement and backdate the amendment, such that Live could recognize $915,500 of "other income" in its FY 2016 financial results; then, Isaac converted all of his Live common shares to a newly-created Series B class of shares, so that Live could claim that its earnings per share were higher than they actually were.

52.     Starting on or about November 30, 2016, Isaac and Yunis and Isaac and Johnson exchanged a series of emails about the Novalk Agreement and how to structure its amendment. Eventually, it was decided that the agreement would be amended such that instead of paying Novalk $1.5 million in cash or 800,000 in Live shares, Live would pay Novalk 350,000 shares valued at the price of Live's shares as of September 15, 2016, which was $1.67 per share.

53.     Also, on or about November 30, 2016, Isaac and Live entered into an agreement with a stock promoter named Protrader Elite LLC ("Protrader"). On or about December 5, 2016, Live wired $60,000 to Protrader. On or about December 14, 2016, Live wired another $60,000 to Protrader.

54.     On or about December 19, 2016, Yunis signed the amended Novalk Agreement, and Johnson forwarded the document to two Live employees, stating, "Here is the executed agreement …. *the effective date is Sept 15th …. but the signature date is now."* Johnson also forwarded the document to a Live employee, and stated, "have Jon counter sign when he comes

into the office this week.  Deal valued at 350,000 shares @ $1.67 Closing [ ] price on 9/15/2016 (effective date) or $584,500."

55.     By subtracting the "amended" purchase price of $584,500 from the original $1.5 million price and falsely claiming that the amended Novalk Agreement was effective as of September 15, 2016, Live would be able to recognize $915,500 in "other income" in its FY 2016 financial results for the year ended September 30, 2016.  This allowed Live to increase its pre-tax income for the fiscal year by 20%.

56.     Defendants' recognition of $915,500 in "other income" for FY 2016 violated Generally Accepted Accounting Principles ("GAAP").  Accounting Standards Codification ("ASC") 855-10-25, Subsequent Events, governs the circumstances under which an issuer should recognize events or transactions in its financial statements that occur subsequent to the balance sheet date, but before the statements were available to be issued.  Under ASC 855-10-25-3, an entity shall not recognize subsequent events that provide evidence about conditions that did not exist at the date of the balance sheet but arose after the balance sheet date but before financial statements are issued or are available to be issued.[2]  The GAAP provisions that Defendants violated are simple and straightforward.  Here, Defendants did not start to even negotiate the Novalk Amendment until November 30, 2016, which was two months after the date of Live's balance sheet on September 30, 2016, and also prior to the time when Live filed its 2016 Form 10-K and prior to the time when Live's financial statements were available to be issued.  To recognize the Novalk Amendment in Live's FY 2016 financial results was an obvious violation of straightforward GAAP provisions, and at minimum, reckless.  Further, putting GAAP aside, it is false and misleading to backdate a contractual agreement.

57.     On or about December 23, 2016, Isaac emailed members of Live's board of directors, stating:

---

[2] Financial statements are considered available to be issued when they are complete in a form and format that complies with GAAP and all approvals necessary for issuance have been obtained.

… I have decided to lock up all of my Isaac Capital Group's shares in LIVE for a period of 5 years. That means, I cannot sell any LIVE shares owned by ICG. This will make a good announcement no doubt. ***The other advantage this share exchange brings is a reduced share count on the common shares. We go from about 2.8m shares to about 2m shares outstanding. A lower outstanding share count will make our EPS look even better …. [This action] will be disclosed in the 10k.***

58.     On December 27, 2016, Isaac advised Live's brokerage firm that Live would have its "numbers coming out tomorrow" and that it "could be a high volume day." One of the emails in a chain between brokerage personnel stated, "Reasonable chance that he'll sell 250k shares or more this week."

59.     On December 27, 2016, after close of market, two stock promoters posted or sent alerts about Live's FY 2016 financial results announcement, which was to occur the following day. The stock promotions, *inter alia,* touted Live's "strong potential" and stated that Live "has a history of providing investors with incredible upside volatility."

60.     On December 28, 2016, at 7:00 a.m. EST, Live issued a press release entitled ***"Live Ventures Announces Biggest Year in Company History Achieving Record Earnings of $8.92 Per Share With Continued Growth Anticipated in 2017"*** (the "December 28, 2016 Press Release"). The December 28, 2016 Press Release stated:

> ***Reporting its most successful year in the Company's history, Live Ventures reported a record $79M in revenues, an increase of 136 percent over the previous year, and net profit of approximately $ 17.82M, representing earnings per share (EPS) of $8.92*** …. Management anticipates revenues to increase by well over 50 percent, easily surpassing $120M, and stockholders' equity to grow at a high double-digit rate …. ***In December, Isaac Capital Group, our largest stockholder, agreed to lock up all of their shares for five years (through December 31, 2021). To ensure that lock-up arrangement, they exchanged all of their shares for a series of "common equivalent" preferred stock, which is not redeemable …. Accordingly, our common stock was reduced from approximately 2.8 million to 2.0 million shares.***

61.     On the morning of December 28, 2016, Isaac instructed Live's brokerage firm to be prepared to sell at least 20,000 share of stock, stating, "in case it goes busurk [sic]. ***Please sell up to 10,000 between 36 and 38 … another 10k between 40 and 42.*** I'll be on my computer so

we will be chatting more closely."

62.     Live's share price skyrocketed to nearly $35 per share on the morning of December 28, 2016, in response to the paid stock touts and Live's misleading press release.  However, Live's share price did not increase enough to trigger the sales of Live's stock that Isaac had directed Live's brokerage to engage in.  If the transactions had occurred, Live would have generated gross proceeds of approximately $760,000.

63.     On December 28, 2016, Kingston's brokerage account was repeatedly accessed from an IP address associated with Isaac's Las Vegas residence using a TOR browser.  TOR browsers route all of an internet user's web traffic through a Tor network, anonymizing it.  28 "good till cancel"[3] limit orders for the sale of 10,674 Live shares were placed.  If the transactions had occurred, gross proceeds of over $383,000 would have been generated.  Five of the limit orders to sell Live shares were executed and generated gross proceeds of approximately $48,000.

64.     On December 29, 2016, Live filed its FY 2016 Form 10-K with the SEC (the "2016 Form 10-K").  The 2016 Form 10-K stated that as of September 30, 2016, Live had a weighted average of approximately 2.8 million common shares outstanding and accordingly, Live's earnings per share was $6.33, in contrast to the December 28, 2016 Press Release, which stated that Live's earnings per share was $8.92.  Live did not provide any explanation to investors for this discrepancy.  The 2016 Form 10-K also stated that Live had created a Series B Convertible Preferred Stock, which as of the date of the report, had zero shares issued and outstanding.

65.     The 2016 Form 10-K falsely stated that with respect to the amendment of the Novalk Agreement:

> ***During the year ended September 30, 2015, the Company purchased software for $1,500,000. Effective September 15, 2016 the Company and the licenser and developer of the software reached agreement whereby the company would pay for the software by issuing to licensor 58,333 of the Company's common shares to settle the accrued but unpaid obligation.*** The shares were not issued prior to September 30, 2016, and the accrued obligation of $584,500 will remain in accrued

---

[3] Good till cancel orders describe a type of order that an investor may place to buy or sell a security that remains active until either the order is filled or the investor cancels it.

expense until the shares are issued.  ***As a result of this agreement, the Company recorded $915,500 of other income.***

66.     Defendants admitted in the 2016 Form 10-K that Live lacked effective internal control over financial reporting.  Specifically, the 2016 Form 10-K stated:

> Our management assessed the effectiveness of our internal control over financial reporting as of September 30, 2016.  In making this assessment, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in Internal Control — Integrated Framework.  Based on our assessment using those criteria, ***our management concluded that our internal control over financial reporting was not effective as of September 30, 2016 due to the lack of timely determination of the Marquis purchase price allocation and inconsistencies found with financial reporting.***

67.     The 2016 Form 10-K did not describe what the "inconsistencies found with financial reporting" were.

68.     Defendants did not hold a public conference call to discuss Live's FY 2016 financial results.

**C.     SeekingAlpha's Report Partially Reveals The Truth**

69.     On January 6, 2017, SeekingAlpha published a report about Live entitled "Live Ventures Exposed: Massive Paid Promotions, Heavy Accounting Manipulation, Deficient Auditor And More."  SeekingAlpha reported the following:

> Live Ventures states that Isaac Capital Group (which is solely controlled by Live Ventures' CEO Jon Isaac) has locked up "ALL" of their shares for 5 years, implying that the CEO cannot sell his shares.
>
> ***Yet in addition to the 800,000 shares which have supposedly been locked up, Isaac has access to around 700,000 additional shares via warrants/options which have average exercise prices as low as $4.14 and which expire in less than 2 years. THE WARRANTS ARE EXERCISEABLE IMMEDIATELY – meaning that Isaac can exercise and sell over $10 million of stock any time he wants.***
>
> ***Live Ventures put out a press release claiming that the company achieved EPS of $8.92 in 2016.  This is WRONG and is inconsistent with Live Ventures' SEC filings.***
>
> ***First off, the $8.92 which was touted in Live Venture's press release was calculated by subtracting the 800,000 shares that Isaac agreed to lock up.  This is wrong.  Even in their own SEC 10K filing, Live is not able to calculate EPS***

*this way. The number as shown in the 10K is actually $5.40. So Live Ventures has already overstated their EPS in the press release by 65%.*

In fact, anyone running a text search on the 10K for the number "$8.92" will find no hits at all.

But then it gets better. Live Ventures didn't even realize a true profit at all. **Live Ventures LOST MONEY.** The GAAP Net Income number provided the company was $17.8 million. But to achieve this, the company added in almost $19 million of arbitrary one-time accounting adjustments, some of which appear to have no precedent in public company accounting. So in fact, Live Ventures did not post a true profit at all – instead, Live Ventures actually lost nearly $2 million.

*** *

Live Ventures' stock has shown a repeated pattern over time. When the stock trades at a very low price, a reverse split occurs to raise the price up and reduce the float. At the same time, some new acquisition or corporate development is announced. **Simultaneous paid promotions (which have now run into the millions of dollars) help to temporarily drive the stock up.** But when the business fails to produce results, the stock price falls again and the process is repeated.

**The most recent promotion campaign saw the stock triple in November to December 2016.** As in the past, there was a reverse split which coincided with some sort of "news". As in the past, there is the presence of heavily compensated stock promoters. And as in the past, the stock price quickly showed a reaction, tripling in a few weeks.

70.     SeekingAlpha further reported that it had discovered "well over 100 examples of [stock] promotions on Live, with paid amounts varying from a few thousand dollars to as high as $1 million[,]" noting that many more promotions "have likely been removed from circulation and can no longer be found."

71.     On this news, Live's stock price dropped $2.62, or 12.7%, to close at $18.05 on January 6, 2017.

72.     On January 9, 2017, Live issued a press release in the form of a letter to its shareholders (the "January 9, 2017 Press Release") which appeared to at least in part, respond to SeekingAlpha's January 6, 2017 report. Specifically, the January 9, 2017 Press Release stated:

Contrary to the false and misleading information written about us, your current management has spent the last five years building our Company for you, our stockholders. **Although we could have easily taken advantage of our stock price**

*when we witnessed spikes and record peaks, no officer or director has sold any shares …. Had our company truly engaged in any type of promotional activity, our Company, its officers, and directors would have sold shares.*

\*\*\*

In December, [Live's] largest stockholder and a third party that for years had provided a large standby lending agreement, agreed to lock up all of their shares for five years …. To ensure that lock-up arrangement, they exchanged all of their shares for a series of "common equivalent" preferred stock …. Accordingly, the Company's common stock was reduced from approximately 2.8 million to 2.0 million shares.

73.     Throughout the remainder of fiscal year 2017, Live continued to report positive financial results and tout its prospects for growth.  For example, on February 9, 2017, Live announced its financial results for Q1 2017 in a press release entitled "Live Ventures Incorporated Announces 60 Percent Increase in Revenues, 1,083 Percent Increase in Earnings per Share and $120M in Total Assets for its First Fiscal Quarter 2017" (the "Q1 2017 Press Release").  The Q1 2017 Press Release also stated that compared to same period of the prior fiscal year, Live's gross profit had increased by 97.3% and that net income was up by a whopping 711%.  On that same day, Live held a public conference call (the "Q1 2017 Call"), wherein Isaac reassured investors that "the information contained within Seeking Alpha's article is false" and assuaged concerns that he was going to try to sell his shares when Live's stock price was up.  Specifically, Isaac stated:

   …[A] lot of people had some concerns that when the stock is up, Jon is going to sell and he's going to exit and this and that …. I mean, if we woke up today and the stock was at $18 or was at $35, it's really – we're still coming to work and we're still working for you guys, the shareholders to bring value to you.  And to be quite frank with you, the most important metric here on our office is not really the stock price of the day …. [O]ur theory on stock price is that, it will hover or dance around our shareholder equity.  So, the higher the shareholder equity, the higher the stock price, and that's how we become more and more valuable year after year.

74.     Despite the Company's announcement that on April 27, 2017, Live had "dismissed Anton & Chia, LLP" from its role as Live's independent registered public accounting firm and had engaged BDO USA, LLP ("BDO") to replace Anton & Chia, and the Company's announcement on May 9, 2017, that a class action lawsuit alleging violations of the federal securities laws had been filed against it, on May 11, 2017, Live announced positive Q2 2017 financial results in a

press release (the "Q2 2017 Press Release"). The Q2 2017 Press Release quoted Isaac as stating, "Our performance in the second fiscal quarter of 2017 remains strong, as our subsidiaries continue to execute on their business plans, while we continue to look at strategically viable acquisition targets[.]"

75.     However, Live's 2017 Form 10-K for the fiscal year ended September 30, 2017 (the "2017 Form 10-K"), indicated that Live lacked effective internal control over financial reporting. Specifically, the 2017 Form 10-K stated:

> Our management assessed the effectiveness of our internal control over financial reporting as of September 30, 2017. In making this assessment, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") of 2013 regarding Internal Control — Integrated Framework. Based on our assessment using those criteria, our management concluded that our internal control over financial reporting was not effective as of September 30, 2017. Our assessment found the following material weaknesses. Management's assessment concluded that it has the following material weaknesses: *(a) lack of sufficient controls around the financial reporting process; (b) lack of proper segregation of duties within the financial reporting process; (c) lack of adequate controls surrounding management's review of the income tax provision process; (d) lack of controls surrounding the assessment of certain cash flow and balance sheet classifications; and (e) lack of sufficient controls around the process for business combinations.*
>
> The Company is evaluating the material weaknesses and developing a plan of remediation to strengthen our overall internal control over accounting for business combinations, income tax provision process, the financial reporting process, the assessment of certain cash flow and balance sheet classifications and segregation of duties. *The remediation plan will include the following actions: implement additional monitoring controls through revising and formalize the income tax review processes, enhance the formality and rigor of review and reconciliation procedures, and hire resources with specific tax, business combinations and financial accounting expertise whereby there can be effective segregation of duties.* The Company is committed to maintaining a strong internal control environment and believes that these remediation efforts will represent significant improvements in our controls and processes. *The Company has started to implement these steps, however, some of these steps will take time to be fully integrated and confirmed to be effective and sustainable.* Additional controls may also be required over time. Until the remediation steps set forth above are fully implemented and tested, the material weakness described above will continue to exist.

**D.    Live And JOI/ARCA Engineer The Sale Of ApplianceSmart To Boost Both Parties' Financial Results**

76.    At the end of 2017, both Live and JOI/ARCA, Isaac's father's company, each had a significant financial issue to contend with.  Live was facing a significant tax hit that would negatively impact its net profits for the upcoming quarter, which was the first quarter of fiscal year 2018, for the quarter ended December 31, 2017.  JOI/ARCA had sold some real property at a gain during its fiscal year ended December 30, 2017, and was facing a large tax liability.

77.    To avoid the negative impacts of these tax issues, Live, JOI/ARCA, and their subsidiaries entered into a stock purchase agreement effective December 30, 2017, in which JOI/ARCA sold 100% of the stock of its subsidiary, ApplianceSmart, to a new subsidiary of Live, in exchange for $6.5 million in cash (the "SPA").  Pursuant to the SPA, JOI/ARCA was required to transfer ApplianceSmart's stock certificate free of liens and encumbrances.

78.    But at the time of the SPA's purported effective date of December 30, 2017, ApplianceSmart was subject to a Credit and Security Agreement with MidCap financial as lender (the "MidCap Credit Agreement").  Under the MidCap Credit Agreement, MidCap had a first lien security interest in all of ApplianceSmart's assets and had possession of ApplianceSmart's stock certificate.  Further, under the MidCap Credit Agreement, ApplianceSmart was required to obtain MidCap's written approval prior to selling any of ApplianceSmart's asset, which ApplianceSmart had not done.  In other words, the SPA was not and could not be effective on December 30, 2017 and the acquisition of ApplianceSmart had not closed on this date either.

79.    By falsely claiming that December 30, 2017 was the "closing date" or "acquisition date of ApplianceSmart, Live could recognize "other income" of $3,773,486 as a "bargain purchase gain on acquisition", which would then have the effect of changing Live's unprofitable quarter into a profitable quarter wherein Live could report positive net income.  The supposed "bargain purchase gain" was calculated by valuing ApplianceSmart's assets at $10,237,486, about 58% more than the $6.5 million purchase price, and then deducting $6.5 million from the asset value.

80.     Defendants' use of December 30, 2017 as the acquisition date of ApplianceSmart, and their recognition of the ApplianceSmart acquisition in Live's results for the quarter ended December 31, 2017, violated GAAP.  ASC 805-10-25-6 provides: "The acquirer shall identify the acquisition date, which is the date on which it obtains control of the acquiree."  ASC 805-10-25-7 provides: "The date on which the acquirer obtains control of the acquiree generally is the date on which the acquirer legally transfers the consideration, acquires the assets, and assumes the liabilities of the acquiree—the closing date.  However, the acquirer might obtain control on a date that is either earlier or later than the closing date.  For example, the acquisition date precedes the closing date if a written agreement provides that the acquirer obtains control of the acquiree on a date before the closing date.  An acquirer shall consider all pertinent facts and circumstances in identifying the acquisition date."  Here, in light of the fact that as of December 30, 2017, ApplianceSmart's stock certificate was still in the possession of MidCap, the SPA did not have an express provision that control of ApplianceSmart transferred from JOI/ARCA to Live on or before December 31, 2017, and ApplianceSmart's revenues and assets remained subject to and encumbered by the terms of the MidCap Credit Agreement, to classify the acquisition date of ApplianceSmart as December 30, 2017 was an obvious violation of straightforward GAAP provisions, and at minimum, reckless.

81.     In early 2018, Live changed independent registered public accountants again, announcing on February 2, 2018, that on January 29, 2018, BDO had "informed Live [] that it would not stand for re-election for the audit of the Company's consolidated financial statements for the year ended September 30, 2018."  On February 7, 2018, Live announced that on February 6, 2018, Live had hired SingerLewak LLP as its new independent registered public accounting firm.

82.     On February 14, 2018, Live issued a press release announcing its Q1 2018 financial results (the "Q1 2018 Press Release") entitled ***"Live Ventures Announces Record Breaking First Quarter in Fiscal 2018",*** filed its Form 10-Q for Q1 2018 (the "Q1 2018 Form 10-Q"), and held a public conference call (the "Q1 2018 Call").  The Q1 2018 Press Release stated:

Despite a one-time, non-cash charge of $2.3 million associated with the enactment of U.S. tax reform, the company reported quarterly basic earnings per share of $0.95, an increase of 33.8 percent over last year.

***

Key highlights of the first fiscal quarter 2018 compared to 2017 include:

- ***Revenues of $40.3 million, up 25.4 percent***
- ***Gross profit of $16.4 million, up 29.6 percent***
- ***Net Income of $1.8 million, up 31.4 percent***
- Basic earnings per share of $0.95, up 33.8 percent
- Total assets of $132 million
- Net cash flow from operating activities totaled $6.3 million, up 98 percent

***

***The company recorded a one-time, non-cash bargain purchase gain related to its acquisition of ApplianceSmart of $3.7 million. This bargain purchase gain is preliminary and subject to change, based on the company finalizing the purchase price allocation with respect to the acquisition of ApplianceSmart.***

83. On the Q1 2018 Call, analysts inquired about what the Company meant by a "bargain purchase gain", and Isaac and Johnson engaged in the following exchange:

UNIDENTIFIED ANALYST: Okay. Yes. I just wanted to get a more visible way of reporting here. Can you to tell me what a bargain purchase gain is? It doesn't sound anything. I've been around 30 years, never heard that term before. And isn't that a onetime item, and should not be included with your income?

VIRLAND A. JOHNSON: Bargain purchase gains are reported wins, assets are in excess of purchase price for those acquired assets.

UNIDENTIFIED ANALYST: And who determines that?

VIRLAND A. JOHNSON: A bargain purchase gain is a rare occasion. It doesn't happen very often. Typically, you see goodwill, which is in excess paid amount over assets acquired.

UNIDENTIFIED ANALYST: Right. So who determines that?

JON ISAAC: ***In layman's terms, it's we bought something that's worth $10, but we paid $7 for it. So the $3 gets added back on to the balance sheet, and it has to go through our income statement for it to end up on the balance sheet.***

VIRLAND A. JOHNSON: Correct.

UNIDENTIFIED ANALYST: Okay. Okay. Understand that. But who determines that? Number one. And then why would that be included in an ordinary income when it's really a special gain that's not -- what would the actual number be, around $0.20 or $0.25 without that, right?

VIRLAND A. JOHNSON: It's typically included as other income when it does happen. And that's exactly how we called it out. And we've also specifically called it out as its own line item. Again, rare does happen, and it's a onetime event, but there is the ability for it to be adjusted sometime in the future within 1 year period of time when we're actually doing the fair value analysis work on all of the assets that are related to the acquisition.

UNIDENTIFIED ANALYST: Okay. Is that something that you individually internally determined? Or was that an audit that some outside party did for you on the asset valuation?

VIRLAND A. JOHNSON: Management makes the initial determination of those values relative to the carrying values that the company has at the time. But ultimately, it's determined through both work that management does and other outside appraisers in terms of assessing the fair value of the assets acquired. Now in this case, specifically, it's receivables, inventories and fixed assets, some prepaid, some restricted cash. There aren't too many categories of assets. Where we are going to expect to see most of the variability will be in receivables, inventory and possibly fixed assets.

JON ISAAC: This has happened twice so far from what I remember with here at our company. And this -- as a shareholder, this is sort of an indicative of what management or how we negotiate our purchases. Many times we're buying things that's below their market value[.]

UNIDENTIFIED ANALYST: That's fine. It's just that it seems like it's not something that should be considered in a normal part of your profit. So when you include it on your profit, in a way, you've portrayed it in the statement here.

84.     On the Q1 2018 Call, analysts inquired about the ApplianceSmart transaction, and Johnson and Isaac engaged in the following colloquy:

UNIDENTIFIED ANALYST: It was supposed to be immediately accretive to earnings. Do you have estimates as far as, when you looked at it, what do we think it's going to add to the company in the next -- this fiscal year? Do you have any estimates?

VIRLAND A. JOHNSON: We want to be cautious, and we don't provide guidance. But we bought it at such a price that we feel that this is going to be accretive to earnings. How much it's going to be accretive to earnings, we don't want to say at this time, but we do feel it's going to be accretive.

JON ISAAC: It was profitable. Can we say that?

VIRLAND A. JOHNSON: It's been profitable, yes.

JON ISAAC: It's a -- we would not buy a company that was losing money, that would be a drag on earnings. So the company generated $65 million, I believe, last year. We put that in the press release back in January. So this should add about -- *our earnings for the quarter that we just announced don't really reflect any of the numbers that ApplianceSmart generated because we didn't own it that long.*

VIRLAND A. JOHNSON: *We had it 1 day.*

JON ISAAC: *Only for 1 day.* But going forward, for Q2, fiscal Q2, we should see a nice jump in revenue. If things go the same as last year, it would add about $15 million or so per quarter in sales. And I think it'll be broken down in the Q -- in the next Q.

VIRLAND A. JOHNSON: It will.

UNIDENTIFIED ANALYST: Yes. I didn't read the Q, but can you mention how you financed that deal?

VIRLAND A. JOHNSON: We arranged the contract such that the purchase price is going to be deferred. The purchase price has to be paid by the end of our Q2.

85.    Although the Q1 2018 Form 10-Q repeated the same positive results contained in the Q1 2018 Press Release, the Q1 2018 Form 10-Q disclosed that Live was not in compliance with the terms of its nearly $30 million loan from Capitala Private Credit Fund V, L.P. Specifically, Live stated:

> On November 3, 2016, the Company, through Vintage Stock Affiliated Holdings LLC ("VSAH"), entered into a series of agreements in connection with its purchase of Vintage Stock. As a part of those agreements, VSAH and Vintage Stock (the "Term Loan Borrowers") obtained $29,871,650 of mezzanine financing (the "Capitala Term Loan") from the lenders as defined in the term loan agreement, and Capitala Private Credit Fund V, L.P., in its capacity as lead arranger ("Capitala"). Wilmington Trust, National Association, acts as administrative and collateral agent on behalf of the Term Loan Lenders. ***We are not in compliance as of December 31, 2017, with the Capitala Term Loan total leverage ratio and do not anticipate that we will regain compliance with this covenant until sometime in fiscal year ended September 30, 2019, based upon our current operating forecast.*** We are seeking alternatives to resolving the out of compliance condition including negotiating with Capitala and seeking alternative credit sources. There can be no assurance that the Company will be able to complete any such transactions on acceptable terms, if at all. The resolution of the out of compliance condition has not occurred with Capitala.

**E.    Live Restates Its Financial Results For The Quarters Ended December 31, 2016, March 31, 2017, And June 30, 2017**

86.    On February 14, 2018, after close of market, Live filed a Form 8-K with the SEC (the "February 14, 2018 Form 8-K"), which disclosed that the Company had to restate its financial results for prior three quarters. The February 14, 2018 Form 8-K stated:

> ***On January 18, 2018, the Audit Committee of the Board of Directors (the "Committee") of Live Ventures Incorporated (the "Company"), in consultation***

***with management, concluded that the Company's previously issued financial
statements for the quarterly periods ended December 31, 2016, March 31, 2017
and June 30, 2017 (collectively, the "Restated Periods") should no longer be
relied upon*** because of errors related to: (i) classification of certain debt of our
subsidiaries Marquis Industries, Inc. ("Marquis") and Vintage Stock, Inc. ("Vintage
Stock") as long-term debt when it should have been classified as short-term debt,
(ii) characterization of deposits (advance payments) on the purchase of Marquis
carpet manufacturing equipment and the related cash flow presentation (operating
versus investing), (iii) accounting for the down round provisions contained in
certain convertible notes and related warrants we issued in 2012, 2013 and 2014,
which warrants were subsequently amended to remove such provisions in
December 2014, (iv) classification of certain amounts relating to shares of our
Series E Preferred Stock, (v) classification of certain prepaid expenses and other
current assets as receivables, and (vi) classification of the seller financing provided
by the sellers of Vintage Stock. ***The errors described above will result in the
restatement of our financial statements for the Restated Periods.***

87.     On February 14, 2018, Live filed the restated Form 10-Qs for the quarters ended

December 31, 20176, March 31, 2017, and June 30, 2017.  For each of the restated Form 10-Qs,

Live's net cash provided by operations declined dramatically—***by $1.8 million each quarter***.  With

respect to the quarter ended December 31, 2016, net cash provided by operations had been

overstated by 36%; for the quarter ended March 31, 2017, net cash provided by operations had

been overstated by 35%; and, for the quarter ended June 30, 2017, net cash provided by operations

had been overstated by 20%.

88.     The restated Form 10-Qs revealed that Defendants had materially understated

Live's debts maturing in the next fiscal year.  For example, Live's originally reported financial

results for the quarter ended December 31, 2016 stated that Live's debts maturing in the next fiscal

year amounted to $6,226,454, but the restated figure was ***over three times more*** at $20,505,143.

89.     Further, while each of the original Form 10-Qs for the quarters ended December

31, 2016, March 31, 2017, and June 30, 2017 had included a list of "Risk Factors", the restated

Form 10-Qs removed all of the original "Risk Factors" and instead stated, "We are a smaller

reporting company as defined by Rule 12b-2 of the Securities Exchange Act of 1934 and are not

required to provide the information under this item."  The "Risk Factors" included in the original

Form 10-Qs, stated that hypothetical risks to Live's business, financial condition and results of

operations, cash flows and liquidity included, *inter alia*:

> Our results of operations may fluctuate from quarter to quarter depending upon several factors, some of which are beyond our control. These factors include, but are not limited to:
>
> - The timing and allocations of new product releases;
>
> - The timing of new store openings or closings;
>
> - Shifts in the timing or content or certain promotions or service offerings;
>
> - The effect of changes in tax rates in the jurisdictions in which we operating;
>
> - Acquisition costs and the integration of companies we acquire or invest in;
>
> - The costs associated with the exit of unprofitable markets or stores
>
> These and other factors could affect our business, financial condition and results of operations, cash flows and liquidity, and this makes the prediction of our financial results on a quarterly basis difficult. Also, it is possible that our quarterly financial results may be below the expectations of public market analysts.

90. On this news, Live's share price dropped by $2.44 per share, or ***15.5%,*** to close at $13.29 per share on February 15, 2018.

### F. Live Cannot Come Up With Financing For The ApplianceSmart Acquisition And Defendants And JOI/ARCA Engineer An Amendment To The SPA

91. After the supposed acquisition of ApplianceSmart, Live was unable to obtain necessary financing to pay the $6.5 million cash purchase price to JOI/ARCA by March 31, 2018. Accordingly, in April 2018, Johnson suggested that Live and JOI/ARCA treat ApplianceSmart's revenues, which had been paid to MidCap pursuant to the MidCap Credit Agreement, as cash paid from Live to JOI/ARCA. Isaac agreed with this plan.

92. On April 26, 2018, Live issued a press release, updating investors on the status of the ApplianceSmart acquisition (the "April 26, 2018 Press Release"). The April 26, 2018 Press Release announced:

> …[O]n December 30, 2017, ApplianceSmart Holdings LLC, a wholly-owned subsidiary of the Company (the "Purchaser"), entered into a Stock Purchase Agreement (the "Agreement") with Appliance Recycling Centers of America, Inc.

(the "Seller") and ApplianceSmart, Inc. ("ApplianceSmart"), a subsidiary of the Seller. Pursuant to the Agreement, the Purchaser purchased (the "Transaction") from the Seller all of the issued and outstanding shares of capital stock of ApplianceSmart in exchange for $6,500,000 (the "Purchase Price"). ***The Purchaser was required to deliver the Purchase Price, and a portion of the Purchase Price was delivered, to the Seller prior to March 31, 2018. Between March 31, 2018 and April 24, 2018, the Purchaser and the Seller negotiated in good faith the method of payment of the remaining outstanding balance of the Purchase Price. On April 25, 2018, the Purchaser delivered to the Seller that certain Promissory Note (the "ApplianceSmart Note") in the original principal amount of $3,919,494.46*** (the "Original Principal Amount"), as such amount may be adjusted per the terms of the ApplianceSmart Note.

93.    However, contrary to the representations in Live's April 26, 2018 Press Release, Live had not paid *any amount* in cash to JOI/ARCA in connection with the ApplianceSmart transaction during the first quarter of 2018. The supposed amount already paid for the ApplianceSmart acquisition of $2,580,505.54 was calculated by taking the difference between the total amount of ApplianceSmart's revenues that went to MidCap during January through March 2018 and the amounts JOI/ARCA obtained under the MidCap Credit Agreement and transferred to ApplianceSmart to fund ApplianceSmart's operations during January through March 2018.

### G.    Live Discloses That The SEC Has Commenced An Investigation And Live's Stock Price Falls Again

94.    On August 14, 2018, after close of market, Live filed its Q3 2018 Form 10-Q for the quarter ended June 30, 2018 (the "Q3 2018 Form 10-Q"), which disclosed that the SEC had commenced an investigation into the Company starting several months ago:

> ***On February 21, 2018, the Company received a subpoena from the Securities and Exchange Commission ("SEC") and a letter from the SEC stating that it is conducting an investigation. The subpoena requests documents and information concerning, among other things the restatement of the Company's financial statements for the quarterly periods ended December 31, 2016, March 31, 2017, and June 30, 2017, the acquisition of Marquis Industries, Inc., Vintage Stock, Inc., and ApplianceSmart, Inc., and the change in auditors.*** We have incurred and may continue to incur significant legal and accounting expenditures in connection with the SEC's investigation. We are unable to predict how long the SEC's investigation will continue or its outcome.

95.    On this news, Live's share price dropped by $1.33 per share, or 11.7%, to close at $10.02 on August 15, 2018.

### H. Throughout The Class Period, Live Falsely Reported Isaac's Compensation For Fiscal Years 2016-2018

96. On or about August 8, 2016, Live created an internal accounting record that stated the Company owed Isaac $234,000 for "Temporary Living Expenses" going back to 2012. On August 9, 2016, Live wired $120,000 to Isaac, with the note "temp living reimb."

97. Live's 2016 Form 10-K stated that the Company ***"ha[s] no written employment agreement with … Jon Isaac."*** The 2016 Form 10-K stated that Isaac had received a salary of $200,000 for the fiscal year, in addition to $13,465 for an option award, for total compensation of $213,465. The 2016 Form 10-K did not mention the $120,000 that Live had paid Isaac in August 2016.

98. On or about May 30, 2017, Live wired Isaac $30,000, with the note "temp living reimb."

99. On June 7, 2017, Live filed a Schedule 14A, Proxy Statement in connection with its annual meeting of shareholders to be held on July 21, 2017 (the "June 7, 2017 Proxy Statement"). The June 7, 2017 Proxy Statement, which was signed by Isaac, stated that for fiscal year 2016, Isaac had received a salary of $200,000 and $13,465 for an option award, and did not mention the $120,000 that Live had paid Isaac that fiscal year.

100. On or about December 18, 2017, Live wired $165,000 to Isaac with the note "expense reimb."

101. On January 18, 2018, Live filed its Form 10-K with the SEC for the fiscal year ended September 30, 2017 (the "2017 Form 10-K"), which Isaac signed. The 2017 Form 10-K stated that for that fiscal year, Isaac had received a salary of $200,000, and $54,000 in "All Other Compensation", for a total of $254,000. The 2017 Form 10-K stated that "'All Other Compensation' for Mr. Isaac includes $54,000 for each of 2017 and 2016, which was accrued by us for the reasonable housing allowance to which Mr. Isaac is entitled under his employment agreement." The 2017 Form 10-K also stated:

> ***The Company entered into an employment agreement with Jon Isaac, its President and Chief Executive Officer, effective January 1, 2013, as amended on***

***January 16, 2018.***  The agreement will expire on December 30, 2020.  Mr. Isaac is entitled to a base annual salary in an amount of $200,000, payable in periodic installments in accordance with the Company's regular payroll practices and subject to all applicable withholdings, including taxes.  Mr. Isaac is eligible to receive an annual performance bonus at the sole discretion of the Compensation Committee of the Board or the entire Board.  ***Mr. Isaac is entitled to reimbursement for all reasonable business expenses incurred by him in connection with his employment and the performance of his duties as our President and Chief Executive Officer, including a reasonable housing expense, not to exceed $7,000 per month.***

102.    On June 25, 2018, Live filed a Schedule 14A, Proxy Statement with the SEC in connection with its annual meeting of shareholders to be held on July 24, 2018 (the "June 25, 2018 Proxy Statement").  The June 25, 2018 Proxy Statement made the same disclosure about Isaac's compensation as Live's 2017 Form 10-K had made.

103.    On December 27, 2018, Live filed its Form 10-K with the SEC for the year ended September 30, 2018 (the "2018 Form 10-K").  The 2018 Form 10-K stated that for the fiscal year, Isaac had been paid a salary of $200,000 and $54,000 in "All Other Compensation" for a total of $254,000.  The 2018 Form 10-K did not disclose that Live had paid Isaac $165,000 in December 2017.

104.    On June 25, 2019, Live filed a Schedule 14A, Proxy Statement with the SEC in connection with its annual meeting of shareholders to be held on July 24, 2019 (the "June 25, 2019 Proxy Statement").  The June 25, 2019 Proxy Statement, which was signed by Isaac, made the same disclosures about Isaac's FY 2018 compensation as stated in the 2018 Form 10-K.

105.    In sum, for fiscal years 2016, 2017 and 2018, Live falsely claimed that Isaac had received a total of $162,000 of additional compensation beyond his $200,000 base salary.  In fact, Isaac had received approximately $315,000 in additional compensation for that period, or approximately 94% more than the disclosed amount.

## I.    Live Continues To Face Setbacks For The Rest Of The Class Period

106.    Live changed independent public accounting firms yet again in October 2018.  On October 18, 2018, Live filed a Form 8-K with the SEC, which disclosed that on October 12, 2018, SingerLewak LLP had ***"informed Live [ ] that it resigned as the Company's independent***

*registered public accounting firm."* On October 26, 2018, Live announced that it had engaged WSRP, LLC as its new independent public accounting firm, effective immediately. WSRP, LLC was the Company's fourth independent accounting firm during the Class Period.

107. Live's 2018 Form 10-K, originally filed with the SEC on December 27, 2018, stated that Defendants had achieved effective internal control over financial reporting. Specifically, the 2018 Form 10-K stated:

> Our management assessed the effectiveness of our internal control over financial reporting as of September 30, 2018. In making this assessment, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") of 2013 regarding Internal Control — Integrated Framework. ***Based on our assessment using those criteria, our management concluded that our internal control over financial reporting was effective as of September 30, 2018.***

108. However, on April 23, 2019, Defendants filed an amendment to Live's 2018 Form 10-K, which Defendants stated was being filed to ***"correct a typographical error and confirm that management concluded that the Company's internal control over financial reporting was not effective as of September 30, 2018"*** and further stated:

> We carried out an evaluation, under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, of the effectiveness of our disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)). ***Based upon that evaluation, our principal executive officer and principal financial officer concluded that, as of September 30, 2018, the period covered in this report, our disclosure controls and procedures were not effective to ensure that information required to be disclosed in reports filed under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the required time periods and is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosure.***

109. Despite the purported potential of the ApplianceSmart acquisition to grow Live's business and revenues, Defendants admitted on a public conference call on February 13, 2019, that ApplianceSmart had been contributing to the Company's losses. Specifically, Isaac stated:

> Marquis was profitable, Vintage was profitable, ApplianceSmart wasn't, so that's where the drag came. ***It was a hit to earnings and the earnings would have been***

***higher had it not been for ApplianceSmart.  But we have – we're confident that
it will be turned around and it'll be a contributor in future quarters.***

110.     On February 13, 2019, Live filed its Q1 2019 Form 10-Q (the "Q1 2019 Form 10-
Q"), which disclosed that in addition to the ongoing SEC investigation that had commenced on
February 21, 2018:

> ***On October 1, 2018, the Company received a letter from the SEC requesting
> information regarding a potential violation of Section 13(a) of the Securities
> Exchange Act of 1934, based upon the timing of the Company's Form 8-K filed
> on February 14, 2018.***  The Company provided a response to the SEC on October
> 26, 2018.  The Company is cooperating with the SEC in its inquiry.

111.     On a public conference call on May 14, 2019, to discuss Live's Q2 2019 financial
results (the "Q2 2019 Call"), Defendants disclosed that, as compared to the same period of the
prior fiscal year, Live's revenue had decreased by 10% and gross profit had declined by 5.1%.
Live further disclosed that net income was down to $0.47 million compared to $1.9 million for the
same quarter of the prior fiscal year.

112.     On the Q2 2019 Call, Defendants reassured investors that they anticipated
ApplianceSmart's business would improve soon due to their efforts.  Specifically, Johnson stated,
"ApplianceSmart has been lagging operationally. We are of the opinion operations begin to turn
around late in the quarter and are looking forward to positive operational results going forward."
On the Q2 2019 Call, an analyst engaged in the following colloquy with Defendants regarding
ApplianceSmart:

> UNIDENTIFIED ANALYST: Just about ApplianceSmart. Can you give us some
> color on why you think that it's turned the corner?  What you think the positives
> are going forward for that division, please?
>
> JON ISAAC: Virland, why don't you answer that question?
>
> VIRLAND A. JOHNSON: Okay.  One, margins are improving, mainly because of
> a focus on out-of-box product versus in-box product, selling more of that as
> opposed to in-box.  And we've significantly cut expenses in the February, March
> time frame, such that -- and we've also consolidated some stores that were not
> performing as well into stores that have been performing quite well.  So those are
> the major reasons for our optimism.

JON ISAAC: We -- the management at Live have been very actively involved with that division. I'd like to say that our other divisions have sort of been on autopilot, but ApplianceSmart, as I like to say, was in the intensive care unit for some time. But we've managed to identify which stores were not performing well. We've been able to exit some of them. Other ones, we're negotiating with landlords on getting out of them.

And then, of course, the mix that Virland spoke about, obviously, our margins are much, much greater on the out-of-box units. ***So we've shifted and we've seen drastic changes in numbers, just very recently.*** And we hope that – in this quarter that it's really -- would have turned the corner.

113. On August 14, 2019, Defendants announced Live's Q3 2019 financial results and held a public conference call (the "Q3 2019 Call"). On the Q3 2019 Call, Defendants disclosed that compared to the same quarter of the prior fiscal year, revenue had decreased by 13.9% and that net income had decreased to $1.5 million compared to $2.1 million.

114. On the Q3 2019 Call, Defendants continued to reassure investors that ApplianceSmart's operations were improving. Isaac stated, "ApplianceSmart is, of course -- needs some attention, but it will turn around, it will be -- on a positive, ***it will be a profitable operation in the near future.***" On the Q3 2019, Isaac also engaged in the following exchange with an analyst regarding ApplianceSmart:

UNIDENTIFIED ANALYST: Can you just fill us in on what's happening with the store closures that are going on with one of the subsidiaries? And what's fully happening with that company? Or maybe (inaudible) ApplianceSmart.

JON ISAAC: Yes. I do know ApplianceSmart has been contributing -- as we've said in prior quarters, ApplianceSmart was contributing losses to our numbers. And we've been taking a very, very active role in managing that subsidiary. We've recently shut down some stores, and we've moved things around. ***But it is definitely in the mode where we're restructuring some things and moving things around in order to turn it around so that it is a net contributor to our income.*** We, obviously, weren't pleased with the losses that it contributed, I believe, last -- this quarter here for June -- ending June. It contributed around 3/4 of $1 million or maybe a little bit less than that. So our EPS, our earnings would have been higher without that. But it's a process. ***And Virland has very good experience in turnarounds, and I have experience in turnarounds as well.***

115. Following the Q3 2019 Call, Defendants did not hold any further public conference calls for the rest of the Class Period.

116. Contrary to Defendants' representations, ApplianceSmart's operations did not turn around. On December 13, 2019, ApplianceSmart filed a voluntary petition in the U.S. Bankruptcy Court for the Southern District of New York seeking relief under Chapter 11 of the Bankruptcy Code.

117. On January 24, 2020, Live issued a press release, which disclosed that Live had received a notification of deficiency from NASDAQ due to its inability to file its FY 2019 Form 10-K timely.

118. On February 10, 2020, Live issued a press release announcing its FY 2019 financial results. Defendants disclosed that compared to Live's financial results for FY 2018, revenues, gross profit and operating income had all declined and that net income had significantly decreased to negative $4 million compared to $6 million.

119. Live's 2019 Form 10-K, which was filed with the SEC on February 10, 2020 (the "2019 Form 10-K"), stated the Company lacked effective internal control over financial reporting. Specifically, the 2019 Form 10-K stated:

> Our management assessed the effectiveness of our internal control over financial reporting as of September 30, 2019. In making this assessment, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") of 2013 regarding Internal Control - Integrated Framework. Based on our assessment using those criteria, our management concluded that our internal controls over financial reporting were ineffective as of September 30, 2019. Management noted the following deficiencies that management believes to be material weaknesses:

> - The Company does not have sufficient segregation of duties within its accounting functions, which is a basic internal control. Due to its size and nature, segregation of all conflicting duties may not always be possible and may not be economically feasible. However, to the extent possible, the initiation of transactions, the custody of assets and the recording of transactions should be performed by separate individuals. Management evaluated the impact of its failure to have segregation of duties on its assessment of its disclosure controls and procedures and has concluded that the control deficiency that resulted represented a material weakness.

> - The Company does not have written documentation of our internal control policies and procedures. Written documentation of key internal controls over financial reporting is a requirement of Section 404 of the Sarbanes-Oxley Act;

- Management has not established appropriate and rigorous procedures for evaluating internal controls over financial reporting. Due to limited resources and lack of segregation of duties, documentation of the limited control structure has not been accomplished.

- The Company employ[s] policies and procedures for reconciliation of the financial statements and note disclosures, however, these processes are not appropriately followed or documented.

*In response to the above identified weaknesses in our internal control over financial reporting, we plan to work on documenting in writing our internal control policies and procedures and implement sufficient segregation of duties within our accounting functions, so that one person cannot initiate, authorize and execute transactions, and so that one person cannot record transactions in the accounting records without sufficient review by a separate person.* We do not have a specific timeline within which we expect to conclude these remediation initiatives but do expect it to be an on-going process for the foreseeable future. We continue to evaluate testing of our internal control policies and procedures, including assessing internal and external resources that may be available to complete these tasks, but do not know when these tasks will be completed.

120. On February 24, 2020, Live issued a press release announcing that it had received a deficiency notice from NASDAQ due to its inability to timely file its Form 10-Q for its Q1 2020 financial results.

121. On August 14, 2020, Live filed a Form 8-K with the SEC, announcing that the Company had restated two more quarters of its financial results. Specifically, Defendants disclosed:

*On August 12, 2020, the Audit Committee of the Board of Directors (the "Committee") of the Company in consultation with management, concluded that the Company's previously issued financial statements for the quarterly periods ended December 31, 2019 (the "December 2019 Restated Period") and March 31, 2020 (the "March 2020 Restated Period", and together with the December 2019 Restated Period, the "Restated Periods") should no longer be relied upon* because of errors related to (i) solely with respect to the March 2020 Restated Period, lease accounting at the Company's ApplianceSmart, Inc. ("ApplianceSmart") subsidiary, and (ii) with respect to both Restated Periods, accounting related to impairment charges associated with certain right of use assets which were written down due to the voluntary Chapter 11 filing by ApplianceSmart. *The errors described above will result in the restatement of our financial statements for the Restated Periods.*

122. On October 9, 2020, Defendants filed a Form 8-K with the SEC, which disclosed another adverse development in connection with the SEC's investigation into Live, as follows:

*On October 7, 2020, Live Ventures Incorporated (the "Company") received a "Wells Notice" from the Staff of the U.S. Securities and Exchange Commission (the "SEC") relating to the Company's previously-disclosed SEC investigation.* A Wells Notice is neither a formal charge of wrongdoing nor a final determination that the recipient has violated any law. *The Wells Notice informed the Company that the SEC Staff has made a preliminary determination to recommend that the SEC file an enforcement action against the Company that would allege certain violations of the federal securities laws.* The Company maintains that its actions were appropriate, has engaged Orrick Herrington & Sutcliffe LLP to defend itself, and intends to vigorously defend against any and all allegations brought forth.

123. Live's 2020 Form 10-K, which was filed with the SEC on January 13, 2021 (the "2020 Form 10-K") stated that the Company lacked effective internal control over financial reporting. The 2020 Form 10-K stated:

Our management assessed the effectiveness of our internal control over financial reporting as of September 30, 2020. In making this assessment, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") of 2013 regarding Internal Control — Integrated Framework. Based on our assessment using those criteria, our management concluded that our internal controls over financial reporting were ineffective as of September 30, 2020. Management noted the following deficiencies that management believes to be material weaknesses:

- The Company does not have written documentation of our internal control policies and procedures. Written documentation of key internal controls over financial reporting is a requirement of Section 404 of the Sarbanes-Oxley Act;

- Management has not established appropriate and rigorous procedures for evaluating internal controls over financial reporting at all of its subsidiaries. Due to limited resources documentation of the control structure has not been accomplished for all subsidiaries.

In response to the above identified weaknesses in our internal control over financial reporting, we plan to work on documenting in writing our internal control policies and procedures and develop an internal testing plan to document our evaluation of effectiveness of the internal controls. We expect to conclude these remediation initiatives during the fiscal year ended September 30, 2021. We continue to evaluate testing of our internal control policies and procedures, including assessing internal and external resources that may be available to complete these tasks, but do not know when these tasks will be completed.

**J.     The End Of The Class Period: The SEC Files A Complaint Against Defendants, JOI/ARCA, And Kingston, And Live's Stock Price Further Plummets**

124.    On August 3, 2021, the SEC issued a press release announcing that it had filed a complaint in the United States District Court for the District of Nevada against Defendants, JOI/ARCA, and Kingston (the "SEC Complaint"). The SEC Complaint alleged, *inter alia,* that Defendants, JOI/ARCA, and Kingston had made material misstatements and omissions and engaged in three fraudulent schemes as follows: (i) Defendants attempted to boost Live's FY 2016 financial results by engineering and backdating the Novalk Amendment and Isaac converted his shares to a newly created Series B Preferred Stock for purposes of touting a higher earnings per share and then tried to profit off of Live's inflated share price before the truth was disclosed in Live's Form 10-K; (ii) Defendants and JOI/ARCA engineered the ApplianceSmart transaction to boost Live's quarterly earnings and to help JOI/ARCA avoid a large tax hit; and, (iii) Defendants materially understated Isaac's compensation for fiscal years 2016-2018. The SEC Complaint revealed the contents of numerous emails demonstrating that Defendants had not only materially misled Live's investors throughout the Class Period, but also repeatedly lied to Live's accountants and to the Financial Industry Regulatory Authority. The SEC Complaint sought injunctive relief, civil penalties, and disgorgement of all funds received from defendants' illegal conduct.

125.    On this news, Live's share price dropped $29.08, or ***46%***, to close at $33.50 on August 4, 2021, on unusually heavy trading volume.

126.    On August 4, 2021, Defendants issued a press release, stating:

> …[A]fter a nearly four-year investigation, the SEC has filed charges against the company. The company categorically denies all charges and will vigorously defend itself. The company asserts that the SEC's pursuit of this matter will not result in any benefit to investors and instead will only serve as a distraction from core business.

127.    Live's share price continued to decline $7.74, or ***23%***, over the next four consecutive trading sessions to close at $25.76 per share on August 10, 2021.

**K.  After The Class Period, The Risks Of Defendants' Fraud Continues To Materialize**

128.  On October 1, 2021, Defendants filed a Form 8-K with the SEC, which stated that Live and Johnson "have mutually agreed that, effective October 1, 2021, we would cease all of our employment-based relationships."  The Company announced that effective September 29, 2021, David Verret became Live's Chief Accounting Officer.

129.  On October 4, 2021, Live filed a Form 8-K with the SEC, which announced that WSRP, LLC, "the Company's independent registered public accounting firm for the past four years, opted not to seek re-appointment as the Company's auditor[,]" and that on September 29, 2021, Live's Audit Committee had engaged Frazier & Deeter LLC as its independent registered accounting firm for fiscal year ended September 30, 2021.

130.  Defendants, JOI/ARCA, and Kingston unsuccessfully moved to dismiss the SEC's complaint.

**V.  DEFENDANTS' DISCLOSURE OBLIGATIONS UNDER ITEMS 303 AND 105 OF REGULATION S-K**

131.  Regulation S-K required Defendants to describe, in Live's financial statements filed with the SEC during the Class Period, "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303(a)(3)(ii) ("Item 303").

132.  Known as Management Discussion and Analysis ("MD&A") requirements, Item 303 is intended to provide "in one section of a filing, material historical and prospective textual disclosure enabling investors and other users to assess the financial condition and results of operations of the registrant, with particular emphasis on the registrant's prospects for the future." SEC Release Nos. 33-8056; 34-34-45321.  Moreover, "Disclosure is *mandatory* where there is a known trend or uncertainty that is reasonably likely to have a material effect on the registrant's financial condition or results of operations."  *Id.*

133.    Item 303 imposes an affirmative duty on issuers to disclose "known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in a material way." S.E.C. Release No. 6835, 1989 WL 1092885, at *4; *see also* 17 C.F.R. § 229.303(a)(3). "Disclosure of known trends or uncertainties that the registrant reasonably expects will have a material impact on net sales, revenues, or income from continuing operations is also required. *Id.*

134.    Pursuant to Item 303(a), for a fiscal year, a registrant thus has an affirmative duty to:

      i.    Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which the income was so affected.

      ii.    Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

135.    17 C.F.R. § 229.303(a)(3)(i)-(ii) (emphasis added); *see also* S.E.C. Release No. 6835, 1989 WL 1092885, at *8 (May 18, 1989) ("Other non-recurring items should be discussed as unusual or infrequent events or transactions that materially affected the amount of reported income from continuing operations.") (citation and quotation omitted).

136.    Thus, even a one-time event, if "reasonably expect[ed]" to have a material impact of results, must be disclosed.  Examples of such *required* disclosures include: "[a] reduction in the registrant's product prices; erosion in the r[e]gistrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract."  S.E.C. Release No. 6835, 1989 WL 1092885, at *4 (May 18, 1989).

137.    Accordingly, as the SEC has repeatedly emphasized, the "specific provisions in Item 303 [as set forth above] require disclosure of forward-looking information." *See Mgmt's Discussion and Analysis of Fin. Condition and Results of Operation*, S.E.C. Release No. 6835, 1989 WL 1092885, at *3 (May 18, 1989).

138.    Indeed, the SEC has stated that disclosure requirements under Item 303 are "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company" and "a historical and prospective analysis of the registrant's financial condition . . . with particular emphasis on the registrant's prospects for the future." S.E.C. Release No. 6835, 1989 WL 1092885, at *3, *17. Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects." *See Comm'n Guidance Regarding Mgmt's Discussion and Analysis of Fin. Condition and Results of Operations*, S.E.C. Release No. 8350, 2003 WL 22996757, at *11 (December 19, 2003).

139.    Here, Live's ongoing GAAP violations, falsely dating contracts, understating the amounts paid to Isaac in compensation, and attempts to artificially inflate Live's financial results and share price during the Class Period were known trends or uncertainties likely to have a material unfavorable impact on Live's net revenues or income. Live had actual knowledge of these trends or uncertainties—indeed, for example, Isaac emailed Live's board in advance of issuing the fraudulent December 28, 2016 Press Release and advised its members that he was converting his shares to a new series of stock for the purpose of boosting Live's earnings per share, and that this action would be disclosed in Live's ensuing 10-K. As such, Live was required to include specific disclosures regarding the same in its MD&A in SEC filings during the Class Period. It did not.

140.    In addition, Item 105 of Regulation S-K, 17. C.F.R. §229.105 ("Item 105") (as amended November 9, 2020) requires a company to provide a discussion of the material factors that make an investment in the registrant speculative or risky.

141. Item 105 provides that the discussion must be organized logically with relevant headings and each risk factor should be set forth under a caption that adequately describes the risk. Item 105 discourages the presentation of risks that could apply generically to any registrant.

142. In violation of Item 105, Defendants' Class Period SEC filings omitted to disclose material facts, including:

a. Defendants entered contractual agreements solely to inflate Live's financial results and/or Live's stock price;

b. Live backdated and falsely dated contracts with the express purpose of inflating Live's financial results and Live's stock price;

c. Live engaged in systematic GAAP violations with the express purpose of inflating Live's financial results and Live's stock price;

d. Live materially understated the amounts of Isaac's compensation for fiscal years 2016-2018.

143. Live failed to adequately disclose, and in fact, did not disclose at all, in the "Risk Factors" section of its SEC filings, the risks to Live's business, operations, and prospects, due to its practices of backdating and falsely dating contracts, engaging in systematic GAAP violations and attempts to artificially inflate Live's financial results and stock price. These risks were some of the most significant factors that made an investment in Live's securities speculative or risky. Instead, Live's Class Period SEC filings contained boilerplate discussions of hypothetical, future issues. For example, Live's 2016 Form 10-K misleadingly discussed the risks that may occur if certain factors impacted the price of Live's common stock. Specifically, the 2016 Form 10-K stated:

> ***The trading price of our common stock has been highly volatile over the past few years and investors could experience losses in response to factors including the following, many of which are beyond our control:***
>
> - decreased demand in the internet services sector;
> - variations in our operating results;

- announcements of technological innovations or new products or services by us or our competitors;

- changes in expectations of our future financial performance, including financial estimates by securities analysts and investors;

- our failure to meet analysts' expectations;

- changes in operating and stock price performance of other technology companies similar to us;

- conditions or trends in the technology industry, the online marketing industry or the mobile device industry;

- additions or departures of key personnel or strategic partners; and

- future sales of our debt or equity securities, including common stock.

144. Further, Live's 2016 Form 10-K disclosed the hypothetical risks of Live's concentrated stock ownership as follows:

> Isaac Capital Group LLC (ICG) is the beneficial owner of approximately 49.5% of our outstanding shares of common stock. Jon Isaac, our Chairman, CEO and President, is the President and sole member of ICG and accordingly has the sole power to vote the shares of our common stock owned by ICG, and as a result, is able to exercise significant influence over all matters that require us to obtain shareholder approval, including the election of directors to our board and approval of significant corporate transactions that we may consider, such as a merger or other sale of our company or its assets. Moreover, such a concentration of voting power could have the effect of delaying or preventing a third party from acquiring us at a premium. This significant concentration of share ownership may also adversely affect the trading price of our common stock because investors may perceive disadvantages in owning stock in companies with concentrated stock ownership.

145. These purported risk disclosures were themselves materially false and misleading because they failed to disclose that these risks had already materialized.

## VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

146. On December 28, 2016, at 7:00 a.m. EST, Live issued a press release entitled *"Live Ventures Announces Biggest Year in Company History Achieving Record Earnings of $8.92 Per Share With Continued Growth Anticipated in 2017."* The December 28, 2016 Press Release stated:

> *Reporting its most successful year in the Company's history, Live Ventures reported a record $79M in revenues, an increase of 136 percent over the previous*

*year, and net profit of approximately $ 17.82M, representing earnings per share (EPS) of $8.92* …. Management anticipates revenues to increase by well over 50 percent, easily surpassing $120M, and stockholders' equity to grow at a high double-digit rate …. *In December, Isaac Capital Group, our largest stockholder, agreed to lock up all of their shares for five years (through December 31, 2021). To ensure that lock-up arrangement, they exchanged all of their shares for a series of "common equivalent" preferred stock, which is not redeemable …. Accordingly, our common stock was reduced from approximately 2.8 million to 2.0 million shares.*

147. The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that: (a) Live had not achieved "earnings of $8.92 per share" for FY 2016, instead, it had achieved earnings of $6.33 per share; (b) Isaac had decided to lock up all of Isaac Capital Group's shares to reduce Live's common stock from approximately 2.8 million to 2 million shares, so that Live could claim that it had achieved earnings per share of $8.92, thus driving up Live's share price, and then Live and Isaac could profit off of sales of the Company's shares at an artificially inflated price; and, (c) Live's positive FY 2016 results resulted in material part from Live's GAAP violations and backdating of the amendment to the Novalk Agreement, which allowed Live to falsely report $915,500 of "other income."

148. The 2016 Form 10-K claimed that the amendment of the Novalk Agreement was "[e]ffective" on September 15, 2016. Specifically, the 2016 Form 10-K stated:

*During the year ended September 30, 2015, the Company purchased software for $1,500,000. Effective September 15, 2016 the Company and the licenser and developer of the software reached agreement whereby the company would pay for the software by issuing to licensor 58,333 of the Company's common shares to settle the accrued but unpaid obligation.* The shares were not issued prior to September 30, 2016, and the accrued obligation of $584,500 will remain in accrued expense until the shares are issued. *As a result of this agreement, the Company recorded $915,500 of other income.*

149. The 2016 Form 10-K also stated the following with respect to the amendment of the Novalk Agreement:

*On December 7, 2016, the Company and Novalk Apps S.A.S. ("Novalk"), a licensor and developer of certain software the Company purchased in fiscal year 2015, memorialized an agreement which is effective September 15, 2016* that changes the terms and conditions relating to payment of the outstanding software license fee of $1,500,000. The software fee will be settled in exchange for to be

issued and certificated 58,333 shares of the Company's common stock subsequent to year ending September 30, 2016. *As a result of this agreement, the Company is recording $915,500 of other income in September 2016* and maintaining an accrued liability to Novalk for $584,500 to be settled when the common shares are issued to Novalk after year ending September 30, 2016.

150.    The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that: (a) during fiscal year 2015, the Company did not purchase software from Novalk; (b) the amendment to the Novalk Agreement was not effective on September 15, 2016; (c) Isaac and Novalk did not start to negotiate the amendment to the Novalk Agreement until November 30, 2016, or two months after the end of Live's fiscal year; (d) Defendants backdated and selected the effective date for the amendment to the Novalk Agreement as September 15, 2016 so that Live could increase by over $80,000 the amount of Live's "other income" and increase by 20% Live's pre-tax income for fiscal year 2016, and; (e) Live's recognition of $915,500 of "other income" as a result of the amendment to the Novalk Agreement in FY 2016 violated GAAP, namely, ASC 855-10-25 and ASC 855-10-25-3, which govern the circumstances under which an entity should recognize events or transactions in its financial statements that occur subsequent to the balance sheet date, but before the financial statements are issued or available to be issued.

151.    The 2016 Form 10-K further stated that Live's other income "increased for the year ended September 30, 2016 as compared to the year ended September 30, 2015 by $2,387,097."

152.    The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that: (a) Live's other income increased for the year ended September 30, 2016, as compared to the year ended September 30, 2015 due in material part to Live backdating the amendment to the Novalk Agreement such that its effective date was September 15, 2016, which would allow the Company to falsely recognize $915,500 of "other income" for FY 2016,  thus allowing Live to its pre-tax income by 20% Live's pre-tax income for fiscal year 2016; (b) Isaac and Novalk did not start to negotiate the Novalk Amendment until November 30, 2016, or two months after the end of Live's fiscal year; and, (c) Live's recognition

of $915,500 of "other income" from the Novalk Amendment in FY 2016 violated GAAP, namely, ASC 855-10-25 and ASC 855-10-25-3.

153.    The 2016 Form 10-K described Live's newly-created Series B Preferred Stock as follows:

> On December 27, 2016, the Company established a new series of preferred shares, convertible B preferred stock.  Our Series B Convertible Preferred Stock, as of the date of this Report, has 0 shares issued and outstanding …. The holders of shares of the Series B Convertible Stock have agreed not to sell[,] transfer, assign, hypothecate, pledge, margin, hedge, trade, or otherwise obtain or attempt to obtain any economic value from any such shares or any shares into which they may be converted (e.g. Common Stock) or for which they may be exchanged.

154.    The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that: (a) Live established a new series of Series B Convertible Preferred Stock so that Isaac could convert ICG's shares to Series B Convertible Preferred Stock and lower the number of Live's outstanding shares from approximately 2.8 million to 2 million; (b) Isaac converted ICG's shares to Series B Convertible Preferred Stock to falsely claim in Live's December 28, 2016 Press Release that Live had achieved earnings per share of $8.92; and, (c) that the establishment of the Series B Convertible Preferred Stock was part of Defendants' scheme to artificially inflate Live's stock price and profit off of the inflated stock price.

155.    The 2016 Form 10-K also stated that Isaac had received a salary of $200,000 and received 13,465 in option awards, for total compensation of $213,465 that fiscal year.

156.    The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that: (a) on or about August 8, 2016, Live created an internal accounting record that stated Live owed Isaac about $234,000 for "Temporary Living Expenses" dating back to 2012; (b) on or about August 9, 2016, Live wired $120,000 to Isaac, with the note "temp living reimb"; and, (c) Isaac received $333,465 in total compensation, not $213,465, for FY 2016.

157.    Live's January 9, 2017 Press Release disclaimed any stock promotion efforts on Live's behalf, stating:

Contrary to the false and misleading information written about us, your current management has spent the last five years building our Company for you, our stockholders. ***Although we could have easily taken advantage of our stock price when we witnessed spikes and record peaks, no officer or director has sold any shares .... Had our company truly engaged in any type of promotional activity, our Company, its officers, and directors would have sold shares.***

158. The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that: (a) Live had hired stock promoters, including hiring Protrader Elite LLC on November 30, 2016; (b) Live had spent millions of dollars on stock promotions; (c) Live had hired stock promoters to help pump Live's stock price in late December 2016, such that Live and Isaac could profit off of sales of Live's shares at artificially inflated prices; (d) on December 28, 2016, Isaac had instructed Live's brokerage to sell up to 10,000 shares if the stock price increased to between $36 and $38, and to sell another 10,000 shares if the stock price increased to between $40 and $42; and, (e) on December 28, 2016, Kingston's brokerage account was repeatedly accessed from an IP address associated with Isaac's Las Vegas residence, and 28 "good till cancel" limit orders for the sale of 10,674 Live shares were placed.

159. Live's February 9, 2017 10-Q repeated false statements regarding the Novalk Amendment similar to those that it made in the 2016 Form 10-K. Specifically, the February 9, 2017 Form 10-Q stated, ***"As of September 15, 2016 the Company was obligated to issue and certificate 58,334 shares of the Company's common stock to No[]valk S.A.S for software licensed to the Company."***

160. The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that: (a) the Novalk Amendment was not effective on September 15, 2016; (c) Isaac and Novalk did not start to negotiate the Novalk Amendment until November 30, 2016, or two months after the end of Live's fiscal year; (d) Defendants backdated and selected the effective date for the Novalk Amendment as September 15, 2016 so that Live could increase by over $80,000 the amount of Live's "other income" and increase by 20% Live's pre-tax income for fiscal year 2016, and; (e) Live's recognition of $915,500 of "other income" from the Novalk Amendment in FY 2016 violated GAAP, namely, ASC 855-10-25 and ASC 855-

10-25-3, which govern the circumstances under which an entity should recognize events or transactions in its financial statements that occur subsequent to the balance sheet date, but before the financial statements are issued or available to be issued.

161. On June 2, 2017, Live filed a Schedule 14A, Proxy Statement for its annual meeting of stockholders to be held on July 21, 2017. The June 2, 2017 Proxy Statement stated that Isaac was paid total compensation of $213,465 for FY 2016.

162. The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that: (a) on or about August 8, 2016, Live created an internal accounting record that stated Live owed Isaac about $234,000 for "Temporary Living Expenses" dating back to 2012; (b) on or about August 9, 2016, Live wired $120,000 to Isaac, with the note "temp living reimb"; and, (c) Isaac received $333,465 in total compensation, not $213,465, for FY 2016.

163. On January 5, 2018, Defendants filed a Form 8-K with the SEC, which falsely described the sale of ApplianceSmart to Live as follows:

> ***On December 30, 2017, ApplianceSmart Holdings LLC (the "Purchaser"), a wholly owned subsidiary of Live Ventures Incorporated (the "Company"), entered into a Stock Purchase Agreement (the "Agreement") with Appliance Recycling Centers of America, Inc. (the "Seller") and ApplianceSmart, Inc. ("ApplianceSmart"), a subsidiary of the Seller.*** ApplianceSmart is a 17-store chain specializing in new and out-of-the-box appliances with annualized revenues of approximately $65 million. Pursuant to the Agreement, the Purchaser purchased from the Seller all of the issued and outstanding shares of capital stock (the "Stock") of ApplianceSmart in exchange for $6,500,000 (the "Purchase Price"). ***The shares of Stock were delivered into escrow*** and will be released to the Purchaser upon Purchaser's receipt of third-party financing in an amount sufficient to fund the Purchase Price, and the subsequent delivery of such funds to certain third-party lenders of the Seller and ApplianceSmart, all of which the parties expect to occur prior to March 31, 2018 ….
>
> The Company believes the acquisition will be synergistic because it anticipates it can improve, among other things, ApplianceSmart's financial position by expanding its current product offering and increasing efficiencies. The acquisition of ApplianceSmart also provides the opportunity for the Company's subsidiary, Vintage Stock, an award-winning entertainment retailer, to expand into new markets. The Company anticipates that the purchase price allocation of ApplianceSmart's assets less liabilities at fair value acquired as part of this

acquisition will be equal to or more than the Purchase Price, resulting in no goodwill for this acquisition.

164. The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that: (a) the effective date or closing date of Live's acquisition of ApplianceSmart was not December 30, 2017; (b) ApplianceSmart's "shares of Stock were" not "delivered into escrow" and remained in the possession of MidCap; (c) JOI/ARCA's ownership of ApplianceSmart was still subject to a credit agreement with lender MidCap Financial, which, *inter alia,* required MidCap's written approval prior to a sale of any or all of ApplianceSmart's assets; (d) the ApplianceSmart transaction was engineered by Isaac and his father, Tony Isaac, with the purported effective date of December 30, 2017, so that Live could claim $3,773,486 as a "bargain purchase gain on acquisition" of ApplianceSmart, which would change Live's unprofitable quarter into a seemingly profitable quarter, and because JOI/ARCA had sold some real property at a gain during its fiscal year ended December 30, 2017, and was facing a large tax liability; (e) Live's claim that the ApplianceSmart sale was effective on December 30, 2017 violated GAAP, namely, ASC 805-10-25-6 and ASC 805-10-25-7, which govern the appropriate identification of an "acquisition date"; and, (f) Live's supposed $3,773,486 bargain purchase gain in connection with the acquisition of ApplianceSmart was devised by valuing ApplianceSmart's assets at $10,273,486, or approximately 58% more than the $6.5 million purchase price, and deducting the asset value from the purchase price.

165. On January 8, 2018, Live issued a press release entitled, ***"Live Ventures Enters Into Agreement to Acquire $65M Per Year ApplianceSmart"*** (the "January 8, 2018 Press Release"). The January 8, 2018 Press Release stated that ***"[Live] has entered into an agreement to acquire 100 percent of the outstanding stock of ApplianceSmart***, a 17-store chain specializing sales and service of new and out-of-the-box appliances with annualized revenues of approximately $65 million …. It is estimated that Live Ventures revenues will rise approximately 42 percent on an annualized basis as a result of this acquisition."

166. The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that: (a) JOI/ARCA's ownership of ApplianceSmart was still subject to a credit agreement with lender MidCap Financial, which, *inter alia,* required MidCap's written approval prior to a sale of any or all of ApplianceSmart's assets and under which MidCap had possession of ApplianceSmart's stock certificate; and, (b) the ApplianceSmart transaction was engineered by Isaac and his father, Tony Isaac, with the purported effective date of December 30, 2017, so that Live could claim $3,773,486 as a "bargain purchase gain on acquisition" of ApplianceSmart, which would change Live's unprofitable quarter into a seemingly profitable quarter, and because JOI/ARCA had sold some real property at a gain during its fiscal year ended December 30, 2017, and was facing a large tax liability; and, (c) Live's supposed $3,773,486 bargain purchase gain in connection with the acquisition of ApplianceSmart was devised by valuing ApplianceSmart's assets at $10,273,486, or approximately 58% more than the $6.5 million purchase price, and deducting the asset value from the purchase price and there was no reasonable basis for Defendants' claim that "Live Ventures['] revenues [would] rise approximately 42 percent on an annualized basis as a result of this [ApplianceSmart] acquisition."

167. Live's 2017 Form 10-K, which was filed with the SEC on January 18, 2018, repeated similar false claims about the ApplianceSmart transaction. Specifically, the 2017 Form 10-K stated:

> ***On December 30, 2017, ApplianceSmart Holdings LLC (the "Purchaser"), a wholly owned subsidiary of the Company, entered into a Stock Purchase Agreement (the "Agreement") with ARCA and ApplianceSmart, Inc. ("ApplianceSmart"), a subsidiary of ARCA.*** ApplianceSmart is a 17-store chain specializing in new and out-of-the-box appliances with annualized revenues of approximately $65 million. Pursuant to the Agreement, the Purchaser purchased from ARCA all of the issued and outstanding shares of capital stock (the "Stock") of ApplianceSmart in exchange for $6,500,000 (the "Purchase Price"). ***The shares of Stock were delivered into escrow*** and will be released to the Purchaser upon Purchaser's receipt of third-party financing in an amount sufficient to fund the Purchase Price, and the subsequent delivery of such funds to certain third-party lenders of ARCA and ApplianceSmart, all of which the parties expect to occur prior to March 31, 2018.

168.    The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that: (a) the effective date or closing date of Live's acquisition of ApplianceSmart was not December 30, 2017; (b) ApplianceSmart's "shares of Stock were" not "delivered into escrow" and remained in the possession of MidCap; (c) JOI/ARCA's ownership of ApplianceSmart was still subject to a credit agreement with lender MidCap Financial, which, *inter alia,* required MidCap's written approval prior to a sale of any or all of ApplianceSmart's assets; (d) the ApplianceSmart transaction was engineered by Isaac and his father, Tony Isaac, with the purported effective date of December 30, 2017, so that Live could claim $3,773,486 as a "bargain purchase gain on acquisition" of ApplianceSmart, which would change Live's unprofitable quarter into a seemingly profitable quarter, and because JOI/ARCA had sold some real property at a gain during its fiscal year ended December 30, 2017, and was facing a large tax liability; (e) Live's claim that the ApplianceSmart sale was effective on December 30, 2017 violated GAAP, namely, ASC 805-10-25-6 and ASC 805-10-25-7, which govern the appropriate identification of an "acquisition date"; and, (f) Live's supposed $3,773,486 bargain purchase gain in connection with the acquisition of ApplianceSmart was devised by valuing ApplianceSmart's assets at $10,273,486, or approximately 58% more than the $6.5 million purchase price, and deducting the asset value from the purchase price.

169.    Live's 2017 Form 10-K stated that with respect to Isaac's compensation, for FY 2016, Isaac had received total compensation of $213,465, and for FY 2017, Isaac had received total compensation of $254,000 ($200,000 as salary and $54,000 in "All Other Compensation"). The 2017 Form 10-K further stated:

> *"All Other Compensation" for Mr. Isaac includes $54,000 for each of 2017 and 2016, which was accrued by us for the reasonable housing allowance to which Mr. Isaac is entitled under his employment agreement.*

170.    The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that: (a) on or about August 8, 2016, Live created an internal accounting record that stated Live owed Isaac about $234,000 for "Temporary Living Expenses" dating back to 2012; (b) on or about August 9, 2016, Live wired $120,000 to Isaac, with the note

"temp living reimb"; (c) Isaac received $333,465 in total compensation, not $213,465, for FY 2016; (d) on or about May 30, 2017, Live wired $30,000 to Isaac, with the note, "temp living reimb."; and, (e) Isaac did not receive $54,000 for each of 2017 and 2016, with respect to expenses accrued by Live for Isaac's reasonable housing allowance.

171.    On February 14, 2018, Live filed its restated Form 10-Q for the quarter ended December 31, 2016.  The restated Form 10-Q for the quarter ended December 31, 2016 made the same disclosure regarding the Novalk Amendment as the original Form 10-Q for that quarter, which stated: ***"As of September 15, 2016, the Company was obligated to issue and certificate 58,334 shares of the Company's common stock to No[]valk S.A.S for software licensed to the Company."***

172.    The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that: (a) the Novalk Amendment was not effective on September 15, 2016; (b) Isaac and Novalk did not start to negotiate the Novalk Amendment until November 30, 2016, or two months after the end of Live's 2016 fiscal year; (c) Defendants backdated and selected the effective date for the Novalk Amendment as September 15, 2016 so that Live could increase by over $80,000 the amount of Live's "other income" and increase by 20% Live's pre-tax income for fiscal year 2016; and, (d) Live's recognition of $915,500 of "other income" from the Novalk Amendment in FY 2016 violated GAAP, namely, ASC 855-10-25 and ASC 855-10-25-3, which govern the circumstances under which an entity should recognize events or transactions in its financial statements that occur subsequent to the balance sheet date, but before the financial statements are issued or available to be issued.

173.    On June 25, 2018, Live filed a Schedule 14A, Proxy Statement, for its annual meeting of stockholders to be held on July 24, 2018.  The June 25, 2018 Proxy Statement stated that for FY 2016, Isaac had received total compensation of $213,465, and for FY 2017, Isaac had received total compensation of $254,000 ($200,000 as salary and $54,000 in "All Other Compensation").  The June 25, 2018 Proxy Statement further stated:

*"All Other Compensation" for Mr. Isaac includes $54,000 for each of 2017 and 2016, which was accrued by us for the reasonable housing allowance to which Mr. Isaac is entitled under his employment agreement.*

174.    The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that: (a) on or about August 8, 2016, Live created an internal accounting record that stated Live owed Isaac about $234,000 for "Temporary Living Expenses" dating back to 2012; (b) on or about August 9, 2016, Live wired $120,000 to Isaac, with the note "temp living reimb"; (c) Isaac received $333,465 in total compensation, not $213,465, for FY 2016; (d) on or about May 30, 2017, Live wired $30,000 to Isaac, with the note, "temp living reimb."; and, (e) Isaac did not receive $54,000 for each of 2017 and 2016, with respect to expenses accrued by Live for Isaac's reasonable housing allowance.

175.    Live's Q1 2018 February 14, 2018 Press Release misleadingly touted Live's financial results for the quarter ended December 31, 2017, and misled investors about the nature of the ApplianceSmart transaction, as follows:

Despite a one-time, non-cash charge of $2.3 million associated with the enactment of U.S. tax reform, the company reported quarterly basic earnings per share of $0.95, an increase of 33.8 percent over last year.

\*\*\*

Key highlights of the first fiscal quarter 2018 compared to 2017 include:

- ***Revenues of $40.3 million, up 25.4 percent***
- ***Gross profit of $16.4 million, up 29.6 percent***
- ***Net Income of $1.8 million, up 31.4 percent***
- Basic earnings per share of $0.95, up 33.8 percent
- Total assets of $132 million
- Net cash flow from operating activities totaled $6.3 million, up 98 percent

\*\*\*

***The company recorded a one-time, non-cash bargain purchase gain related to its acquisition of ApplianceSmart of $3.7 million. This bargain purchase gain is preliminary and subject to change, based on the company finalizing the purchase price allocation with respect to the acquisition of ApplianceSmart.***

176.    Live's Q1 2018 Form 10-Q, which was filed with the SEC on February 14, 2018, similarly stated that with respect to the ApplianceSmart acquisition:

***On December 30, 2017, ASH, a wholly owned subsidiary of the Company, entered into a Stock Purchase Agreement (the "Agreement") with ARCA and ApplianceSmart, a subsidiary of ARCA.*** Pursuant to the Agreement, the Purchaser purchased from ARCA all of the issued and outstanding shares of capital stock (the "Stock") of ApplianceSmart in exchange for $6,500,000 (the "Purchase Price"). ***The shares of Stock were delivered into escrow*** and will be released to the Purchaser upon Purchaser's receipt of third-party financing in an amount sufficient to fund the Purchase Price, and the subsequent delivery of such funds to certain third-party lenders of ARCA and ApplianceSmart, all of which the parties expect to occur prior to March 31, 2018.

177. Live's Q1 2018 Form 10-Q also reported gross profit of approximately $16.4 million and net income of approximately $1.8 million for the quarter.

178. The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that: (a) the effective date or closing date of Live's acquisition of ApplianceSmart was not December 30, 2017; (b) ApplianceSmart's "shares of Stock were" not "delivered into escrow" and remained in the possession of MidCap; (c) JOI/ARCA's ownership of ApplianceSmart was still subject to a credit agreement with lender MidCap Financial, which, *inter alia,* required MidCap's written approval prior to a sale of any or all of ApplianceSmart's assets; (d) the ApplianceSmart transaction was engineered by Isaac and his father, Tony Isaac, with the purported effective date of December 30, 2017, so that Live could claim $3,773,486 as a "bargain purchase gain on acquisition" of ApplianceSmart, which would change Live's unprofitable quarter into a seemingly profitable quarter, and because JOI/ARCA had sold some real property at a gain during its fiscal year ending December 30, 2017, and was facing a large tax liability; (e) Live's claim that the ApplianceSmart sale was effective on December 30, 2017 violated GAAP, namely, ASC 805-10-25-6 and ASC 805-10-25-7, which govern the appropriate identification of an "acquisition date"; (f) Live's supposed $3,773,486 bargain purchase gain in connection with the acquisition of ApplianceSmart was devised by valuing ApplianceSmart's assets at $10,273,486, or approximately 58% more than the $6.5 million purchase price, and deducting the asset value from the purchase price; and, (g) it was due in material part to Live's GAAP violations that "[d]espite a one-time, non-cash charge of $2.3 million associated with the enactment of U.S. tax reform" Live could claim "[g]ross profit of $16.4 million, up 29.6 percent",

"[n]et [i]ncome of $1.8 million, up 31.4 percent", [b]asic earnings per share of $0.95, up 33.8 percent" for the quarter.

179.    On the Q1 2018 Call, analysts inquired about what the Company meant by a "bargain purchase gain", and Isaac and Johnson engaged in the following exchange:

> UNIDENTIFIED ANALYST: Okay.  Yes. I just wanted to get a more visible way of reporting here.  Can you to tell me what a bargain purchase gain is? It doesn't sound anything.  I've been around 30 years, never heard that term before.  And isn't that a onetime item, and should not be included with your income?

> VIRLAND A. JOHNSON: Bargain purchase gains are reported wins, assets are in excess of purchase price for those acquired assets.

> UNIDENTIFIED ANALYST: And who determines that?

> VIRLAND A. JOHNSON: A bargain purchase gain is a rare occasion.  It doesn't happen very often.  Typically, you see goodwill, which is in excess paid amount over assets acquired.

> UNIDENTIFIED ANALYST: Right. So who determines that?

> JON ISAAC: *In layman's terms, it's we bought something that's worth $10, but we paid $7 for it.  So the $3 gets added back on to the balance sheet, and it has to go through our income statement for it to end up on the balance sheet.*

> VIRLAND A. JOHNSON: Correct.

180.    On the Q1 2018 Call, Johnson also stated:

> *Net income was $1.8 million …. For the quarter, we had a bargain purchase gain of $3.7 million from our new and recent acquisition of ApplianceSmart, a 17-store retail appliance dealer with stores in Minnesota, Ohio, Georgia and Texas.*

181.    The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that: (a) the effective date or closing date of Live's acquisition of ApplianceSmart was not December 30, 2017; (b) ApplianceSmart's "shares of Stock were" not "delivered into escrow" and remained in the possession of MidCap; (c) JOI/ARCA's ownership of ApplianceSmart was still subject to a credit agreement with lender MidCap Financial, which, *inter alia,* required MidCap's written approval prior to a sale of any or all of ApplianceSmart's assets; (d) the ApplianceSmart transaction was engineered by Isaac and his father, Tony Isaac, with the purported effective date of December 30, 2017, so that Live could claim $3,773,486 as a "bargain purchase gain on acquisition" of ApplianceSmart, which would change Live's

unprofitable quarter into a seemingly profitable quarter, and because JOI/ARCA had sold some real property at a gain during its fiscal year ending December 30, 2017, and was facing a large tax liability; (e) Live's claim that the ApplianceSmart sale was effective on December 30, 2017 violated GAAP, namely, ASC 805-10-25-6 and ASC 805-10-25-7, which govern the appropriate identification of an "acquisition date"; and, (f) Live's supposed $3,773,486 bargain purchase gain in connection with the acquisition of ApplianceSmart was devised by valuing ApplianceSmart's assets at $10,273,486, or approximately 58% more than the $6.5 million purchase price, and deducting the asset value from the purchase price.

182.    On the Q1 2018 Call, analysts inquired about the ApplianceSmart transaction, and Johnson and Isaac engaged in the following colloquy:

> UNIDENTIFIED ANALYST: It was supposed to be immediately accretive to earnings. Do you have estimates as far as, when you looked at it, what do we think it's going to add to the company in the next -- this fiscal year? Do you have any estimates?
>
> VIRLAND A. JOHNSON: We want to be cautious, and we don't provide guidance. But we bought it at such a price that we feel that this is going to be accretive to earnings. How much it's going to be accretive to earnings, we don't want to say at this time, but we do feel it's going to be accretive.
>
> JON ISAAC: It was profitable. Can we say that?
>
> VIRLAND A. JOHNSON: It's been profitable, yes.
>
> JON ISAAC: It's a -- we would not buy a company that was losing money, that would be a drag on earnings. So the company generated $65 million, I believe, last year. We put that in the press release back in January. So this should add about -- *our earnings for the quarter that we just announced don't really reflect any of the numbers that ApplianceSmart generated because we didn't own it that long.*
>
> VIRLAND A. JOHNSON: *We had it 1 day.*
>
> JON ISAAC: *Only for 1 day.* But going forward, for Q2, fiscal Q2, we should see a nice jump in revenue. If things go the same as last year, it would add about $15 million or so per quarter in sales. And I think it'll be broken down in the Q -- in the next Q.

183.    The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that: (a) the effective date or closing date of Live's acquisition of ApplianceSmart was not December 30, 2017; (b) ApplianceSmart's "shares of Stock were" not "delivered into escrow" and remained in the possession of MidCap; (c) JOI/ARCA's ownership

of ApplianceSmart was still subject to a credit agreement with lender MidCap Financial, which, *inter alia,* required MidCap's written approval prior to a sale of any or all of ApplianceSmart's assets; (d) the ApplianceSmart transaction was engineered by Isaac and his father, Tony Isaac, with the purported effective date of December 30, 2017, so that Live could claim $3,773,486 as a "bargain purchase gain on acquisition" of ApplianceSmart, which would change Live's unprofitable quarter into a seemingly profitable quarter, and because JOI/ARCA had sold some real property at a gain during its fiscal year ending December 30, 2017, and was facing a large tax liability; (e) Live's claim that the ApplianceSmart sale was effective on December 30, 2017 violated GAAP, namely, ASC 805-10-25-6 and ASC 805-10-25-7, which govern the appropriate identification of an "acquisition date"; (f) Live's supposed $3,773,486 bargain purchase gain in connection with the acquisition of ApplianceSmart was devised by valuing ApplianceSmart's assets at $10,273,486, or approximately 58% more than the $6.5 million purchase price, and deducting the asset value from the purchase price; and, (g) Live did not "own" ApplianceSmart for even "one day" during the first fiscal quarter of 2018.

184. Live's April 26, 2018 Press Release announced an update on the status of the ApplianceSmart acquisition as follows:

> …*[O]n December 30, 2017, ApplianceSmart Holdings LLC, a wholly-owned subsidiary of the Company (the "Purchaser"), entered into a Stock Purchase Agreement (the "Agreement") with Appliance Recycling Centers of America, Inc. (the "Seller") and ApplianceSmart, Inc. ("ApplianceSmart"), a subsidiary of the Seller.* Pursuant to the Agreement, the Purchaser purchased (the "Transaction") from the Seller all of the issued and outstanding shares of capital stock of ApplianceSmart in exchange for $6,500,000 (the "Purchase Price"). *The Purchaser was required to deliver the Purchase Price, and a portion of the Purchase Price was delivered, to the Seller prior to March 31, 2018. Between March 31, 2018 and April 24, 2018, the Purchaser and the Seller negotiated in good faith the method of payment of the remaining outstanding balance of the Purchase Price. On April 25, 2018, the Purchaser delivered to the Seller that certain Promissory Note (the "ApplianceSmart Note") in the original principal amount of $3,919,494.46* (the "Original Principal Amount"), as such amount may be adjusted per the terms of the ApplianceSmart Note.

185. The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that: (a) the effective date or closing date of Live's acquisition

of ApplianceSmart was not December 30, 2017; (b) as of December 30, 2017, JOI/ARCA's ownership of ApplianceSmart was still subject to a credit agreement with lender MidCap Financial, which, *inter alia,* required MidCap's written approval prior to a sale of any or all of ApplianceSmart's assets; (c) the ApplianceSmart transaction was engineered by Isaac and his father, Tony Isaac, with the purported effective date of December 30, 2017, so that Live could claim $3,773,486 as a "bargain purchase gain on acquisition" of ApplianceSmart, which would change Live's unprofitable quarter into a seemingly profitable quarter, and because JOI/ARCA had sold some real property at a gain during its fiscal year ending December 30, 2017, and was facing a large tax liability; (d) Live's claim that the ApplianceSmart sale was effective on December 30, 2017 violated GAAP, namely, ASC 805-10-25-6 and ASC 805-10-25-7, which govern the appropriate identification of an "acquisition date"; (f) no portion of the $6.5 million purchase price of ApplianceSmart had been paid as of March 13, 2018 because Live had been able to find sufficient financing; and, (g) the purportedly paid amount of $2,580,505.54 had been devised by Johnson by taking the difference between (i) the total amount of ApplianceSmart's revenues that went directly to MidCap during January through March 2018 and (ii) the amounts JOI/ARCA obtained under the MidCap Credit Agreeement, which it transferred to ApplianceSmart to fund its operations from January through March 2018.

186.    Both Live's Q2 Form 10-Q for the quarter ended March 31, 2018 and Live's Q3 2018 Form 10-Q for the quarter ended June 30, 2018 stated the following:

> ***On December 30, 2017 (the "ApplianceSmart Closing Date"), the Company, through its newly formed, wholly-owned subsidiary, ASH, entered into a series of agreements in connection with its purchase of ApplianceSmart*** …. Total consideration was $6,500,000, with no liabilities assumed by ASH. ***On December 30, 2017, ASH agreed to pay the $6,500,000 no later than March 31, 2018.*** Effective April 1, 2018, ASH issued an interest bearing promissory note the Seller, with interest at 5% per annum, with a three-year term in the original amount of $3,919,494 for the balance of the purchase price ….***The remaining $2,580,506 was paid in cash by ASH to the Seller.***

187.    Live's 2018 Form 10-K for the fiscal year ended September 30, 2018 stated:

> ***On December 30, 2017 (the "ApplianceSmart Closing Date"), the Company, through its newly formed, wholly-owned subsidiary, ApplianceSmart Affiliated***

*Holdings LLC ("ASH"), entered into a series of agreements in connection with its purchase of ApplianceSmart*....Total consideration was $6,500,000, with no liabilities assumed by ASH. On December 30, 2017, ASH agreed to pay the $6,500,000 no later than March 31, 2018.

188.    The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that: (a) the effective date or closing date of Live's acquisition of ApplianceSmart was not December 30, 2017; (b) as of December 30, 2017, JOI/ARCA's ownership of ApplianceSmart was still subject to a credit agreement with lender MidCap Financial, which, *inter alia,* required MidCap's written approval prior to a sale of any or all of ApplianceSmart's assets; (c) the ApplianceSmart transaction was engineered by Isaac and his father, Tony Isaac, with the purported effective date of December 30, 2017, so that Live could claim $3,773,486 as a "bargain purchase gain on acquisition" of ApplianceSmart, which would change Live's unprofitable quarter into a seemingly profitable quarter, and because JOI/ARCA had sold some real property at a gain during its fiscal year ending December 30, 2017, and was facing a large tax liability; (d) Live's claim that the ApplianceSmart sale was effective on December 30, 2017 violated GAAP, namely, ASC 805-10-25-6 and ASC 805-10-25-7, which govern the appropriate identification of an "acquisition date"; (f) no portion, let alone $2,580,506 of the $6.5 million purchase price of ApplianceSmart had been paid by Live; and, (g) the purportedly paid amount of $2,580,506 had been devised by Johnson by taking the difference between (i) the total amount of ApplianceSmart's revenues that went directly to MidCap during January through March 2018 and (ii) the amounts JOI/ARCA obtained under the MidCap Credit Agreeement, which it transferred to ApplianceSmart to fund its operations from January through March 2018.

189.    Live's 2018 Form 10-K further made misrepresentations regarding Isaac's compensation, stating that Isaac had been paid $200,000 as salary and $54,000 in "All Other Compensation", for a total of $254,000.  The 2018 Form 10-K stated:

> *"All Other Compensation" for Mr. Isaac includes $54,000 for each of 2018 and 2017, which was accrued by us for the reasonable housing allowance to which Mr. Isaac is entitled under his employment agreement.*

190.    On June 25, 2019, Live filed a Schedule 14A, Proxy Statement, for its annual meeting of stockholders to be held on July 24, 2019.  The June 25, 2019 Proxy Statement made the same disclosures regarding Isaac's compensation as the 2018 Form 10-K did.

191.    The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that: (a) on or about May 30, 2017, Live wired $30,000 to Isaac, with the note, "temp living reimb."; (b) on or about December 18, 2017, Live wired Isaac $165,000 with the note, "expense reimb."; (c) Isaac did not receive $54,000 for each of 2017 and 2018, with respect to expenses accrued by Live for Isaac's reasonable housing allowance; and, (d) with respect to fiscal years 2016, 2017, and 2018, Isaac had received a total of $315,000 in additional compensation, or approximately 94% more than what Live claimed Isaac had received for that time period.

## VII.    CLASS ACTION ALLEGATIONS

192.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Live securities between December 28, 2016 and August 3, 2021, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers, and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

193.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Live's shares actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of Live shares were traded publicly during the Class Period on the NASDAQ.  Record owners and other members of the Class may be identified from records maintained by Live or its transfer agent and may be notified of the

pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

194. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

195. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

196. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Live; and

(c) whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(d) whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and,

(e) to what extent the members of the Class have sustained damages and the proper measure of damages.

197. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

198.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's securities are traded in efficient markets;

(d)    the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)    the Company traded on the NASDAQ, and was covered by market analysts;

(f)    the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

(g)    Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and;

(h)    unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

199.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

200.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## VIII.    LOSS CAUSATION

201.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Plaintiff and the Class.

202. Throughout the Class Period, as detailed herein, Defendants made materially false and/or misleading statements and/or omissions. This course of wrongful conduct caused the price of Live securities to be artificially inflated. But for Defendants' misrepresentations and/or omissions, Plaintiff and the other members of the Class would not have purchased Live securities or would not have purchased such securities at artificially inflated prices. Later, when Defendants' prior misrepresentations and/or omissions were disclosed to the market, and/or when the concealed risks materialized, the price of Live shares fell significantly as the prior artificial price inflation was dissipated. As a result of their purchases and/or acquisition of Live securities during the Class Period, Plaintiff and other members of the Class suffered economic losses, *i.e.*, damages, under the Exchange Act. The timing and magnitude of the decline in the prices of the Company's shares negate any inference that the economic losses and damages suffered by Plaintiff and other members of the Class were caused by changed market conditions, macroeconomic factors, or Company-specific facts unrelated to Defendants' wrongful conduct.

203. As detailed *supra*, the truth regarding the Company's business, operations, and prospects, as well as its accounting violations, was partially revealed, and/or the concealed risks materialized, on January 6, 2017, February 14, 2018, August 14, 2018, and August 3-10, 2021. As a direct result of these partial disclosures, the price of Live's stock declined significantly, thereby damaging investors as the artificial inflation in Live's stock price was removed.

## IX. ADDITIONAL SCIENTER ALLEGATIONS

204. As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Live, their control over, and/or receipt and/or modification of Live's allegedly materially misleading misstatements and/or their

associations with the Company which made them privy to confidential proprietary information concerning Live, participated in the fraudulent scheme alleged herein.

205. Defendants were motivated to issue misstatements regarding the Company's business, operations, and prospects for financial reasons. When Isaac joined Live in late 2011, Live had been struggling for years and was on the verge of declaring bankruptcy. As Isaac himself stated in Live's January 9, 2017 Press Release:

> As early as five years ago before your current management took over, our Company was fighting a delisting notice from Nasdaq. Days away from being delisted and moving to the "over-the-counter" market, our Company appeared to be on its last legs, and likely just a few short months away from bankruptcy as a result of years of losses …. [F]or our 2011 fiscal year … our Company reported only $4 million in net revenues and a net loss of $5.5 million …. Most importantly, our Company had no executable business model to speak of, and no intrinsic value.

206. In connection with Live's acquisitions of Marquis and Vintage Stock, Live incurred significant debts and obligations just before the start of the Class Period. Between September 2016 and December 2016, Live's debt increased by about $60 million—from $15,886,186 to $75,042,413. On July 6, 2015, Marquis entered into a $15 million credit agreement with Bank of America, which was secured by "substantially all of Marquis assets", which as of December 31, 2016, had $2,791,005 outstanding, and was due in July 2020. On June 20, 2016 and August 5, 2016, Marquis entered into three equipment loans with Banc of America Leasing & Capital, LLC: (i) note #1 was for $5 million, which was due on September 23, 2021, (ii) note #2 was for $2,209,807, which was due on January 30, 2022, and (iii) note #3 was for $3,679,514, which had been funded but not yet executed as of December 31, 2016. On November 3, 2016, in connection with Live's purchase of Vintage Stock, Live obtained $29,871,650 of financing from Capitala Private Credit Fund V, L.P. (the "Capitala Loan"), which it was required to pay $750,000 plus interest upon quarterly, and which would reach full maturity in November 2021; Live obtained $12 million of financing from Texas Capital Bank, which would reach full maturity in November 2020; and, Live and Vintage Stock entered into a seller financed loan in the amount of $10 million which was due to the previous owners of Vintage Stock.

207.    Thus, Defendants were motivated to issue misstatements to stay in compliance with the covenants under its multitude of financing agreements.  Further, Defendants were motivated to issue misstatements during the Class Period to regain compliance with the covenant regarding total loan ratio pursuant to the terms of the Capitala Loan, which Defendants admitted Live was not in compliance with as of September 30, 2017.

208.    Defendants had the motive to and attempted to take advantage of Live's artificially inflated stock price.  For example, on December 28, 2016, Isaac instructed Live's brokerage to sell up to 20,000 shares in the wake of the hype generated by Live's paid stock promotions and false and misleading December 28, 2016 Press Release, and Kingston's brokerage account was repeatedly accessed on that day from an IP address associated with Isaac's Las Vegas residence, with 28 "good till cancel" orders placed.  Had the various transactions all occurred, Defendants would have realized gross proceeds of over $1.1 million.

209.    By backdating the Novalk Amendment to September 15, 2016, and violating GAAP provisions ASC 855-10-25 and ASC 855-10-25-3, Live improperly recognized "other income" of $915,500, and overstated its FY 2016 pre-tax income by 20%.  This further bolstered Live's FY 2016 financial results in an effort to artificially inflate Live's share price.

210.    Defendants also had the motive and opportunity to issue misstatements in connection with Live's acquisition of ApplianceSmart.  JOI/ARCA was Isaac's father's company, and Isaac was a beneficial owner of 8.6% of the outstanding capital stock of JOI/ARCA.  Like his son, Tony Isaac joined Live in December 2011.  At all relevant times Tony Isaac was a director of Live.  At the end of 2017, JOI/ARCA was facing a significant tax liability due to the sale of some real property earlier in the fiscal year, for which it owed a gain, and Live had had an unprofitable quarter.  By falsely claiming an effective date for the ApplianceSmart SPA of December 30, 2017, and violating GAAP provisions ASC 805-10-25-6 and ASC 805-25-7, Defendants improperly recognized "other income" of $3,773,486 as a "bargain purchase gain", which allowed Defendants to claim that Live's Q1 2018 had been profitable, as opposed to unprofitable.

211.    Further, when Live could not come up with the financing to purchase ApplianceSmart, Defendants and JOI/ARCA falsely claimed that Live had paid approximately $2.6 million to JOI/ARCA and that the parties had negotiated in "good faith" to restructure their agreement with respect to the outstanding balance of the purchase price.  Johnson also falsely indicated in JOI/ARCA's financial statements for fiscal year ended December 31, 2017, that Live had paid $2,580,505.54 in cash to JOI/ARCA as partial payment for the acquisition of ApplianceSmart.

212.    The magnitude of Defendants' restated financial results for the quarters ended December 31, 2016, March 31, 2017, and June 30, 2017, which Defendants filed with the SEC on February 14, 2018, further supports their scienter.  The restated financial results for Q1, Q2 and Q3 2017 revealed that Defendants had greatly understated their debts.  Defendants originally claimed in Live's Q1 2017 Form 10-Q for the quarter ended December 31, 2016, which was filed on February 9, 2017, that Live's debts maturing in the next fiscal year amounted to $6,226,454. The restated Q1 2017 Form 10-Q reflected an increase in that figure of more than three times, to $20,505,143.  Defendants originally claimed in Live's Q2 2017 Form 10-Q for the quarter ended March 31, 2017, that was filed with the SEC on May 11, 2017, that Live's debts maturing in the next fiscal year amounted to $5,832,567; the restated Q2 2017 Form 10-Q changed that figure to $21,210,899.  Defendants originally claimed in Live's Q3 2017 Form 10-Q for the quarter ended June 30, 2017, that Live's debts maturing in the next fiscal year amounted to $5,847,194; the restated Q3 2017 Form 10-Q changed that figure to $23,222,636.

213.    In addition to restating the amounts of current portion of long-term debt for Q1, Q2 and Q3 2017, the restated Form 10-Qs reflected a material decrease in net cash provided by operations as compared to the originally-filed Form 10-Qs.  The restated Form 10-Qs showed that Defendants had originally overstated net cash provided by operations by ***$1.8 million each quarter***.  For Q1 2017, Defendants overstated this figure by 36%; for Q2 2017, Defendants overstated this figure by 35%; and, for Q3 2017, Defendants overstated this figure by 20%.

214. The SEC's ongoing investigation and filing of charges against Defendants further supports Defendants' scienter. On February 21, 2018, the SEC issued a subpoena to Live and advised Live that it was commencing an investigation; the subpoena requested documents and information concerning, among other things the restatement of the Company's financial statements for the quarterly periods ended December 31, 2016, March 31, 2017, and June 30, 2017, the acquisition of Marquis, Vintage Stock, and ApplianceSmart, Inc., and Live's change in auditors. On October 1, 2018, the SEC sent Live a letter requesting information regarding a potential violation of Section 13(a) of the Securities Exchange Act of 1934, based on the timing of Live's Form 8-K, filed on February 14, 2018. The February 14, 2018 Form 8-K had disclosed that Live's previously issued financial statements for the quarterly periods ended December 31, 2016, March 31, 2017, and June 30, 2017, should no longer be relied upon. On October 7, 2020, the Company received a "Wells Notice" from the SEC, which informed Defendants that the SEC had made a preliminary determination to recommend that the SEC file an enforcement action against the Company alleging violations of the federal securities laws. Finally, on August 3, 2021, the SEC announced that it had filed a complaint against Defendants, JOI/ARCA, and Kingston, which alleged, *inter alia,* that Defendants had made materially false and misleading statements and omissions in connection with the fraudulent schemes described above.

## X. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

215. The market for Live's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Live's securities traded at artificially inflated prices during the Class Period. On June 25, 2021, the Company's share price reached a Class Period high of $75.25 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Live's securities and market information relating to Live and have been damaged thereby.

216.     During the Class Period, the artificial inflation of Live's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Live's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Live and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

217.     At all relevant times, the market for Live's securities was an efficient market for the following reasons, among others:

(a)     Live's shares met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, Live filed periodic public reports with the SEC and/or the NASDAQ;

(c)     Live regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     Live was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

218.     As a result of the foregoing, the market for Live's securities promptly digested current information regarding Live from all publicly available sources and reflected such information in Live's share price.  Under these circumstances, all purchasers of Live's securities during the Class Period suffered similar injury through their purchase of Live's securities at artificially inflated prices and a presumption of reliance applies.

219.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XI.     NO SAFE HARBOR

220.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading,

and/or the forward-looking statement was authorized or approved by an executive officer of Live who knew that the statement was false when made.

## XII. CAUSES OF ACTION

### FIRST CLAIM

**Violation of Section 10(b) of The Exchange Act and
Rule 10b-5 Promulgated Thereunder
Against All Defendants**

221. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

222. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Live's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

223. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Live's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

224. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Live's financial well-being and prospects, as specified herein.

225. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course

of conduct as alleged herein in an effort to assure investors of Live's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Live and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

226.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

227.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Live's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have

actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

228.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Live's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Live's securities during the Class Period at artificially high prices and were damaged thereby.

229.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Live was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Live securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

230.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

231.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### SECOND CLAIM
**Violation of Section 20(a) of The Exchange Act**
**Against the Individual Defendants**

232.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully

1  set forth herein.

2      233. The Individual Defendants acted as controlling persons of Live within the meaning
3  of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and
4  their ownership and contractual rights, participation in, and/or awareness of the Company's
5  operations and intimate knowledge of the false financial statements filed by the Company with the
6  SEC and disseminated to the investing public, Individual Defendants had the power to influence
7  and control and did influence and control, directly or indirectly, the decision-making of the
8  Company, including the content and dissemination of the various statements which Plaintiff
9  contends are false and misleading. The Individual Defendants were provided with or had unlimited
10 access to copies of the Company's reports, press releases, public filings, and other statements
11 alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and
12 had the ability to prevent the issuance of the statements or cause the statements to be corrected.

13     234. In particular, the Individual Defendants had direct and supervisory involvement in
14 the day-to-day operations of the Company and, therefore, had the power to control or influence
15 the particular transactions giving rise to the securities violations as alleged herein, and exercised
16 the same.

17     235. As set forth above, Live and the Individual Defendants each violated Section 10(b)
18 and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position
19 as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the
20 Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and
21 other members of the Class suffered damages in connection with their purchases of the Company's
22 securities during the Class Period.

23                             **THIRD CLAIM**

24           **Violation of Section 10(b) of The Exchange Act and**
          **Rules 10b-5(a) and 10b-5(c) Promulgated Thereunder**
25           **Against Defendants Live, Isaac, Johnson and JOI/ARCA**

26     236. Plaintiff repeats and re-alleges each and every allegation contained above as if fully
27 set forth herein.

28

237. During the Class Period, Defendants and JOI/ARCA carried out a plan, scheme, and course of conduct that was intended to and throughout the Class Period, did: (a) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (b) artificially manipulate the price of Live's securities; and (c) cause economic harm to Plaintiff and other members of the Class.

238. Defendants and JOI/ARCA, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Live's financial well-being and prospects, as specified herein.

239. Defendants and JOI/ARCA employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Live's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Live and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

240. Defendants' and JOI/ARCA's liability arises from the fact that they developed and engaged in a scheme to manipulate the price of Live's securities and were aware of the dissemination of the information to the investing public that they knew or recklessly disregarded was materially false and misleading. Defendants and JOI/ARCA are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on the Class members by disseminating materially false and misleading statements and/or concealing material information. Defendants and JOI/ARCA were culpable for this deceit insofar as they acted, or omitted to act, in furtherance of the scheme with scienter.

241.    Defendants and JOI/ARCA developed and engaged in a scheme to create the false appearance that Live acquired ApplianceSmart on December 30, 2017, such that Live could use December 30, 2017 as the acquisition date for accounting purposes in connection with its financial results for the quarter ended December 31, 2017 and thus recognize $3,773,486 of "other income" from a "bargain purchase gain" to transform an unprofitable quarter into a profitable quarter.  In connection with this scheme, Johnson came up with a plan for Live and JOI/ARCA to falsely claim that Live had made a partial cash payment of $2,580,505.54 to JOI/ARCA, when Live had made no payment at all.  The $2,580,505.54 that Defendants claimed had been paid to JOI/ARCA by Live was instead the amount that ApplianceSmart had paid to MidCap under the terms of the MidCap Credit Agreement during the time period of January through March 2018.

242.    Live's January 5, 2018 Form 8-K falsely represented that the capital stock of ApplianceSmart had been delivered into escrow when in fact, that was not true.    Instead, ApplianceSmart's stock certificate was in the possession of MidCap and ApplianceSmart was still subject to the terms of the MidCap Credit Agreement.  Similar false representations were repeated in Live's Q1 2018 Form 10-Q.  Further, Defendants and JOI/ARCA falsely represented that Live had paid $2,580,505.54 in cash to JOI/ARCA, when in fact, Live had not made any cash payment; this statement was repeated in Live's 2017 Form 10-K and Live's April 26, 2018 Form 8-K and Live's Q2 2018 Form 10-Q.

243.    Defendants and JOI/ARCA had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Live's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' and JOI/ARCA's overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants and JOI/ARCA, if they did not have actual knowledge of the misrepresentations and/or omissions

alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

244. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Live's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants and JOI/ARCA, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants and JOI/ARCA, but not disclosed in public statements by Defendants and JOI/ARCA during the Class Period, Plaintiff and the other members of the Class acquired Live's securities during the Class Period at artificially high prices and were damaged thereby. Defendants' and JOI/ARCA's scheme: (a) deceived the investing public regarding Live's operations and the true value of Live's stock, and (ii) caused Plaintiff and other Class members to purchase or otherwise acquire Live's securities at artificially inflated prices, which fell as the true condition of Live's business was revealed.

245. At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Live was experiencing, which were not disclosed by Defendants and JOI/ARCA, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Live securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

246. By virtue of the foregoing, Defendants and JOI/ARCA violated Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b-5(c) promulgated thereunder.

247. As a direct and proximate result of Defendants' and JOI/ARCA'S wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

# XIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d)     Such other and further relief as the Court may deem just and proper.

# XIV. DEMAND FOR A TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: March 6, 2023

**GLANCY PRONGAY & MURRAY LLP**

By: */s/ Natalie S. Pang*
Robert V. Prongay
Natalie S. Pang (admitted *pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com
Email: npang@glancylaw.com

*Lead Counsel for Lead Plaintiff*
*Daniel E. Sieggreen*

Andrew R. Muehlbauer, Esq.
**MUEHLBAUER LAW OFFICE, LTD.**
Nevada Bar No. 10161
7915 West Sahara Avenue, Suite 104
Las Vegas, Nevada 89117
Telephone: (702) 330.4505
Facsimile: (702) 825.0141
Email: andrew@mlolegal.com

*Liaison Counsel for Lead Plaintiff*
*Daniel E. Sieggreen*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

I hereby certify that on March 6, 2023, I electronically filed the foregoing document using the CM/ECF system which will send notification of such filing to the e-mail addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List.

*/s/ Natalie S. Pang*
Natalie S. Pang