# EXHIBIT F

Live Ventures Incorporated's February 14, 2018 Form 10-Q

Case 2:21-cv-01517-CDS-EJY   Document 35-3   Filed 05/05/23   Page 2 of 79

10-Q 1 live_10q-123117.htm FORM 10-Q

Table of Contents

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549
### FORM 10-Q

_____

(Mark One)

☒ QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended December 31, 2017

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____

Commission File Number 001-33937

## <u>Live Ventures Incorporated</u>
(Exact name of registrant as specified in its charter)

| **Nevada** | **85-0206668** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification No.) |

| **325 E. Warm Springs Road, Suite 102** | |
| **Las Vegas, Nevada** | **89119** |
| (Address of principal executive offices) | (Zip Code) |

**(702) 939-0231**
(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒  No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒  No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | |
|---|---|
| Large accelerated filer ☐ | Accelerated filer ☐ |
| Non-accelerated filer ☐ (do not check if a smaller reporting company) | Smaller reporting company ☒ |
| Emerging growth company ☐ | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

Case 2:21-cv-01517-CDS-EJY    Document 35-3    Filed 05/05/23    Page 3 of 79

The number of shares of the issuer's common stock, par value $.001 per share, outstanding as of February 13, 2018 was 1,972,136

Case 2:21-cv-01517-CDS-EJY    Document 35-3    Filed 05/05/23    Page 4 of 79

# INDEX TO FORM 10-Q FILING

## FOR THE QUARTER ENDED DECEMBER 31, 2017

## TABLE OF CONTENTS

### PART I

### FINANCIAL INFORMATION

| | | Page |
|---|---|---|
| Item 1. | **Financial Statements** | 3 |
| | **Condensed Consolidated Balance Sheets as of December 31, 2017 (Unaudited) and September 30, 2017** | 3 |
| | **Condensed Consolidated Statements of Income (Unaudited) for the Three months ended December 31, 2017 and 2016** | 4 |
| | **Condensed Consolidated Statements of Cash Flows (Unaudited) for the Three months ended December 31, 2017 and 2016** | 5 |
| | **Notes to the Condensed Consolidated Financial Statements (Unaudited)** | 6 |
| Item 2. | **Management's Discussion and Analysis of Financial Condition and Results of Operations** | 31 |
| Item 3. | **Quantitative and Qualitative Disclosures about Market Risk** | 39 |
| Item 4. | **Controls and Procedures** | 39 |

### PART II

### OTHER INFORMATION

| | | |
|---|---|---|
| Item 1. | **Legal Proceedings** | 41 |
| Item 2. | **Unregistered Sales of Equity Securities and Use of Proceeds** | 41 |
| Item 3. | **Defaults upon Senior Securities** | 41 |
| Item 4. | **Mine Safety Disclosures** | 41 |
| Item 5. | **Other Information** | 41 |
| Item 6. | **Exhibits** | 41 |
| **Signatures** | | 42 |

2

# PART I - FINANCIAL INFORMATION

## ITEM 1. FINANCIAL STATEMENTS

### LIVE VENTURES INCORPORATED AND SUBSIDIARIES
### CONSOLIDATED BALANCE SHEETS

| | December 31, 2017 | September 30, 2017 |
|---|---|---|
| | (Unaudited) | |
| **Assets** | | |
| Cash and cash equivalents | $ 1,783,041 | $ 3,972,539 |
| Trade receivables, net | 7,884,255 | 10,636,925 |
| Inventories | 43,675,593 | 34,501,801 |
| Prepaid expenses and other current assets | 3,242,516 | 6,435,891 |
| Total current assets | 56,585,405 | 55,547,156 |
| | | |
| Property and equipment, net | 27,479,364 | 22,817,860 |
| Restricted cash | 1,285,747 | – |
| Deposits and other assets | 275,734 | 77,520 |
| Deferred taxes | 5,589,369 | 9,000,010 |
| Intangible assets, net | 3,993,671 | 4,205,314 |
| Goodwill | 36,946,735 | 36,946,735 |
| Total assets | $ 132,156,025 | $ 128,594,595 |
| | | |
| **Liabilities and Stockholders' Equity** | | |
| Liabilities: | | |
| Accounts payable | $ 6,607,702 | $ 8,224,057 |
| Accrued liabilities | 15,314,194 | 8,986,734 |
| Income taxes payable | 350,545 | 351,689 |
| Current portion of long-term debt | 42,994,795 | 48,877,536 |
| Total current liabilities | 65,267,236 | 66,440,016 |
| | | |
| Long-term debt, net of current portion | 29,601,254 | 26,570,271 |
| Note payable, related party | 2,000,000 | 2,000,000 |
| Total liabilities | 96,868,490 | 95,010,287 |
| | | |
| Commitments and contingencies | | |
| | | |
| Stockholders' equity: | | |
| Series B convertible preferred stock, $0.001 par value, 1,000,000 shares authorized, 214,244 shares issued and outstanding at December 31, 2017 and September 30, 2017 | 214 | 214 |
| Series E convertible preferred stock, $0.001 par value, 200,000 shares authorized, 127,840 shares issued and 77,840 shares outstanding at December 31, 2017 127,840 shares issued and outstanding at September 30, 2017, with a liquidation preference of $0.30 per share outstanding | 128 | 128 |
| Common stock, $0.001 par value, 10,000,000 shares authorized, 2,088,186 shares issued and 1,972,136 shares outstanding at December 31, 2017; 2,088,186 shares issued and 1,991,879 shares outstanding at September 30, 2017 | 2,088 | 2,088 |
| Paid in capital | 63,236,534 | 63,157,178 |
| Treasury stock common 116,050 shares as of December 31, 2017 and 96,307 shares as of September 30, 2017 | (1,248,976) | (999,584) |
| Treasury stock series E preferred 50,000 shares as of December 31, 2017 and no shares as of September 30, 2017 | (4,000) | – |

Case 2:21-cv-01517-CDS-EJY   Document 35-3   Filed 05/05/23   Page 6 of 79

| | | | | |
|---|---|---:|---|---:|
| Accumulated deficit | | (26,698,453) | | (28,575,716) |
| Total stockholders' equity | | 35,287,535 | | 33,584,308 |
| Total liabilities and stockholders' equity | $ | 132,156,025 | $ | 128,594,595 |

The accompanying notes are an integral part of these condensed consolidated financial statements.

3

**LIVE VENTURES INCORPORATED AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF INCOME**
**(UNAUDITED)**

| | Three Months Ended December 31, | |
| --- | --- | --- |
| | 2017 | 2016 |
| Revenues | $ 40,368,064 | $ 32,188,664 |
| Cost of revenues | 23,972,174 | 19,543,432 |
| Gross profit | 16,395,890 | 12,645,232 |
| | | |
| Operating expenses: | | |
| General and administrative expenses | 10,399,130 | 7,058,674 |
| Sales and marketing expenses | 2,075,972 | 1,907,490 |
| Total operating expenses | 12,475,102 | 8,966,164 |
| | | |
| Operating income | 3,920,788 | 3,679,068 |
| Other (expense) income: | | |
| Interest expense, net | (2,468,312) | (1,449,476) |
| Bargain purchase gain on acquisition | 3,773,486 | – |
| Other income | 77,084 | 41,890 |
| Total other (expense) income, net | 1,382,258 | (1,407,586) |
| | | |
| Income before provision for income taxes | 5,303,046 | 2,271,482 |
| Provision for income taxes | 3,425,491 | 842,909 |
| Net income | $ 1,877,555 | $ 1,428,573 |
| | | |
| Earnings per share: | | |
| Basic | $ 0.95 | $ 0.71 |
| Diluted | $ 0.50 | $ 0.37 |
| | | |
| Weighted average common shares outstanding: | | |
| Basic | 1,975,380 | 1,999,983 |
| Diluted | 3,749,041 | 3,833,523 |

The accompanying notes are an integral part of these condensed consolidated financial statements.

4

# LIVE VENTURES INCORPORATED AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF CASH FLOWS
### (UNAUDITED)

| | Three Months Ended December 31, | |
|---|---|---|
| | 2017 | 2016 |
| OPERATING ACTIVITIES: | | |
| Net income | $ 1,877,555 | $ 1,428,573 |
| Adjustments to reconcile net income to net cash provided by operating activities, net of acquisition: | | |
| Depreciation and amortization | 1,395,905 | 935,047 |
| (Gain) on bargain purchase of acquisition | (3,773,486) | – |
| (Gain) loss on disposal of property and equipment | (5,294) | – |
| Amortization of debt issuance cost | 58,512 | 40,136 |
| Stock based compensation expense | 79,356 | 1,443 |
| Change in reserve for uncollectible accounts | 14,697 | 66 |
| Change in reserve for obsolete inventory | 18,176 | 83,613 |
| Change in deferred income taxes | 3,410,641 | 768,135 |
| Changes in assets and liabilities: | | |
| Trade receivables | 2,987,973 | 129,459 |
| Inventories | (1,238,904) | (1,318,562) |
| Prepaid expenses and other current assets | 3,262,722 | 140,826 |
| Deposits and other assets | 6,627 | (55,565) |
| Accounts payable | (1,616,355) | (221,388) |
| Accrued liabilities | (172,832) | 1,246,047 |
| Income taxes payable | (1,144) | – |
| Net cash provided by operating activities | 6,304,149 | 3,177,830 |
| INVESTING ACTIVITIES: | | |
| Acquisition of business, net of cash acquired and seller financing provided | – | (47,310,900) |
| Purchase of intangible assets - Software | (24,675) | – |
| Proceeds from the sale of property and equipment | 17,998 | – |
| Purchases of property and equipment | (5,323,308) | (3,052,298) |
| Net cash used in investing activities | (5,329,985) | (50,363,198) |
| FINANCING ACTIVITIES: | | |
| Net borrowings under revolver loans | (5,071,969) | 14,056,099 |
| Payments of debt issuance costs | – | (1,155,000) |
| Purchase of series E preferred treasury stock | (4,000) | – |
| Proceeds from issuance of notes payable | 3,931,591 | 35,889,321 |
| Purchase of common treasury stock | (249,392) | – |
| Payments on notes payable | (1,769,892) | (789,194) |
| Net cash provided by (used in) financing activities | (3,163,662) | 48,001,226 |
| INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | (2,189,498) | 815,858 |
| CASH AND CASH EQUIVALENTS, beginning of period | 3,972,539 | 770,895 |
| CASH AND CASH EQUIVALENTS, end of period | $ 1,783,041 | $ 1,586,753 |
| Supplemental cash flow disclosures: | | |
| Interest paid | $ 1,802,658 | $ 790,580 |
| Noncash financing and investing activities: | | |
| Notes payable issued to sellers of Vintage Stock | $ – | $ 10,000,000 |
| Due to sellers of ApplianceSmart, Inc. | $ 6,500,000 | $ – |

| | | | |
|---|---:|---|---:|
| Restated equipment deposit as a purchase of equipment in fiscal 2016 | $          – | $ | 1,816,555 |
| Conversion of accrued expense liabilities into common stock | $          – | $ | 3,384,500 |
| Accrued and unpaid dividends | $        292 | $ | 479 |

The accompanying notes are an integral part of these condensed consolidated financial statements.

5

Case 2:21-cv-01517-CDS-EJY Document 35-3 Filed 05/05/23 Page 10 of 79

LIVE VENTURES INCORPORATED AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)
FOR THE THREE MONTHS ENDED DECEMBER 31, 2017 AND 2016

**Note 1:      Background and Basis of Presentation**

The accompanying condensed consolidated financial statements include the accounts of Live Ventures Incorporated, a Nevada corporation, and its subsidiaries (collectively, the "Company"). Commencing in fiscal year 2015, the Company began a strategic shift in its business plan away from providing online marketing solutions for small and medium sized business to acquiring profitable companies in various industries that have demonstrated a strong history of earnings power. The Company continues to actively develop, revise and evaluate its products, services and its marketing strategies in its businesses. The Company has three operating segments: Manufacturing, Retail and Online (our new name for the previously named Marketplace Platform segment) and Services. With Marquis Industries, Inc. ("Marquis"), the Company is engaged in the manufacture and sale of carpet and the sale of vinyl and wood floorcoverings. With Vintage Stock, Inc. ("Vintage Stock"), the Company is engaged in the sale of new and used movies, music, collectibles, comics, books, games, game systems and components. With ApplianceSmart, Inc. ("ApplianceSmart"), the Company is engaged in the sale of new major appliances through a chain of company-owned retail stores.

The unaudited condensed consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles ("GAAP") for interim financial information. Accordingly, they do not include all of the information and footnotes required by GAAP for audited financial statements. In the opinion of the Company's management, this interim information includes all adjustments, consisting only of normal recurring adjustments, necessary for a fair presentation of the results for the interim periods. The results of operations for three months ended December 31, 2017 are not necessarily indicative of the results to be expected for the fiscal year ending September 30, 2018. This financial information should be read in conjunction with the consolidated financial statements and related notes thereto as of September 30, 2017 and for the fiscal year then ended included in the Company's Annual Report on Form 10-K for the fiscal year ended September 30, 2017, as amended, filed with the U.S. Securities and Exchange Commission (the "SEC") on January 18, 2018 (the "2017 10-K").

On November 22, 2016, the Company's board of directors authorized a one-for-six (1:6) reverse stock split and a contemporaneous one-for-six (1:6) reduction in the number of authorized shares of common stock from 60,000,000 to 10,000,000 shares, to take effect for stockholders of record as of December 5, 2016. No fractional shares were issued. All share, option and warrant related information presented in these financial statements and accompanying footnotes has been retroactively adjusted to reflect the decreased number of shares resulting in this action.

**Note 2:      Summary of Significant Accounting Policies**

**Principles of Consolidation**

The condensed consolidated financial statements represent the consolidated financial position, results of operations and cash flows of Live Ventures Incorporated and its wholly-owned subsidiaries. On July 6, 2015, the Company acquired 80% of Marquis Industries, Inc. and subsidiaries ("Marquis"). Effective November 30, 2015, the Company acquired the remaining 20% of Marquis. On November 3, 2016, the Company acquired 100% of Vintage Stock, Inc., a Missouri corporation ("Vintage Stock"), through its newly formed, wholly-owned subsidiary, Vintage Stock Affiliated Holdings LLC ("VSAH"). Effective December 30, 2017, the Company acquired 100% of ApplianceSmart Inc., a Minnesota corporation ("ApplianceSmart"), through its newly formed, wholly-owned subsidiary, ApplianceSmart Holdings LLC ("ASH"). All intercompany transactions and balances have been eliminated in consolidation.

**Use of Estimates**

The preparation of the consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

Significant estimates made in connection with the consolidated financial statements include the estimate of dilution and fees associated with billings, the estimated reserve for doubtful current and long-term trade and other receivables, sales return allowance, the estimated reserve for excess and obsolete inventory, estimated fair value and forfeiture rates for stock-based compensation, fair values in connection with the analysis of goodwill, other intangibles and long-lived assets for impairment, current portion of long-term debt, valuation allowance against deferred tax assets and estimated useful lives for intangible assets and property and equipment.

Case 2:21-cv-01517-ODS-EJY    Document 35-3    Filed 05/05/23    Page 11 of 79

6

**Financial Instruments**

Financial instruments consist primarily of cash equivalents, trade and other receivables, advances to affiliates and obligations under accounts payable, accrued expenses and notes payable. The carrying amounts of cash equivalents, trade receivables and other receivables, accounts payable, accrued expenses and short-term notes payable approximate fair value because of the short maturity of these instruments. The fair value of the long-term debt is calculated based on interest rates available for debt with terms and maturities similar to the Company's existing debt arrangements, unless quoted market prices were available (Level 2 inputs). The carrying amounts of long-term debt at December 31, 2017 and September 30, 2017 approximate fair value.

**Cash and Restricted Cash**

Cash and cash equivalents consist of highly liquid investments with a maturity of three months or less at the time of purchase. Restricted cash consists of balances on deposit pledged as collateral. Fair value of cash equivalents and restricted cash approximates carrying value.

**Trade Receivables**

The Company grants trade credit to customers under credit terms that it believes are customary in the industry it operates and does not require collateral to support customer trade receivables. Some of the Company's trade receivables are factored primarily through two factors. Factored trade receivables are sold without recourse for substantially all of the balance receivable for credit approved accounts. The factor purchases the trade receivable(s) for the gross amount of the respective invoice(s), less factoring commissions, trade and cash discounts. The factor charges the Company a factoring commission for each trade account, which is between 0.75-1.00% of the gross amount of the invoice(s) factored on the date of the purchase, plus interest calculated at 3.25%-6% per annum. The minimum annual commission due the factor is $75,000 per contract year. The total amount of trade receivables factored was $8,741,531 and $8,280,697 for the three months ended December 31, 2017 and 2016, respectively.

**Allowance for Doubtful Accounts**

The Company maintains an allowance for doubtful accounts, which includes allowances for accounts and factored trade receivables, customer refunds, dilution and fees from local exchange carrier billing aggregators and other uncollectible accounts. The allowance for doubtful accounts is based upon historical bad debt experience and periodic evaluations of the aging and collectability of the trade receivables. This allowance is maintained at a level which the Company believes is sufficient to cover potential credit losses and trade receivables are only written off to bad debt expense as uncollectible after all reasonable collection efforts have been made. The Company has also purchased accounts receivable credit insurance to cover non-factored trade and other receivables which helps reduce potential losses due to doubtful accounts. At December 31, 2017 and September 30, 2017, the allowance for doubtful accounts was $1,105,920 and $1,091,223, respectively.

**Inventories**

*Manufacturing Segment*

Inventories are valued at the lower of the inventory's cost (first in, first out basis ("FIFO")) or market. Management compares the cost of inventory with its net realizable value and an allowance is made to write down inventory to net realizable value, if lower. Management also reviews inventory to determine if excess or obsolete inventory is present and a reserve is made to reduce the carrying value for inventory for such excess and or obsolete inventory. At December 31, 2017 and September 30, 2017, the reserve for obsolete inventory was $91,940.

*Retail and Online Segment*

Merchandise inventories are valued at the lower of cost or market using the average cost method which approximates FIFO. Under the average cost method, as new product is received from vendors, its current cost is added to the existing cost of product on-hand and this amount is re-averaged over the cumulative units in inventory available for sale. Pre-owned products traded in by customers are recorded as merchandise inventory for the amount of cash consideration or store credit less any premiums given to the customer. Management reviews the merchandise inventory to make required adjustments to reflect potential obsolescence or the lower of cost or market. In valuing merchandise inventory, management considers quantities on hand, recent sales, potential price protections, returns to vendors and other factors. Management's ability to assess these factors is dependent upon forecasting customer demand and to provide a well-balanced merchandise assortment. Merchandise inventory valuation is adjusted based on anticipated physical inventory losses or

shrinkage and actual losses resulting from periodic physical inventory counts. Merchandise inventory reserves as of December 31, 2017 and September 30, 2017 were $1,259,805 and $1,256,629, respectively.

7

Case 2:21-cv-01517-CDS-EJY Document 35-3 Filed 05/05/23 Page 14 of 79

**Property and Equipment**

Property and equipment are stated at cost less accumulated depreciation. Expenditures for repairs and maintenance are charged to expense as incurred and additions and improvements that significantly extend the lives of assets are capitalized. Upon sale or other retirement of depreciable property, the cost and accumulated depreciation are removed from the related accounts and any gain or loss is reflected in operations. Depreciation is computed using the straight-line method over the estimated useful lives of the assets. The useful lives of building and improvements are three to forty years, transportation equipment is five to ten years, machinery and equipment are five to ten years, furnishings and fixtures are three to five years and office and computer equipment are three to five years. Depreciation expense was $1,159,587 and $870,516 for the three months ended December 31, 2017 and 2016, respectively.

We periodically review our property and equipment when events or changes in circumstances indicate that their carrying amounts may not be recoverable or their depreciation or amortization periods should be accelerated. We assess recoverability based on several factors, including our intention with respect to our stores and those stores projected undiscounted cash flows. An impairment loss would be recognized for the amount by which the carrying amount of the assets exceeds their fair value, as approximated by the present value of their projected discounted cash flows.

**Goodwill**

The Company accounts for purchased goodwill and intangible assets in accordance with ASC 350, *Intangibles—Goodwill and Other*. Under ASC 350, purchased goodwill is not amortized; rather, they are tested for impairment on at least an annual basis. Goodwill represents the excess of consideration paid over the fair value of underlying identifiable net assets of the business acquired.

We test goodwill annually on July 1 of each fiscal year or more frequently if events arise or circumstances change that indicate that goodwill may be impaired. The Company assesses whether goodwill impairment exists using both the qualitative and quantitative assessments. The qualitative assessment involves determining whether events or circumstances exist that indicate it is more likely than not that the fair value of a reporting unit is less than its carrying amount, including goodwill. If based on this qualitative assessment the Company determines it is not more likely than not that the fair value of a reporting unit is less than its carrying amount or if the Company elects not to perform a qualitative assessment, a quantitative assessment is performed using a two-step approach required by ASC 350 to determine whether a goodwill impairment exists.

The first step of the quantitative test is to compare the carrying amount of the reporting unit's assets to the fair value of the reporting unit. If the fair value exceeds the carrying value, no further evaluation is required, and no impairment loss is recognized. If the carrying amount exceeds the fair value, then the second step is required to be completed, which involves allocating the fair value of the reporting unit to each asset and liability using the guidance in ASC 805 ("*Business Combinations, Accounting for Identifiable Intangible Assets in a Business Combination*"), with the excess being applied to goodwill. An impairment loss occurs if the amount of the recorded goodwill exceeds the implied goodwill. The determination of the fair value of our reporting units is based, among other things, on estimates of future operating performance of the reporting unit being valued. We are required to complete an impairment test for goodwill and record any resulting impairment losses at least annually. Changes in market conditions, among other factors, may have an impact on these estimates and require interim impairment assessments.

When performing the two-step quantitative impairment test, the Company's methodology includes the use of an income approach which discounts future net cash flows to their present value at a rate that reflects the Company's cost of capital, otherwise known as the discounted cash flow method ("DCF"). These estimated fair values are based on estimates of future cash flows of the businesses. Factors affecting these future cash flows include the continued market acceptance of the products and services offered by the businesses, the development of new products and services by the businesses and the underlying cost of development, the future cost structure of the businesses, and future technological changes. The Company also incorporates market multiples for comparable companies in determining the fair value of our reporting units. Any such impairment would be recognized in full in the reporting period in which it has been identified.

8

**Intangible Assets**

The Company's intangible assets consist of customer relationship intangibles, trade names, licenses for the use of internet domain names, Universal Resource Locators, or URL's, software, and marketing and technology related intangibles. Upon acquisition, critical estimates are made in valuing acquired intangible assets, which include but are not limited to: future expected cash flows from customer contracts, customer lists, and estimating cash flows from projects when completed; tradename and market position, as well as assumptions about the period of time that customer relationships will continue; and discount rates. Management's estimates of fair value are based upon assumptions believed to be reasonable, but which are inherently uncertain and unpredictable and, as a result, actual results may differ from the assumptions used in determining the fair values. All intangible assets are capitalized at their original cost and amortized over their estimated useful lives as follows: domain name and marketing – 3 to 20 years; software – 3 to 5 years, customer relationships – 7 to 15 years. Intangible amortization expense is $236,318 and $61,497 for the three months ended December 31, 2017 and 2016, respectively.

**Revenue Recognition**

*Manufacturing Segment*

The Manufacturing Segment derives revenue primarily from the sale of carpet products; including shipping and handling amounts, which are recognized when the following criteria are met: there is persuasive evidence that a sales agreement exists, delivery has occurred, or services have been rendered, the price to the buyer is fixed or determinable, and collectability is reasonably assured. Delivery is not considered to have occurred until the customer takes title to the goods and assumes the risks and rewards of ownership, which is generally on the date of shipment. At the time revenue is recognized, the Company records a provision for the estimated amount of future returns based primarily on historical experience and any known trends or conditions that exist at the time revenue is recognized. Revenues are recorded net of taxes collected from customers.

*Retail and Online Segment*

The Retail and Online Segment derives product revenue primarily from direct sales. Product revenue is recognized when the following revenue recognition criteria are met: there is persuasive evidence of an arrangement exists, delivery has occurred, the price to the buyer is fixed or determinable, and collectability is reasonably assured. Currently, all direct product revenue is recorded on a gross basis, as the Company is the primary obligor. Revenues are recorded net of taxes collected from customers.

At the time revenue is recognized, the Company records a provision for the estimated amount of future returns based primarily on historical experience and any known trends or conditions that exist at the time revenue is recognized.

*Services Segment*

The Services Segment recognizes revenue from directory subscription services as billed for and accepted by the customer. Directory services revenue is billed and recognized monthly for directory services subscribed. The Company has utilized outside billing companies to perform direct ACH withdrawals. For billings via ACH withdrawals, revenue is recognized when such billings are accepted by the customer. Customer refunds are recorded as an offset to gross Services Segment revenue.

Revenue for billings to certain customers that are billed directly by the Company and not through outside billing companies is recognized based on estimated future collections which are reasonably assured. The Company continuously reviews this estimate for reasonableness based on its collection experience.

**Shipping and Handling**

The Company classifies shipping and handling charged to customers as revenues and classifies costs relating to shipping and handling as cost of revenues.

9

**Customer Liabilities**

The Company establishes a liability upon the issuance of merchandise credits and the sale of gift cards. Breakage income related to gift cards which are no longer reportable under state escheatment laws of $28,092 and $13,305 for the for the period of November 3, 2016 through December 31, 2016, and the three month period ended December 31, 2017, respectively, is recorded in other income in our consolidated financial statements. No amounts were recorded for breakage for any period prior to November 3, 2016.

**Fair Value Measurements**

ASC Topic 820, "Fair Value Measurements and Disclosures," requires disclosure of the fair value of financial instruments held by the Company. ASC topic 825, "Financial Instruments," defines fair value, and establishes a three-level valuation hierarchy for disclosures of fair value measurement that enhances disclosure requirements for fair value measures. The three levels of valuation hierarchy are defined as follows: Level 1 - inputs to the valuation methodology are quoted prices for identical assets or liabilities in active markets. Level 2 – to the valuation methodology include quoted prices for similar assets and liabilities in active markets, and inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the financial instrument. Level 3 – inputs to the valuation methodology are unobservable and significant to the fair value measurement.

**Income Taxes**

The Company accounts for income taxes using the asset and liability method. The asset and liability method requires recognition of deferred tax assets and liabilities for expected future tax consequences of temporary differences that currently exist between tax bases and financial reporting bases of the Company's assets and liabilities. Deferred income tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which these temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date. A valuation allowance is provided on deferred taxes if it is determined that it is more likely than not that the asset will not be realized. The Company recognizes penalties and interest accrued related to income tax liabilities in the provision for income taxes in its Consolidated Statements of Income.

Significant management judgment is required to determine the amount of benefit to be recognized in relation to an uncertain tax position. The Company uses a two-step process to evaluate tax positions. The first step requires an entity to determine whether it is more likely than not (greater than 50% chance) that the tax position will be sustained. The second step requires an entity to recognize in the financial statements the benefit of a tax position that meets the more-likely-than-not recognition criterion. The amounts ultimately paid upon resolution of issues raised by taxing authorities may differ materially from the amounts accrued and may materially impact the financial statements of the Company in future periods.

**Lease Accounting**

We lease retail stores, warehouse facilities and office space. These assets and properties are generally leased under noncancelable agreements that expire at various dates through 2024 with various renewal options for additional periods. The agreements, which have been classified as operating leases, generally provide for minimum and, in some cases percentage rent and require us to pay all insurance, taxes and other maintenance costs. Leases with step rent provisions, escalation clauses or other lease concessions are accounted for on a straight-line basis over the lease term and includes "rent holidays" (periods in which we are not obligated to pay rent). Cash or lease incentives received upon entering into certain store leases ("tenant improvement allowances") are recognized on a straight-line basis as a reduction to rent expense over the lease term. We record the unamortized portion of tenant improvement allowances as a part of deferred rent. We do not have leases with capital improvement funding. Percentage rentals are based on sales performance in excess of specified minimums at various stores and are accounted for in the period in which the amount of percentage rent can be accurately estimated.

**Stock-Based Compensation**

The Company from time to time grants restricted stock awards and options to employees, non-employees and Company executives and directors. Such awards are valued based on the grant date fair-value of the instruments, net of estimated forfeitures. The value of each award is amortized on a straight-line basis over the vesting period.

10

Case 2:21-cv-01517-ODS-EJY    Document 35-3    Filed 05/05/23    Page 17 of 79

**Earnings Per Share**

Earnings per share is calculated in accordance with ASC 260, "*Earnings Per share*". Under ASC 260 basic earnings per share is computed using the weighted average number of common shares outstanding during the period except that it does not include unvested restricted stock subject to cancellation. Diluted earnings per share is computed using the weighted average number of common shares and, if dilutive, potential common shares outstanding during the period. Potential common shares consist of the incremental common shares issuable upon the exercise of warrants, options, restricted shares and convertible preferred stock. The dilutive effect of outstanding restricted shares, options and warrants is reflected in diluted earnings per share by application of the treasury stock method. Convertible preferred stock is reflected on an if-converted basis.

**Segment Reporting**

ASC Topic 280, "*Segment Reporting*," requires use of the "management approach" model for segment reporting. The management approach model is based on the way a Company's management organizes segments within the Company for making operating decisions and assessing performance. The Company determined it has three reportable segments (See Note 17).

**Concentration of Credit Risk**

The Company maintains cash balances at several banks in several states including, Arkansas, California, Colorado, Georgia, Idaho, Illinois, Kansas, Missouri, Nevada, New Mexico, New York, Oklahoma, Texas, and Utah. Accounts are insured by the Federal Deposit Insurance Corporation up to $250,000 per institution as of December 31, 2017. At times, balances may exceed federally insured limits.

**Reclassifications**

Certain amounts in the prior year consolidated financial statements have been reclassified to conform to the current year presentation. These reclassifications had no effect on the previously reported net income or stockholders' equity.

**Recently Issued Accounting Pronouncements**

In May 2014, the Financial Accounting Standards Boad (the "FASB") issued Accounting Standards Update ("ASU") No. 2014-09, *Revenue from Contracts with Customers* ASU 2014-09, which supersedes nearly all existing revenue recognition guidance under U.S. GAAP. The core principle of ASU 2014-09 is to recognize revenues when promised goods or services are transferred to customers in an amount that reflects the consideration to which an entity expects to be entitled for those goods or services. ASU 2014-09 defines a five-step process to achieve this core principle and, in doing so, more judgment and estimates may be required within the revenue recognition process than are required under existing U.S. GAAP. The standard is effective for annual periods beginning after December 15, 2016, and interim periods therein, using either of the following transition methods: (i) a full retrospective approach reflecting the application of the standard in each prior reporting period with the option to elect certain practical expedients, or (ii) a retrospective approach with the cumulative effect of initially adopting ASU 2014-09 recognized at the date of adoption (which includes additional footnote disclosures). Early adoption is not permitted. In August 2015, the FASB issued ASU No. 2015-04, *Revenue from Contracts with Customers (Topic 606): Deferral of the Effective Date.* The amendment in this ASU defers the effective date of ASU No. 2014-09 for all entities for one year. Public business entities should apply the guidance in ASU 2014-09 to annual reporting periods beginning December 15, 2017, including interim reporting periods within that reporting period. Earlier application is permitted only as of annual reporting periods beginning after December 31, 2016, including interim reporting periods within that reporting period.

In March 2016, the FASB issued ASU No. 2016-08, *Revenue from Contracts with Customers*. The standard addresses the implementation guidance on principal versus agent considerations in the new revenue recognition standard. The ASU clarifies how an entity should identify the unit of accounting (i.e. the specified good or service) for the principal versus agent evaluation and how it should apply the control principle to certain types of arrangements.

Subsequently, the FASB has issued the following standards related to ASU 2014-09 and ASU No. 2016-08: ASU No. 2016-10, *Revenue from Contracts with Customers (Topic 606): Identifying Performance Obligations and Licensing* ("ASU 2016-10"); ASU No. 2016-12, *Revenue from Contracts with Customers (Topic 606): Narrow-Scope Improvements and Practical Expedients* ("ASU 2016-12"); ASU No. 2016-20, *Technical Corrections and Improvements to Topic 606, Revenue from Contracts with Customers* ("ASU 2016-20"); and, ASU 2017-05—*Other Income—Gains and Losses from the Derecognition of Nonfinancial Assets (Subtopic 610-20): Clarifying the Scope of Asset Derecognition Guidance and Accounting for Partial Sales of Nonfinancial Assets* ("ASU 2017-05"). The Company must adopt ASU 2016-10, ASU 2016-12, ASU 2016-20 and ASU 2017-05 with ASU 2014-09 (collectively, the "new revenue standards"). The Company is in the early stages of assessing the provisions of the new standard. We are continuing to evaluate the impact of the transition methods on our financial statements.

Case 2:21-cv-01517-ODS-EJY    Document 35-3    Filed 05/05/23    Page 18 of 79

11

In July 2015, the FASB issued ASU 2015-11, *Inventory (Topic 330): Simplifying the Measurement of Inventory*. This standard changes the measurement principle for inventory from the lower of cost or market to the lower of cost and net realizable value. Net realizable value is defined as the estimated selling price in the ordinary course of business, less reasonably predictable costs of completion, disposal and transportation. This standard is effective for interim and annual reporting periods beginning after December 15, 2016, with early adoption permitted. We have not adopted this standard and are currently evaluating the impact that this standard will have on our consolidated financial statements.

ASU 2016-02, *Leases (Topic 842)*. The standard requires a lessee to recognize a liability to make lease payments and a right-of-use asset representing a right to use the underlying asset for the lease term on the balance sheet. The ASU is effective for fiscal years, and interim periods within those years, beginning after December 15, 2018, with early adoption permitted. We are currently evaluating the impact that this standard will have on our consolidated financial statements.

ASU 2016-04, *Recognition of Breakage for Certain Prepaid Stored-Value Products*. The standard specifies how prepaid stored-value product liabilities should be derecognized, thereby eliminating the current and potential future diversity in practice. The ASU is effective for fiscal years, and interim periods within those years, beginning after December 15, 2017, with early adoption permitted. We are currently evaluating the impact that this standard will have on our consolidated financial statements.

ASU 2016-09, *Compensation- Stock Compensation (Topic 718) Improvements to Employee Share-Based Payment Accounting*, introduces targeted amendments intended to simplify the accounting for stock compensation. Specifically, the ASU requires all excess tax benefits and tax deficiencies (including tax benefits of dividends on share-based payment awards) to be recognized as income tax expense or benefit in the income statement. The tax effects of exercised or vested awards should be treated as discrete items in the reporting period in which they occur. An entity also should recognize excess tax benefits, and assess the need for a valuation allowance, regardless of whether the benefit reduces taxes payable in the current period. That is, off balance sheet accounting for net operating losses stemming from excess tax benefits would no longer be required and instead such net operating losses would be recognized when they arise. Existing net operating losses that are currently tracked off balance sheet would be recognized, net of a valuation allowance if required, through an adjustment to opening retained earnings in the period of adoption. Entities will no longer need to maintain and track an "APIC pool." The ASU also requires excess tax benefits to be classified along with other income tax cash flows as an operating activity in the statement of cash flows. In addition, the ASU elevates the statutory tax withholding threshold to qualify for equity classification up to the maximum statutory tax rates in the applicable jurisdiction(s). The ASU also clarifies that cash paid by an employer when directly withholding shares for tax withholding purposes should be classified as a financing activity. The ASU provides an optional accounting policy election (with limited exceptions), to be applied on an entity-wide basis, to either estimate the number of awards that are expected to vest (consistent with existing U.S. GAAP) or account for forfeitures when they occur. The ASU is effective for public business entities for annual periods beginning after December 15, 2016, and interim periods within those annual periods. Early adoption is permitted in any interim or annual period for which the financial statements have not been issued or made available to be issued. Certain detailed transition provisions apply if an entity elects to early adopt. We are currently evaluating the impact that this standard will have on our consolidated financial statements.

ASU 2016-15, *Statement of Cash Flows (Topic 230): Restricted Cash* (a consensus of the FASB Emerging Issues Task Force). ASU 2016-15 clarifies whether the following items should be categorized as operating, investing or financing in the statement of cash flows: (i) debt prepayments and extinguishment costs, (ii) settlement of zero-coupon debt, (iii) settlement of contingent consideration, (iv) insurance proceeds, (v) settlement of corporate-owned life insurance (COLI) and bank-owned life insurance (BOLI) policies, (vi) distributions from equity method investees, (vii) beneficial interests in securitization transactions, and (viii) receipts and payments with aspects of more than one class of cash flows. ASU 2016-15 takes effect in 2018 for public companies. If an entity elects early adoption, it must adopt all of the amendments in the same period.We are currently evaluating the impact that this standard will have on our consolidated financial statements.

ASU 2017-01, *Business Combinations (Topic 805): Clarifying the Definition of a Business*. Under the current implementation guidance in Topic 805, there are three elements of a business—inputs, processes, and outputs. While an integrated set of assets and activities (collectively referred to as a "set") that is a business usually has outputs, outputs are not required to be present. In addition, all the inputs and processes that a seller uses in operating a set are not required if market participants can acquire the set and continue to produce outputs, for example, by integrating the acquired set with their own inputs and processes. The amendments in this Update provide a screen to determine when a set is not a business. The screen requires that when substantially all of the fair value of the gross assets acquired (or disposed of) is concentrated in a single identifiable asset or a group of similar identifiable assets, the set is not a business. This screen reduces the number of transactions that need to be further evaluated by public business entities applying the amendments in this Update to annual periods beginning after December 15, 2017, including interim periods within those periods. We have adopted this standard at the end of our fiscal 2017 year and it did not have a significant impact on our consolidated results of operations, financial condition and cash flows.

Case 2:21-cv-01517-CDS-EJY    Document 35-3    Filed 05/05/23    Page 20 of 79

12

ASU 2017-04, *Intangibles- Goodwill and Other (Topic 350) Simplifying the Test for Goodwill Impairment*, eliminates step 2 from the goodwill impairment test. As amended, the goodwill impairment test will consist of one step comparing the fair value of a reporting unit with its carrying amount. An entity should recognize a goodwill impairment charge for the amount by which the carrying amount exceeds the reporting unit's fair value. An entity may still perform the optional qualitative assessment for a reporting unit to determine if it is more likely than not that goodwill is impaired. A public business entity that is an SEC filer should prospectively adopt the ASU for its annual or any interim goodwill impairment tests in fiscal years beginning after December 15, 2019. Early adoption is permitted for interim or annual goodwill impairment tests performed on testing dates after January 1, 2017. We have adopted this standard effective with our goodwill impairment test date of July 1, 2017.

ASU 2017-09, *Compensation- Stock Compensation (Topic 718): Scope of Modification Accounting*, clarifies such that an entity must apply modification accounting to changes in the terms or conditions of a share-based payment award unless all of the following criteria are met: (1) the fair value of the modified award is the same as the fair value of the original award immediately before the modification. The ASU indicates that if the modification does not affect any of the inputs to the valuation technique used to value the award, the entity is not required to estimate the value immediately before and after the modification; (2) the vesting conditions of the modified award are the same as the vesting conditions of the original award immediately before the modification; and (3) the classification of the modified award as an equity instrument or a liability instrument is the same as the classification of the original award immediately before the modification. The ASU is effective for all entities for fiscal years beginning after December 15, 2017, including interim periods within those years. Early adoption is permitted, including adoption in an interim period. We are currently evaluating the impact that this standard will have on our consolidated financial statements.

In July 2017, the FASB issued ASU No. 2017-11, Earnings Per Share (Topic 260), Distinguishing Liabilities from Equity (Topic 480) and Derivative and Hedging (Topic 815). The standard is intended to simplify the accounting for certain financial instruments with down round features. This ASU changes the classification analysis of particular equity-linked financial instruments (e.g. warrants, embedded conversion features) allowing the down round feature to be disregarded when determining whether the instrument is to be indexed to an entity's own stock. Because of this, the inclusion of a down round feature by itself exempts an instrument from having to be remeasured at fair value each earnings period. The standard requires that entities recognize the effect of the down round feature on EPS when it is triggered (i.e., when the exercise price is adjusted downward due to the down round feature) equivalent to the change in the fair value of the instrument instantly before and after the strike price is modified. An adjustment to diluted EPS calculation may be required. The standard does not change the accounting for liability-classified instruments that occurred due to a different feature or term other than a down round feature. Additionally, entities must disclose the presence of down round features in financial instruments they issue, when the down round feature triggers a strike price adjustment, and the amount of the adjustment necessary. ASU 2017-11 is effective for all fiscal years beginning after December 15, 2018. The Company has decided to early adopt ASU 2017-11 and it did not have a significant impact on its consolidated results of operations, financial condition and cash flows.

**Note 3: Comprehensive Income**

Comprehensive income is the sum of net income and other items that must bypass the income statement because they have not been realized, including items like an unrealized holding gain or loss from available for sale securities and foreign currency translation gains or losses. For our Company, for three months ended December 31, 2017 and 2016, net income does not differ from comprehensive income.

13

**Note 4:     Balance Sheet Detail Information**

| | December 31, 2017 | | September 30, 2017 | |
|---|---|---|---|---|
| | (Unaudited) | | | |
| **Trade receivables, current, net:** | | | | |
| Accounts receivable, current | $ | 8,645,603 | $ | 11,383,576 |
| Less: Reserve for doubtful accounts | | (761,348) | | (746,651) |
| | $ | 7,884,255 | $ | 10,636,925 |
| **Trade receivables , long term, net:** | | | | |
| Accounts receivable, long term | $ | 344,572 | $ | 344,572 |
| Less: Reserve for doubtful accounts | | (344,572) | | (344,572) |
| | $ | – | $ | – |
| **Total trade receivables, net:** | | | | |
| Gross trade receivables | $ | 8,990,175 | $ | 11,728,148 |
| Less: Reserve for doubtful accounts | | (1,105,920) | | (1,091,223) |
| | $ | 7,884,255 | $ | 10,636,925 |
| **Components of reserve for doubtful accounts are as follows:** | | | | |
| Reserve for dilution and fees on amounts due from billing aggregators | $ | 1,063,617 | $ | 1,063,617 |
| Reserve for customer refunds | | 881 | | 978 |
| Reserve for trade receivables | | 41,422 | | 26,628 |
| | $ | 1,105,920 | $ | 1,091,223 |
| **Inventory** | | | | |
| Raw materials | $ | 8,052,609 | $ | 7,709,969 |
| Work in progress | | 1,030,973 | | 987,689 |
| Finished goods | | 5,128,820 | | 3,922,362 |
| Merchandise | | 30,829,936 | | 23,230,350 |
| | | 45,042,338 | | 35,850,370 |
| Less: Inventory reserves | | (1,366,745) | | (1,348,569) |
| | $ | 43,675,593 | $ | 34,501,801 |
| **Property and equipment, net:** | | | | |
| Building and improvements | $ | 9,122,625 | $ | 8,090,797 |
| Transportation equipment | | 82,266 | | 104,853 |
| Machinery and equipment | | 22,082,982 | | 17,402,064 |
| Furnishings and fixtures | | 2,510,281 | | 4,360,820 |
| Office, computer equipment and other | | 2,189,406 | | 224,822 |
| | | 35,987,560 | | 30,183,356 |
| Less: Accumulated depreciation | | (8,508,196) | | (7,365,496) |
| | $ | 27,479,364 | $ | 22,817,860 |
| **Intangible assets, net:** | | | | |
| Domain name and marketing related intangibles | $ | 18,957 | $ | 18,957 |
| Lease intangibles | | 1,033,412 | | 1,033,412 |
| Customer relationship intangibles | | 2,689,039 | | 2,689,039 |
| Purchased software | | 1,620,652 | | 1,595,977 |
| | | 5,362,060 | | 5,337,385 |
| Less:  Accumulated amortization | | (1,368,389) | | (1,132,071) |
| | $ | 3,993,671 | $ | 4,205,314 |
| **Accrued liabilities:** | | | | |
| Accrued payroll and bonuses | $ | 2,200,981 | $ | 2,602,695 |
| Due to seller of ApplianceSmart, Inc. | | 6,500,000 | | – |
| Accrued sales and property taxes | | 1,031,985 | | 824,206 |
| Deferred rent | | 484,878 | | 502,617 |
| Accrued gift card liability | | 1,668,443 | | 1,479,622 |
| Accrued interest payable | | 547,405 | | 464,184 |

Case 2:21-cv-01517-ODS-EJY    Document 35-3    Filed 05/05/23    Page 23 of 79

| | | | |
|---|---|---|---|
| Accrued bank overdraft | | 1,802,097 | 1,367,539 |
| Customer deposits | | 197,967 | 182,052 |
| Accrued expenses - other | | 880,438 | 1,563,819 |
| | $ 15,314,194 | $ | 8,986,734 |

14

**Note 5:**      **Acquisitions**

*Acquisition of Vintage Stock Inc.*

On November 3, 2016 (the "Vintage Stock Closing Date"), the Company, through its newly formed, wholly-owned subsidiary, VSAH, entered into a series of agreements in connection with its purchase of Vintage Stock. Vintage Stock is a retailer that sells, buys and trades new and pre-owned movies, video games and music products, as well as ancillary products such as books, comics, toys and collectibles.

Total consideration paid of $57,653,698 was paid through a combination of $8,000,000 of capital provided by the Company and debt financing provided by the TCB Revolver (as defined below) in the aggregate amount of approximately $12,000,000, mezzanine financing from the Capitala Term Loan (as defined below) of approximately $30 million, and the Company issued $10,000,000 in subordinated acquisition notes payable to the sellers of Vintage Stock, as more fully described in Note 8.

The following table below summarizes our final purchase price allocation of the consideration paid to the respective fair values of the assets acquired and liabilities assumed in the Vintage Stock acquisition as of the Vintage Stock Closing Date. The Company finalized its estimates after it determined that it had obtained all necessary information that existed as of the Vintage Stock Acquisition Date related to these matters.

| | |
|---|---:|
| Cash and cash equivalents | $ 272,590 |
| Trade and other receivables | 177,338 |
| Inventory | 18,711,192 |
| Prepaid expenses and other current assets | 814,201 |
| Property and equipment | 4,859,676 |
| Intangible - leases | 1,033,412 |
| Intangible - trade names | 1,200,000 |
| Intangible - customer list | 50,000 |
| Intangible - customer relationship | 1,000,000 |
| Goodwill | 36,946,735 |
| Notes payable | (542,074) |
| Accounts payable | (5,165,612) |
| Accrued expenses | (1,703,760) |
| | $ 57,653,698 |

In connection with the purchase of Vintage Stock, we incurred bank fees of $15,000, appraisal fees of $20,497, legal fees of $192,339 and consulting fees of $119,774 – for a total of $347,610; all of which was recorded as general and administrative expense during the year ended September 30, 2017. Goodwill of $36,946,735 is the excess of total consideration less identifiable assets at fair value less debt assumed at fair value and is tax deductible. Goodwill is attributable to Vintage Stock's management, assembled workforce, operating model, the number of stores, locations and competitive presence in each of its respective markets.

The operating results of Vintage Stock have been included in our consolidated financial statements beginning on November 3, 2016 and are reported in our Retail and Online segment.

The estimated fair value of the customer relationship intangible related to Vintage Stock was determined using the income approach, which discounts expected future cash flows to present value. The Company estimated the fair value of this intangible asset using the residual method and a present value discount rate of 17% or $1,000,000. Customer relationships relate to the Company's ability to sell existing and future products. The Company is amortizing the Customer relationships intangible asset on a straight-line basis over an estimated life of 5 years.

The estimated fair value of the trade names intangible that Vintage Stock uses – "Vintage Stock", "EntertainMart" and "Movie Trading Company" was determined using a royalty income approach, which estimates an assumed royalty income stream and then discounts that expected future revenue or cash flow stream to present value. The Company estimated the fair value of this intangible asset using the residual method and a present value discount rate of 17% or $1,200,000. Trade names relate to the Company's awareness by consumers in the market place. The Company is amortizing the trade names intangible asset on a straight-line basis over an estimated life of 7 years.

Case 2:21-cv-01517-CDS-EJY   Document 35-3   Filed 05/05/23   Page 25 of 79

15

The estimated fair value of the customer list intangible asset was determined using the cost approach, which estimates the cost to acquire each email address in the list. The Company estimated the fair value of this intangible asset to be $0.19 per acquired email address, less a discount 40% attributable to domain and trade names or a net cost per email address of $0.11 or approximately $50,000. The Company is amortizing the customer list intangible asset on a straight-line basis over an estimated life of 3 years.

*Acquisition of ApplianceSmart Inc.*

On December 30, 2017 (the "ApplianceSmart Closing Date"), the Company, through its newly formed, wholly-owned subsidiary, Appliancesmart Holdings LLC, entered into a series of agreements in connection with its purchase of Appliancesmart. Appliancesmart is a retailer engaged in the sale of new major appliances through a chain of company-owned retail stores.

Total consideration of $6,500,000 is to be paid to the seller of Appliancesmart by March 31, 2018.

The following table below summarizes our preliminary purchase price allocation of the consideration to be paid to the respective fair values of the assets acquired and liabilities assumed in the Appliancesmart acquisition as of the ApplianceSmart Closing Date.

| | | |
|---|---|---|
| Trade receivables | $ | 250,000 |
| Inventory | | 7,953,064 |
| Prepaid expenses | | 69,347 |
| Refundable deposits | | 204,841 |
| Restricted cash | | 1,285,747 |
| Property and equipment | | 510,487 |
| Bargain gain on acquisition | | (3,773,486) |
| | $ | 6,500,000 |

The preliminary purchase price allocation is subject to change. We will complete this analysis to determine the fair value of accounts receivable, inventory, prepaid expenses, property and equipment, intangibles, deposits, restricted cash and other assets and liabilities on the acquisition date. Once this analysis is complete, we will adjust, if necessary, the provisional amounts assigned to accounts receivable, inventory, prepaid expenses, property and equipment, intangibles, deposits, restricted cash and other assets and liabilities in the accounting period in which the analysis is completed.

The operating results of Appliancesmart are included in our unaudited condensed consolidate financial statements beginning on December 31, 2017 and are reported in our Retail and Online Segment.

**Note 6:     Intangibles**

The Company's intangible assets consist of customer relationship intangibles, trade names, licenses for the use of internet domain names, URL's, software, and marketing and technology related intangibles. All such assets are capitalized at their original cost and amortized over their estimated useful lives as follows: domain name and marketing – 3 to 20 years; software – 3 to 5 years, customer relationships – 7 to 15 years. When certain events or changes in operating conditions occur, an impairment assessment is performed and lives of intangible assets with determined lives may be adjusted. Intangible amortization expense is $236,318 and $61,497 for the three months ended December 31, 2017 and 2016, respectively.

The following summarizes estimated future amortization expense related to intangible assets that have net balances as of December 31, 2017:

| | | |
|---|---|---|
| 2018 | $ | 952,310 |
| 2019 | | 949,533 |
| 2020 | | 782,320 |
| 2021 | | 579,433 |
| 2022 | | 358,411 |
| Thereafter | | 371,664 |
| | $ | 3,993,671 |

16

**Note 7:      Goodwill**

Goodwill is not amortized, but rather is evaluated for impairment on July 1 annually or when indicators of a potential impairment are present. The annual evaluation for impairment of goodwill is based on valuation models that incorporate assumptions and internal projections of expected future cash flows and operating plans. We believe such assumptions are also comparable to those that would be used by other marketplace participants.

**Note 8:      Long Term Debt**

*Bank of America Revolver Loan*

On July 6, 2015, Marquis entered into a $15 million revolving credit agreement with Bank of America Corporation ("BofA Revolver"). The BofA Revolver is a five-year, asset-based facility that is secured by substantially all of Marquis' assets. Availability under the Bank of America Revolver is subject to a monthly borrowing base calculation.

Payment obligations under the BofA Revolver include monthly payments of interest and all outstanding principal and accrued interest thereon due in July 2020, which is when the BofA Revolver loan agreement terminates. The BofA Revolver is recorded as a currently liability due to a lockbox requirement, and a subjective acceleration clause as part of the agreement.

Borrowing availability under the BofA Revolver is limited to a borrowing base which allows Marquis to borrow up to 85% of eligible accounts receivable, plus the lesser of 1) $7,500,000; 2) 65% of the value of eligible inventory; or 3) 85% of the appraisal value of the eligible inventory. For purposes of clarity and definition of the advance rate for inventory – it shall be 55.3% for raw materials, 0% for work-in-process and 70% for finished goods subject to eligibility, special reserves and advance limit. Letters of credit reduce the amount available to borrow under the BofA Revolver by an amount equal to the face value of the letters of credit.

As of February 22, 2017, Marquis's ability to make prepayments against Marquis subordinated debt, including the related party loan with Isaac Capital Group and pay cash dividends is generally permitted if 1) excess availability under the BofA Revolver is more than $4 million, and has been for each of the 90 days preceding the requested distribution and 2) excess availability under the BofA Revolver is more than $4 million, and the fixed charge coverage ratio, as calculated on a pro-forma basis for the prior 12 months is 2:1 or greater. Restrictions apply to our ability to make additional prepayments against Marquis subordinated debt and pay cash dividends if the fixed charge coverage ratio, as calculated on a pro-forma basis for the prior 12 months is less than 2:1 and excess availability under the BofA Revolver is less than $4 million at the time of payment or distribution. There is no restriction on dividends that can be taken by the Company so long as Marquis maintains $4 million of current availability at the time of the dividend or distribution. This translates to having no restriction on Net Income so long as the Company retains sufficient assets to establish $4 million of current availability and continues to meet the required fixed charge coverage ratio of 2:1 as stated above.

The BofA Revolver places certain restrictions and covenants on Marquis, including a limitation on asset sales, additional liens, investment, loans, guarantees, acquisitions, incurrence of additional indebtedness for Marquis to maintain a fixed charge coverage ratio of at least 1.05 to 1, tested as of the last day of each month for the twelve consecutive months ending on such day.

The BofA Revolver Loan bears interest at a variable rate based on a base rate plus a margin. The current base rate is the greater of (a) Bank of America prime rate, (b) the current federal funds rate plus 0.50%, or (c) 30-day LIBOR plus 1.00% plus the margin, which varies, depending on the fixed coverage ratio table below. Levels I – IV determine the interest rate to be charged Marquis which is based on the fixed charge coverage ratio achieved.

| Level | Fixed Charge Coverage Ratio | Base Rate Revolver | LIBOR Revolver | Base Rate Term | LIBOR Term Loans |
|-------|------------------------------|--------------------|----------------|----------------|------------------|
| I | >2.00 to 1.00 | 0.50% | 1.50% | 0.75% | 1.75% |
| II | <2.00 to 1.00 but >1.50 to 1.00 | 0.75% | 1.75% | 1.00% | 2.00% |
| III | <1.50 to 1.00 but >1.20 to 1.00 | 1.00% | 2.00% | 1.25% | 2.25% |
| IV | <1.2 to 1.00 | 1.25% | 2.25% | 1.50% | 2.50% |

17

Case 2:21-cv-01517-ODS-EJY    Document 35-3    Filed 05/05/23    Page 28 of 79

On October 20, 2016, it was agreed that Level IV interest rates would be applicable until October 20, 2017, and then the Level would be adjusted up or down on a quarterly basis going forward based upon the above fixed coverage ratio achieved by Marquis.

The BofA Revolver provides for customary events of default with corresponding grace periods, including failure to pay any principal or interest when due, failure to comply with covenants, change in control of Marquis, a material representation or warranty made by us or the borrowers proving to be false in any material respect, certain bankruptcy, insolvency or receivership events affecting Marquis or its subsidiaries, defaults relating to certain other indebtedness, imposition of certain judgments and mergers or the liquidation of Marquis or certain of its subsidiaries. During the period of October 1, 2017 through December 31, 2017, Marquis cumulatively borrowed $22,263,030 and repaid $25,516,014 under the BofA Revolver. Our maximum borrowings outstanding during the same period were $6,280,675. Our weighted average interest rate on those outstanding borrowings for the period of October 1, 2017 through December 31, 2017 was 3.89%. As of December 31, 2017, total additional availability under the BofA Revolver was $11,619,176; with $1,597,831 outstanding, and outstanding standby letters of credit of $72,715.

*Real Estate Transaction*

On June 14, 2016, Marquis entered into a transaction with Store Capital Acquisitions, LLC. The transaction included a sale-leaseback of land owned by Marquis and a loan secured by the improvements on such land. The total aggregate proceeds received from the sale of the land and the loan was $10,000,000, which consisted of $644,479 from the sale of the land and a note payable of $9,355,521. In connection with the transaction, Marquis entered into a lease with a 15-year term commencing on the closing of the transaction, which provides Marquis an option to extend the lease upon the expiration of its term. The initial annual lease rate is $59,614. The proceeds from this transaction were used to pay down the Bank of America Revolver and Term loans, and related party loan, as well as purchasing a building from the previous owners of Marquis that was not purchased in the July 2015 transaction. The note payable bears interest at 9.25% per annum, with principal and interest due monthly. The note payable matures June 13, 2056. For the first five years of the note payable, there is a pre-payment penalty of 5%, which declines by 1% for each year the loan remains un-paid. At the end of 5 years, there is no pre-payment penalty. In connection with the note payable, Marquis incurred $457,757 in transaction costs that are being recognized as a debt issuance cost that is being amortized and recorded as interest expense over the term of the note payable.

*Kingston Diversified Holdings LLC Agreement ($2 Million Line of Credit)*

On December 21, 2016, the Company and Kingston Diversified Holdings LLC ("Kingston") entered into an agreement (the "December 21 Agreement") modifying its then existing agreement between the parties. The December 21 Agreement, effective September 15, 2016, memorializes an October 2015 interim agreement to extend the maturity date by twelve months for 55,888 shares of Series B Convertible Preferred Stock with a value on September 15, 2016 of $2,800,000, as a compromise between the parties in respect of certain of their respective rights and duties under the agreement. The December 21 Agreement also decreases the maximum principal amount of the Notes from $10,000,000 in principal amount to $2,000,000 in principal amount, and eliminates any and all actual, contingent, or other obligations of the Company to issue to Kingston any shares of the Company's common stock, or to grant any rights, warrants, options, or other derivatives that are exercisable or convertible into shares of the Company's common stock.

Kingston acknowledges that from the effective date through and including December 31, 2021, it shall not sell, transfer, assign, hypothecate, pledge, margin, hedge, trade, or otherwise obtain or attempt to obtain any economic value from any of the shares of Series B Preferred Stock or any shares into which they may be converted or from which they may be exchanged. As a result of the December 15 Agreement, the Company recorded $2,800,000 as an outstanding accrued liability as of September 30, 2016. As of December 31, 2017, and September 30, 2017, the Company had no borrowings on the Kingston line of credit. On December 29, 2016, the Company issued 55,888 shares of Series B Convertible Preferred Stock in settlement of the outstanding accrued liability due Kingston of $2,800,000.

*Equipment Loans*

On June 20, 2016 and August 5, 2016, Marquis entered into a transaction which provided for a master agreement and separate loan schedules (the "Equipment Loans") with Banc of America Leasing & Capital, LLC which provided:

Note #1 is $5 million, secured by equipment. The Equipment Loan #1 is due September 23, 2021, payable in 59 monthly payments of $84,273 beginning September 23, 2016, with a final payment in the sum of $584,273, interest at 3.8905% per annum.

Note #2 is $2,209,807, secured by equipment. The Equipment Loan #2 is due January 30, 2022, payable in 59 monthly payments of $34,768 beginning January 30, 2017, with a final payment in the sum of $476,729, interest at 4.63% per annum.

Case 2:21-cv-01517-CDS-EJY    Document 35-3    Filed 05/05/23    Page 29 of 79

18

Note #3 is $3,679,514, secured by equipment. The Equipment Loan #3 is due December 30, 2023, payable in 84 monthly payments of $51,658 beginning January 30, 2017, with a final payment due December 30, 2023, interest rate at 4.7985% per annum.

Note #4 is $1,095,113, secured by equipment. The Equipment Loan #4 is due December 30, 2023, payable in 81 monthly payments of $15,901 beginning April 30, 2017, with final payment due December 30, 2023, interest at 4.8907% per annum.

Note #5 is $3,931,591, secured by equipment. The Equipment Loan #5 is due December 28, 2024, payable in 84 monthly payments of $54,943 beginning January 28, 2018, with the final payment due December 28, 2024, interest at 4.67% per annum.

*Texas Capital Bank Revolver Loan*

On November 3, 2016, Vintage Stock entered into a $20 million credit agreement (as amended on January 23, 2017 and as further amended on September 20, 2017) with Texas Capital Bank ("TCB Revolver"). The TCB Revolver is a five-year, asset-based facility that is secured by substantially all of Vintage Stock's assets. Availability under the TCB Revolver is subject to a monthly borrowing base calculation.

Payment obligations under the TCB Revolver include monthly payments of interest and all outstanding principal and accrued interest thereon due in November 2020, which is when the TCB Revolver loan agreement terminates. The TCB Revolver has been classified as a currently liability due to a lockbox requirement and a subjective acceleration clause as part of the agreement.

Borrowing availability under the TCB Revolver is limited to a borrowing base which allows Vintage Stock to borrow up to 95% of the appraisal value of the inventory, plus 85% of eligible receivables, net of certain reserves. The borrowing base provides for borrowing up to 95% of the appraisal value for the period of November 4, 2016 through December 31, 2016, then 90% of the appraisal value during the fiscal months of January through September and 92.5% of the appraisal value during the fiscal months of October through December. Letters of credit reduce the amount available to borrow under the TCB Revolver by an amount equal to the face value of the letters of credit.

Vintage Stock's ability to make prepayments against Vintage Stock subordinated debt including the Capitala Term Loan and pay cash dividends is generally permitted if 1) excess availability under the TCB Revolver is more than $2 million, and is projected to be within 12 months after such payment and 2) excess availability under the TCB Revolver is more than $2 million, and the fixed charge coverage ratio, as calculated on a pro-forma basis for the prior 12 months is 1.2:1.0 or greater. Restrictions apply to our ability to make additional prepayments against Vintage Stock subordinated debt including the Capitala Term Loan and pay cash dividends if the fixed charge coverage ratio, as calculated on a pro-forma basis for the prior 12 months is less than 1.2:1.0 and excess availability under the TCB Revolver is less than $2 million at the time of payment or distribution. There is no restriction on dividends that can be taken by the Company so long as Vintage Stock maintains $2 million of current availability at the time of the dividend or distribution. This translates to having no restriction on Net Income so long as the Company retains sufficient assets to establish $2 million of current availability and continues to meet the required fixed charge coverage ratio of 1.2:1 as stated above.

The TCB Revolver places certain restrictions on Vintage Stock, including a limitation on asset sales, a limitation of 25 new leases in any fiscal year, additional liens, investment, loans, guarantees, acquisitions and incurrence of additional indebtedness.

The per annum interest rate under the TCB Revolver is variable and is equal to the one-month LIBOR rate for deposits in United States Dollars that appears on Thomson Reuters British Bankers Association LIBOR Rates Page (or the successor thereto) as of 11:00 a.m., London, England time, on the applicable determination date plus a margin of 2.75%.

The TCB Revolver provides for customary events of default with corresponding grace periods, including failure to pay any principal or interest when due, failure to comply with covenants, change in control of Vintage Stock, a material representation or warranty made by us or the borrowers proving to be false in any material respect, certain bankruptcy, insolvency or receivership events affecting Vintage Stock, defaults relating to certain other indebtedness, imposition of certain judgments and mergers or the liquidation of Vintage Stock. During the period of October 1, 2017 through December 31, 2017, Vintage Stock cumulatively borrowed $18,424,451 and repaid $20,243,439 under the TCB Revolver. Our maximum borrowings outstanding during the period of October 1, 2017 through December 31, 2017 were $16,077,015. Our weighted average interest rate on those outstanding borrowings for the period of November 3, 2016 through June 30, 2017 was 4.02731%. As of December 31, 2017, total additional availability under the TCB Revolver was $6,214,324, with $10,701,449 outstanding; and outstanding standby letters of credit of $0. In connection with the TCB Revolver, Vintage incurred $25,000 in transaction cost that is being recognized as debt issuance cost that is being amortized and recorded as interest expense over the term of the TCB Revolver.

Case 2:21-cv-01517-CDS-EJY   Document 35-3   Filed 05/05/23   Page 31 of 79

19

*Capitala Term Loan*

On November 3, 2016, the Company, through VSAH, entered into a series of agreements in connection with its purchase of Vintage Stock. As a part of those agreements, VSAH and Vintage Stock (the "Term Loan Borrowers") obtained $29,871,650 of mezzanine financing from the Lenders as defined in the term loan agreement (the "Term Loan Lenders"), and Capitala Private Credit Fund V, L.P., in its capacity as lead arranger. Wilmington Trust, National Association, acts as administrative and collateral agent on behalf of the Term Loan Lenders (the "Term Loan Administrative Agent").

The Term loans under the term loan agreement (collectively, the "Capitala Term Loan") bear interest at the LIBO rate (as described below) or base rate, plus an applicable margin in each case. In their loan notice to the Term Loan Administrative Agent, the Term Loan Borrowers selected the LIBO rate for the initial term loans made under the term loan agreement on the Closing Date.

The interest rate for LIBO rate loans under the term loan agreement is equal to the sum of (a) the greater of (i) a rate per annum equal to (A) the offered rate for deposits in United States Dollars for the applicable interest period and for the amount of the applicable loan that is a LIBOR loan that appears on Bloomberg ICE LIBOR Screen (or any successor thereto) that displays an average ICE Benchmark Administration Limited Interest Settlement Rate for deposits in United States Dollars (for delivery on the first day of such interest period) with a term equivalent to such interest period, determined as of approximately 11:00 a.m. (London time) two business days prior to the first day of such interest period, divided by (B) the sum of one minus the daily average during such interest period of the aggregate maximum reserve requirement (expressed as a decimal) then imposed under Regulation D of the Federal Reserve Board for "Eurocurrency Liabilities" (as defined therein), and (ii) 0.50% per annum, *plus* (b) the sum of (i) 12.50% per annum in cash pay *plus* (ii) 3.00% per annum payable in kind by compounding such interest to the principal amount of the obligations under the Term Loan Agreement on each interest payment date.

The interest rate for base rate loans under the term loan agreement is equal to the sum of (a) the highest of (with a minimum of 1.50%) (i) the federal funds rate plus 0.50%, (ii) the prime rate, and (iii) the LIBO rate plus 1.00%, *plus* (b) the sum of (i) 11.50% per annum payable in cash *plus* (ii) 3.00% per annum payable in kind by compounding such interest to the principal amount of the obligations under the Term Loan Agreement on each interest payment date.

The Term Loans place certain restrictions and covenants on Vintage Stock, including a limitation on asset sales, additional liens, investment, loans, guarantees, acquisitions and incurrence of additional indebtedness for Vintage Stock. Vintage Stock is required to maintain a fixed charge coverage ratio of 1.3 for year ended September 30, 2017, 1.4 for year ended September 30, 2018 and 1.5 for all years thereafter. For years ended September 30, 2017 and thereafter, Vintage Stock is required to incur no more than $1.2 million in annual capital expenditures subject to certain cumulative quarter and year to date covenants. Vintage Stock is required to maintain a total leverage ratio of 3.25 for year ended September 30, 2017, 2.5 for year ended September 30, 2018 and 2.0 for all years thereafter. In addition, for quarter ended December 31, 2017, the total leverage ratio cannot exceed 3.0 and for quarters ended March 31, 2018 and June 30, 2018, the total leverage ratio cannot exceed 2.75.

The Term Loans provide for customary events of default with corresponding grace periods, including failure to pay any principal or interest when due, failure to comply with covenants, change in control of Vintage Stock, a material representation or warranty made by us or the borrowers proving to be false in any material respect, certain bankruptcy, insolvency or receivership events affecting Marquis or its subsidiaries, defaults relating to certain other indebtedness, imposition of certain judgments and mergers or the liquidation of Vintage Stock or certain of its subsidiaries.

The payment obligations under the term loan agreement include (i) monthly payments of interest and (ii) principal installment payments in an amount equal to $725,000 due on March 31, June 30, September 30, and December 31 of each year, with the first such payment due on December 31, 2016. The outstanding principal amounts of the term loans and all accrued interest thereon under the Term Loan Agreement are due and payable in November 2021.

The Term Loan Borrowers may prepay the term loans under the term loan agreement from time to time, subject to the payment (with certain exceptions described below) of a prepayment premium of: (i) an amount equal to 2.0% of the principal amount of the term loan prepaid if prepaid during the period of time from and after the Closing Date up to the first anniversary of the Closing Date; (ii) 1.0% of the principal amount of the term loan prepaid if prepaid during the period of time from and after the first anniversary of the Closing Date up to the second anniversary of the Closing Date; and (iii) zero if prepaid from and after the second anniversary of the Closing Date.

Case 2:21-cv-01517-ODS-EJY https://www.sec.gov/Archives/edgar/data/1045742/000168316818000419/live_10q-123117.htm Document 35-3 Filed 05/05/23 Page 34 of 79

The Term Loan Borrowers may make the following prepayments of the term loans under term loan agreement without being required to pay any prepayment premium:

(i)    an amount not to exceed $3 million of the term loans;

(ii)    in addition to any amount prepaid in respect of item (i), an additional amount not to exceed $1.45 million, but only if that additional amount is paid prior to the first anniversary of the Closing Date; and

(iii)    in addition to any amount prepaid in respect of item (i), an additional amount not to exceed the difference between $2.9 million and any amount prepaid in respect of item (ii), but only if that additional amount is paid from and after the first anniversary of the Closing Date but prior to the second anniversary of the Closing Date.

There are also various mandatory prepayment triggers under the term loan agreement, including in respect of excess cash flow, dispositions, equity and debt issuances, extraordinary receipts, equity contributions, change in control, and failure to obtain required landlord consents. Our weighted average interest rate on our Capitala Term Loan outstanding borrowings for the period of October 1, 2017 through December 31, 2017 was 16.78%. In connection with the Capitala Term Loan, Vintage Stock incurred $1,088,000 in transaction cost that is being recognized as debt issuance cost that is being amortized and recorded as interest expense over the term of the Capitala Term Loan.

*Sellers Subordinated Acquisition Note*

In connection with the purchase of Vintage Stock., on November 3, 2016, VSAH and Vintage Stock entered into a seller financed mezzanine loan in the amount of $10 million with the previous owners of Vintage Stock. The Sellers Subordinated Acquisition Note bears interest at 8% per annum, with interest payable monthly in arrears. The Sellers Subordinated Acquisition Note matures five years and six months from November 3, 2016.

*Loan Covenant Compliance*

We were in compliance with all covenants under our existing revolving and other loan agreements as of September 30, 2017 due to waivers granted by both Texas Capital Bank for the TCB Revolver and Capitala for the Capitala Term Loan. We are not in compliance as of December 31, 2017 with the Capitala Term Loan total leverage ratio and do not anticipate that we will regain compliance with this covenant until sometime in fiscal year ended September 30, 2019 based upon our current operating forecast. We are seeking alternatives to resolve the out of compliance condition, including negotiating with Capitala and seeking alternative credit sources. Resolution of the out of compliance condition has not occurred as of February 14, 2018, the date of issuance of these financial statements. The Capitala Term Loan has been classified as a short-term obligation at December 31, 2017 as a result of this default.

21

Long-term debt as of December 31, 2017 and September 30, 2017 consisted of the following:

| | December 31, 2017 | September 30, 2017 |
|---|---|---|
| Bank of America Revolver Loan - variable interest rate based upon a base rate plus a margin, interest payable monthly, maturity date July 2020, secured by substantially all Marquis assets | $ 1,597,832 | $ 4,850,815 |
| Texas Capital Bank Revolver Loan - variable interest rate based upon the one-month LIBOR rate plus a margin, interest payable monthly, maturity date November 2020, secured by substantially all Vintage Stock assets | 10,701,451 | 12,520,437 |
| Note Payable Capitala Term Loan - variable interest rate based upon a base rate plus a margin, 3% per annum interest payable in kind, with the balance of interest payable monthly in cash, principal due quarterly in the amount of $725,000, maturity date November 2021, note subordinate to Texas Capital Bank Revolver Loan, secured by Vintage Stock Assets | 27,417,505 | 28,310,505 |
| Note Payable to the Sellers of Vintage Stock, interest at 8% per annum, with interest payable monthly, maturity date May 2022, note subordinate to both Texas Capital Bank Revolver and Capitala Term Loan, secured by Vintage Stock Assets | 10,000,000 | 10,000,000 |
| Note #1 Payable to Banc of America Leasing & Capital LLC - interest at 3.8905% per annum, with interest and principal payable monthly in the amount of $84,273 for 59 months, beginning September 23, 2016, with a final payment due in the amount of $584,273, maturity date September 2021, secured by equipment | 3,884,108 | 4,097,764 |
| Note #2 Payable to Banc of America Leasing & Capital LLC - interest at 4.63% per annum, with interest and principal payable monthly  in the amount of $34,768 for 59 months, beginning January 30, 2017, with a final payment due in the amount of $476,729, maturity date January 2022, secured by equipment | 1,888,137 | 1,969,954 |
| Note #3 Payable to Banc of America Leasing & Capital LLC - interest at 4.7985% per annum with interest and principal payable monthly in the amount of $51,658 for 84 months, beginning January 30, 2017, secured by equipment. | 3,226,294 | 3,341,642 |
| Note #4 Payable to Banc of America Leasing & Capital LLC - interest at 4.8907% per annum, with interest and principal payable monthly in the amount of $15,901 for 81 months, beginning April 30, 2017, secured by equipment. | 990,476 | 1,025,782 |
| Note #5 Payable to Banc of America Leasing & Capital LLC - interest at 4.67% per annum, with interest and principal payable monthly in the amount of $54,943 for 84 months, beginning January 28, 2018, secured by equipment. | 3,931,591 | – |
| Note Payable to Store Capital Acquisitions, LLC, - interest at 9.25% per annum, with interest and principal payable monthly in the amount of $73,970 for 480 months, beginning July 1, 2016, maturity date of June 2056, secured by Marquis land and buildings | 9,321,966 | 9,328,208 |
| Note Payable to Cathay Bank, variable interest rate, Prime Rate plus 2.50%, with interest payable monthly, maturity date December 2017, secured by substantially all Modern Everyday assets | – | 174,757 |
| Note Payable to Cathay Bank, variable interest rate, Prime Rate plus 1.50%, with interest payable monthly, maturity date December 2017, secured by substantially all Modern Everyday assets | – | 249,766 |
| Note payable to individual, interest at 11% per annum, payable on a 90 day written notice, unsecured | 206,529 | 206,529 |
| Note payable to individual, interest at 10% per annum, payable on a 90 day written notice, unsecured | 500,000 | 500,000 |
| Note payable to individual, interest at 8.25% per annum, payable on a 120 day written demand notice, unsecured | 225,000 | 225,000 |

Case 2:21-cv-01517-CDS-EJY    Document 35-3    Filed 05/05/23    Page 36 of 79

| | | |
|---|---:|---:|
| Total notes payable | 73,890,889 | 76,801,159 |
| Less unamortized debt issuance costs | (1,294,840) | (1,353,352) |
| Net amount | 72,596,049 | 75,447,807 |
| Less current portion | (42,994,795) | (48,877,536) |
| Long-term portion | $ 29,601,254 | $ 26,570,271 |

22

Future maturities of debt at December 31, 2017 are as follows which does not include related party debt separately stated:

| Years ending December 31, | | |
|---|---|---:|
| 2018 | $ | 42,994,795 |
| 2019 | | 2,453,414 |
| 2020 | | 2,565,333 |
| 2021 | | 3,292,214 |
| 2022 | | 11,376,961 |
| Thereafter | | 11,208,172 |
| Total | $ | 73,890,889 |

**Note 9:       Note Payable, Related Party**

In connection with the purchase of Marquis by the Company, the Company entered into a mezzanine loan in the amount of up to $7,000,000 with Isaac Capital Fund ("ICF"), a private lender whose managing member is Jon Isaac, our President and Chief Executive Officer. The ICF mezzanine loan bears interest at 12.5% per annum with payment obligations of interest each month and all principal due in January 2021. As of December 31, 2017 and September 30, 2017, there was $2,000,000 outstanding on this mezzanine loan.

**Note 10:       Stockholders' Equity**

*Series B Convertible Preferred Stock*

On December 27, 2016, the Company established a new series of preferred stock, Series B Convertible Preferred Stock. The shares, as a series, are entitled to dividends in an amount equal to $1.00 (in the aggregate for all then-issued and outstanding shares of Series B Convertible Preferred Stock). The series does not have any redemption rights or Stock basis, except as otherwise required by the Nevada Revised Statutes. The series does not provide for any specific allocation of seats on the Board of Directors. At any time and from time to time, the shares of Series B Convertible Preferred Stock are convertible into shares of common stock at a ratio of one share of Series B Preferred Stock into five shares of common stock, subject to equitable adjustment in the event of forward stock splits and reverse stock splits.

The holders of shares of the Series B Convertible Stock have agreed not to sell transfer, assign, hypothecate, pledge, margin, hedge, trade, or otherwise obtain or attempt to obtain any economic value from any of such shares or any shares into which they may be converted (e.g., common stock) or for which they may be exchanged. This "lockup" agreement expires on December 31, 2021. Our Warrant Agreements with Isaac Capital Group ("ICG") have been amended to provide that the shares underlying those warrants are exercisable into shares of Series B Convertible Preferred Stock, which warrant shares are also subject to the same "lockup" agreement as the currently outstanding shares of Series B Convertible Preferred Stock.

During the three months ended December 31, 2017, the Company did not issue any shares of Series B Convertible Preferred Stock.

During the three months ended December 31, 2016, the Company issued:

55,888 shares of Series B Convertible Preferred Stock were issued to Kingston Diversified Holdings LLC on December 29, 2016 to settle and pay for an outstanding accrued liability in the amount of $2,800,000. The 55,888 shares of Series B Convertible Preferred Stock issued is convertible at an exchange ratio of (five) shares of common stock for each share of Series B Convertible Preferred Stock, or 279,440 shares of common stock.

158,356 shares of Series B Convertible Preferred Stock were issued to ICG on December 27, 2016 in exchange for 791,758 shares of our common stock at an exchange ratio of five shares of common stock for each share of Series B Convertible Preferred Stock.

23

Case 2:21-cv-01517-CDS-EJY   Document 35-3   Filed 05/05/23   Page 38 of 79

*Series E Convertible Preferred Stock*

As of December 31, 2017, there were 127,840 shares of Series E Convertible Preferred Stock and 77,840 shares outstanding. The shares accrue dividends at the rate of 5% per annum on the liquidation preference per share, payable quarterly from legally available funds. The shares carry a cash liquidation preference of $0.30 per share, plus any accrued but unpaid dividends. If such funds are not available, dividends shall continue to accumulate until they can be paid from legally available funds. Holders of the preferred shares are entitled, after two years from issuance, to convert them into shares of our common stock on a one-to-one basis together with payment of $85.50 per converted share. On November 18, 2017, the Company repurchased 50,000 shares of Series E Convertible Preferred Stock for an aggregate purchase price of $4,000.

*Series E Convertible Preferred Stock Dividends*

During the three months ended December 31, 2017 and December 31, 2016, the Company accrued dividends of $292 and $479, respectively, payable to holders of Series E preferred stock. As of December 31, 2017 and September 30, 2017, unpaid dividends were $292 and $959, respectively.

*Common Stock*

On November 22, 2016, the Company's board of directors authorized a one-for-six (1:6) reverse stock split and a contemporaneous one-for-six (1:6) reduction in the number of authorized shares of common stock from 60,000,000 to 10,000,000 shares, to take effect for stockholders of record as of December 5, 2016. No fractional shares were issued. All share, option and warrant related information presented in these financial statements and footnotes has been retroactively adjusted to reflect the decreased number of shares resulting in this action.

During the three months ended December 31, 2017, the Company did not issue any shares of common stock.

During the three months ended December 31, 2016, the Company issued:

58,333 of common stock were issued to Novalk Apps S.A.S. on December 28, 2016 to settle and pay for an outstanding accrued liability in the amount of $584,500. The value was based on the market value of the Company's common stock on the date of issuance.

2,284 of common stock were issued to various holders of fractional shares of the Company's common stock pursuant to the 1:6 stock split effective for stockholders of record on December 5, 2016. All fractional shares of the Company's common stock were eliminated.

*Treasury Stock*

For the year ended September 30, 2017, the Company purchased a total of 96,307 shares of its common stock in the open market (treasury shares) over a two-year period, for $999,584. For the three-month period ended December 31, 2017, the Company purchased 19,743 additional shares of its common stock in the open market (treasury shares) for $249,392. The Company accounted for the purchase of these treasury shares using the cost method.

*2014 Omnibus Equity Incentive Plan*

On January 7, 2014, our Board of Directors adopted the 2014 Omnibus Equity Incentive Plan (the "2014 Plan"), which authorizes issuance of distribution equivalent rights, incentive stock options, non-qualified stock options, performance stock, performance units, restricted ordinary shares, restricted stock units, stock appreciation rights, tandem stock appreciation rights and unrestricted ordinary shares to our directors, officer, employees, consultants and advisors. The Company has reserved up to 300,000 shares of common stock for issuance under the 2014 Plan. The Company's stockholders approved the 2014 Plan on July 11, 2014.

**Note 11:     Warrants**

The Company issued several notes in prior periods and converted them resulting in the issuance of warrants. The following table summarizes information about the Company's warrants at December 31, 2017:

| | Number of units - Series B | Weighted Average | Weighted Average Remaining | Intrinsic Value |
|---|---|---|---|---|

| | Convertible preferred warrants | Exercise Price | Contractual Term (in years) | |
|---|---|---|---|---|
| Outstanding at December 31, 2017 | 118,029 | $ 20.80 | 0.87 | $ 6,974,953 |
| Exercisable at December 31, 2017 | 118,029 | $ 20.80 | 0.87 | $ 6,974,953 |

24

As of September 30, 2016, the Company had 590,146 common stock warrants outstanding with weighted average exercise price, weighted average remaining contractual term and intrinsic value of $4.14, 1.73 years and $4,307,493, respectively. On December 27, 2016, ICG and the Company agreed to amend and exchange the common stock warrants for warrants to purchase shares of Series B Convertible Preferred Stock, and the number of warrants held adjusted by an exchange ratio of 5:1 shares of common stock for shares of Series B Convertible Preferred Stock. ICG, the holder of the warrants outstanding, is not permitted to sell, transfer, assign, hypothecate, pledge, margin, hedge, trade or otherwise obtain or attempt to obtain any economic value from the shares of Series B Convertible Preferred Stock should the warrants be exercised prior to December 31, 2021.

Warrants for 10,914 and 12,383 shares of Series B Convertible Preferred Stock expired on September 10, 2017 and December 11, 2017, respectively. On January 16, 2018, the Company agreed to extend the expiration date on all warrants outstanding if not exercised prior to expiration date by an additional two years, including the September 10, 2017 and December 11, 2017 expired warrants. Warrants outstanding and exercisable as of December 31, 2017 and September 30, 2017 reflect the additional extension of time by two years for the 10,914 and 12,383 warrants previously expired.

The exercise price for the Series B Convertible Preferred Stock warrants outstanding and exercisable at December 31, 2017 is as follows:

| | Series B Convertible Preferred | | | |
| | Outstanding | | Exercisable | |
| Number of Warrants | Exercise Price | Number of Warrants | Exercise Price |
|---|---|---|---|
| 54,396 | $ 16.60 | 54,396 | $ 16.60 |
| 17,857 | 16.80 | 17,857 | 16.80 |
| 12,383 | 24.30 | 12,383 | 24.30 |
| 33,393 | 28.50 | 33,393 | 28.50 |
| 118,029 | | 118,029 | |

**Note 12:    Stock-Based Compensation**

From time to time, the Company grants stock options and restricted stock awards to directors, officers and employees. These awards are valued at the grant date by determining the fair value of the instruments, net of estimated forfeitures. The value of each award is amortized on a straight-line basis over the requisite service period.

*Stock Options*

The following table summarizes stock option activity for the three months ended December 31, 2017:

| | Number of Shares | Weighted Average Exercise Price | Weighted Average Remaining Contractual Life | Intrinsic Value |
|---|---|---|---|---|
| Outstanding at September 30, 2017 | 211,668 | $ 13.19 | 3.47 | $ 454,417 |
| Granted | 20,000 | 32.24 | 10.00 | |
| Exercised | – | | | |
| Forfeited | – | | | |
| Outstanding at December 31, 2017 | 231,668 | $ 14.84 | 4.04 | $ 915,208 |
| Exercisable at December 31, 2017 | 179,167 | $ 8.68 | 2.15 | $ 851,208 |

The Company recognized compensation expense of $79,356 and $1,436 during the three months ended December 31, 2017 and 2016, respectively, related to stock option awards granted to certain employees and officers based on the grant date fair value of the awards, net of estimated forfeitures.

25

At December 31, 2017, the Company has $434,366 of unrecognized compensation expense (net of estimated forfeitures) associated with stock option awards which the company expects to recognize as compensation expense through October of 2022.

The exercise price for stock options outstanding and exercisable outstanding at December 31, 2017 is as follows:

| Outstanding | | Exercisable | |
|---|---|---|---|
| Number of Options | Exercise Price | Number of Options | Exercise Price |
| 31,250 | $ 5.00 | 31,250 | $ 5.00 |
| 25,000 | 7.50 | 25,000 | 7.50 |
| 31,250 | 10.00 | 31,250 | 10.00 |
| 4,167 | 10.86 | 4,167 | 10.86 |
| 4,167 | 10.86 | | |
| 4,167 | 10.86 | | |
| 4,167 | 10.86 | | |
| 6,250 | 12.50 | 6,250 | 12.50 |
| 6,250 | 15.00 | 6,250 | 15.00 |
| 75,000 | 15.18 | 75,000 | 15.18 |
| 8,000 | 23.41 | | |
| 8,000 | 27.60 | | |
| 8,000 | 31.74 | | |
| 8,000 | 36.50 | | |
| 8,000 | 41.98 | | |
| 231,668 | | 179,167 | |

The following table summarizes information about the Company's non-vested shares outstanding as of December 31, 2017:

| Non-vested Shares | Number of Shares | Weighted Average Grant-Date Fair Value |
|---|---|---|
| Non-vested at September 30, 2017 | 36,668 | $ 17.70 |
| Granted | 20,000 | $ 10.14 |
| Vested | (4,167) | $ 8.41 |
| Non-vested at December 31, 2017 | 52,501 | $ 13.89 |

Options were granted during 2017 and 2016, where the exercise price was less than the common stock price at the date of grant or where the exercise price was greater than the common stock price at the date of grant. The assumptions used in calculating the fair value of stock options granted use the Black-Scholes option pricing model for options granted were as follows:

| | |
|---|---|
| Risk-free interest rate | 1.25% |
| Expected life of the options | 5.0 to 10.0 years |
| Expected volatility | 107% |
| Expected dividend yield | 0% |

26

Case 2:21-cv-01517-CDS-EJY Document 35-3 Filed 05/05/23 Page 42 of 79

## Note 13: Earnings Per Share

Net earnings per share is calculated using the weighted average number of shares of common stock outstanding during the applicable period. Basic weighted average shares of common stock outstanding do not include shares of restricted stock that have not yet vested, although such shares are included as outstanding shares in the Company's Consolidated Balance Sheet. Diluted net earnings per share is computed using the weighted average number of common shares outstanding and if dilutive, potential common shares outstanding during the period. Potential shares of common stock consist of the additional shares of common stock issuable in respect of restricted share awards, stock options and convertible preferred stock. Preferred stock dividends are subtracted from net earnings to determine the amount available to common stockholders.

The following table presents the computation of basic and diluted net earnings per share:

|  | 2017 | 2016 |
|---|---|---|
| **Basic** | | |
| Net income | $ 1,877,555 | $ 1,428,573 |
| Less: preferred stock dividends | (292) | (479) |
| Net income applicable to common stock | $ 1,877,263 | $ 1,428,094 |
| | | |
| Weighted average common shares outstanding | 1,975,380 | 1,999,983 |
| | | |
| Basic earnings per share | $ 0.95 | $ 0.71 |
| **Diluted** | | |
| Net income applicable to common stock | $ 1,877,263 | $ 1,428,094 |
| Add: preferred stock dividends | 292 | 479 |
| Net income applicable for diluted earnings per share | $ 1,877,555 | $ 1,428,573 |
| | | |
| Weighted average common shares outstanding | 1,975,380 | 1,999,983 |
| Add: Options | 34,476 | 44,355 |
| Add: Common Stock Warrants | – | – |
| Add: Series B Preferred Stock | 1,071,200 | 1,071,200 |
| Add: Series B Preferred Stock Warrants | 590,145 | 590,145 |
| Add: Series E Preferred Stock | 77,840 | 127,840 |
| Assumed weighted average common shares outstanding | 3,749,041 | 3,833,523 |
| | | |
| Diluted earnings per share | $ 0.50 | $ 0.37 |

There are 40,000 and 0 common stock options that are anti-dilutive that are not included in the three months ended December 31, 2017 and 2016, diluted earnings per share computations, respectively.

## Note 14: Related Party Transactions

In connection with the purchase of Marquis Industries, Inc., the Company entered into a mezzanine loan in the amount of up to $7,000,000 with ICF, a private lender whose managing member is Jon Isaac, the Chief Executive Officer of the Company. The ICF mezzanine loan bears interest at a rate of 12.5% per annum with payment obligations of interest each month and all principal due in January 2021. As of December 31, 2017 and September 30, 2017, respectively, there was $2,000,000 outstanding on this mezzanine loan. During the three months ended December 31, 2017 and 2016, the Company recognized total interest expense of $63,889 and $63,889, respectively, associated with the ICF notes.

27

Customer Connexx LLC, a wholly-owned subsidiary of Appliance Recycling Centers of America, Inc. ("ARCA"), rents approximately 9,879 square feet of office space from the Company at its Las Vegas office which totals 11,100 square feet. ARCA paid the Company $45,388 in rent and other common area reimbursed expenses for the three months ended December 31, 2017. Tony Isaac, a member of the Board of Directors of the Company and Virland Johnson, Chief Financial Officer of the Company are Chief Executive Officer and Board of Directors member and Chief Financial Officer of ARCA, respectively.

Warrants for 10,914 and 12,383 shares of Series B Convertible Preferred Stock expired on September 10, 2017 and December 11, 2017, respectively. On January 16, 2018, the Company agreed to extend the expiration date on all warrants outstanding if not exercised prior to expiration date by an additional two years, including the September 10, 2017 and December 11, 2017 expired warrants. Warrants outstanding and exercisable as of December 31, 2017 and September 30, 2017 reflect the additional extension of time by two years for the 10,914 and 12,383 warrants previously expired.

On December 30, 2017, ASH, a wholly owned subsidiary of the Company, entered into a Stock Purchase Agreement (the "Agreement") with ARCA and ApplianceSmart, a subsidiary of ARCA.  Pursuant to the Agreement, the Purchaser purchased from ARCA all of the issued and outstanding shares of capital stock (the "Stock") of ApplianceSmart in exchange for $6,500,000 (the "Purchase Price"). The shares of Stock were delivered into escrow and will be released to the Purchaser upon Purchaser's receipt of third-party financing in an amount sufficient to fund the Purchase Price, and the subsequent delivery of such funds to certain third-party lenders of ARCA and ApplianceSmart, all of which the parties expect to occur prior to March 31, 2018.

In connection with the acquisition of Vintage Stock on November 3, 2016, Rodney Spriggs, President of Vintage Stock holds a 41.134752% interest in the $10,000,000 Seller Subordinated Acquisition Note payable by VSAH. The terms of payment are interest only, payable monthly on the 1st of each month, until maturity 5 years and 6 months from the date of the note – November 3, 2016. Interest paid to Mr. Spriggs for the three months ended December 31, 2017 and 2016, was $83,184 and $24,681, respectively. Interest unpaid and accrued as of December 31, 2017 and September 30, 2017 is $28,337 and $27,423, respectively.

Also see Note 5, 8, 9, 10 and 11.

**Note 15:      Commitments and Contingencies**

*Litigation*

The Company is involved in various claims and lawsuits arising in the normal course of business. These proceedings could result in fines, penalties, compensatory or treble dames or non-monetary relief. The nature of legal proceedings is such that the Company cannot assure the outcome of any particular matter, and an unfavorable ruling or development could have a materially adverse effect on our consolidated financial position, results of operations and cash flows in the period which a ruling or settlement occurs. However, based on information available to the Company's management to date, the Company's management does not expect that the outcome of any matter pending against us is likely to have a materially adverse effect on the Company's consolidated financial position as of December 31, 2017, results of operations, cash flows or liquidity of the Company.

**Note 16:      Income Taxes**

The income tax rate for the three months ended December 31, 2017 and December 31, 2016 were 64.6% and 37.1%, respectively. The effective income tax rate differs from the U.S. federal statuary rate primarily due to state taxes, extraordinary gains, and certain non-deductible expenses. As of December 31, 2017, and December 31, 2016 the Company had no uncertain tax positions. The Company is subject to taxation and files income tax returns in the U.S., and various state jurisdictions. The Company is subject to audit for U.S. purposes for the current and prior three years; and for state purposes the current and prior four years. The Company has net operating loss carry-forwards of approximately $27.6 million for U.S. income tax purposes, these net operating loss carryforwards are subject to IRC Section 382 limitations and can be carried forward indefinitely.

During the first quarter, ended December 31, 2017, the Company revised its estimated annual effective rate to reflect a change in the federal statutory rate from 34% to 21%, resulting from legislation that was enacted on December 22, 2017. The rate change is administratively effective as of January 1, 2018, which requires the Company to use a blended rate for the annual period. As a result, the blended federal statutory rate for the year is 24.53%. In addition, we recognized a tax expense in our tax provision for the period related to adjusting our deferred tax balance to reflect the new corporate tax rate. As a result, income tax expense reported for the three months was adjusted to reflect the effects of the change in tax law and resulted in an increase in income tax expense of approximately $2.3 million for the three-month period ended December 31, 2017.

Case 2:21-cv-01517-CDS-EJY     Document 35-3     Filed 05/05/23     Page 44 of 79

28

**Note 17:**    **Segment Reporting**

The Company operates in three segments which are characterized as: (1) Manufacturing, (2) Retail and Online, and (3) Services. The Manufacturing Segment consists of Marquis Industries, the Retail and Online segment consists of Vintage Stock, ApplianceSmart, Modern Everyday and LiveDeal.com, and the Services segment consists of the directory services business.

The following tables summarize segment information for the three months ended December 31, 2017 and 2016:

|  | Three Months Ended December 31, | |
|  | 2017 | 2016 |
|  | (Unaudited) | |
| **Revenues** | | |
| Retail and Online | $ 21,293,471 | $ 14,776,723 |
| Manufacturing | 18,878,535 | 17,187,534 |
| Services | 196,058 | 224,407 |
|  | $ 40,368,064 | $ 32,188,664 |
| **Gross profit** | | |
| Retail and Online | $ 11,455,802 | $ 8,067,608 |
| Manufacturing | 4,752,568 | 4,363,293 |
| Services | 187,520 | 214,331 |
|  | $ 16,395,890 | $ 12,645,232 |
| **Operating income** | | |
| Retail and Online | $ 2,231,476 | $ 1,743,967 |
| Manufacturing | 1,502,254 | 1,721,260 |
| Services | 187,058 | 213,841 |
|  | $ 3,920,788 | $ 3,679,068 |
| **Depreciation and amortization** | | |
| Retail and Online | $ 677,461 | $ 228,431 |
| Manufacturing | 718,444 | 706,616 |
| Services | – | – |
|  | $ 1,395,905 | $ 935,047 |
| **Interest expense, net** | | |
| Retail and Online | $ 2,022,407 | $ 1,079,306 |
| Manufacturing | 445,905 | 370,170 |
| Services | – | – |
|  | $ 2,468,312 | $ 1,449,476 |
| **Net income before provision for income taxes** | | |
| Retail and Online | $ 4,052,595 | $ 851,110 |
| Manufacturing | 1,063,393 | 1,206,531 |
| Services | 187,058 | 213,841 |
|  | $ 5,303,046 | $ 2,271,482 |

29

|  | As of December 31, 2017 | As of September 30, 2017 |
|---|---|---|
| **Total assets** | | |
| Retail and Online | $ 85,459,467 | $ 81,703,371 |
| Manufacturing | 46,611,136 | 46,783,429 |
| Services | 85,422 | 107,795 |
| | $ 132,156,025 | $ 128,594,595 |
| | | |
| **Intangible assets and goodwill** | | |
| Retail and Online | $ 40,574,539 | $ 40,778,865 |
| Manufacturing | 365,867 | 373,184 |
| Services | – | – |
| | $ 40,940,406 | $ 41,152,049 |
| | | |
| **Cost of revenue** | | |
| Retail and Online | $ 9,837,669 | $ 6,709,115 |
| Manufacturing | 14,125,967 | 12,824,241 |
| Services | 8,538 | 10,076 |
| | $ 23,972,174 | $ 19,543,432 |
| | | |
| **G&A** | | |
| Retail and Online | $ 9,011,603 | $ 6,063,363 |
| Manufacturing | 1,387,066 | 994,821 |
| Services | 461 | 490 |
| | $ 10,399,130 | $ 7,058,674 |
| | | |
| **Sales and marketing** | | |
| Retail and Online | $ 212,723 | $ 260,278 |
| Manufacturing | 1,863,248 | 1,647,212 |
| Services | 1 | – |
| | $ 2,075,972 | $ 1,907,490 |
| | | |
| **Other income** | | |
| Retail and Online | $ 3,843,526 | $ 186,449 |
| Manufacturing | 7,044 | (144,559) |
| Services | – | – |
| | $ 3,850,570 | $ 41,890 |

**Note 18:    Subsequent Events**

None.

30

ITEM 2.      MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

For a description of our significant accounting policies and an understanding of the significant factors that influenced our performance during the three months ended December 31, 2017, this "Management's Discussion and Analysis of Financial Condition and Results of Operations" (hereafter referred to as "MD&A") should be read in conjunction with the condensed consolidated financial statements, including the related notes, appearing in Part I, Item 1 of this Quarterly Report on Form 10-Q, as well as our 2017 Form 10-K.

**Note about Forward-Looking Statements**

This Quarterly Report on Form 10-Q includes statements that constitute "forward-looking statements." These forward-looking statements are often characterized by the terms "may," "believes," "projects," "intends," "plans," "expects," or "anticipates," and do not reflect historical facts.

Specific forward-looking statements contained in this portion of the Quarterly Report include, but are not limited to (i) statements that are based on current projections and expectations about the markets in which we operate, (ii) statements about current projections and expectations of general economic conditions, (iii) statements about specific industry projections and expectations of economic activity, (iv) statements relating to our future operations and prospects, (v) statements about future results and future performance, (vi) statements that the cash on hand and additional cash generated from operations together with potential sources of cash through issuance of debt or equity will provide the company with sufficient liquidity for the next 12 months; and (vii) statements that the outcome of pending legal proceedings will not have a material adverse effect on business, financial position and results of operations, cash flow or liquidity.

Forward-looking statements involve risks, uncertainties and other factors, which may cause our actual results, performance or achievements to be materially different from those expressed or implied by such forward-looking statements. Factors and risks that could affect our results, future performance and capital requirements and cause them to materially differ from those contained in the forward-looking statements include those identified in our 2017 Form 10-K under Item 1A "Risk Factors", as well as other factors that we are currently unable to identify or quantify, but that may exist in the future.

In addition, the foregoing factors may generally affect our business, results of operations and financial position. Forward-looking statements speak only as of the date the statements were made. We do not undertake and specifically decline any obligation to update any forward-looking statements. Any information contained on our website www.live-ventures.com or any other websites referenced in this Quarterly Report are not part of this Quarterly Report.

**Our Company**

Live Ventures Incorporated is a holding company for diversified businesses, which, together with our subsidiaries, we refer to as the "Company", "Live Ventures", "we", "us" or "our." We acquire and operate profitable companies in various industries that have demonstrated a strong history of earnings power. We currently have three segments to our business, Manufacturing, Retail and Online, and Services.

Under the Live Ventures brand, we seek opportunities to acquire profitable and well-managed companies. We work closely with third parties to help us identify target companies that fit within the criteria we have established for opportunities.

Our principal offices are located at 325 E. Warm Springs Road, Suite 102, Las Vegas, Nevada 89119, our telephone number is (702) 939-0231, and our corporate website (which does not form part of this report) is located at www.live-ventures.com. Our common stock trades on the NASDAQ Capital Market under the symbol "LIVE".

31

Case 2:21-cv-01517-CDS-EJY   Document 35-3   Filed 05/05/23   Page 48 of 79

**Manufacturing Segment**

*Marquis Industries*

Our Manufacturing segment is composed of Marquis Affiliated Holdings LLC and wholly-owned subsidiaries ("Marquis"). Marquis is a leading carpet manufacturer and a manufacturer of innovative yarn products, as well as a reseller of hard surface flooring products. Over the last decade, Marquis has been an innovator and leader in the value-oriented polyester carpet sector, which is currently the market's fastest-growing fiber category. We focus on the residential, niche commercial, and hospitality end-markets and serve over 2,000 customers.

Since commencing operations in 1995, Marquis has built a strong reputation for outstanding value, styling, and customer service. Its innovation has yielded products and technologies that differentiate its brands in the flooring marketplace. Marquis's state-of-the-art operations enable high quality products, unique customization, and exceptionally short lead-times. Through its A-O Division, Marquis utilizes its state-of-the-art yarn extrusion capacity to market monofilament textured yarn products to the artificial turf industry.

**Retail and Online Segment**

Our Retail and Online Segment is composed of Vintage Stock Affiliated Holdings LLC and wholly-owned subsidiaries ("Vintage"), Appliancesmart Holdings LLC and its wholly-owned subsidiary ("Appliancesmart"), Modern Everyday, Inc. ("MEI") and LiveDeal Inc. ("LiveDeal").

*Vintage Stock*

On November 3, 2016, Live Ventures through its wholly-owned subsidiary Vintage Stock Holdings LLC acquired 100% of Vintage Stock (collectively "Vintage Stock"). Vintage Stock is an award-winning specialty entertainment retailer with 58 storefronts across the Midwest and Southwest. Vintage Stock enjoys a wide customer base comprised of electronic entertainment enthusiasts, avid collectors, female gamers, children, seniors and more. Vintage Stock offers a large selection of entertainment products including new and pre-owned movies, video games and music products, as well as ancillary products such as books, comics, toys and collectibles all available in a single location. With its integrated buy-sell-trade business model, Vintage Stock buys, sells and trades new and pre-owned movies, music, video games, electronics and collectibles through 33 Vintage Stock, 3 V-Stock, 13 Movie Trading company and 9 EntertainMart retail locations strategically positioned across Texas, Idaho, Oklahoma, Kansas, Missouri, Colorado, Illinois, Arkansas, Utah and New Mexico. In addition to offering a wide array of products, Vintage Stock also offers services to customers, such as rentals, special orders, disc and video game hardware repair and more. Vintage Stock's "Cooler Than Cash" program rewards loyal customers. When Vintage Stock customers bring in items to sell, the customer has two options: (i) sell their pre-owned products for cash or (ii) opt for store credit and receive a fifty percent bonus.

*ApplianceSmart*

On December 30, 2017 (the "Closing Date"), the Company, through its newly formed, wholly-owned subsidiary, Appliancesmart Holdings LLC, entered into a series of agreements in connection with its purchase of Appliancesmart. Appliancesmart is engaged in the sale of new major appliances through a chain of company-owned retail stores. Appliancesmart is a leading appliance dealer in Minnesota, Ohio, Georgia and Texas with 17 stores. Appliancesmart sells leading brands such as Whirlpool, General Electric, Frigidaire, LG and Samsung.

*Modern Everyday*

Modern Everyday, Inc. ("MEI") was a specialty retailer offering consumers a selection of products that range from home, kitchen and dining products, apparel and sporting goods to children's toys and beauty products. Some of MEI's products remain available for sale on amazon.com. The Company has decided not to invest additional funds in this line of business and is in the process of selling the remaining inventory.

*LiveDeal*

LiveDeal Inc. operatesLiveDeal.com, a real time "deal engine" connecting restaurants with consumers. LiveDeal.com provides marketing solutions to restaurants to boost customer awareness and merchant visibility on the internet. The marketing solutions that LiveDeal.com provides have not provided any revenue to date. The Company is evaluating possibilities for using the LiveDeal.com deal engine for alternative marketing purposes.

Case 2:21-cv-01517-CDS-EJY    Document 35-3    Filed 05/05/23    Page 49 of 79

32

## Services Segment

*Telco*

Telco Billing Inc. ("Telco") provides legacy services primarily under our InstantProfile ® line of directory listing services. We no longer accept new customers under our legacy service offerings.

## Critical Accounting Policies

Our unaudited condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP") for interim financial information and do not include all disclosures required under GAAP for complete financial statements. Preparation of these statements requires us to make judgments and estimates. Some accounting policies have a significant and material impact on amounts reported in these financial statements. Estimates and assumptions are based on management's experience and other information available prior to the issuance of our financial statements. Our actual realized results may differ materially from management's initial estimates as reported. For a summary of significant accounting policies and the means by which we develop estimates thereon, see ("Part 1, Item 1 of this 10-Q report – Financial Statements - Notes to unaudited condensed consolidated financial statements Note 2 – summary of significant accounting policies), which are an integral component of this filing.

## Results of Operations

The following table sets forth certain statement of operations items and as a percentage of revenue, for the periods indicated:

|  | Three Months Ended December 31, 2017 | | Three Months Ended December 31, 2016 | |
|---|---|---|---|---|
|  |  | % of Total Revenue |  | % of Total Revenue |
| Statement of Income Data: |  |  |  |  |
| Revenue | $ 40,368,064 | 100.0% | $ 32,188,664 | 100.0% |
| Cost of Revenue | 23,972,174 | 59.4% | 19,543,432 | 60.7% |
| Gross Profit | 16,395,890 | 40.6% | 12,645,232 | 39.3% |
| General and Administrative Expense | 10,399,130 | 25.8% | 7,058,674 | 21.9% |
| Selling and Marketing Expense | 2,075,972 | 5.1% | 1,907,490 | 5.9% |
| Operating Income | 3,920,788 | 9.7% | 3,679,068 | 11.4% |
| Interest Expense, net | (2,468,312) | -6.1% | (1,449,476) | -4.5% |
| Bargain Purchase Gain on Acquisition | 3,773,486 | 9.3% | – | 0.0% |
| Other Income | 77,084 | 0.2% | 41,890 | 0.1% |
| Net Income before Income Taxes | 5,303,046 | 13.1% | 2,271,482 | 7.1% |
| Provision for Income Taxes | 3,425,491 | 8.5% | 842,909 | 2.6% |
| Net Income | $ 1,877,555 | 4.7% | $ 1,428,573 | 4.4% |

33

The following tables set forth revenues for key product categories, percentages of total revenue and gross profits earned by key product category and gross profit percent as compared to revenues for each key product category indicated:

| | Three Months Ended December 31, 2017 | | Three Months Ended December 31, 2016 | |
| --- | --- | --- | --- | --- |
| | Net Revenue | % of Total Revenue | Net Revenue | % of Total Revenue |
| Revenue | | | | |
| Used Movies, Music, Games and Other | $ 11,363,804 | 28.2% | $ 7,800,095 | 24.2% |
| New Movies, Music, Games and Other | 9,572,459 | 23.7% | 6,705,249 | 20.8% |
| Rentals, Concessions and Other | 288,534 | 0.7% | 177,033 | 0.5% |
| Retail Appliance Boxed Sales | 47,346 | 0.1% | – | 0.0% |
| Retail Appliance UnBoxed Sales | 16,429 | 0.0% | – | 0.0% |
| Retail Appliance Delivery, Warranty and Other | 4,899 | 0.0% | – | 0.0% |
| Kitchen and Home Products | – | 0.0% | 94,346 | 0.3% |
| Carpets | 12,903,685 | 32.0% | 12,836,550 | 39.9% |
| Hard Surface Products | 5,088,419 | 12.6% | 3,190,603 | 9.9% |
| Synthetic Turf Products | 886,431 | 2.2% | 1,160,381 | 3.6% |
| Directory Services | 196,058 | 0.5% | 224,407 | 0.7% |
| Total Revenue | $ 40,368,064 | 100.0% | $ 32,188,664 | 100.0% |

| | Three Months Ended December 31, 2017 | | Three Months Ended December 31, 2016 | |
| --- | --- | --- | --- | --- |
| | Gross Profit | Gross Profit % | Gross Profit | Gross Profit % |
| Gross Profit | | | | |
| Used Movies, Music, Games and Other | $ 8,877,018 | 78.1% | $ 6,117,123 | 78.4% |
| New Movies, Music, Games and Other | 2,378,610 | 24.8% | 1,807,770 | 27.0% |
| Rentals, Concessions and Other | 180,974 | 62.7% | 101,035 | 57.1% |
| Retail Appliance Boxed Sales | 10,553 | 22.3% | – | 0.0% |
| Retail Appliance UnBoxed Sales | 5,489 | 33.4% | – | 0.0% |
| Retail Appliance Delivery, Warranty and Other | 3,158 | 64.5% | – | 0.0% |
| New Kitchen and Home Products | – | 0.0% | 41,680 | 44.2% |
| Carpets | 3,129,350 | 24.3% | 3,257,862 | 25.4% |
| Hard Surface Products | 1,319,551 | 25.9% | 877,369 | 27.5% |
| Synthetic Turf Products | 303,667 | 34.3% | 228,062 | 19.7% |
| Directory Services | 187,520 | 95.6% | 214,331 | 95.5% |
| Total Gross Profit | $ 16,395,890 | 40.6% | $ 12,645,232 | 39.3% |

**Revenue**

Revenue increased $8,179,400, or 25.4% for the three months ended December 31, 2017 as compared to the three months ended December 31, 2016.

The increase in revenue was primarily attributable to the following:

Revenue from our recent acquisition of Appliancesmart – Retail Appliance Boxed Sales $36,793, Retail Appliance UnBoxed Sales $10,940 and Retail Appliance Delivery, Warranty and Other $1,741. The Appliancesmart acquisition closed on December 30, 2017. Appliancesmart had one day of revenues and associated cost of revenue and expenses in the fiscal quarter.

Comparable revenue from our acquisition of Vintage Stock was a short period of November 3, 2016 through December 31, 2016

Revenue increased for Used Movies, Music, Games and Other $3,563,709 or 28.2% of total revenue, New Movies, Music, Games and Other $2,867,210 or 23.7% of total revenue, Rentals, Concessions and Other $111,501 or 0.7% of total revenue.

Case 2:21-cv-01517-CDS-EJY    Document 35-3    Filed 05/05/23    Page 52 of 79

Revenue increased in the following categories as compared to the prior year period:

Hard Surface Products $1,897,816 or 59.5%, and Carpets $67,135 or 0.5%.

The revenue increases were partially offset by the following decreases in revenue as compared to the prior year period:

Synthetic Turf Products $273,950 or 23.6%, Kitchen and Home Products $94,346, and Directory Services $28,349 or 12.6%.

**Cost of Revenue**

Cost of revenue increased $4,428,742, or 22.7% for the three months ended December 31, 2017 as compared to the three months ended December 31, 2016, primarily because of the change in revenue discussed above as well as the changes in gross profit discussed below.

**Gross Profit**

Gross profit increased $3,750,658 or 29.7%, for the three months ended December 31, 2017 as compared to the three months ended December 31, 2016.
The increase in gross profit was primarily attributable to the following:

Gross Profits from Vintage Stock increased -Used Movies, Music, Games and Other $2,759,895 and gross margin declined to 78.1% from 78.4%, New Movies, Music, Games and Other $570,840 and gross margin declined to 24.8% from 27.0%, Rentals, Concessions and Other $79,939 and gross margin increased to 62.7% from 57.1%.

Gross Profits from our recent acquisition Appliancesmart – Retail Appliance Boxed Sales $10,553 or 22.3% gross margin, Retail Appliance UnBoxed Sales $5,489 or 33.4% gross margin and Retail Appliance Delivery, Warranty and Other $3,158 or 64.5% gross margin. The Appliancesmart acquisition closed on December 30, 2017. Appliancesmart had one day of revenues and associated cost of revenue and expenses in the fiscal quarter.

Gross profit increased in the following categories as compared to the prior year period:

Hard Surface Products gross profit increased $442,182 or 50.4%. Hard surface products gross profit margin decreased to 24.3% from 25.4%. Synthetic Turf gross profit increased $75,605 or 33.2%. Synthetic Turf gross profit margin increased to 34.3% from 19.7%.

Gross profit increases were partially offset by the following decreases in gross profit as compared to the prior year period.

Carpets gross profit decreased $128,512 or 3.9%. Carpets gross profit margin decreased to 24.3% from 25.4%.

Directory Services gross profit decreased $26,811 or 12.5%. Directory Services gross profit margin increased to 95.6% from 95.5%.

**General and Administrative Expense**

General and Administrative expense increased $3,340,456 or 47.3%, for the three months ended December 31, 2017 as compared to the three months ended December 31, 2016.

**Selling and Marketing Expense**

Selling and marketing expense increased $168,482 or 8.8%, for the three months ended December 31, 2017 as compared to the three months ended December 31, 2016.

## Operating Income

Because of the factors described above, operating income of $3,920,788 for the three months ended December 31, 2017, represented an increase of $241,720 over the comparable prior year period of $3,679,068, or 6.6%.

## Interest Expense, net

Interest expense net increased $1,018,836 or 70.3%, for the three months ended December 31, 2017 as compared to the three months ended December 31, 2016.

## Other Income and Expense

Other income and expense increased $3,808,680, for the three months ended December 31, 2017 as compared to the three months ended December 31, 2016 primarily due to the bargain purchase gain recorded with the Appliancesmart acquisition of $3,773,486.

## Provision for Income Taxes

Provision for income taxes increased $2,582,581 for the three months ended December 31, 2017 as compared to the three months ended December 31, 2016. The increase in provision for income taxes is primarily attributable to the increase in pre-tax income and recent tax legislation requiring the Company to adjust their deferred tax balance. The income tax provision is primarily deferred due to the Company's approximately $27.6 million of net operating loss carryforwards for federal income tax purposes.

## Net Income

The factors described above led to net income of $1,877,555 for the three months ended December 31, 2017, or an 31.4% increase from net income of $1,428,573 for the three months ended December 31, 2016.

## Segment Performance

We report our business in the following segments: Manufacturing, Retail and Online, and Services. We identified these segments based on a combination of business type, customers serviced and how we divide management responsibility. Our revenues and profits are driven through our physical stores, e-commerce, individual sales reps and our internet services.

Operating income by operating segment, is defined as income before net interest expense, other income and expense and provision for income taxes.

| | Three Months Ended December 31, 2017 Segments in $ | | | | Three Months Ended December 31, 2016 Segments - $ | | | |
|---|---|---|---|---|---|---|---|---|
| | Retail & Online | Mfg | Services | Total | Retail & Online | Mfg | Services | Total |
| Revenue | $ 21,293,471 | $ 18,878,535 | $ 196,058 | $ 40,368,064 | $ 14,776,723 | $ 17,187,534 | $ 224,407 | $ 32,188,664 |
| Cost of Revenue | 9,837,669 | 14,125,967 | 8,538 | 23,972,174 | 6,709,115 | 12,824,241 | 10,076 | 19,543,432 |
| Gross Profit | 11,455,802 | 4,752,568 | 187,520 | 16,395,890 | 8,067,608 | 4,363,293 | 214,331 | 12,645,232 |
| General and Administrative Expense | 9,011,603 | 1,387,066 | 461 | 10,399,130 | 6,063,363 | 994,821 | 490 | 7,058,674 |
| Selling and Marketing Expense | 212,723 | 1,863,248 | 1 | 2,075,972 | 260,278 | 1,647,212 | — | 1,907,490 |
| Operating Income (Loss) | $ 2,231,476 | $ 1,502,254 | $ 187,058 | $ 3,920,788 | $ 1,743,967 | $ 1,721,260 | $ 213,841 | $ 3,679,068 |

| | Three Months Ended December 31, 2017 Segments in % of Revenue | | | | Three Months Ended December 31, 2016 Segments - % of Revenue | | | |
|---|---|---|---|---|---|---|---|---|
| | Retail & Online | Mfg | Services | Total | Retail & Online | Mfg | Services | Total |
| Revenue | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Cost of Revenue | 46.2% | 74.8% | 4.4% | 59.4% | 45.4% | 74.6% | 4.5% | 60.7% |
| Gross Profit | 53.8% | 25.2% | 95.6% | 40.6% | 54.6% | 25.4% | 95.5% | 39.3% |
| General and Administrative Expense | 42.3% | 7.3% | 0.2% | 25.8% | 41.0% | 5.8% | 0.2% | 21.9% |
| Selling and Marketing Expense | 1.0% | 9.9% | 0.0% | 5.1% | 1.8% | 9.6% | 0.0% | 5.9% |
| Operating Income (Loss) | 10.5% | 8.0% | 95.4% | 9.7% | 11.8% | 10.0% | 95.3% | 11.4% |

36

**Retail and Online Segment**

Segment results for Retail and Online include Vintage, ApplianceSmart, Modern Everyday and LiveDeal. Revenue for the three months ended December 31, 2017 increased $6,516,748, or 44.1%, as compared to the prior year period, as a result of the acquisition of the Vintage business on November 3, 2016 which provided increases in revenue of $3,563,709 of Used movies, music, games and other revenue; $2,867,210 of New movies, music, games and other revenue; $111,501 of Movie Rental, concession and other revenue and revenue from our new acquisition Appliancesmart for one day of operations Retail Appliance Boxed Sales of $47,346, Retail Appliance UnBoxed Sales of $16,429 and Retail Appliance Delivery, Warranty and Other $4,899; partially offset by a decrease in New kitchen and home products revenue of $94,346 from the prior year period.

Cost of revenue for the three months ended December 31, 2017 increased $3,128,554, or 46.6%, primarily because of the Vintage business which had cost of revenue increases for Used movies, music, games and other of $803,814; New movies, music, games and other of $2,296,370; Movie Rental, concession and other of $31,562 and cost of revenue for our new acquisition Appliancesmart for one day of operations Retail Appliance Boxed Sales $36,793, Retail Appliance UnBoxed Sales $10,940 and Retail Appliance Delivery, Warranty and Other $1,741; partially offset by a decrease in cost of revenue for New Kitchen and home products of $52,666 from the prior year period.

Operating income for the three months ended December 31, 2017 increased $487,509, because of increased gross profit of $3,388,194, partially offset by an increase in general and administrative expense of $2,948,240, and a decrease in selling and marketing expense of $47,555.

**Manufacturing Segment**

Segment results for Manufacturing include Marquis, which is our carpet, hard surface and synthetic turf products business. Revenue for the three months ended December 31, 2017 increased $1,691,001, or 9.8%, as compared to the prior year period, because of increased sales of hard surface products of $1,897,816 and carpets of $67,135, partially offset by a decrease in Synthetic Turf of $273,950. Cost of revenue for the three months ended December 31, 2017 increased $1,301,726, or 10.2%, as compared to the prior year period, because of an increase in cost of revenue for hard surface products of $1,455,634 and carpets of $195,647, partially offset by a decrease in Synthetic Turf of $349,555. Operating income for the three months ended December 31, 2017 decreased $219,006, or 12.7%, as compared to the prior year period, because of an increase in gross profit of $389,275, an increase in general and administrative expense of $293,245 and an increase in selling and marketing expense of $216,036.

**Services Segment**

Segment results for Services include Telco results, which is our directory services business. Revenues for the three months ended December 31, 2017 decreased $28,349, or 12.6%, as compared to the prior year period, because of decreasing renewals. Operating earnings for the three months ended December 31, 2017 decreased $26,783, or 12.5% compared to the prior year period, primarily due to decreased renewal revenues. We expect revenue and operating income from this segment to continue to decrease in the future. We are no longer accepting new customers in our directory services business.

**Liquidity and Capital Resources**

*Overview*

Based on our current operating plans, we believe that available cash balances, cash generated from our operating activities and funds available under the BofA Revolver and the TCB Revolver, together will provide sufficient liquidity to fund our operations, pay our scheduled loan payments, fund our continued investments in store openings and remodeling activities, continue to repurchase shares and pay dividends on our series E preferred shares as declared by the Board of Directors, for at least the next 12 months.

We have two asset-based revolver lines of credit (a) Bank of America Revolver Loan ("BofA Revolver") that Marquis uses and (b) Texas Capital Bank Revolver Loan ("TCB Revolver") that Vintage Stock uses.

As of December 31, 2017, we had total cash on hand of $1,783,041 and an additional $11,619,176 of available borrowing under the BofA Revolver and an additional $6,214,324 of available borrowing under the TCB Revolver. As we continue to pursue acquisitions, and other strategic transactions to expand and grow our business, we regularly monitor capital market conditions and may raise additional funds through borrowings or public or private sales of debt or equity securities. The amount, nature and timing of any borrowings or sales of debt or equity securities will depend on our operating performance and other circumstances; our then-current

Case 2:21-cv-01517-ODS-EJY    Document 35-3    Filed 05/05/23    Page 56 of 79

commitments and obligations; the amount, nature and timing of our capital requirements; any limitations imposed by our current credit arrangements; and overall market conditions.

37

As of December 31, 2017, we have $43,123,145 current portion of notes payable, including $27,417,505 of loan payable to Capitala. We are not in compliance as of December 31, 2017 with the Capitala Term Loan total leverage ratio and do not anticipate that we will regain compliance with this covenant until sometime in fiscal year ended September 30, 2019 based upon our current operating forecast. We are seeking alternatives to resolving the out of compliance condition including negotiating with Capitala and seeking alternative credit sources. There can be no assurance that the Company will be able to complete any such transactions on acceptable terms, if at all. The resolution of the out of compliance condition has not occurred with Capitala and is not certain as of the date of filing of these financial statements February 14, 2018. The Capitala Term Loan has been classified as a short-term obligation at December 31, 2017 and September 30, 2017 as a result of this default.

*Cash Flows*

During the three months ended December 31, 2017, cash provided by operations was $6,304,149, compared to $3,177,830 during the three months ended December 31, 2016. The increase in cash provided by operations of $3,126,319 as compared to the prior period; was primarily due to an increase in net income of $448,982, an increase in depreciation and amortization expense of $460,858, a decrease due to the bargain purchase gain of Appliancesmart of $3,773,486, an increase to the change in deferred income taxes primarily related to the change in corporate tax rates of $2,642,506, an increase in non-cash expenses of $40,189, and an increase in cash provided by operations for working capital purposes of $3,307,270.

Some of the significant changes in cash provided by or used by operations for working capital purposes, as compared to the prior year period include:

Cash provided by a decrease in prepaid expenses and other current assets of $3,121,896 was the primary result of financing deposits initially placed with equipment manufacturers from Banc of America Leasing & Capital LLC upon receiving and putting into service certain new equipment at Marquis.

Cash provided by a decrease in accounts receivable of $2,858,514 due to increased collections at Marquis.

Cash used to decrease accounts payable by $1,394,967 at both Marquis and Vintage.

Cash used in investing activities was $5,329,985 and $50,363,198 for the three months ended December 31, 2017 and December 31, 2016, respectively. The $45,033,213 decrease in cash used in investing activities, as compared to the prior period, is primarily attributable to the acquisition of Vintage Stock for $47,310,900 of consideration given, net of cash acquired, including the $10,000,000 of seller financing provided, partially offset by the increase in purchase and placement into service of new equipment of $2,271,010, primarily for Marquis; proceeds from the sale of property and equipment of $17,998 and the purchase of intangible assets – software of $24,675.

Cash used by financing activities was $3,163,662 and provided by financing activities of $48,001,226 for the three months ended December 31, 2017 and December 31, 2016, respectively. The $51,164,888 decrease in cash provided, as compared to the prior period, was attributable to decreased net borrowings on our two revolver loans of $19,128,068; a decrease in the proceeds from notes payable of $31,957,730 primarily attributable to the acquisition of Vintage Stock, a decrease in debt issuance costs of $1,155,000, an increase in payments of notes payable of $980,698, and an increase in purchase of common treasury stock of $249,392, and an increase in the purchase of series E preferred treasury stock of $4,000.

*Sources of Liquidity*

We utilize cash on hand and cash generated from operations and have funds available to us under our two revolving loan facilities (BofA Revolver and TCB Revolver) to cover normal and seasonal fluctuations in cash flows and to support our various growth initiatives. Our cash and cash equivalents are carried at cost and consist primarily of demand deposits with commercial banks.

38

Case 2:21-cv-01517-CDS-EJY    Document 35-3    Filed 05/05/23    Page 58 of 79

*BofA Revolver*

Marquis may borrow funds for operations under the BofA Revolver subject to availability as described in Note 8 to the unaudited condensed consolidated financial statements. At December 31, 2017 and September 30, 2017, we had $11,619,176 and $9,691,672 of additional borrowing availability on the BofA Revolver, respectively. Maximum borrowing under the BofA Revolver is $15 million. A total of approximately $72,715 of letters of credit was outstanding at December 31, 2017 and September 30, 2017. The weighted average interest rate for the period of October 1, 2017 through December 31, 2017 was 3.89%. We borrowed $22,263,030 and repaid $25,516,014 on the BofA Revolver during the three months ended December 31, 2017; leaving an outstanding balance on the BofA Revolver of $1,597,832 and $4,850,815 at December 31, 2017 and September 30, 2017, respectively.

*TCB Revolver*

Vintage Stock may borrow funds for operations under the TCB Revolver subject to availability as described in Note 8 to the unaudited condensed consolidated financial statements. On December 31, 2017 and September 30, 2017 – we had $6,214,324 and $3,250,393, of additional borrowing availability on the TCB Revolver, respectively. Maximum borrowing under the TCB Revolver is $20 million. No letters of credit were outstanding at any time during the period of September 30, 2017 through December 31, 2017. The weighted average interest rate for the period of October 1, 2017 through December 31, 2017 was 4.02731%. We borrowed $18,424,451 and repaid $20,243,439 on the TCB Revolver during the period of October 1, 2017 through December 31, 2017; leaving an outstanding balance on the TCB Revolver of $10,701,449 and $12,520,437 at December 31, 2017 and September 30, 2017, respectively.

*Future Sources of Cash; New Acquisitions, Products and Services*

We may require additional debt financing and or capital to finance new acquisitions, refinance existing indebtedness or other strategic investments in our business. Other sources of financing may include stock issuances and additional loans; or other forms of financing. Any financing obtained may further dilute or otherwise impair the ownership interest of our existing stockholders.

**Off-Balance Sheet Arrangements**

At December 31, 2017, we had no off-balance sheet arrangements, commitments or guarantees that require additional disclosure or measurement.

**ITEM 3.        QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

As of December 31, 2017, we did not participate in any market risk-sensitive commodity instruments for which fair value disclosure would be required. We believe we are not subject in any material way to other forms of market risk, such as foreign currency exchange risk, foreign customer purchases or commodity price risk.

**ITEM 4.        CONTROLS AND PROCEDURES**

Evaluation of Disclosure control and Procedures. We carried out an evaluation, under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, of the effectiveness of our disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)). Based upon that evaluation, our principal executive officer and principal financial officer concluded that, as of the end of period covered in this report, our disclosure controls and procedures were not effective to ensure that information required to be disclosed in reports filed under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized and reported within the required time periods and is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosure.

Notwithstanding the foregoing, a control system, no matter how well designed and operated, can provide only reasonable, not absolute assurance that it will detect or uncover failures within the Company to disclose material information otherwise required to be set forth in our periodic reports. Management has concluded that adequate definition and documentation of existing accounting processes, internal controls and the testing thereof are not in place to be deemed adequate and reliable. The Company and its management are working to remediate these deficiencies in our financial reporting.

39

Case 2:21-cv-01517-ODS-EJY   Document 35-3   Filed 05/05/23   Page 59 of 79

Changes in Internal Control over Financial Reporting. There were no changes in the Company's internal control over financial reporting during the quarter ended December 31, 2017, that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

Management's Report on Internal Control Over Financial Reporting. Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)). Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2017. In making this assessment, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in 2013 regarding Internal Control – Integrated Framework. Based on our assessment using those criteria, our management concluded that our internal control over financial reporting was not effective as of December 31, 2017. Our assessment found the following material weaknesses. Management's assessment concluded that it has the following material weaknesses: (a) lack of sufficient controls around the financial reporting process; (b) lack of proper segregation of duties within the financial reporting process; (c) lack of adequate controls surrounding management's review of the income tax provision process; (d) lack of controls surrounding the assessment of certain cash flow and balance sheet classifications; and (e) lack of sufficient controls around the process for business combinations.

The Company is evaluating the material weaknesses and developing a plan of remediation to strengthen our overall internal control over accounting for business combinations, income tax provision process, the financial reporting process, the assessment of certain cash flow and balance sheet classifications and segregation of duties. The remediation plan will include the following actions: implement additional monitoring controls through revising and formalize the income tax review processes, enhance the formality and rigor of review and reconciliation procedures, and hire resources with specific tax, business combinations and financial accounting expertise whereby there can be effective segregation of duties. The Company is committed to maintaining a strong internal control environment and believes that these remediation efforts will represent significant improvements in our controls and processes. The Company has started to implement these steps, however, some of these steps will take time to be fully integrated and confirmed to be effective and sustainable. Additional controls may also be required over time. Until the remediation steps set forth above are fully implemented and tested, the material weakness described above will continue to exist.

The Company's management, including the Company's CEO and CFO, does not expect that the Company's disclosure controls and procedures or the Company's internal control over financial reporting will prevent or detect all error and all fraud. A control system, regardless of how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system will be met. These inherent limitations include the following: judgements in decision-making can be faulty, and control and process breakdowns can occur because of simple errors or mistakes, controls can be circumvented by individuals, acting alone or in collusion with each other, or by management override, the design of any system of controls is based in part on certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions, over time, controls may become inadequate because of changes in conditions or deterioration in the degree of compliance with policies or procedures. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected.

40

# PART II – OTHER INFORMATION

**ITEM 1.        Legal Proceedings**

We are involved in various claims and lawsuits arising in the normal course of business. The ultimate results of claims and litigation cannot be predicted with certainty. We currently believe that the ultimate outcome of such lawsuits and proceedings will not, individually or in the aggregate, have a material adverse effect on our consolidated financial position, results of operations or cash flows.

**Item 1A.        Risk Factors**

We are a smaller reporting company as defined by Rule 12b-2 of the Securities Exchange Act of 1934 and are not required to provide the information under this item.

**ITEM 2.        Unregistered Sales of Equity Securities and Use of Proceeds**

None.

**ITEM 3.        Defaults Upon Senior Securities**

On November 3, 2016, the Company, through Vintage Stock Affiliated Holdings LLC ("VSAH"), entered into a series of agreements in connection with its purchase of Vintage Stock. As a part of those agreements, VSAH and Vintage Stock (the "Term Loan Borrowers") obtained $29,871,650 of mezzanine financing (the "Capitala Term Loan") from the lenders as defined in the term loan agreement, and Capitala Private Credit Fund V, L.P., in its capacity as lead arranger ("Capitala"). Wilmington Trust, National Association, acts as administrative and collateral agent on behalf of the Term Loan Lenders. We are not in compliance as of December 31, 2017, with the Capitala Term Loan total leverage ratio and do not anticipate that we will regain compliance with this covenant until sometime in fiscal year ended September 30, 2019, based upon our current operating forecast. We are seeking alternatives to resolving the out of compliance condition including negotiating with Capitala and seeking alternative credit sources. There can be no assurance that the Company will be able to complete any such transactions on acceptable terms, if at all. The resolution of the out of compliance condition has not occurred with Capitala.

**ITEM 4.        Mine Safety Disclosures**

None.

**ITEM 5.        Other Information**

None.

**ITEM 6. EXHIBITS**

The following exhibits are being filed herewith:

| Exhibit Number | Description |
| --- | --- |
| 10.1 | Stock Purchase Agreement dated December 30, 2017 |
| 31.1 | Certification of Principal Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 31.2 | Certification of Principal Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32.1 | Section 1350 Certification of the Principal Executive Officer |
| 32.2 | Section 1350 Certification of the Principal Financial Officer |
| 101.INS | XBRL Instance Document |
| 101.SCH | XBRL Schema Document |
| 101.CAL | XBRL Calculation Linkbase Document |
| 101.DEF | XBRL Definition Linkbase Document |
| 101.LAB | XBRL Label Linkbase Document |
| 101.PRE | XBRL Presentation Linkbase Document |

Case 2:21-cv-01517-CDS-EJY    Document 35-3    Filed 05/05/23    Page 61 of 79

41

Case 2:21-cv-01517-CDS-EJY   Document 35-3   Filed 05/05/23   Page 62 of 79

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

|  |  |  |
|---|---|---|
|  |  | Live Ventures Incorporated |
|  |  | ____/s/ Jon Isaac_____ |
| Dated: | February 14, 2018 | President and Chief Executive Officer |
|  |  | (Principal Executive Officer) |
|  |  |  |
|  |  |  |
| Dated: | February 14, 2018 | ____/s/ Virland A. Johnson_____ |
|  |  | Chief Financial Officer |
|  |  | (Principal Financial Officer) |

42

EX-10.1 2 live_10q-ex1001.htm STOCK PURCHASE AGREEMENT

**EXHIBIT 10.1**

## STOCK PURCHASE AGREEMENT

**THIS STOCK PURCHASE AGREEMENT** (this "*Agreement*"), dated as of December 30, 2017, is entered into by and among APPLIANCESMART HOLDINGS LLC, a Nevada limited liability company (the "*Buyer*"), APPLIANCESMART, INC., a Minnesota corporation (the "*Company*"), and APPLIANCE RECYCLING CENTERS OF AMERICA, INC., a Minnesota corporation (the "*Seller*"), the sole stockholder of the Company.

### R E C I T A L S

**A.** The Seller owns all of the issued and outstanding capital stock of the Company; and

**B.** The Seller desires to sell to the Buyer, and the Buyer desires to purchase from the Seller, all of the issued and outstanding capital stock of the Company, upon the terms and subject to the conditions hereinafter set forth.

**NOW**, **THEREFORE**, in consideration of the foregoing and the premises and mutual covenants hereinafter contained, the parties hereto intending to be legally bound, agree as follows:

### ARTICLE I
### DEFINITIONS

**Section 1.01.**     Definitions.

Except as otherwise expressly provided in this Agreement, the capitalized terms used in this Agreement shall have the meanings specified below and shall be equally applicable to both the singular and plural forms:

"*Affiliate*" as to a specified Person, means a Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by or is under common control with, the Person specified.

"*Company Business*" means the sale of appliances at various retail locations.

"*Contract*" shall mean any written or oral contract, note, bond, mortgage, indenture, lease, license, or other legally binding agreement, instrument, commitment, guarantee, executory commitment, understanding or obligation.

"*Encumbrances*" means any lien, security interest, mortgage, pledge, hypothecation, charge, preemptive right, voting trust, imposition, covenant, condition, right of first refusal, easement or conditional sale or other title retention agreement or other restriction; provided, however, that Encumbrances shall not include any Permitted Encumbrance or any Encumbrances arising under any of the Transaction Documents.

"*Equity Securities*" means: (a) in the case of a corporation, any and all shares of capital stock; (b) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of capital stock; (c) in the case of a partnership or limited liability company, any and all partnership or membership interests (whether general or limited); (d) in each case, any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person; and (e) in each case, any option or other right to acquire, or securities or Indebtedness convertible into or exchangeable for, any of the foregoing.

1

Case 2:21-cv-01517-ODS-EJY   Document 35-3   Filed 05/05/23   Page 64 of 79

"*GAAP*" means U.S. generally accepted accounting principles applied consistently by the Company throughout the periods covered thereby.

"*Governmental Authority*" means any government, any governmental or quasi-governmental entity or municipality or political or other subdivision thereof, department, commission, board, self-regulating authority, bureau, branch, authority, official, agency or instrumentality, and any court, tribunal, arbitrator or judicial body, in each case, whether federal, state, city, county, local, provincial, foreign or multi-national.

"*Indebtedness*" means at a particular time, without duplication: (a) any indebtedness for borrowed money or issued in substitution for or exchange of indebtedness for borrowed money; (b) any indebtedness evidenced by any note, bond, debenture or other debt security; (c) any indebtedness for the deferred purchase price of property or services with respect to which a Person is liable, contingently or otherwise, as obligor or otherwise (including trade payables and other current liabilities incurred in the ordinary course of business); (d) any commitment by which a Person assures a creditor against loss (including contingent reimbursement obligations with respect to letters of credit); (e) any indebtedness guaranteed in any manner by a Person (including guarantees in the form of an agreement to repurchase or reimburse); (f) any obligations under capitalized leases with respect to which a Person is liable, contingently or otherwise, as obligor, guarantor or otherwise, or with respect to which obligations a Person assures a creditor against loss; (g) any indebtedness secured by an Encumbrance on a Person's assets; and (h) accrued interest to and including the Closing Date in respect of any of the obligations described in the foregoing clauses (a) through (g) of this definition and all premiums, penalties, charges, fees, expenses and other amounts due in connection with the payment and satisfaction in full of such obligations.

"*Inventory*" means the consumable inventory of the Company, wherever located, including, without limitation, all finished goods, work in process, raw materials, spare parts and all other materials and supplies to be used or consumed by the Company in the Business.

"*Liability*" means any direct or indirect indebtedness, liability, assessment, expense, claim, loss, damage, deficiency, obligation or responsibility, known or unknown, disputed or undisputed, joint or several, vested or unvested, executory or not, fixed or unfixed, choate or inchoate, liquidated or unliquidated, secured or unsecured, determinable or undeterminable, accrued or unaccrued, absolute or not, contingent or not, whether or not required to be reflected in financial statements in accordance with GAAP, and whether due or to become due.

"
*Material Adverse Effect*" means any change, event, development, circumstance or effect (each, an "*Effect*") that, individually or taken together with all other Effects is, or would be reasonably expected to be materially adverse to the business, financial condition, properties or results of operations of the Company; provided, however, that, in determining whether there has been a Material Adverse Effect or whether a Material Adverse Effect would occur, this definition shall exclude any material adverse effect to the extent arising out of, attributable to, or resulting from: (a) actions or inactions taken by the Company in compliance with the terms of this Agreement; (b) changes in conditions generally affecting the industry in which the Company conducts its business (unless such changes affect the Company in a materially disproportionate manner compared to other companies in the Company's industry); (c) changes in general economic, political or financial market conditions (unless such changes affect the Company in a materially disproportionate manner compared to other companies in the Company's industry); and (d) any outbreak or escalation of hostilities (including, without limitation, any declaration of war by the U.S. Congress) or acts of terrorism.

2

Case 2:21-cv-01517-CDS-EJY    Document 35-3    Filed 05/05/23    Page 65 of 79

"*Permits*" means any approval, consent, license, accreditation, certification, registration certificate, permit, waiver or other authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Authority.

"*Person*" means any natural person, corporation, partnership, proprietorship, other business organization, trust, union, association or Governmental Authority.

"*Proceeding*" means any action, arbitration, mediation, audit, hearing, investigation, litigation or suit (whether civil, criminal, administrative, investigative or informal) commenced, brought, conducted or heard by or before or otherwise involving any Governmental Authority, arbitrator or mediator.

"*Representative*" as to a specified Person means any officer, director, principal, employee, attorney, accountant, consultant, lender, or other representative of the Person specified.

"*Subsidiary*" means each corporation, partnership or other entity, fifty percent (50%) or more of the outstanding voting shares of which or other voting interests or equity interests in the case of a partnership or other entity are owned or controlled directly by the Company.

"*Transaction Documents*" means this Agreement, the Transition Services Agreement and each of the documents to be delivered at the Closing pursuant to the terms of this Agreement.

"*Transition Services Agreement*" means the Transition Services Agreement substantially in the form of Exhibit B attached hereto.

## ARTICLE II
## CONSIDERATION

**Section 2.01.    Sale of Stock**.

Upon the terms and conditions hereinafter set forth, the Seller hereby agrees to sell, assign, transfer and deliver to the Buyer at the Closing, and the Buyer hereby agrees to purchase and accept from the Seller at the Closing, upon the terms and subject to the conditions set forth in this Agreement, 100% of the issued and outstanding capital stock of the Company (the "*Stock*"). The Stock shall be conveyed free and clear of all Encumbrances (other than restrictions on transfer imposed by applicable federal and state securities laws), including but not limited to those Encumbrances imposed by the MidCap Credit Agreement (as defined below).

**Section 2.02.    Purchase Price**.

The entire consideration for the purchase and sale of the Stock pursuant to this Agreement shall be $6,500,000 (the "*Purchase Price*"). In reliance upon the representations, warranties and covenants set forth herein and in consideration of the Seller's sale, assignment, transfer and delivery of the Stock to the Buyer, the Buyer shall pay to the Seller the Purchase Price upon Buyer's receipt of third-party financing in an amount sufficient to finance the Purchase Price, and the subsequent delivery of such funds to certain third party lenders of the Seller and the Company, all of which the parties expect to occur prior to March 31, 2018.

**Section 2.03.    Transfer Taxes**.

Notwithstanding anything in this Agreement to the contrary, all transfer, documentary, stamp, registration and all other Taxes, fees and duties, if any, incurred in connection with the sale and transfer of the Stock will be split equally by the Buyer, on the one hand, and the Seller, on the other hand. The party required by Law to do so will file all necessary tax returns and other documentation with respect to all such transfer, documentary, sales, use, stamp, registration and other taxes and fees, and, if required by applicable Law, the other parties will join in the execution of any such tax returns and other documentation.

3

**Section 2.04.    Tax Withholding**.

The Buyer shall be entitled to deduct or withhold or cause to be deducted or withheld from the consideration otherwise payable to, or on behalf of, the Seller pursuant to this Agreement such taxes, if any, required to be deducted or withheld in accordance with applicable Laws, which deducted or withheld taxes shall be remitted to the appropriate taxing authorities in accordance with applicable Laws.

**ARTICLE III**
**CLOSING**

**Section 3.01.    Closing**.

(a)            The closing of the transactions contemplated by this Agreement (the "***Closing***") shall take place by the remote exchange of documents and signatures by facsimile or electronic mail (.PDF) on the first business day following the satisfaction (or, to the extent permitted by applicable Law, waiver) of the conditions set forth in Article IV, commencing at 10:00 a.m. local time. The date and time of the Closing are herein referred to as the "***Closing Date***," and the Closing shall be deemed effective at 5:01 p.m. (Central Time) on the Closing Date.

(b)            The Seller shall deliver, or cause to be delivered, to a mutually agreed upon third-party escrow agent ("***Escrow Agent***"), each of the following:

(i)            a certificate or certificates representing the Stock duly endorsed for transfer or with duly executed stock powers assigning the Stock to the Buyer;

(ii)            documents and instruments reasonably acceptable to the Buyer demonstrating the release of all Encumbrances imposed by the MidCap Credit Agreement and the instruments, documents and agreements contemplated by the MidCap Credit Agreement, including but not limited to the Security Documents (as defined in the MidCap Credit Agreement);

(iii)            the Transition Services Agreement;

(iv)            evidence reasonably acceptable to the Buyer that all of the outstanding Indebtedness has been repaid in full;

(v)            all book and records relating to the organization, ownership and maintenance of the Company in possession or control of the Seller, if not already located on the premises of the Company;

(vi)            a fairness opinion or valuation of the fair market value of the Inventory by an independent third party;

(vii)            a certificate, signed by an officer of the Company, certifying the truth and correctness of attached copies of the Company's organizational documents (including amendments thereto);

4

(viii)      a certificate duly issued by the applicable Governmental Authority in the State of Minnesota and all other jurisdictions in which the Company is qualified to conduct business, showing that the Company is validly existing or qualified to do business in such jurisdiction; and

(ix)      such other documents and instruments as may be reasonably required by the Buyer to consummate the transactions contemplated hereby.

All of the foregoing shall be held in escrow by the Escrow Agent until such time as Buyer pays the Purchase Price in accordance with Section 2.02 hereof. Upon payment of the Purchase Price by Buyer in accordance with Section 2.02 hereof, all the foregoing shall be automatically released by the Escrow Agent without any further action by any of the parties hereto.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller hereby represents and warrants to the Buyer that the following statements contained in this Article IV are true and correct as of the date hereof (except, as to any representations and warranties that specifically relate to an earlier date, such representations and warranties are true and correct as of such earlier date):

Section 4.01.    **Execution and Effect of Agreement**.

The Seller has the power and authority to execute and deliver this Agreement and the other Transaction Documents to which the Seller is a party and to perform its obligations under each of the Transaction Documents to which the Seller is a party and to consummate the transactions contemplated by the Transaction Documents to which the Seller is a party. The execution and delivery by the Seller of this Agreement and the other Transaction Documents to which the Seller is a party and the consummation by the Seller of the transactions contemplated by the Transaction Documents to which the Seller is a party have been duly authorized by all necessary action on the part of the Seller and no other proceeding, approval or authorization on the part of the Seller is necessary to authorize the execution, delivery and performance of this Agreement or any other Transaction Document to which the Seller is a party or the transactions contemplated by the Transaction Documents to which the Seller is a party. This Agreement and each of the other Transaction Documents to which the Seller is a party have been duly executed and delivered by the Seller and constitute the legal, valid and binding obligation of the Seller, enforceable against the Seller in accordance with their terms, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject as to enforceability, to general principles of equity, regardless of whether enforcement is sought in a proceeding at law or in equity (the "*Bankruptcy and Equity Exceptions*").

Section 4.02.    **No Violation**.

Neither the execution or delivery by the Seller of this Agreement or any other Transaction Document to which the Seller is a party, nor the consummation of the transactions contemplated by the Transaction Documents to which the Seller is a party does or will: (a) violate any statute, regulation, rule, injunction, judgment, order, decree, ruling, charge or restriction of any Governmental Authority to which the Seller is a party or by which or to which it is bound or subject; (b) require notice to, conflict with or result in a breach of, or give rise to a right of termination of, or accelerate the performance required by, any terms of any Contract to which the Seller is a party, or constitute a default thereunder; or (c) result in the creation of any Encumbrance upon any of the Seller's assets (except Encumbrances that individually and in the aggregate are not material).

5

**Section 4.03.    Title; Agreements**.

The Seller holds of record and beneficially all of the Stock, free and clear of any and all Encumbrances or other restrictions on transfer (other than restrictions on transfer imposed by applicable federal and state securities laws). The Seller is not a party to any voting trust, proxy or other agreement or understanding with respect to any equity interest of the Company.

**Section 4.04.    Litigation; Consents**.

There are no Proceedings (including any arbitration proceedings), orders, or claims pending or, to the Seller's knowledge, threatened against the Seller with respect to the execution, delivery or performance of this Agreement or the transactions contemplated hereby or the Stock owned by the Seller; (ii) there are no investigations, inquiries or other Proceedings involving the Seller pending or to the Seller's knowledge, threatened; and (iii) there are no Proceedings (including any arbitration proceedings), orders, or claims pending or threatened by the Seller against any third party, at law or in equity, or before or by any Governmental Authority relating to the Company or the Stock (including any actions, suits, proceedings or investigations with respect to the transactions contemplated by this Agreement or any Transaction Document).

**Section 4.05.    Brokers**.

Neither the Seller nor any Person acting on behalf of the Seller has agreed to pay a commission, finder's fee, investment banking fee or similar payment in connection with this Agreement or any matter related hereto.

**ARTICLE V**
**REPRESENTATIONS AND WARRANTIES RELATING TO THE COMPANY**

The Company and the Seller each represent and warrant to the Buyer that the following statements contained in this Article V are true and correct as of the date hereof (except, as to any representations and warranties that specifically relate to an earlier date, such representations and warranties are true and correct as of such earlier date):

**Section 5.01.    Organization and Good Standing**.

The Company is a corporation duly incorporated and validly existing under the laws of the State of Minnesota and the Company has full power and authority to carry on its business in the places and in the manner as now conducted and to own or hold under lease the properties and assets it now owns or holds under lease. The Company is duly qualified in all jurisdictions in which the conduct of its business or activities or its ownership of assets requires qualification under applicable Laws, except whereby the failure to be so qualified would not have a Material Adverse Effect. True, complete and correct copies of the articles of incorporation of the Company and the bylaws of the Company, each as amended to date, of the Company (the "***Organizational Documents***") have been made available to the Buyer and are in full force and effect. The Company has no Subsidiaries. The Company does not control directly or indirectly or have any direct or indirect equity participation in any corporation, partnership, trust, or other business association.

6

**Section 5.02.    Capitalization**.

The Seller is the record and beneficial owner of all of the Stock. The Stock comprises the entire capitalization of the Company on a fully diluted basis. For purposes of this Agreement, "fully diluted basis" shall mean, at the time of determination, the Stock and any warrants, options, rights to subscribe for or to purchase, or other securities convertible into, or exercisable or exchangeable for Equity Securities, assuming, without duplication, the conversion, exchange or exercise of all outstanding warrants, options, rights to subscribe for or to purchase, or other securities convertible into, or exercisable or exchangeable for Equity Securities, that are not already issued and that are then currently convertible, exchangeable or exercisable. Other than the Stock, there are no outstanding options (whether under an option plan or otherwise), rights (preemptive or otherwise), warrants, calls, convertible securities, commitments or any other arrangements to which the Company is a party requiring or restricting the issuance, sale or transfer by the Company of any Equity Securities of or in the Company or any securities convertible directly or indirectly into Equity Securities of or in the Company or evidencing the right to subscribe for any Equity Securities, or giving any Person any rights with respect to the Equity Securities of or in the Company. There are no voting agreements, voting trusts, equity appreciation rights, phantom equity plans or other agreements (including cumulative voting rights), commitments or understandings to which the Company is a party with respect to the Equity Securities of the Company. The Company is not subject to any obligation (contingent or otherwise) to repurchase or otherwise acquire or retire any of its Equity Securities. All of the Stock has been duly authorized and is validly issued, fully paid and nonassessable and was not issued in violation of any statutory or contractual preemptive rights or similar restrictions. There are no statutory or contractual preemptive rights, rights of first refusal or similar rights or restrictions with respect to the sale of the Stock hereunder arising under any written or verbal agreement to which the Company is a party or to which the Seller is a party.

**Section 5.03.    Indebtedness; No Undisclosed Liabilities**.

Other than outstanding accounts payable incurred in the ordinary course of business, certain personal property leases that are immaterial in amount, and that indebtedness under that certain Credit and Security Agreement dated as of May 10, 2017 (the "***Midcap Credit Agreement***") (such Indebtedness is collectively referred to as the "***Outstanding Indebtedness***"), by and among the lenders referenced in the Midcap Credit Agreement, MidCap Funding X Trust, as Agent, and the Company and other borrowers thereto, there is no indebtedness of the Company. The Company has no liability that would be required under GAAP to be reserved against or reflected in a balance sheet other than: (i) Liabilities set forth or reserved against and disclosed on the Balance Sheet; (ii) Liabilities which have arisen after the Balance Sheet Date in the ordinary course of business consistent with past practice; or (iii) Liabilities incurred in connection with this Agreement or any of the other Transaction Documents and the transactions contemplated hereby or thereby.

**Section 5.04.    No Change in the Business**.

Since September 30, 2017, there has been no change in the business, financial condition, properties or results of operations of the Company that has had or could be reasonably expected to have a Material Adverse Effect. Since September 30, 2017, the Company has conducted its business in the ordinary course consistent with past custom and practice.

**Section 5.05.    Permits; Compliance with Law**.

(a)        The Company is in compliance in all material respects with all applicable federal, state and local laws, rules and regulations of any Governmental Authority regarding the operation of the Company Business ("***Laws***"). The Company has not received any written notices from any Governmental Authority that it is in material violation or breach of any Laws, which violation or breach has not been cured to the satisfaction any such Governmental Authority.

7

(b)        The Company holds all Permits necessary for the conduct of its business as currently conducted. The Permits are valid and in full force and effect, and the Company has not received any notice that any Governmental Authority intends to cancel, suspend, terminate or not renew any of such Permits. The transactions contemplated by this Agreement and the other Transaction Documents will not result in a default under, or a breach or violation of, any of the Permits listed on Schedule 5.05(b).

**Section 5.06.     Real Property; Leases of Real Property**.

The Company does not own any real property. Schedule 5.06 contains a true, complete and correct list of all leases, subleases, license agreements or other rights of possession or occupancy of real property to which the Company is a party (each, a "*Lease*"). All of the Leases are in full force and effect, and the Company is not in default in any material respect beyond any applicable notice or grace period, and has not received written notice of any such default still outstanding on the date hereof under any such Lease. To the Company's knowledge, on the date hereof, there exists no uncured material default under any Lease by any third party. True, complete and correct copies of each Lease have been made available to the Buyer. Except as described on Schedule 5.06, no consent is required of any landlord or any other party to any Lease to consummate the transactions contemplated hereby, and upon consummation of the transactions contemplated hereby, each Lease will continue to entitle the Company to the use and possession of the real property specified in such Leases for the purposes for which such real property is now being used by the Company. The Company has not agreed, nor is it otherwise committed, to lease any real property except for the real property described in the Leases.

**Section 5.07.     Litigation; Consents**.

(a)        Other than potential claims with respect to the damage caused by the fire at 6080 E. Main Street, Columbus, Ohio 43212: (i) there are no Proceedings, orders, or claims pending or, to the Company's knowledge, threatened against or affecting the Company or any assets of the Company or with respect to any service provided by the Company; (ii) there are no investigations, inquiries or other Proceedings involving the Company pending or to the Company's knowledge, threatened; and (iii) there are no Proceedings, orders, or claims pending or threatened by the Company against any third party, at law or in equity, or before or by any Governmental Authority (including any actions, suits, proceedings or investigations with respect to the transactions contemplated by this Agreement or any Transaction Document). The Company is not subject to any arbitration proceedings under collective bargaining agreements or otherwise or any investigations or inquiries by any Governmental Authority. The Company is not subject to any judgment, order or decree of any court or other Governmental Authority and the Company has not received any opinion or memorandum or legal advice from legal counsel to the effect that the Company is exposed, from a legal standpoint, to any liability which would reasonably be expected to result in a Material Adverse Effect.

(b)        No notice to, consent, approval, permit, authorization of, declaration to or filing with any Governmental Authority or any other third party to be obtained or made by the Company (collectively, "*Consents*") is required in connection with: (i) the execution and delivery of this Agreement or any other Transaction Document or the consummation of the transactions contemplated hereby or thereby, except for those listed on Schedule 5.08(b); or (ii) a change in control of the Company, except for those listed on Schedule 5.07(b).

8

**Section 5.08.     Certain Payments**.

Neither the Company nor any of its directors, officers, nor to the Seller's knowledge or Company's knowledge, any of its employees or agents has directly or indirectly made any contribution, gift, bribe, rebate, payoff, influence payment, kickback or other payment in violation of any federal, state, local, municipal, foreign or other law, ordinance, regulation, statute or treaty to any person or entity, private or public, regardless of form, whether in money, property, or services: (a) to obtain favorable treatment in securing business; (b) to pay for favorable treatment for business secured; or (c) to obtain special concessions or for special concessions already obtained, for or in respect of the Company or any Affiliate thereof.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer hereby represents and warrants to the Seller that the following statements contained in this Article VI are true and correct as of the date hereof (except, as to any representations and warranties that specifically relate to an earlier date, such representations and warranties are true and correct as of such earlier date):

**Section 6.01.     Organization and Good Standing**. The Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Nevada. The Buyer has full power and authority to own its properties and carry on its business as it is now being conducted.

**Section 6.02.     Execution and Effect of Agreement**.

The Buyer has the power and authority to enter into this Agreement and each of the other Transaction Documents to which it is a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by the Buyer of this Agreement and each of the other Transaction Documents to which it is a party and the consummation by the Buyer of the transactions contemplated hereby and the Transaction Documents have been duly authorized by all necessary action on the part of the Buyer, and no other proceeding, approval or authorization on the part of the Buyer is necessary to authorize the execution, delivery and performance of this Agreement or any other Transaction Document and the transactions contemplated hereunder and under the Transaction Documents. This Agreement and each Transaction Document to which the Buyer is a party have been duly executed and delivered by the Buyer and constitute the legal, valid and binding obligation of the Buyer, enforceable against the Buyer in accordance with its terms, except as limited by the Bankruptcy and Equity Exceptions.

**Section 6.03.     No Violation**.

Neither the execution or delivery by the Buyer of this Agreement and each of the other Transaction Documents to which it is a party nor the consummation of the transactions contemplated under this Agreement and each of the Transaction Documents to which the Buyer is a party, will: (i) violate any statute, regulation, rule, injunction, judgment, order, decree, ruling, charge or restriction of any Governmental Authority to which the Buyer is a party or by which or to which the Buyer or any of its assets or properties is bound or subject, or the provisions of the organizational documents of the Buyer; or (ii) conflict in any material respect with or result in a material breach of, or give rise to a right of termination of, or accelerate the performance required by, the terms of any material agreement to which the Buyer is a party or to which it or any of its assets or properties is bound or subject.

**Section 6.04.     Litigation; Consents**.

(a)          There is no Proceeding, order or claim pending, or to the Buyer's knowledge, threatened, against the Buyer which seeks to restrain, prohibit or otherwise challenges the consummation, legality or validity of the transactions contemplated hereby.

9

(b)        No consent, approval, permit, authorization of, declaration to or filing with any Governmental Authority or any other third party on the part of the Buyer is required in connection with the execution and delivery of this Agreement or any other Transaction Documents to which the Buyer is a party, or the consummation of the transactions contemplated hereunder or under any of the Transaction Documents to which the Buyer is a party.

**Section 6.05.     Brokers**.

Neither the Buyer nor any Person acting on behalf of the Buyer has agreed to pay a commission, finder's fee, investment banking fee or similar payment in connection with this Agreement or any matter related hereto.

### ARTICLE VII
### COVENANTS

**Section 7.01.     Cooperation**.

If, at any time after the Closing, any further action is necessary or desirable to carry out the purposes of this Agreement and to vest the Buyer with full right, title and possession to the Stock, the Seller agrees to take, and will take, all such lawful and necessary action required to so do or that the Buyer otherwise reasonably requests to carry out and give effect to the Seller's agreements and undertakings pursuant to this Agreement. In furtherance thereof, the Seller agrees to execute and deliver, or cause to be executed and delivered, such further instruments or documents or take such other action as may be necessary or convenient, in the opinion of the Buyer or the Buyer's legal counsel, to carry out the transactions contemplated hereby.

**Section 7.02.     Press Releases**.

None of the Buyer, the Seller, the Company or any of their respective Affiliates, directors, officers, Representatives, or agents, shall make any press release or public announcement disclosing the existence of this Agreement or make known publicly any facts related to the transactions contemplated hereby without the prior written consent of the Buyer, on the one hand, or the Seller, on the other hand, except where such disclosure is required by Law or a national securities exchange, in which event only after prior consultation with such other party.

**Section 7.03.     Transaction Expenses**.

Each party shall bear all out-of-pocket costs and expenses incurred by such party to third parties in connection with the negotiation, preparation, execution, delivery and performance of this Agreement and the Transaction Documents to which such Person is a party, and in connection with the consummation of the transactions contemplated hereby and thereby including, without limitation, legal, accounting and investment banker's or broker's fees (the "***Transaction Expenses***"). Without limiting the generality of the foregoing, all Transaction Expenses of the Company (prior to the Closing) and the Seller shall be borne, paid, satisfied, and discharged solely and exclusively by the Seller and shall have been paid in full by the Seller or the Company prior to the Closing, and neither the Buyer nor the Company shall have any liability or responsibility therefor.

10

Section 7.04.    **Non-Competition and Non-Solicitation**.

The Seller agrees and confirms that in connection with the agreements and covenants herein, including, without limitation, the Purchase Price, and as a material inducement to the Buyer to enter into this Agreement, it agrees with, and will hereafter fully comply with, abide by, and perform as follows:

(a)        Non-Solicitation. The Seller, for itself and on behalf of its Affiliates, hereby covenants and agrees that it will not (whether directly or indirectly): (i) for a period of five years after the Closing Date, recruit, solicit or induce, or attempt to induce, for employment by the Seller or any Affiliate of the Seller, any Person who is an employee of the Company whose employment by the Company continues after the Closing; or (ii) for a period of five years after the Closing Date, solicit, induce or attempt to induce any customer or potential customer of the Buyer, any of the Buyer's Affiliates or the Company, or any customer, client, consultant, independent contractor, vendor, supplier, or partner of the Buyer, any of the Buyer's Affiliates or the Company, to terminate, diminish, or materially alter in a manner harmful to the Buyer, any of the Buyer's Affiliates or the Company, its relationship or their relationships with the Buyer, any of the Buyer's Affiliates, or the Company. For purposes of clarity under this Section 8.09 and not by way of limitation, the Company shall be deemed to include its successors and assigns.

(b)        Noncompetition. The Seller, for itself and on behalf of its Affiliates, covenants and agrees that for a period of five years after the Closing Date, it will not (whether directly or indirectly): engage in the Company Business anywhere in the United States, directly or indirectly, as a shareholder, member, partner, owner, joint venture, investor, lender or in any other capacity whatsoever.

(c)        The Seller hereby acknowledges and confirms that the provisions of this Section 7.04 are reasonable and necessary to protect the interests of the Buyer and the Company, that any violation of this Section 7.04 will result in an immediate, irreparable injury to the Buyer and the Company and that damages at law would not be reasonable or adequate compensation to the Buyer and the Company for violation of this Section 7.04 and that, in addition to any other available remedies, the Buyer and the Company shall be entitled to have the provisions of this Section 7.04 specifically enforced by preliminary and permanent injunctive relief without the necessity of proving actual damages or posting a bond or other security to an equitable accounting of all earnings, profits and other benefits arising out of any violation of this Section 7.04. In the event that the provisions of this Section 7.04 shall ever be deemed to exceed the time, geographic scope or other limitations permitted by applicable Law, then the provisions shall be deemed reformed to the maximum extent permitted by applicable Law.

Section 7.05.    **Tax Matters**.

Following Seller's request in writing, Buyer shall make an election under Section 338(h)(10) of the Internal Revenue Code of 1986, as amended (and any corresponding election under state, local, and foreign tax law) (collectively, a "***Section 338(h)(10) Election***") with respect to the Stock to be acquired by Buyer under this Agreement.  If a request for a Section 338(h)(10) Election is made (i) Buyer shall prepare and timely file with the appropriate taxing authorities any forms used to make the Section 338(h)(10) Election and (ii) Seller and Buyer each acknowledge and agree to execute and deliver before or after Closing all federal and state forms used to make a Section 338(h)(10) Election requiring their signature.  The Company shall include any income, gain, loss, deduction, or other tax item resulting from the Section 338(h)(10) Election on its tax returns to the extent required by applicable law.  Seller shall pay (or reimburse Buyer within 15 days after payment by Buyer or the Company) any tax imposed on the Company attributable to the making of the Section 338(h)(10) Election (including, but not limited to, any tax imposed under Treasury Regulation § 1.338(h)(10)-1(d)(4), and any state, local or foreign tax imposed on the Company's gain), and Seller shall indemnify, defend, and hold harmless Buyer, the Company, and each of their respective successors, assigns, and Affiliates from and against any liability arising out of any failure to pay any such tax.

11

Case 2:21-cv-01517-CDS-EJY   Document 35-3   Filed 05/05/23   Page 74 of 79

# ARTICLE VIII
## INDEMNIFICATION

**Section 8.01.    Obligations of the Seller**.

(a)    As consideration for the commitment of the Buyer hereunder, subject to the conditions and limitations set forth in this Article VIII, the Seller hereby agrees to indemnify and hold harmless the Buyer, the Company and each of their Affiliates, directors, officers, agents and employees and each other Person, if any, controlling the Buyer (each a "***Buyer Indemnified Person***") from and against any direct loss, damage, Liability, demand, settlement, judgment, award, fine, penalty, charge, cost or expense of any nature (including, without limitation, the reasonable fees of counsel) (each, a "***Loss***"), to which such Buyer Indemnified Person becomes subject as a result of, or based upon or arising out of, directly or indirectly: (i) any inaccuracy in or breach of any representation or warranty made by the Seller in Article IV or the Seller and the Company in Article V of this Agreement; or (ii) any breach or nonperformance of any covenant or agreement made or to be performed by the Seller or the Company pursuant to this Agreement.

(b)    For purposes of this Article VIII, the amount of any Loss incurred by any Buyer Indemnified Person shall be reduced by: (x) any insurance proceeds received by the Buyer or the Company as a result of such Loss (net of any deductible or retention amount), which proceeds the Buyer would diligently seek to claim and obtain; and (y) any third-party recovery received by the Buyer or the Company as a result of such claims (net of any out of pocket costs of collection. For the avoidance of doubt, any such offset or setoff shall reduce dollar-for-dollar any amount due from the Seller. With respect to any Loss suffered by a Buyer Indemnified Person, the Buyer shall diligently seek to mitigate any Losses.

**Section 8.02.    Obligations of the Buyer**.

As consideration for the commitment of the Seller hereunder, subject to the conditions and limitations set forth in this Article VIII, the Buyer agrees to indemnify and hold harmless the Seller and each of their Affiliates (each a "***Seller Indemnified Person***") from and against any Loss to which a Seller Indemnified Person becomes subject as a result of, or based upon or arising out of, directly or indirectly: (a) any inaccuracy in or breach of any representation or warranty made by the Buyer pursuant to Article VI of this Agreement; or (b) any breach or nonperformance of any covenant made or to be performed by the Buyer or, after the Closing, the Company, pursuant to this Agreement.

**Section 8.03.    Remedies**.

Each party hereto acknowledges that irreparable damage would result if this Agreement is not specifically enforced. Therefore, the rights and obligations of the parties under this Agreement, including, without limitation, their respective rights and obligations to sell and purchase the Stock and the rights and obligations of the parties hereunder shall be enforceable by a decree of specific performance issued by any court of competent jurisdiction, and appropriate injunctive relief may be applied for and granted in connection therewith. Each party hereto agrees that monetary damages would not be adequate compensation for any Loss incurred by reason of a breach by it of the provisions of this Agreement and hereby agrees to waive the defense that a remedy at law may be adequate in any action for specific performance hereunder.

12

**ARTICLE IX.**
**GENERAL PROVISIONS**

**Section 9.01.    Amendments and Waivers**.

Any term of this Agreement may be amended, supplemented or modified only with the written consent of each of the Buyer and the Seller. The observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of: (a) the Buyer if such waiver is sought to be enforced against the Buyer or the Company; or (b) the Seller if the waiver is sought to be enforced against the Seller. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

**Section 9.02.    Successors and Assigns**.

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective legal representatives, successors, heirs, executors and assigns. Neither this Agreement nor any rights or obligations hereunder may be assigned or transferred without the prior written consent of the other parties hereto, except that the Buyer may: (a) assign its rights under this Agreement to any lender of the Buyer or the Company for collateral security purposes; or (b) designate one or more of its Affiliates to perform its obligations hereunder (in any or all of which cases the Buyer nonetheless shall remain responsible for, and shall guarantee, the performance of all of its obligations hereunder).

**Section 9.03.    No Third Party Beneficiaries**.

The rights created by this Agreement are solely for the benefit of the parties hereto and their respective successors or permitted assigns, and no other Person shall have or be construed to have any legal or equitable right, remedy or claim under or in respect of or by virtue of this Agreement or any provision herein contained; provided, however, that the provisions of Article VIII above concerning indemnification and the provisions of Section 9.13 concerning the release of the Released Claims by the Releasors are intended for the benefit and burden of the parties specified therein, and their respective legal representatives, successors, heirs, executors and assigns.

**Section 9.04.    Choice of Law**; Consent to Jurisdiction.

**(a)**    This Agreement shall be governed by and construed under and the rights of the parties determined in accordance with the internal, substantive laws of the State of Nevada (without reference to the choice of law provisions of the State of Nevada or of any other jurisdiction that would result in the application of the laws of any other jurisdiction).

**(b)**    Without limiting the other provisions of this Section 9.04(b), the parties hereto agree that any legal proceeding by or against any party hereto or with respect to or arising out of this Agreement shall be brought exclusively in Clark County, Nevada. By execution and delivery of this Agreement, each party hereto irrevocably and unconditionally submits to the exclusive jurisdiction of such courts and to the appellate courts therefrom solely for the purposes of disputes arising under this Agreement and not as a general submission to such jurisdiction or with respect to any other dispute, matter or claim whatsoever. The parties hereto irrevocably consent to the service of process out of any of the aforementioned courts in any such action or proceeding by the delivery of copies thereof by overnight courier to the address for such party to which notices are deliverable hereunder. Any such service of process shall be effective upon delivery. Nothing herein shall affect the right to serve process in any other manner permitted by applicable Law. The parties hereto hereby waive any right to stay or dismiss any action or proceeding under or in connection with this Agreement brought before the foregoing courts on the basis of: (i) any claim that it is not personally subject to the jurisdiction of the above-named courts for any reason, or that it or any of its property is immune from the above-described legal process; (ii) that such action or proceeding is brought in an inconvenient forum, that venue for the action or proceeding is improper or that this Agreement may not be enforced in or by such courts; or (iii) any other defense that would hinder or delay the levy, execution or collection of any amount to which any party hereto is entitled pursuant to any final judgment of any court having jurisdiction.

13

Case 2:21-cv-01517-ODS-EJY    Document 35-3    Filed 05/05/23    Page 76 of 79

Section 9.05.    **WAIVER OF JURY TRIAL**.

EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY PROCEEDING (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY TRANSACTION OR AGREEMENT CONTEMPLATED HEREBY OR THE ACTIONS OF ANY PARTY HERETO IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT HEREOF.

Section 9.06.    **Specific Performance.**

The Seller agrees and acknowledges that irreparable damage would occur to the Buyer in the event that any provision of this Agreement was not performed in accordance with the terms hereof or in the event of any breach or threatened breach of any provision of this Agreement by the Seller and that, therefore, the Buyer shall be entitled to expedited and immediate: (a) specific performance of the terms hereof; (b) injunctive relief to enjoin any breach or threatened breach of any of the terms hereof; or (c) other appropriate equitable relief, in each case in addition to any other remedy at law, in equity, by contract, or otherwise and that in connection therewith the Buyer shall not be required or compelled to post any bond or security in connection with any application or petition for any such equitable remedy or relief it or they may seek.

Section 9.07.    **Notices.**

Unless otherwise specifically provided in this Agreement, any notice required or permitted under this Agreement shall be given in writing and shall be deemed effectively given upon the earlier of: (a) personal delivery to the party to be notified; (b) actual receipt after deposit with the United States Post Office, by certified mail, postage prepaid return receipt requested; (c) the actual receipt after dispatch via nationally recognized overnight courier; or (d) confirmation of transmission by electronic mail (provided such transmission is also contemporaneously sent via one of the methods specified in clauses (a), (b) or (c)), all addressed to the party to be notified at the address indicated for such party below, or at such other address as such party may designate by five business days' advance written notice to the other parties. Notices should be provided in accordance with this Section 9.07 at the following addresses:

14

If to the Seller, to:

Appliance Recycling Centers of America, Inc.
175 Jackson Ave. North, Suite 102
Minneapolis, MN 55343
E-mail: t.isaac@isaa.com
Attn: Tony Isaac, CEO

If to the Buyer or the Company, to:

ApplianceSmart Holdings LLC
c/o Live Ventures Incorporated
325 E. Warm Springs Road, Suite 102
Las Vegas, NV 89119
E-mail: j.isaac@isaac.com
Attn: Jon Isaac, President and CEO

**Section 9.08. Severability**.

If one or more provisions of this Agreement shall be held invalid, illegal or unenforceable, such provision shall, to the extent possible, be modified in such manner as to be valid, legal and enforceable but so as to most nearly retain the intent of the parties, and if such modification is not possible, such provision shall be severed from this Agreement. In either case, the balance of this Agreement shall be interpreted as if such provision were so modified or excluded, as the case may be, and shall be enforceable in accordance with its terms.

**Section 9.09. Entire Agreement**.

This Agreement, together with the Company Disclosure Schedules hereto, constitutes the entire agreement among the parties with respect to the subject matter hereof and supersedes all prior understandings and agreements, whether written or oral, and no party shall be liable or bound to any other party in any manner by any warranties, representations or covenants except as specifically set forth herein or therein.

**Section 9.10. Construction**.

The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of such party's (or its Representative's) actual authorship of any provision of this Agreement and the parties have agreed that no provision or provisions of this Agreement can, may, or should be attributed to any particular party. When a reference is made in this Agreement to Sections, such reference shall be to a Section of this Agreement unless otherwise indicated. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation" whether or not actually followed by such words. References to "or" shall be read, interpreted and construed if the context permits as "and/or". For purposes of this Agreement, whenever the context requires: the singular number shall include the plural, and vice versa; the masculine gender shall include the feminine and neuter genders; the feminine gender shall include the masculine and neuter genders; and the neuter gender shall include the masculine and feminine genders.

15

Case 2:21-cv-01517-CDS-EJY    Document 35-3    Filed 05/05/23    Page 78 of 79

**Section 9.11.    Titles and Subtitles**.

The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

**Section 9.12.    Counterparts; Copies Sent by Facsimile or .PDF**

This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Delivery of facsimile or .pdf, or other electronic copies of signature pages for this Agreement, other documents required by the Agreement, and all certificates and other documents required to be delivered for Closing shall be valid and treated for all purposes as delivery of the originals.

**Section 9.13.    Release**.

The consideration described in this Agreement represents the only payments and consideration to be received by the Seller in exchange for the Stock owned by the Seller and to be sold to the Buyer hereunder. In exchange for such consideration, the Seller, for itself and its successors and assigns (collectively, the "*Releasors*"), hereby forever fully and irrevocably releases and discharges the Buyer, the Company and each of their respective predecessors, successors, subsidiaries and Affiliates, managers, Representatives and agents (collectively, the "*Released Parties*") from any and all actions, suits, claims, demands, debts, sums of money, accounts, reckonings, bonds, bills, covenants, Contracts, controversies, promises, judgments, Liabilities or obligations of any kind whatsoever in law or equity, or otherwise (including claims for damages, costs, expenses, and attorneys', brokers' and accountants' fees and expenses) for additional payment or consideration in connection with the transactions contemplated by this Agreement, as well as all other events, facts, conditions or circumstances existing or arising prior to the Closing Date, which the Releasors can, shall or may have against the Released Parties, and that now exist or may hereafter accrue (collectively, the "*Released Claims*"); provided, that the Released Claims shall not include claims arising under or otherwise specifically available to the Releasors under this Agreement, any of the other Transactional Documents or any of the transactions contemplated hereby, indemnification or advancement of expenses arising under applicable Law or the Organizational Documents, or rights, claims and actions arising out of or under any insurance policies. The Releasors shall refrain from asserting any claim or demand or commencing (or causing to be commenced) any Proceeding, in any court or before any tribunal, against any Released Party based upon any Released Claim.

*(Remainder of this page intentionally left blank; signatures begin on the next page.)*

16

**IN WITNESS WHEREOF**, the parties have executed this Stock Purchase Agreement as of the date first above written.

**SELLER**:

APPLIANCE RECYCLING CENTERS OF AMERICA, INC.

By: _/s/ Tony Isaac_____
Name: Tony Isaac
Title: Chief Executive Officer

**COMPANY**:

APPLIANCESMART, INC.

By: _/s/ Tony Isaac_____
Name: Tony Isaac
Title: Chief Executive Officer

**BUYER**:

APPLIANCESMART HOLDINGS LLC

By: _/s/ Jon Isaac_____
Name: Jon Isaac
Title: President and Chief Executive Officer

17