GLANCY PRONGAY & MURRAY LLP
Robert V. Prongay
Natalie S. Pang (admitted *pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com
        npang@glancylaw.com

MUEHLBAUER LAW OFFICE, LTD.
Andrew R. Muehlbauer, Esq.
Nevada Bar No. 10161
7915 West Sahara Ave., Suite 104
Las Vegas, Nevada 89117
Telephone: (702) 330-4505
Facsimile: (702) 825-0141
Email: andrew@molegal.com

*Attorneys for Lead Plaintiff*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| DANIEL E. SIEGGREEN, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>LIVE VENTURES INCORPORATED, JON ISAAC, and VIRLAND A. JOHNSON,<br><br>Defendants. | Case No. 2:21-cv-01517-CDS-EJY<br><br>**LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**<br><br>**ORAL ARGUMENT REQUESTED**<br><br>Judge:    Hon. Cristina D. Silva |

1002691.2

Case No. 2:21-cv-01517-CDS-EJY

## I.    **INTRODUCTION**

Plaintiff's Complaint details Defendants' alleged securities law violations during the Class Period that, among other things, caused Live's investors to lose millions and resulted in a Securities and Exchange Commission ("SEC") enforcement action against Defendants.[1]

The Complaint details two fraudulent schemes by which Defendants violated §10(b) of the Exchange Act and Rules 10b-5(a) and (c) promulgated thereunder. First, at year-end 2016, Live Defendants engaged in a scheme to artificially inflate Live's share price and profit from it. As part of this scheme, Live Defendants backdated an agreement with Isaac's close friend by two months so that Live could recognize the transaction in fiscal year ("FY") 2016; they paid stock promoters to tout Live's FY 2016 results shortly before Live issued a press release that falsely stated Live's FY 2016 EPS as $8.92; and, as Live's share price rose following this press release, Isaac instructed Live's brokerage to sell up to 20,000 of Live's shares. Then, at year-end 2017, Defendants engaged in a scheme which allowed Live to report a profitable quarter and JOI to avoid a large tax liability. As part of this scheme, Live and JOI engineered a transaction whereby Live was to acquire a subsidiary of JOI, and the parties backdated the acquisition date by at least three months so that Live could recognize the transaction in the quarter ended December 31, 2017, and JOI could recognize the transaction in FY 2017. Defendants utterly ignore these scheme liability allegations and thus waive any challenge thereto.

In addition, Live Defendants made materially false and misleading statements during the Class Period in violation of §10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder. Specifically, Live Defendants falsely backdated the agreements with Isaac's friend and the acquisition of JOI's subsidiary; misrepresented Live's FY 2016 results and EPS as well as Live's financial results for the quarterly period ended December 31, 2017; and understated Isaac's compensation for FY 2016-

---

[1] "Live Defendants" are, collectively, Live Ventures, Inc. ("Live" or the "Company"), its president and CEO Jon Isaac ("Isaac"), and its CFO Virland A. Johnson ("Johnson"). Defendant JanOne, Inc. is referred to as "JOI", and together with the Live Defendants, "Defendants". Plaintiff responds to Live Defendants' (Dkt. No. 31) and JOI's (Dkt. No. 39) motions to dismiss the Complaint together in this omnibus opposition as the motions are nearly identical to one another (the only somewhat substantive distinction being p. 28 of JOI's motion, addressed at Sec. IV(B), *infra*).

Citations to "¶__" refer to Lead Plaintiff's ("Plaintiff") Amended Class Action Complaint for Violations of the Federal Securities Laws (Dkt. No. 25, the "Complaint"). Citations to "MTD__" refer to Live Defendants' motion to dismiss. Citations to "JOI MTD __" refer to JOI's motion to dismiss.

The "Class Period" is December 28, 2016 through August 3, 2021, both dates inclusive (¶1).

Unless otherwise indicated, all emphasis is added and all internal quotations and citations are omitted.

2018.

The Complaint alleges a strong inference of Defendants' scienter. They had the motive and opportunity to conceal the truth due to Live's dire financial situation and mounting debts, and JOI's large tax liability. Live was forced to restate its financial statements for five quarterly periods. Live cycled through four auditors during the Class Period and lacked effective internal controls for the entire Class Period. The SEC investigated and brought an enforcement action against Defendants. Defendants try to downplay Plaintiff's allegations, arguing that mere disagreements with their application of accounting rules do not support scienter. But this case is not about mere disagreements over the application of accounting rules. Plaintiff alleges detailed fraudulent schemes and materially misleading statements intended to inflate Live's share price, which damaged investors, and Plaintiff's allegations raise a cogent inference of scienter that is *at least* as compelling an inference as Defendants' claim that they simply made some innocent accounting errors. Indeed, mere disagreements about or misapplication of accounting rules do not result in the prosecution of claims by the SEC for seventeen fraud-related causes of action. Defendants' motions should be denied in their entirety.[2]

## II.   STATEMENT OF FACTS

### A.   Live's Background

Live is a Las Vegas-based company, formerly focused on providing online marketing solutions for small and medium businesses. ¶48. After years of losses, Live was on the brink of bankruptcy. ¶46. Despite Live's dire status, Canadian father-and-son duo Tony and Jon Isaac joined Live's board, and within a month, Jon became Live's president and CEO at age 28. ¶47. Under the Isaacs, Live commenced a "strategic shift" in FY 2015 to focus on acquiring "profitable companies in various industries." ¶48. In July 2015, Live acquired an 80% interest in Marquis Industries, Inc., ("Marquis") and in November 2016, Live acquired 100% of Vintage Stock, V-Stock, Movie Trading Company and

---

[2] Defendants seek judicial notice of over six hundred pages of documents in connection with their motions (Dkt. Nos. 37, 40, "Def's RJN"). To the extent Defendants attempt to use these documents to defeat Plaintiff's claims by arguing that the Court should draw inferences from the facts contained therein in favor of Defendants, such attempts are improper. *See Khoja v. Orexigen Therapeutics, Inc.,* 899 F.3d 988, 1003 (9th Cir. 2018) (recognizing a "concerning pattern in securities cases" where defendants attempt to exploit judicial notice "improperly to defeat what would otherwise constitute adequately stated claims at the pleading stage[,]" and noting that "it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint.").

EntertainMart ("Vintage Stock"). ¶49. Live's debts increased exponentially due to the acquisitions—by the start of the Class Period, Live's debts had skyrocketed to $75 million. ¶50.

### B.    Live Defendants' Scheme To Fraudulently Boost Live's FY 2016 Results

In October 2014, Isaac and his close friend, Juan Yunis ("Yunis") entered into an agreement under which Live would purchase software from Yunis' company, Novalk Apps S.A.S. ("Novalk") for consideration of $1.5 million in cash or 800,000 shares of Live's stock. ¶42. Between October 2014 and November 30, 2016, Live made zero payments to Novalk under the agreement (*id.*). On November 30, 2016, two months after the end of Live's FY 2016, Isaac and Yunis, and Isaac and Johnson exchanged emails about amending the agreement and decided that instead of paying Novalk $1.5 million in cash or 800,000 of Live's shares, Live would pay Novalk 350,000 shares—valued at the price of Live's shares on September 15, 2016, of $1.67 per share. ¶52. On December 19, 2016, Yunis signed the Novalk Amendment, which Johnson forwarded to Live employees, stating:

> Here is the executed agreement …. ***The effective date is Sept 15th …. But the signature date is now*** …. Have Jon counter sign when he comes into the office this week.  Deal valued at 350,000 shares @ $1.67 Closing [ ] price on 9/15/2016 (effective date) or $584,500.

¶54. Subtracting the "amended" $584,500 purchase price from the original agreement's $1.5 million price and backdating the amendment to September 15, 2016 allowed Live to falsely recognize $915,500 in "other income" in its FY 2016[3] results, increasing its pre-tax income for the year by 20%. ¶55.

### C.    Live Defendants' Year-End 2016 Scheme To Artificially Inflate Live's Share Price And Profit From It

On November 30, 2016, Isaac and Live entered into an agreement with a stock promoter, Protrader Elite LLC ("Protrader"); during December 2016, Live paid Protrader $120,000. ¶53. On December 23, 2016, Isaac emailed Live's board of directors, stating:

> I have decided to lock up all of my Isaac Capital Group's[4] shares in LIVE for a period of 5 years …. This will make a good announcement no doubt. ***The other advantage this share exchange brings is a reduced share count on the common shares.  We go from about 2.8m shares to about 2m shares outstanding.  A lower outstanding share count***

---

[3] Live's fiscal year starts on October 1 and ends on September 30 of the following year. ¶37.

[4] At all relevant times, Isaac was the sole member and president of Isaac Capital Group ("ICG") and had the sole power to vote shares of Live common shares owned by ICG. ¶7. During the Class Period, Isaac, through ICG, controlled approximately between 43.1% to 49.5% of Live's common shares. ¶38.

*will make our EPS look even better*[.] ¶57.

On December 27, 2016, after close of market, stock promoters touted Live's forthcoming FY 2016 results. ¶59. On the morning of December 28, 2016, Isaac told Live's brokerage that the Company's share price might go "busurk" and instructed it to sell up to 20,000 shares of Live's stock if the price per share rose to certain amounts. ¶61. That same morning, Live issued a press release entitled, "*Live Ventures Announces Biggest Year in Company History Achieving Record Earnings of $8.92 Per Share With Continued Growth Anticipated in 2017."* ¶60. Throughout the day on December 28, 2016, Isaac sold and attempted to sell Live shares through Yunis' brokerage account, which Isaac access to. ¶63. On December 29, 2016, Live filed its FY 2016 Form 10-K, which stated that Live's FY 2016 EPS was $6.33, and that the effective date of the Novalk Amendment was September 15, 2016. ¶¶64-65.

### D.    SeekingAlpha's Report Partially Reveals The Truth

On January 6, 2017, SeekingAlpha published a scathing report about Live, which stated that the $8.92 EPS touted by Live's December 28, 2016 press release was "WRONG" and was calculated by improperly subtracting the 800,000 shares Isaac had agreed to lock up from Live's 2.8 million outstanding shares. ¶69. SeekingAlpha reported that Live's "Heavy Accounting Manipulation," allowed Live to, *inter alia,* claim a net profit for FY 2016, when in fact, Live "actually lost nearly $2 million," and that Live had spent "into the millions" in stock promotions to temporarily drive its stock price up, noting "[t]he most recent promotion campaign saw the stock price triple in November to December 2016." ¶69. On this news, Live's share price fell $2.62. or 12.7%, to close at $18.05 on January 6, 2017. ¶71. On January 9, 2017, Live issued a press release refuting SeekingAlpha's report, claiming, "[h]ad our company truly engaged in any type of promotional activity, our Company, its officers, and directors would have sold shares[,]" and explaining that Live's outstanding common stock was reduced from 2.8 million to 2 million shares because "[Live's] largest stockholder and a third party … agreed to lock up all of their shares for five years[.]" ¶72.

### E.    Live Defendants and JOI's Year-End 2017 Fraudulent Scheme

At year-end of 2017, Live was facing a major tax hit that would negatively impact its net profits for the quarterly period ended December 31, 2017 and JOI, a company that Tony Isaac was the CEO of

and which Johnson also served as CFO for, was facing a large tax liability because it had sold real property at a gain during its FY ended December 30, 2017. ¶76. Defendants came up with a plan: JOI and Live would enter into a stock purchase agreement (the "SPA"), whereby JOI would sell the stock certificate of its wholly owned subsidiary, ApplianceSmart, free of liens and encumbrances, to Live for $6.5 million in cash, and the parties would claim December 30, 2017 as the acquisition date. ¶¶77, 79. Claiming the acquisition date was December 30, 2017 allowed Live to recognize "other income" of $3,773,486 as a "bargain purchase gain on acquisition", thus rendering Live's unprofitable quarter profitable. Johnson calculated the "bargain purchase gain" by valuing ApplianceSmart's assets at about 58% more than its $6.5 million purchase price, or $10,237,486, and then subtracting $6.5 million from the supposed asset value. ¶79. But the acquisition date *was not and could not be* December 30, 2017 because ApplianceSmart was subject to a credit agreement under which, *inter alia,* MidCap had possession of ApplianceSmart's stock certificate. ¶78. As of March 31, 2018, ApplianceSmart was still subject to the MidCap credit agreement. ¶¶91-93.

Under the SPA, Live was required to pay $6.5 million in cash to JOI by March 31, 2018. But Live was unable to come up with the financing and did not pay any portion of the purchase price by March 31, 2018. ¶¶91, 93. In April 2018, Johnson came up with a plan to which Isaac agreed: treat ApplianceSmart's revenues—which had been paid to MidCap between January and March 2018 in the amount of about $2.6 million—as cash paid from Live to JOI under the SPA. ¶¶91-93. Live Defendants then issued a press release on April 26, 2018, falsely stating:

> [A] portion of the Purchase Price [of ApplianceSmart] was delivered, to the Seller prior to March 31, 2018.  Between March 31, 2018 and April 24, 2018, the Purchaser and the Seller negotiated in good faith the method of payment of the remaining outstanding balance …. On April 25, 2018, the Purchaser delivered to the Seller that certain Promissory Note [ ] in the original principal amount of $3,919,464.46[.]

¶92.

### F.   Live Defendants' First Class Period Restatement Reveals That Live Materially Understated Its Debts And Overstated Its Net Cash Provided By Operations

On February 14, 2018, after close of market, Live announced:

> On January 18, 2018, the Audit Committee … in consultation with management, concluded that the Company's previously issued financial statements for the quarterly periods ended December 31, 2016, March 31, 2017, and June 30, 2017 … should no

longer be relied upon [and would be restated due to six categories of accounting errors, including] classification of certain debt of our subsidiaries [Marquis] and [Vintage Stock] as long-term debt when it should have been classified as short-term debt.

¶86. That same day, Live filed the restated Form 10-Qs for the quarterly periods ended December 31, 2016, March 31, 2017, and June 30, 2017, which revealed that Live had materially overstated its net cash provided by operations and had materially understated Live's debts maturing in the next fiscal year. ¶¶87-88. On this news, Live's share price fell $2.44 per share, or 15.5%, to close at $13.29 per share on February 15, 2018. ¶90.

**G.      The SEC Commences An Investigation And Live's Stock Price Drops**

On August 14, 2018, Live Defendants disclosed that on February 21, 2018, the SEC had commenced an investigation into "among other things the restatement of the Company's financial statements for the quarterly periods ended December 31, 2016, March 31, 2017, and June 30, 2017, and the acquisition of [Marquis], [Vintage Stock], and ApplianceSmart, Inc., and the change in auditors." ¶94. On this news, Live's share price dropped by $1.33 per share, or 11.7%, to close at $10.02 on August 15, 2018. ¶95.

**H.      Throughout The Class Period, Live Defendants Understated Isaac's FY 2016-2018 Compensation**

For FY 2016-2018, Live paid Isaac $315,000 for purported living expenses, but during the Class Period, Live Defendants claimed that Isaac had only been paid $162,000 for such expenses. ¶105. During FY 2016, Live paid Isaac $120,000 for living expenses. ¶96. But Live's 2016 Form 10-K and June 7, 2017 Proxy Statement stated that Isaac's FY 2016 compensation was comprised only of $200,000 in salary and $13,465 for an option award. ¶96. The 2016 Form 10-K stated that Live had "no written employment agreement" with Isaac. ¶97. On May 30, 2017, Live paid Isaac $30,000 for living expenses. ¶98. Live's 2017 Form 10-K and June 25, 2018 Proxy Statement stated that Isaac had received total compensation for FY 2017 of $254,000, comprised of $200,000 in salary and $54,000 in "All Other Compensation". ¶101. The 2017 Form 10-K stated that "All Other Compensation" included $54,000 that was paid to Isaac for FY 2017 and for FY 2016 to cover the "reasonable housing allowance to which Mr. Isaac is entitled to under his employment agreement." ¶101. Live paid Isaac $165,000 for living expenses for FY 2018, but Live's 2018 Form 10-K and June 25, 2019 Proxy Statement stated that Isaac's

FY 2018 compensation was comprised of $200,000 in salary and $54,000 in "All Other Compensation." ¶¶103-04.

### I. The SEC Files An Enforcement Action Against Live Defendants And JOI And Live's Stock Price Plummets Again

On August 3, 2021, the SEC issued a press release announcing that it had filed a formal complaint against Defendants (the "SEC Complaint"). ¶124. The SEC Complaint asserted 17 claims for violations of the federal securities laws and sought civil penalties, disgorgement, and permanent injunctive relief, including "permanently barring Jon Isaac and Johnson from acting as an officer or director of any issuer[.]"[5] The SEC Complaint revealed the contents of numerous emails and documents gathered over the course of its nearly four-year investigation, which evidenced that throughout the Class Period, Live Defendants lied to Live's investors, Live's accountants, and the Financial Industry Regulatory Authority. The SEC Complaint revealed that Live Defendants fraudulently backdated the Novalk Amendment to boost Live's FY 2016 financial results (SEC Complaint, ¶¶15-37), Live Defendants engaged in a scheme at year-end 2016 to artificially inflate Live's share price and profit from it (SEC Complaint, ¶¶43-77, 88), Defendants fraudulently engineered the ApplianceSmart SPA to avoid negative financial consequences at year-end 2017 (and fraudulently engineered the amendment thereto) (SEC Complaint, ¶¶91-109, 115-40), and Live Defendants materially understated Isaac's FY 2016-2018 compensation (SEC Complaint, ¶¶141-61). On this news, Live's share price plummeted by $29.08 per share, or *46%*, to close at $33.50 on August 4, 2021, on unusually heavy trading volume. ¶125. Live's share price continued to decline $7.74, or 23%, over the next four consecutive trading sessions, to close at $25.76 per share on August 10, 2021. ¶127.

### J. After The Class Period, The Risks Of Defendants' Fraud Continues To Materialize

On October 1, 2021, Live announced that Johnson and Live had agreed to "cease all of [their] employment-based relationships." ¶128. On October 4, 2021, Live announced that its fourth auditor during the Class Period had resigned. ¶129. Live Defendants and JOI moved to dismiss the SEC Complaint but the U.S. District Court for the District of Nevada denied the motions in their entirety

---

[5] Plaintiff's Request for Judicial Notice ("Pltf's RJN"), Exhibit ("Ex.") A (the "SEC Complaint") at ¶¶169-261 & Prayer for Relief VI.

(¶130), finding that the SEC had stated claims for, *inter alia*: (i) violations of §10(b) and Rules 10b-5(b) promulgated thereunder as to Isaac, Live, and Johnson for making material misrepresentations about the Novalk Amendment; (ii) violations of §10(b) and Rule 10b-5(b) promulgated thereunder as to Isaac and Live for materially misrepresenting Live's FY 2016 EPS as $8.92; (iii) violations of §10(b) and Rules 10b-5(a) and 10b-5(c) promulgated thereunder as to Isaac and Live for engaging in a scheme to artificially inflate Live's share price at year-end 2016; (iv) violations of §10(b) and Rule 10b-5(b) promulgated thereunder as to Live, Isaac, and Johnson for making material misrepresentations about the ApplianceSmart transaction; (v) violations of §10(b) and Rules 10b-5(a) and 10b-5(c) promulgated thereunder as to Live, Isaac, Johnson and JOI for engaging in a scheme to make false statements about the ApplianceSmart transaction, and; (vi) violations of §14(a) and Rule 14a-3 promulgated thereunder by misrepresenting Isaac's FY 2016-2018 compensation in Live's proxy statements. *See Sec. & Exch. Comm'n v. Live Ventures Inc.*, 2022 WL 17253784, at *4-6 (D. Nev. Nov. 28, 2022) (*"SEC v. Live"*).

### III.    APPLICABLE LEGAL STANDARDS DISFAVOR DEFENDANTS' MOTIONS

Even in cases subject to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), when ruling on a Rule 12(b)(6) motion to dismiss, "courts must … accept all factual allegations in the complaint as true[,]" (*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)), and "construe them in the light most favorable to the plaintiffs." *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1013 (9th Cir. 2005). Thus, a court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007).

### IV.    ARGUMENT: THE COMPLAINT ALLEGES EXCHANGE ACT VIOLATIONS

To state a claim under §10(b) of the Exchange Act and SEC Rule 10b-5(b), a plaintiff must allege: (1) a material misrepresentation or omission (*i.e.*, "falsity"); (2) scienter; (3) the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011); 17 C.F.R. §240.10b-5(b). Defendants challenge only falsity and scienter. As to these and all required elements, the Complaint is sufficient.

To allege a claim for scheme liability under §10(b) of the Exchange Act and Rules 10b-5(a) or (c), a plaintiff must allege: (1) that the defendant committed a deceptive or manipulative act, (2) in

furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance. *See In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1192 (D. Or. 2015); 17 C.F.R. §240.10b-5(b). Scheme liability claims are not subject to the PSLRA's heightened pleading requirements. *Galena,* 117 F. Supp. 3d at 1193. Defendants fail to challenge any of the elements of Plaintiff's scheme liability claim, and they thus have waived their right to assert such a challenge.

### A.    PLAINTIFF ALLEGES FALSITY UNDER RULE 10b-5(b)

A plaintiff need only allege facts giving rise to a "reasonable inference" that the challenged statement was false or misleading to allege falsity under Rule 10b-5(b). *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 797 (9th Cir. 2017). "Both the materiality and misleading nature of a misstatement or omission are usually questions for the trier of fact." *SEC v. Mozilo*, 2009 WL 3807124, at *9 (C.D. Cal. Nov. 3, 2009). Thus, a complaint must not be dismissed unless a misstatement or omission was "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance." *Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 967 (N.D. Cal. 2014).

### 1.    Statements About The Novalk Amendment

Live Defendants try to downplay the undisputed fact that they backdated the Novalk Amendment by over two months, arguing that they merely have a different interpretation of GAAP (MTD at 12-14). But GAAP is irrelevant to backdating a contract. Live Defendants did not even start "negotiating" the Novalk Amendment until November 30, 2016; Yunis signed the Novalk Amendment on December 19, 2016, and Isaac signed it sometime later. Contrary to Live Defendants' public statements, the effective date of the contract was not September 15, 2016 (¶¶148-49, 159, 171). Further, Live Defendants' statements about the circumstances of and the financial implications of the Novalk Amendment, such as that the amendment allowed Live to recognize $915,500 of "Other Income", were false and misleading (¶¶148-49, 151). Under ASC 855-10-25-3, an entity shall not recognize subsequent events that provide evidence about conditions that did not exist at the date of the balance sheet, but arose after the balance sheet date before financial statements are issued. Evidence about the Novalk Amendment did *not* exist at the time of the balance sheet date of September 30, 2016 because Live Defendants did not even start negotiating the amendment until November 30, 2016. Live Defendants proffer a different interpretation of the applicable GAAP provisions, but at best, raise premature factual

disputes that cannot be resolved at this juncture. *See Baron v. Hyrecar Inc.*, 2022 WL 17413562, at *5 (C.D. Cal. Dec. 5, 2022) ("Whether accounting practices are consistent with GAAP is a question of fact and the [c]ourt may not make such a factual determination at the pleadings stage.").

### 2.   Statements About Live's FY 2016 EPS

Live Defendants argue that Live's December 28, 2016 press release and 2016 Form 10-K "fully disclosed" the truth about how Live's FY 2016 EPS was calculated (MTD at 14). "Although not labeled as such, [Live] appears to be asserting the truth-on-the-market affirmative defense …. As a general rule, however, the truth-on-the-market defense is intensely fact-specific, so courts rarely dismiss a complaint on this basis." *Nguyen v. Radient Pharms. Corp.*, 2011 WL 5041959, at *7 (C.D. Cal. Oct. 20, 2011). Live Defendants have not met the "heavy burden of proof" to assert such a defense. *See id.* Further, "a statement, though literally accurate, may possess by virtue of the context or manner of its presentation, the ability to mislead investors. Statements must be considered in the context of their total presentation." *In re Iso Ray, Inc. Sec. Litig.*, 189 F. Supp. 3d 1057, 1067 (E.D. Wash. 2016) (even if statement that "Cesium-131 […] Treatment Reports […] 100% Survival Rate at 5 Years [ ]" was literally true, it created a "false and misleading impression that the 100% survival rate … is attributable to patients having received Cesium-131 … when, in reality, patients undergoing [ ] surgery alone fared statistically the same.").

Live's December 28, 2016 press release was false and misleading because it described Live's $8.92 EPS in the context of its *FY 2016* results—the very title of the press release was, "***Live Ventures Announces Biggest Year … Achieving Record Earnings of $8.92 Per Share*** With Continued Growth Anticipated in 2017." The press release continued on, stating, "***Reporting its most successful year*** … Live Ventures reported a record $79M in revenues ***… representing [EPS] of $8.92[.]***" It makes no difference if Live Defendants disclosed how the $8.92 EPS was calculated "as of the date of the press release" (MTD at 15:4-6)—they created the materially false and misleading impression that Live's FY 2016 EPS was $8.92, when in fact, it was $6.33.[6]

---

[6] EPS is calculated by dividing a company's net profit by the weighted average number of common shares outstanding during the period. For FY 2016, Live's net profit was purportedly $17,829,857 and the weighted average number of outstanding common stock was 2,815,072 shares. Def's RJN, Ex. A, p. 28 & F-3.

1002691.2        Case No. 2:21-cv-01517-CDS-EJY                                                        10

Moreover, contrary to Live Defendants' assertion that Live's 2016 Form 10-K disclosed "the facts surrounding the outstanding share count" (MTD at 15:11-19) the Form 10-K did not disclose that Isaac locked up ICG's shares to bolster Live's EPS as falsely reported in Live's December 28, 2016 press release so that Live Defendants could profit from Live's artificially inflated share price.

### 3.    Statements About Stock Promotions

Live Defendants curiously argue that Live's January 9, 2017 letter to shareholders did *not* fail to disclose that Live engaged in promotional activity. MTD at 16. But the letter contained no disclosure that Live engaged in promotional activity. Instead, the letter stated, "***Had** our company truly engaged in any type of promotional activity* … [we] would have sold shares." Couching promotional activity as hypothetical conduct, when Live Defendants had already engaged in such activity, was false and misleading. *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) (statements couching issue as hypothetical when issue had already occurred were false and misleading, as "learning that stop-work orders *might* be issued is quite different from knowing they were in *fact* issued.")

Live Defendants argue that their statements were immaterial because it is not illegal to pay stock promoters. MTD at 16. But under the federal securities laws, once a defendant chooses to speak on a topic, it has an affirmative duty to tell the whole truth about that topic—regardless of whether the topic involves illegal conduct. *See In re Acadia Pharms. Inc. Sec. Litig.*, 2020 WL 2838686, at *7 (S.D. Cal. June 1, 2020) (defendant had no duty to accuse itself of wrongdoing, but where defendant spoke about its commercialization strategy, which included giving kickbacks to physicians, defendant had a duty to disclose the kickbacks). It is unclear why Live Defendants, after choosing to speak on the topic, did not simply tell the truth since, as Live Defendants point out, it is legal to pay stock promoters. Nonetheless, materiality is a question for the trier of fact that is inappropriately decided on a motion to dismiss. *See Mozilo*, 2009 WL 3807124, at *9.

### 4.    Statements About The ApplianceSmart Acquisition

Live Defendants argue that their statements about the ApplianceSmart acquisition date of December 30, 2017 and that "[t]he shares of [ApplianceSmart] Stock were delivered into escrow" were not false or misleading because the SPA was attached as an exhibit to Live's SEC filings, and thus, "the transaction's terms [we]re fully disclosed." MTD at 17-18. Again, Live Defendants assert a truth-on-

the-market defense but fail to "prove that the information that was withheld or misrepresented was transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by [an] insider's one-sided representations." *See Nguyen*, 2011 WL 5041959, at *6-7 (alterations in original) (defendants failed to meet necessary burden to show that public disclosure of an agreement in its entirety sufficiently informed the public of alleged omitted details about the relationship between the parties to the agreement).

Moreover, the mere public disclosure of an agreement is not enough to defeat "allegations that a company failed to disclose material facts relating to a contractual agreement[.]" *See Nguyen*, 2011 WL 5041959, at *6. Numerous courts have found such allegations "sufficient to plead a material misstatement or omission." *Id.* Although the SPA was attached as an exhibit to Live's Q1 2018 Form 10-Q and 2017 Form 10-K[7], the SPA did not include *any* terms of the MidCap agreement, such as the fact that MidCap *still had possession of ApplianceSmart's stock certificate* at the time of the purported acquisition. Unlike *In re Merrill Lynch Auction Rate Sec. Litig.*, 704 F. Supp. 2d 378, 392 (S.D.N.Y. 2010), *aff'd.*, 671 F.3d 120 (2d Cir. 2011), upon which Live Defendants rely (MTD at 17), Live Defendants made no disclosures that would have led a reasonable investor to realize that, contrary to Live Defendants' statements and the SPA itself (¶¶163, 165, 167, 175, 176, 180, 182, 184, 186, 187), *inter alia,* as of December 30, 2017, ApplianceSmart's stock certificate had not been and could not be delivered into escrow, and Live had not acquired, nor could it acquire, ApplianceSmart. *See Nguyen*, 2011 WL 5041959, at *5-6 (that defendant attached to an SEC filing its agreement with the Mayo Clinic, which provided that the parties would work together on a clinical study, did not shield defendant from liability for stating that it was conducting a clinical study with the Mayo Clinic, when, in fact, defendant was not at the time conducting such a study). At the very best, Live Defendants' arguments raise "a question of fact inappropriate for a motion to dismiss." *See SEC v. Live,* 2022 WL 17253784, at *5 (whether Defendants made material misrepresentations about the ApplianceSmart transaction was a factual question that could not be decided on a motion to dismiss).[8]

---

[7] Contrary to Live Defendants' assertions, the SPA was not attached as an exhibit to Live's January 5, 2018 Form 8-K, January 8, 2018 Press Release, or 2018 Form 10-K.

[8] Further, Live Defendants simply ignore allegations that their statements about the "amendment" to the SPA were also false. (footnote continued)

### 5.    Statements About Isaac's Compensation

Live Defendants argue that they truthfully disclosed Isaac's compensation under Isaac's employment agreement with Live (MTD at 18), thus impermissibly asking the Court to ignore their wildly inconsistent statements about Isaac's employment agreement. For example, Live's 2016 Form 10-K, expressly *disclaimed the existence* of any employment agreement with Isaac, but Live's 2017 and 2018 Form 10-Ks stated that Isaac had had an employment agreement with Live since January 1, 2013.[9] At least one of these statements about Isaac and Live's employment agreement was false and misleading. *See Sec. & Exch. Comm'n v. Premier Holding Corp.*, 2020 WL 8099514, at *8 (C.D. Cal. Nov. 30, 2020) (representations that company had no employment agreement with defendant despite the existence of such an agreement were materially false and misleading).

Live Defendants affirmatively concede that Live's Form 2016 10-K did not disclose Isaac's living expense reimbursement and Live Defendants effectively concede that the "actual" compensation Isaac received for FY 2016-2018 was greater than Live publicly disclosed (MTD at 18:21:-25). Yet Live Defendants argue that their statements were not false or misleading because they disclosed how much Isaac *accrued* in compensation. However, "[w]hether the compensation is actual or accrued is irrelevant; [Live Defendants] had a duty to disclose all compensation" because they decided to speak on that topic. *See SEC v. Live,* 2022 WL 17253784, at *5 (rejecting Live Defendants' argument that disclosure of Isaac's "accrued" expenses was sufficient).[10] Live Defendants argue that their representations were not material, but courts in this Circuit have found similar representations actionable. *See e.g., Premier Holding*, 2020 WL 8099514, at *8 (failure to disclose reimbursements for personal expenses as compensation rendered statements about defendant's compensation materially

---

For example, Live Defendants represented that Live had made a partial payment under the SPA to JOI before March 31, 2018 (¶¶184, 186), but in fact, at the time of their statements, Live had made zero payments under the SPA (¶241).

[9] Further, contrary to Live's statements in its 2017 and 2018 Forms 10-K that the effective date of its employment agreement with Isaac was January 1, 2013, as Live Defendants note in their motion, Live's 2013 Form 10-K stated that the effective date of Isaac's employment agreement was *February 14, 2013* (MTD at 18l, Def's RJN Ex.1 at 26-27).

[10] Even if, *arguendo,* Live Defendants disclosed how much Isaac "accrued" in expenses, Live Defendants' statements were still false and misleading. For example, Live's 2018 Form 10-K stated that Isaac was "entitled to reimbursement for reasonable business expenses … including a reasonable housing expense, not to exceed $7,000 per month [or $84,000 per year]" and that Isaac's FY 2018 compensation included $54,000 of "accrued" expense reimbursements. But Isaac was paid $165,000 in expense reimbursements in FY 2018. Thus, Isaac was reimbursed in an amount almost two times greater than his "employment agreement" allowed, and Isaac was also reimbursed for more than three times what he had "accrued"— both of which warrant disclosure.

false and misleading).

### 6. Live's Financial Statements Were Materially False And Misleading

"Under GAAP, previously issued financial statements should be restated only to correct material accounting errors that existed at the time the statements were originally issued …. [T]he mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made." *Sudunagunta v. NantKwest, Inc.*, 2017 WL 8810760, at *9 (C.D. Cal. Sept. 20, 2017). During the Class Period, Live Defendants restated Live's financial results for five quarterly periods. ¶¶86, 121. Accordingly, the Complaint sufficiently alleges that Live's financial statements for the quarterly periods ended December 31, 2016, March 31, 2017, June 30, 2017, December 31, 2019, and March 31, 2020 were materially false and misleading when made. Moreover, Live's FY 2016 financial results were materially false and misleading by recognizing $915,500 in "other income" due to the backdated Novalk Amendment, which increased Live's FY 2016 pre-tax income by *20%.* Further, Live's financial results for the quarter ended December 31, 2017 were materially false and misleading by recognizing a "bargain purchase gain" of about $3.8 million due to the falsely dated ApplianceSmart acquisition, which turned what would have been an unprofitable quarter for Live into a profitable quarter. *See Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1014 (N.D. Cal. 2020) (where improperly recognizing royalties before sales occurred allowed defendant to report a "significant growth in revenue … instead of the alleged true state of affairs, a stark decline[,]" defendant's representations regarding revenue were materially misleading).

### 7. Live Defendants Violated Their Disclosure Duties Under Reg. S-K

Live Defendants do not dispute that they violated their disclosure duties under Items 303 and 105 of SEC Regulation S-K and have thus waived any challenge thereto.[11] Item 303 requires the disclosure of "any known trends of uncertainties that have or that [it] reasonably expects will have a material favorable or unfavorable impact on [its business]." 17 C.F.R. §229.303(b)(2)(ii). Live's pattern of backdating contracts, understating Isaac's compensation, attempts to artificially inflate Live's

---

[11] *See West v. State Farm Mut. Auto. Ins. Co.*, 489 F. App'x 153, 154 (9th Cir. 2012) ("[i]ssues not raised in the opening brief usually are deemed waived.").

financial results and share price, and GAAP violations constituted trends or uncertainties that Live Defendants were obligated to disclose. Plaintiff has "plausibly pled that [Live Defendants] w[ere] aware of [these issues] at the time of [their] disclosures, and that future [deficiencies] would have an unfavorable impact" on Live's business. *See Pirani v. Slack Techs., Inc.*, 445 F. Supp. 3d 367, 386 (N.D. Cal. 2020), *aff'd*, 13 F.4th 940 (9th Cir. 2021).

Live Defendants further violated Item 105 of Regulation S-K, which requires an issuer to disclose "the most significant factors that make [an investment] speculative or risky." *See* 17 C.F.R. §229.105. Live Defendants' risk disclosures were insufficient under Item 105. For example, Live Defendants' boilerplate disclosures described as *hypothetical* the risks of ICG's concentrated ownership of Live's common shares (¶144) but did not disclose that these risks were *then-existing*. *See Mingbo Cai v. Switch, Inc.,* 2019 WL 3065591, at *6 (D. Nev. July 12, 2019) ("boilerplate risk factors" that did not indicate "the specific risks arising from Switch's new sales strategy" violated Item 105). Moreover, Live Defendants' risk disclosures themselves were false and misleading for failing to disclose that, *inter alia*, Isaac had taken advantage of Live's concentrated common share ownership to falsely overstate Live's FY 2016 EPS in Live's December 28, 2016 press release to try to profit from Live's artificially inflated share price.

**B.    PLAINTIFF ALLEGES SCHEME LIABILITY UNDER RULE 10b-5**

**1.    Scheme Liability Does Not Require Plaintiff To Allege A False Statement**

Defendants grossly misrepresent the law on scheme liability under Rules 10b-5(a) and (c), arguing that Plaintiff must allege the "existence of a material misrepresentation or omission." MTD at 11; JOI MTD at 13 (citing *Lorenzo v. SEC*, 139 S.Ct. 1094, 1104 (2019)).[12] In *Lorenzo*, the Supreme Court held that a person who disseminates a false or misleading statement, but who is not a maker of the statement for purposes of liability under Rule 10b-5(b), can nonetheless be held liable under §10(b)

---

[12] Defendants also mis-cite *Halliburton Co. v. Erica P. John Funds, Inc.*, 573 U.S. 258, 267 (2014), which dealt with burden shifting at the class certification stage. *Halliburton* does not require a material misrepresentation or omission as a predicate to scheme liability under Rules 10b-5(a) and (c), and *Halliburton*'s partial quotation of the false statement language from Rule 10b-5(b) does not impose such an unwritten requirement into Rules 10b-5(a) and (c). To require a material misrepresentation or omission under all three prongs of Rule 10b-5, as Defendants suggest, would render sub-sections (a) and (c) meaningless—and would thus violate a basic canon of statutory construction. *Halliburton* itself cites to *Matrixx Initiative, Inc. v. Siracusano*, 563 U.S. 27 (2011), which makes clear that a material misstatement or omission is only *one* way a defendant violates §10(b) of the Exchange Act and Rule 10b-5 thereunder. *Id.* at 37.

for participating in a fraudulent scheme in violation of Rules 10b-5(a) and (c). *Id.* at 1098-99. Nothing in *Lorenzo* or *Halliburton* supports Defendants' argument that the existence of a false statement is *required* to allege scheme liability under Rules 10b-5(a) and (c). Defendants' attempt to tether Plaintiff's scheme liability claims to a false statement not only misstates *Lorenzo*, it ignores the law in this Circuit, which makes clear that scheme claims can "overlap" with false statement claims, but there certainly is no *requirement* of a false statement to serve as a predicate for a scheme claim. *See, e.g.*, *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 709 (9th Cir. 2021) (holding post-*Lorenzo* that scheme claims under Rules 10b-5(a) and (c) can overlap substantially with false statement and omission claims under Rule 10b-5(b)).[13]

### 2. Plaintiff's Scheme Liability Claims Should Be Sustained Because Defendants Fail To Contest Them

Plaintiff clearly alleges the deceptive conduct giving rise to Defendants' scheme liability. *E.g.*, ¶¶4-10, 15-18, 51-68 (titled "Live Engages In A Scheme…"), 223, 225, 239-42, 244. Plaintiff's "THIRD CLAIM" explicitly alleges violations of Rules 10b-5(a) and 10b-5(c) against Live, Isaac, Johnson, and JOI. ¶¶236-46.[14] Defendants completely ignore the Complaint's conduct-based allegations and the elements of scheme liability under Rules 10b-5(a) and (c). Instead, they incorrectly argue that a false statement or omission is required to allege scheme liability (MTD at 11; JOI MTD at 13) and conclude, based on this fundamental misstatement of the law, that scheme liability is not alleged because falsity is lacking. Because Defendants fail to challenge scheme liability, they waive the argument, and Plaintiff's scheme claims must be sustained. *See Alphabet*, 1 F.4th at 709 (reversing district court dismissal of 10b-5(a) and (c) claims where "[the defendant] had not targeted those claims in its motion to dismiss"); *Aqua Metals*, 2019 WL 3817849, at *8 (denying motion to dismiss 10b-5(a) & (c) claim,

---

[13] *See Galena*, 117 F.Supp.3d at 1192-94 ("Rules 10b–5(a) and (c)…prohibit manipulative or deceptive acts, versus material misrepresentations or omissions."); *In re Aqua Metals, Inc. Sec. Litig.*, 2019 WL 3817849, *9 (N.D. Cal. Aug. 14, 2019) (denying motion to dismiss scheme claims, and holding that defendants' "acts are sufficiently alleged to have been fraudulent in and of themselves, without depending on the alleged misrepresentations.").

[14] JOI argues, without citing any supporting authority, that Plaintiff's omission of JOI in the Prayer for Relief (which was a scrivener's error) warrants dismissal of the Complaint (JOI MTD at 28). As Plaintiff can remedy any deficiencies in the Prayer for Relief through amendment, dismissal of JOI on these grounds is not appropriate. *See San Jose Options, Inc. v. Ho Chung Yeh*, 2014 WL 1868738, at *8 n.6 (N.D. Cal. May 7, 2014) (granting leave to amend to, *inter alia,* remedy deficiencies in prayer for relief).

noting "Defendants did not challenge the scheme liability claim in their opening brief, and for this reason alone the Court could deny their motion to dismiss this claim") (citing *Eberle v. City of Anaheim*, 901 F.2d 814, 817-18 (9th Cir. 1995) (issues not raised in opening brief may not properly be raised for the first time in reply brief); *City of Roseville Employees' Ret. Sys. v. Orloff Fam. Tr. UAD 12/31/01*, 484 F.App'x 138, 141, n.2 (9th Cir. 2012) (party who failed to develop argument in opening brief waived the issue)).

### 3.    The Complaint Sufficiently Details The Alleged Scheme To Defraud

While Defendants' failure to challenge the scheme claims is sufficient to sustain the claims and require Defendants to answer them, the Court also should uphold the claims on their merit. The Complaint details a compelling account of Defendants' deceptive conduct. First, Live Defendants engaged in a scheme at year-end 2016, whereby they sought to, and did, artificially inflate Live's share price and tried to profit from it. Live Defendants engineered and backdated the Novalk Amendment so that it would increase Live's FY 2016 pre-tax income by 20%, hired stock promoters to tout Live's soon-to-be-released FY 2016 results, locked up ICG's shares of Live's common stock, and then issued a press release that claimed Live's FY 2016 EPS was $8.92 due to ICG locking up its shares of Live's common stock. The same day that Live issued that press release, Isaac instructed Live's brokerage to sell up to 20,000 shares of Live's stock if it reached certain per-share amounts and Isaac placed 28 good till cancel limit orders for the sale of up to 10,674 of Live's shares from Yunis' brokerage account, which Isaac had access to. Later, Live Defendants attempted to cover up their conduct by denying that Live ever engaged stock promoters or tried to profit off of Live's artificially inflated share price. *See Galena*, 117 F.Supp.3d at 1193-94 (allegations that defendants engaged in a scheme to manipulate company's stock price, which included hiring authors to public promotional materials, "the planning and execution of well-timed social media posts", and the "attempted cover-up" of the relationship between defendants and its investor relations firms stated a claim for scheme liability).

Second, at year-end 2017, Defendants engaged in a scheme whereby they engineered Live's acquisition of JOI's subsidiary, ApplianceSmart, and claimed the acquisition date was December 30, 2017, despite the fact that ApplianceSmart could not be acquired because it was in the possession of MidCap, so Live could report a profitable instead of unprofitable quarter for the quarterly period ended

December 31, 2017, and so JOI could avoid the tax consequences from selling real property for a gain during its FY 2017. Later, when Live could not come up with the money to pay for ApplianceSmart, Defendants came up with a scheme to treat the consideration ApplianceSmart paid to MidCap as part of the purchase price that Live had delivered to JOI. *See Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1191 (C.D. Cal. 2007) (allegations that defendants backdated stock options and filed incorrect financial statements stated a scheme liability claim).

### C.      **PLAINTIFF ALLEGES SCIENTER**

To assess whether a plaintiff has alleged scienter, "the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Mulderrig*, 492 F. Supp. 3d at 1024. "The inference that the defendant acted with scienter need not be irrefutable, i.e., of the smoking-gun genre, or even the most plausible of competing inferences." *See Tellabs*, 551 U.S. at 324.

### 1.      **The Complaint's Motive Allegations Support Scienter**

While not required to allege scienter, "at the pleading stage," "motive and opportunity" may "be considered as circumstantial evidence" of scienter. *See Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000). Here, Defendants' motive and opportunity to conceal the truth bolsters a strong inference of scienter.

Live had taken on a tremendous amount of debt in the months leading up to the start of the Class Period—between September and December of 2016, Live's debts increased from about $15.9 million to $75 million (¶206). Among those debts was a loan from Capitala Private Credit Fund V, L.P. ("Capitala") for about $30 million (¶206). Live Defendants admitted that as of September 30, 2017, Live had not been in compliance with the terms of its agreement with Capitala (¶207), and that as of December 31, 2017, Live had not regained compliance (¶85). Thus, Live Defendants' motive to conceal the truth was not based on a generic desire of every company to raise capital—Defendants were struggling to keep Live afloat. *See Flynn v. Sientra, Inc.*, 2016 WL 3360676, at *15 (C.D. Cal. June 9, 2016) (that defendants "were motivated to conceal the contamination at the Silimed plant from investors so that they could raise enough money in the SPO to keep Sientra afloat and prevent a default on its

loan" supported scienter).[15] Moreover, with respect to the ApplianceSmart transaction, Defendants were motivated to turn what had been an unprofitable quarter into a profitable quarter for Live and prevent JOI from facing a large tax liability due to its sale of real property at a gain during its fiscal year.

Further, Live Defendants were motivated to falsely overstate Live's FY 2016 EPS so that they could profit from Live's artificially inflated share price. On December 23, 2016, Isaac stated in an email to Live's board of directors that locking up ICG's shares would "make a good announcement" and "bring[] a reduced share count on the common shares …. [which] will make our EPS look even better." ¶57. On December 27, 2016, Isaac told Live's brokerage that Live's "numbers [were] coming out tomorrow" and that it "could be a high volume day." ¶58. In the early morning of December 28, 2016, Live issued a press release falsely stating that its FY 2016 EPS was $8.92. Following the issuance of the press release, on that same day, Isaac instructed Live's brokerage to sell up to 20,000 shares if Live's share price hit certain thresholds (¶9). And throughout that same day, Yunis' brokerage account, which Isaac had access to, was repeatedly accessed from an IP address associated with Isaac's Las Vegas residence, and 28 "good till cancel" limit orders for the sale of 10,674 Live shares were placed. ¶208. Five of the "good till cancel" limit orders were executed and generated gross proceeds of approximately $48,000. ¶63. Live's share price rose but did not go as "busurk" as Isaac had hoped, but had all the attempted transactions occurred, Defendants would have realized gross profits of over $1.1 million. ¶208. Live Defendants baselessly argue that it "is of no moment" that they tried to profit from Live's artificially inflated share price at year-end 2016. MTD at 16:6-10. But Live Defendants offer no "innocent explanations" as to why their "trading-related conduct [was] economically rational." *See In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1187 (C.D. Cal. 2008). At minimum, any "innocent explanations" of Live Defendants' attempts to sell Live's shares in the wake of issuing Live's false December 28, 2016 press release are "at least as cogent and compelling as inferences that encourage a scienter finding[.]" *See id.*

---

[15] *See In re Portal Software, Inc. Sec. Litig.*, 2005 WL 1910923, at *12 (N.D. Cal. Aug. 10, 2005) ("plaintiffs' contention that defendants were motivated to inflate artificially Portal's stock price in the short term in order … and obtain much-needed capital does allege facts of a palpable motive for fraud" that was "stronger than the generic desire to raise capital which can be attributed to every company; *In re Am. Apparel, Inc. S'holder Litig.*, 2013 WL 10914316, at *30 (C.D. Cal. Aug. 8, 2013) ("The fact that [defendant] was in a period of turmoil … and may have needed outside capital is strong evidence that the company acted with fraudulent intent[.]").

### 2.    Defendants Ignored A Plethora Of Red Flags

"At the pleading stage, courts have recognized that allegations of [GAAP] violations, coupled with allegations that significant red flags were ignored, can suffice to withstand a motion to dismiss." *Batwin v. Occam Networks, Inc.*, 2008 WL 2676364, at *17 (C.D. Cal. July 1, 2008). In addition to Defendants' GAAP violations, Defendants ignored a multitude of additional red flags, which when taken together, support a strong inference of scienter.

### (a)    The GAAP Provisions Were Simple And Straightforward

"[T]he simplicity of the accounting principles violated" supports an inference that Defendants acted with scienter that is at least "just as likely … as an inference of innocent and unknowing behavior." *See Backe v. Novatel Wireless, Inc.*, 642 F.Supp.2d 1169, 1186 (S.D. Cal. 2009). Defendants argue that they simply have a different opinion about the application of relevant GAAP provisions to "the ultimate accounting treatment for the Novalk Amendment, the calculation of FY 2016 EPS, and the acquisition date of ApplianceSmart." MTD at 21:3-21; JOI MTD at 24-25.

First, try as they might to cabin the Complaint's scienter allegations into disagreements about GAAP, Defendants' scienter goes far beyond GAAP violations. GAAP has nothing to do with Defendants' decision to backdate a contract or transaction. With respect to the Novalk Amendment, it is common sense that a contract cannot be effective months before it was even contemplated. With respect to the ApplianceSmart acquisition, it is common sense that one has not acquired something that is still fully in the possession of another. These basic principles support an inference that is at least as compelling as any non-culpable inference, that Live Defendants intentionally misrepresented the circumstances of the Novalk Amendment, including its effective date, and that Defendants intentionally misrepresented the circumstances of the ApplianceSmart acquisition, including the acquisition date. With respect to Live's FY 2016 EPS, Live Defendants undoubtedly knew that Live's fiscal year ended on September 30, and thus knew that it was false to state that Live's EPS nearly two months *after the end of the fiscal year*, represented Live's FY 2016 EPS.

Second, the relevant GAAP that Defendants violated were simple and not reasonably susceptible to their interpretations. As described above (*see* Sec. IV(A)(1), *supra*), Live Defendants violated ASC 855-10-25-3 by recognizing the Novalk Amendment in Live's FY 2016 financial results because

evidence about the Novalk Amendment did not exist at the time of the balance sheet date. ASC 805-10-25-7 provides that the acquisition date is generally "the date on which the acquirer legally transfers the consideration, acquires the assets, and assumes the liabilities of the acquiree". ¶80. Defendants violated straightforward GAAP rules by recognizing the ApplianceSmart acquisition date as December 30, 2017, because as of that date, *none* of these things had occurred.[16]

### (b)   The Magnitude And Impact Of Defendants' GAAP Violations

Accounting violations "that have a significant impact on core business operations can lead to a strong[] inference" of scienter. *See Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp.3d 1029, 1042 (N.D. Cal. 2016) (violations that impacted income and profits supported scienter). Live Defendants' GAAP violations significantly impacted Live's FY 2016 financial results by increasing Live's pre-tax income by 20%. Defendants' GAAP violations impacted Live's financial results for the quarter ended December 31, 2017, by turning Live's unprofitable quarter into a profitable quarter and shielding JOI from a tax liability that would have negatively impacted its FY 2017 results. Live's restatement on February 14, 2018 revealed that Live Defendants had materially understated Live's debts maturing in the next fiscal year and materially overstated Live's net cash provided by operations for each of the quarters ended December 31, 2016, March 31, 2017, and June 30, 2017. Live understated its debts maturing in the next fiscal year by 70%, 72.5% and 74.8%, respectively, and overstated Live's net cash provided by operations by $1.8 million for each restated quarter, or by 36%, 35% and 20%, respectively. ¶¶212-13. "These were not minor accounting errors. To the contrary, they dramatically

---

[16] *See In re Microstrategy, Inc. Sec. Litig.*, 115 F. Supp.2d 620, 637, 650-56 (E.D. Va. 2000), where the GAAP provisions at issue could be "reduced, in essence, to the simple principle that revenue cannot be recognized for unexecuted contracts and/or where there are significant obligations and/or contingencies relating to such contracts[,]" the court found a strong inference of scienter as "no reasonable accountant would have made the same decisions with the same facts."

Further supporting scienter is that Johnson, who served as Live's and JOI's CFO, and who helped engineer both fraudulent schemes alleged in the Complaint, was a certified public accountant. *See Richard v. Nw. Pipe Co.*, 2011 WL 3813073, at *4 (W.D. Wash. Aug. 26, 2011) ("defendants, who were both CPAs and had extensive accounting experience, should have known of the falsity of their statements.")

Defendants argue that scienter is negated because "Live's outside auditors also reviewed the accounting treatment selected by Defendants and did not raise any concerns" (MTD at 23:7-14; JOI MTD at 26-27). But the SEC's investigation revealed that Live lied to its outside accountants about the Novalk Amendment (SEC Complaint, ¶¶38-42) and about the ApplianceSmart transaction (SEC Complaint, ¶¶110-14). *See In re Am. Apparel, Inc. S'holder Litig.*, 2013 WL 10914316, at *29 (C.D. Cal. Aug. 8, 2013) (allegations that defendant withheld financial information from auditor supported inference that auditor's "going concern analysis was incomplete and misleading."). Further, a clean audit opinion alone cannot negate scienter. *See In re Ramp Networks, Inc. Sec.*, 201 F. Supp. 2d 1051, 1074 n.6 (N.D. Cal. 2002) (rejecting argument that scienter cannot be shown in the face of a clean audit opinion).

Case No. 2:21-cv-01517-CDS-EJY                                          21

affected [Defendants]' financial results, and in ways that a typical corporate executive should have noticed them." *See Magnachip*, 167 F.Supp.3d at 1042.[17] On August 14, 2020 Live restated its financial statements for the quarters ended December 31, 2019 and March 31, 2020. ¶112. That Live's accounting violations impacted its financial results at different points over the course of at least four fiscal years further supports scienter. *See Magnachip,* 167 F.Supp.3d at 1042 (accounting errors that are "pervasive over a long period of time" support scienter).

(c)    <strong>Live Lacked Effective Internal Controls</strong>

Live Defendants admitted that Live lacked adequate internal control over its financial reporting for the entire Class Period. ¶¶66-67, 75, 108, 119, 123. The sole instance during the Class Period that Live Defendants claimed Live had effective internal controls was later admitted by Live to be a "typographical error". ¶¶107-08. Due to Live Defendants' undisputed awareness of Live's lengthy history of ineffective internal controls, the inference of scienter as to statements about the Novalk Amendment, Live's FY 2016 financial results, Live's financial results for the quarter ended December 31, 2017, Live's financial results for the five restated quarters, and the ApplianceSmart transaction, "is at least as compelling as inferring that [Live Defendants] were simply unaware of [Live]'s practices when the statements were made, or taken by surprise when the market took an unexpected turn for the worse." *See In re New Century*, 588 F. Supp. 2d 1206, 1230 (C.D. Cal. 2008) (defendant's "prior knowledge of problems with internal controls" supported scienter); *Stocke v. Shuffle Master, Inc.*, 615 F. Supp. 2d 1180, 1191 (D. Nev. 2009) (defendant's acknowledgment that "internal control deficiencies still existed, and among other things, that [defendant] lacked adequate resources in their accounting and finance departments" supported scienter).

(d)    <strong>Live Cycled Through Four Auditors During The Class Period</strong>

"Courts have held the ending of a relationship between a company and its auditor, whether through termination by the company or resignation by the auditor, under similar circumstances, can support an inference of scienter." *Fryman v. Atlas Fin. Holdings, Inc.*, 2022 WL 11365777, at *27 (N.D.

---

[17] *See Commtouch Software Ltd. Sec. Litig.*, 2002 WL 31417998, at *9 (N.D. Cal. July 24, 2002) ("size and character of the restatement" supported scienter where defendant overstated revenue by over 20%); *Batwin*, 2008 WL 267364, at *6 (understating net loss by 9% supported scienter); *Mulderrig*, 492 F.Supp.3d at 1014, 1025-26 (GAAP violations, which allowed defendant to report quarterly revenue growth as 19% when in fact, revenue declined by 27%, supported scienter).

Ill. Apr. 18, 2022) (citing cases). During the Class Period, Live dismissed one auditor and three auditors resigned; Live's final auditor during the Class Period resigned shortly after the end of the Class Period. On April 27, 2017, Live "dismissed" Anton & Chia, LLP, which had audited Live's FY 2015 and 2016 financial statements, and engaged BDO USA, LLP ("BDO"). ¶74. On January 29, 2018, BDO, which only audited Live's financial statements for FY 2017, "informed Live [ ] that it would not stand for re-election" as Live's auditor. ¶22. On February 6, 2018, Live engaged SingerLewak LLP as its auditor. ¶81. On October 12, 2018, SingerLewak, which did not audit or provide an opinion on any of the Company's financial statements during its tenure resigned as Live's auditor. ¶24. The multitude of and the short-lived nature of Live's Class Period auditors supports an inference that is at least as compelling as any non-culpable inference that rather than correct Live's accounting deficiencies, Live Defendants kept in place improper accounting practices, which prompted the dismissal and resignations of Live's auditors. *See Batwin*, 2008 WL 2676364, at *13 (allegation that defendants terminated independent auditor and kept improper accounting practices in place supported scienter).

### 3.    The SEC's Investigation And Findings Support Scienter

Government investigations contribute to the "circumstances that add up to a strong inference of scienter." *In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 820 (N.D. Ill. 2017) (SEC and DOJ investigations supported scienter). That the SEC investigated Defendants for the conduct that forms the basis of Plaintiff's allegations bolsters the inference of scienter. *See In re Toyota Motor Corp. Sec. Litig.*, 2012 WL 3791716, at *6 (C.D. Cal. Mar. 12, 2012) (National Highway Safety Traffic Safety Administration investigations before and during the class period permitted an inference that supported defendant's scienter); *Magnachip*, 167 F. Supp. 3d at 1043 ("SEC's ongoing investigation" into defendant was "part of a broader picture from which a court may, at the initial pleading stage, infer a compelling claim of scienter."). Further, after a nearly four-year investigation, the SEC brought a civil enforcement action against Defendants based on its findings. The SEC Complaint revealed the contents of numerous emails and documents that laid bare Defendants' fraudulent schemes, and the materially false and misleading nature of Defendants' statements. *See In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 974 (N.D. Cal. 2009) (among "the most relevant allegations" supporting scienter was that "[i]n an independent investigation, the SEC concluded that" defendants had, *inter alia,* been on notice

"of significant internal control weaknesses …. [yet] failed to implement and maintain adequate internal controls and falsely certified that [defendant]'s financial statements and books and records were accurate.").

### D.     PLAINTIFF ALLEGES A VIOLATION OF SECTION 20(a)

"Section 20(a) provides derivative liability for those who control others found to be primarily liable under the [Exchange] Act." *Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1205 (N.D. Cal. 2012). Defendants' sole argument against §20(a) liability is that Plaintiff fails to plead an underlying primary violation (MTD at 24; JOI MTD at 27-28). As described above, Plaintiff has sufficiently alleged a predicate violation of §10(b) of the Exchange Act and thus has sufficiently alleged a violation of §20(a).

## V.     CONCLUSION

For the foregoing reasons, Defendants' motions should be denied in their entirety. In the alternative, should the Court grant any portion of Defendants' motions, Plaintiff respectfully request leave to amend the Complaint, as amendment would not be futile. *See Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052-53 (9th Cir. 2003) (district court abused its discretion in granting motion to dismiss with prejudice, noting leave to amend should be granted with particular liberality in PSLRA cases); *McMullen v. Fluor Corp.*, 81 F. App'x 197, 201 (9th Cir. 2003) (district court erred in denying plaintiff "another opportunity to meet the PSLRA's strict standards.").

Dated:  June 20, 2023                                    Respectfully Submitted,

                                                         By:  *s/ Natalie S. Pang*
                                                         Robert V. Prongay
                                                         Natalie S. Pang (admitted *pro hac vice*)
                                                         GLANCY PRONGAY & MURRAY LLP
                                                         1925 Century Park East, Suite 2100
                                                         Los Angeles, California 90067
                                                         Tel. (310) 201-9150

                                                         *Attorneys for Lead Plaintiff*