GLANCY PRONGAY & MURRAY LLP
Robert V. Prongay
Natalie S. Pang (admitted *pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com
        npang@glancylaw.com

MUEHLBAUER LAW OFFICE, LTD.
Andrew R. Muehlbauer, Esq.
Nevada Bar No. 10161
7915 West Sahara Ave., Suite 104
Las Vegas, Nevada 89117
Telephone: (702) 330-4505
Facsimile: (702) 825-0141
Email: andrew@molegal.com

*Attorneys for Lead Plaintiff*

### UNITED STATES DISTRICT COURT

### DISTRICT OF NEVADA

| | |
|---|---|
| DANIEL E. SIEGGREEN, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>LIVE VENTURES INCORPORATED, JON ISAAC, and VIRLAND A. JOHNSON,<br><br>Defendants. | Case No. 2:21-cv-01517-CDS-EJY<br><br>**DECLARATION OF NATALIE S. PANG IN SUPPORT OF LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE AMENDED CLASS ACTION COMPLAINT** |

Case No. 2:21-cv-01517-CDS-EJY

I, Natalie S. Pang, hereby declare the following:

I am an attorney at law admitted *pro hac vice* to practice in this Court in connection with the above-captioned matter.  I am a member of the law firm of Glancy Prongay & Murray LLP, counsel of record for Lead Plaintiff Daniel E. Sieggreen and the putative class in this matter.  I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.

1.     Attached hereto as Exhibit A is a true and correct copy of the initial complaint filed by the U.S. Securities and Exchange Commission in the matter of *Securities and Exchange Commission v. Live Ventures Incorporated et al.*, on August 2, 2021, in the United States District Court for the District of Nevada (Case No. 2:21-cv-01433-JCM-VCF).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 20th day of June, 2023, at Los Angeles, California.

*/s Natalie S. Pang*
Natalie S. Pang

# EXHIBIT A

JOHN B. BULGOZDY (Cal. Bar No. 219897)
Email: bulgozdyj@sec.gov
ROBERT STILLWELL (Cal. Bar No. 308630)
Email: stillwellr@sec.gov
WENDY PEARSON (Cal. Bar No. 211099)
Email: pearsonw@sec.gov

Securities and Exchange Commission
Michele Wein Layne, Regional Director
Alka N. Patel, Associate Regional Director
Amy Jane Longo, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No.: 2:21-cv-1433 |
| Plaintiff, | |
| vs. | **COMPLAINT** |
| LIVE VENTURES INCORPORATED; JANONE INC. (f/k/a Appliance Recycling Centers of America, Inc.); JOHN ISAAC a/k/a JON ISAAC; KINGSTON DIVERSIFIED HOLDINGS LLC; and VIRLAND A. JOHNSON, | |
| Defendants. | |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1. The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a). Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this Complaint, including but not limited to emails, the Internet, electronic filing with the SEC, and electronic bank transfers.

2. Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district. Defendants Live Ventures Incorporated and JanOne Inc. are both Nevada corporations headquartered and operating in this district. Defendants John Isaac a/k/a Jon Isaac and Virland Johnson both work and live in this district. Defendant Kingston Diversified Holdings LLC regularly does business with Live Ventures Incorporated, owned securities and bank accounts in this district, and serves as a nominee company of John Isaac a/k/a Jon Isaac, who is domiciled in this district.

## SUMMARY

3. Defendant Live Ventures Incorporated ("LIVE") and its chief executive officer John Isaac a/k/a Jon Isaac ("Jon Isaac") engaged in three distinct fraudulent schemes, and made materially false and misleading statements that omitted material information.

4. The first scheme occurred in late 2016, and centered on Jon Isaac's efforts to boost LIVE's FY 2016 earnings, and then to profit from the resulting spike in LIVE's stock when the earnings were announced. As part of the scheme, Jon Isaac engineered a transaction after the close of FY 2016 that falsely created the appearance that negotiations had started during FY 2016. The deal, made between LIVE and Novalk Apps. S.A.S. ("Novalk"), created $915,500 of fraudulent

"other income" and increased LIVE's FY 2016 pre-tax income by 20%. Jon Isaac lied to LIVE's outside accountants to justify recognition of the "other income" in FY 2016. Next, Jon Isaac used LIVE's inflated earnings and a fraudulently reduced share count to calculate an earnings per share amount for LIVE's FY 2016 that was 40% higher than the earnings per share in its audited financial statements. He put these fraudulently inflated earnings per share in a press release that LIVE issued on December 28, 2016. Prior to the press release, Jon Isaac and LIVE hired a stock promoter to hype LIVE's stock, and made arrangements to access the brokerage account of Defendant Kingston Diversified Holdings LLC ("Kingston"). Jon Isaac, LIVE, and Kingston arranged to sell LIVE stock upon the anticipated rise in LIVE's stock from the inflated results. If all the orders were executed, these Defendants would have realized gross proceeds of over $1.1 million. On December 29, Jon Isaac and LIVE issued its Form 10-K, which included the fraudulent $915,500 of other income and a disclosure about the circumstances that was false, misleading, and omitted material information, including that the entire transaction arose after the close of LIVE's FY 2016. Subsequently, Jon Isaac tried to cover up his conduct by filing a Form 8-K and issuing a letter to shareholders in which he fraudulently denied that he or LIVE had hired a stock promoter, and lied to the Financial Industry Regulatory Authority ("FINRA") about the scheme. Defendant Virland Johnson ("Johnson"), aided and abetted LIVE's false and misleading statements about recognition of the "other income" from the engineered transaction with Novalk.

5. In the second scheme, LIVE falsely claimed that it had effectively closed the acquisition of a subsidiary of Defendant JanOne Inc. ("JOI/ARCA") named "ApplianceSmart," on December 30, 2017, and recognized a "bargain purchase gain" of over $3.7 million in its first quarter of FY 2018, which enabled LIVE to report positive net income in what would have otherwise been an unprofitable quarter. In fact, as of December 31, 2017, neither LIVE nor JOI/ARCA had transferred consideration to each other, and LIVE did not gain effective control of ApplianceSmart until 2018. LIVE, Jon Isaac, and Johnson made materially false and misleading statements about the ApplianceSmart transaction in LIVE's Form 10-Q for the quarter ending December 31, 2017. Jon Isaac and Johnson lied to LIVE's outside accountants to support recognition of December 30, 2017 as the acquisition date for accounting purposes. Defendants

LIVE, JOI/ARCA, Jon Isaac, and Johnson engaged in a scheme to create the false appearance that the ApplianceSmart transaction had closed on December 30, 2017, when in fact they knew that the facts and circumstances did not support such a claim.

6.      Third, throughout the period from 2016 to 2018, LIVE failed accurately to disclose Jon Isaac's total compensation, reporting accruals of $162,000 in temporary housing allowances when $315,000 in additional compensation was actually paid to Jon Isaac over that period.  In addition, throughout that same period, LIVE failed to have effective internal accounting controls to ensure that its financial results were accurately reported in its public filings.

7.      The SEC requests that the Court impose permanent injunctions against each of the Defendants for their respective violations of the federal securities laws, and bar Jon Isaac and Johnson from acting as an officer or director of a public issuer pursuant to Section 21(d)(2) of the Exchange Act.  The SEC requests that the Court order Jon Isaac and Kingston to disgorge their ill-gotten gains with prejudgment interest thereon.  The SEC requests that the Court assess civil money penalties against LIVE, JOI/ARCA, Jon Isaac, Johnson, and Kingston, pursuant to Section 21(d)(3) of the Exchange Act; and against Jon Isaac and Kingston pursuant to Section 20(d) of the Securities Act.

**THE DEFENDANTS**

8.      **Live Ventures Incorporated ("LIVE")** is a Nevada corporation headquartered in Las Vegas.  LIVE's securities are registered with the SEC under Section 12(b) of the Exchange Act and are listed on the NASDAQ under "LIVE."  LIVE's fiscal year starts on October 1 and ends on September 30 of the following year.  In 2018, a wholly-owned subsidiary of LIVE named ApplianceSmart Holdings LLC ("ASH"), acquired all of the issued and outstanding shares of ApplianceSmart, Inc. ("ApplianceSmart").

9.      **JanOne Inc. ("JOI/ARCA")** is a Nevada corporation, formerly known as Appliance Recycling Centers of America, Inc. ("ARCA").  JOI/ARCA's securities are currently registered with the SEC under Section 12(b) of the Exchange Act and are listed on the NASDAQ under "JAN."  During the relevant period, JOI/ARCA was primarily engaged in the business of recycling and selling appliances.  Until 2018, JOI/ARCA owned ApplianceSmart.

10. **John Isaac a/k/a Jon Isaac ("Jon Isaac")** is a resident of Las Vegas, Nevada. Jon Isaac has served as LIVE's chief executive officer ("CEO") and president since January 2012. Between February 2013 and January 2017, Jon Isaac also served as LIVE's CFO.

11. **Kingston Diversified Holdings, LLC ("Kingston")** is a Delaware limited liability company. Kingston is not registered with the SEC. Kingston is owned by Juan Yunis, a Colombian national. At different times since its formation in 2012, Kingston has used as its address two different office addresses associated with Jon Isaac; a mailbox at a UPS store associated with Jon Isaac's company Isaac Capital Group, LLC; a mailbox at another UPS store associated with Jon Isaac's personal bank account; and an address at a mailbox store called Postal Annex associated with Jon Isaac's personal bank account. In or around November 2016, Jon Isaac's personal assistant faxed to Kingston's brokerage firm a corporate resolution adding Yunis as an "additional authorized individual" to Kingston's brokerage account, and after that date, Jon Isaac acquired electronic access to Kingston's account at the brokerage firm. Through intermediary accounts, Jon Isaac transferred $242,000 from Kingston during the relevant period.

12. **Virland A. Johnson ("Johnson")** is a resident of Gilbert, Arizona. Johnson was hired in November 2016 to work as a consultant for LIVE. On January 3, 2017, Johnson was named chief financial officer ("CFO") of LIVE. Since August 2017, Johnson has served as CFO of JOI/ARCA. Johnson is a certified public accountant licensed in Arizona.

## RELATED PERSONS

13. **Antonios "Tony" Isaac ("Tony Isaac")** is a Canadian citizen residing in Las Vegas, Nevada. Tony Isaac is the CEO of JOI/ARCA. Tony Isaac has been a board member of, and strategic advisor for, LIVE since December 2011. Tony Isaac is Jon Isaac's father.

14. **Juan C. Yunis ("Yunis")** is a Colombian citizen residing in Barranquilla, Colombia. Yunis has used telephone numbers in California, Florida, and Colombia. According to Delaware corporate filings, Yunis has been Kingston's sole member since December 2016. Since at least October 2014, Yunis has been the CEO of Novalk Apps S.A.S. ("Novalk"), a Colombian corporation that had several contracts with LIVE, and regularly invoiced LIVE for goods and services. At various times, funds originating from Novalk's or Yunis's bank accounts were wired

to Jon Isaac's personal bank account, such as $128,781.64 wired from Yunis's personal bank account to Jon Isaac on September 17, 2018; and $500,000 from Yunis to Jon Isaac on December 14, 2018.

## THE ALLEGATIONS

**A.    Fraud in Connection with the Fiscal Year Ending September 30, 2016 ("FY 2016")**

**1.    LIVE's FY 2016 Form 10-K Contained Materially False and Misleading Statements About $915,500 of "Other Income" from the "Novalk Amendment"**

15.    In connection with the announcement of LIVE's FY 2016 results, Jon Isaac and LIVE made material misstatements and omitted material facts in LIVE's Form 10-K concerning recognition of $915,500 of "other income" from the amendment to a 2014 contract (the "Novalk Amendment"), which boosted LIVE's pre-tax income by 20%.  Defendant Johnson aided and abetted Jon Isaac and LIVE in the improper recognition of "other income" from the Novalk Amendment.  Because Jon Isaac negotiated the Novalk Amendment after the close of LIVE's fiscal year it was not proper under generally accepted accounting principles ("GAAP") to recognize the other income in its FY 2016 Form 10-K.  Jon Isaac engineered the transaction and lied to make it appear that there was a basis for recognizing the "other income" in FY 2016.

16.    The Novalk Amendment identifies September 16, 2016 as its "effective date," recites that on that date Novalk proposed that LIVE issue 350,000 shares to Novalk and LIVE agreed to those terms, which changed the terms of a sales agreement, effective October 2014, for LIVE to purchase software from Novalk.  The original sales agreement stated that the purchase price for the software was either:  (a) $1.5 million in cash; (b) 800,000 shares of LIVE stock; (c) a combination of cash and stock to be determined within six months of closing; or (d) if the seller failed to elect within six months, then the manner of payment was to be determined by the buyer.

17.    Between October 2014 and November 30, 2016, LIVE did not make any payment to Novalk under the terms of the software sales agreement.

18.    On or about November 30, 2016, Jon Isaac sent an email to Yunis, the CEO of

Novalk, which said: "We want to cancel the deal on the software we bought from you. the $1.5m. I don't think we will use it. Thoughts?"

19. On or about December 5, 2016, Jon Isaac emailed Johnson and another LIVE employee, with the subject "novalk," about the October 2014 software sales agreement. In the email, Jon Isaac stated that he was able to get a "discount on the price. So let's proceed with the purchase of this asset, but, instead of paying him $1.5m cash or 800,000 shares," the price was going to be 350,000 shares "at 9/30 closing date.. [sic] stock price was 1.91."

20. On or about December 19, 2016, the following email chain was sent and received: (a) Jon Isaac emailed the Novalk Amendment to Yunis; (b) Yunis emailed back the signed Amendment; (c) Jon Isaac forwarded the signed Novalk Amendment to Johnson; and (d) Johnson forwarded the document to two LIVE employees with the comment: "Here is the executed agreement .....the effective date is Sept 15th ......but the signature date is now."

21. On or about December 19, 2016, a second email chain was sent and received: (a) Jon Isaac emailed the Novalk Amendment to Yunis; (b) Yunis emailed back the signed Amendment; (c) Jon Isaac forwarded the signed Novalk Amendment to Johnson; and (d) Johnson forwarded it to a LIVE employee with the instructions: "[H]ave Jon counter sign when he comes into the office this week. Deal valued at 350,000 shares @ $1.67 Closing [sic] price on 9/15/2016 (effective date) or $584,500."

22. While Jon Isaac was the CFO of LIVE, Johnson prepared LIVE's FY 2016 financial statements. At the time, Johnson was a consultant working for LIVE.

23. Jon Isaac and Johnson caused LIVE to recognize $915,500 in "other income" in its financial statements and Form 10-K for the fiscal year ending September 30, 2016, based on the pretext that the Novalk Amendment was "effective" during FY 2016.

24. The $915,500 in "other income" was calculated by subtracting the "new" price of $584,500, calculated using LIVE's stock price as of September 15, 2016, from the original 2014 price of $1.5 million.

25. Recognition of $915,500 of "other income" during FY 2016 was material to LIVE's FY 2016 financial results because it increased LIVE's pre-tax income for FY 2016 by 20%.

6

26. LIVE's Form 10-K for the fiscal year ending September 30, 2016, was filed with the SEC on December 29, 2016, and included in the financial results $915,500 of "other income" from the Novalk Amendment.

27. The Form 10-K included a disclosure in a footnote that LIVE had recognized "other income" of $915,500 from the Novalk Amendment, stated that the agreement was "memorialized" on December 7, 2016 and disclosed that it had an "effective" date of September 15, 2016. The Form 10-K disclosed that LIVE would issue 58,333 shares subsequent to September 30, 2016, in settlement of its debt to Novalk.

28. LIVE's Form 10-K for FY 2016 was prepared by Johnson.

29. Jon Isaac reviewed and approved LIVE's Form 10-K for FY 2016.

30. Jon Isaac signed and certified LIVE's Form 10-K for FY 2016, as principal executive officer and principal financial officer of LIVE, and as such was the maker of the statements contained in the Form 10-K.

31. LIVE's recognition of $915,500 from the Novalk Amendment in FY 2016 violated Generally Accepted Accounting Principles ("GAAP"). Accounting Standards Codification ("ASC") 855-10-25, Subsequent Events, provides guidance for the circumstances under which an entity should recognize events or transactions in its financial statements that occur subsequent to the balance sheet date, but before the statements were available to be issued. Under the relevant provisions of ASC 855-10-25, a subsequent event shall not be recognized when evidence about the condition did not exist at the balance sheet date but arose after the balance sheet date but before financial statements are issued or available to be issued.

32. Because Jon Isaac did not begin to negotiate the Novalk Amendment until at least November 30, 2016, or two months after the close of LIVE's FY 2016, LIVE violated GAAP when it recognized "other income" from the transaction in its FY 2016 financial statements.

33. By selecting as the "effective date" September 15 rather than September 30, Jon Isaac increased by over $80,000 the amount of "other income" that he could include in LIVE's financial results using the pre-text of the Novalk Amendment.

34. The footnote to LIVE's financial statements purportedly disclosing the Novalk

7

Amendment was false and misleading, because it failed to disclose that the events surrounding the Novalk Amendment began over two months after the end of LIVE's fiscal year on September 30, 2016, that Jon Isaac deliberately backdated and selected the effective date so it would positively impact the FY 2016 results, and that it was improper under GAAP to recognize the income in FY 2016.

35. At all times with regard to LIVE's improper recognition of $915,500 of "other income" from the Novalk Amendment and false statements in the Form 10-K, Jon Isaac acted with scienter. Jon Isaac knew that he did not start negotiating the Novalk Amendment until the end of November 2016, but deliberately used an "effective date" months prior for the purpose of including "other income" from the transaction in LIVE's FY 2016 year-end results. Jon Isaac falsely made it appear that the negotiations started prior to September 30, 2016, for the purpose of fraudulently including $915,500 of "other income" in LIVE's FY 2016 results. Jon Isaac changed the "effective date" of the Novalk Amendment from September 30, 2016, to September 15, 2016, at which time LIVE's stock price was lower, thus increasing by over $80,000 the "other income" that LIVE might recognize in an obvious effort to financially engineer LIVE's FY 2016 results. Jon Isaac lied to LIVE's accountants about the facts and circumstances of the Novalk Amendment.

36. Jon Isaac's state of mind is imputed to LIVE, of which he was the CEO and CFO at that time.

37. Johnson aided and abetted LIVE's improper recognition and false and misleading disclosure of "other income" from the Novalk Amendment. Emails addressed to Johnson showed that Jon Isaac was manipulating the purported effective date of the Novalk Amendment from September 30 to September 15, and thus increasing the amount of "other income" being created by the transaction. Johnson knew, or was reckless in not knowing, that there was no agreement as of September 15, 2016, as recited in the Novalk Amendment. Johnson knew, or was reckless in not knowing, that Jon Isaac was manipulating the date of the transaction to make it seem like it occurred in FY 2016 to manipulate LIVE's FY 2016 financial statements.

      **2. Jon Isaac Lied to LIVE's Accountants About the Circumstances of the Novalk Amendment**

38. In connection with the issuance of LIVE's Form 10-K for FY 2016, LIVE's management made certain representations to LIVE's outside accountants in a "management representation letter," which the accountants relied on in rendering an opinion concerning the accuracy of LIVE's financial statements.

39. In his capacity as CEO and CFO of LIVE, Jon Isaac reviewed, approved, and signed a management representation letter, dated December 28, 2016, to LIVE's outside accountants in connection with the audit of LIVE's FY 2016 financial statements (October 1, 2015 to September 30, 2016), that represented, in pertinent part:

> On December 7, 2016, [LIVE] and Novalk memorialized an agreement which is effective September 15, 2016 that changes the terms and conditions relating to payment of the outstanding software license fee [to Novalk] of $1,500,000. The software fee will be settled in exchange for 58,333 shares of [LIVE's] common stock which are to be issued and certificated subsequent to the year ended September 30, 2016. As a result of this agreement, [LIVE] recorded $915,500 of other income in September 2016 and maintained an accrued liability to Novalk for $584,500 to be settled when the common shares are issued to Novalk after the year-end, September 30, 2016.

40. The outside accountants relied on the representations in LIVE's December 28, 2016 management representation letter in rendering an opinion concerning LIVE's FY 2016 financial statements.

41. Jon Isaac's representations in the December 28, 2016 management representation letter were false and misleading, and omitted material information. Jon Isaac failed to disclose that the negotiations for the Novalk Amendment did not begin until after the close of LIVE's fiscal year on September 30, 2016. This information was material because it would preclude recognition of income from the transaction during FY 2016 under GAAP.

42. Jon Isaac acted with scienter when he made the false and misleading statements to LIVE's outside accountants. Jon Isaac knew that he had not approached Novalk until November 30, 2016, when he proposed to cancel the deal, and that this precluded recognition of the

9

transaction in LIVE's financial statements for the first quarter of FY 2016. Jon Isaac deliberately backdated the "effective date" of the transaction in a deliberate effort to manipulate LIVE's reported financial results for FY 2016.

**3. The December 28, 2016 Press Release Contained False and Misleading Statements about LIVE's FY 2016 Earnings per Share**

43. At 7 a.m. eastern standard time on December 28, 2016, Jon Isaac caused LIVE to issue a press release announcing its 2016 results with the headline: "[LIVE] Announces Biggest Year in Company History Achieving Record Earnings of $8.92 Per Share With Continued Growth Anticipated in 2017." In fact, LIVE's audited earnings per share for FY 2016, as stated in its financial statements and Form 10-K, were only $6.33 per share. The December 28, 2016 press release fraudulently overstated LIVE's earnings per share by 40%.

44. Jon Isaac prepared the press release to be issued to the public announcing LIVE's results for the fiscal year 2016. On or about December 27, 2016, Jon Isaac sent the final version of the press release to LIVE's public relations firm. In a follow-up email on the same day, Jon Isaac instructed LIVE's public relations firm to "[u]se the largest distribution you can," and to issue the press release at 7 a.m. eastern standard time on December 28, 2016.

45. Jon Isaac calculated the $8.92 earnings per share by using LIVE's audited income amount, divided by a share count of about 2 million, even though LIVE's weighted average share count as of September 30, 2016 (the end of FY 2016) was about 2.8 million. By using the lower share count, Jon Isaac increased LIVE's earnings per share by 40% over the audited earnings per share of $6.33 reported in LIVE's FY 2016 Form 10-K.

46. Jon Isaac caused the calculation of earnings per share of $8.92 to be included in the December 28, 2016 press release.

47. The December 28, 2016 press release was materially false and misleading, because LIVE's earnings per share for FY 2016, as reported in its Form 10-K filed on December 29, 2016, were only $6.33 per share.

48. The December 28, 2016 press release omitted material information that Jon Isaac used an artificially low share count to boost the earnings per share in the announcement by 40%,

10

thus making LIVE's financial performance seem much better than was reported in LIVE's FY 2016 audited financial statements and Form 10-K.

49. Jon Isaac was the maker of the false statement about LIVE's earnings per share in the December 28, 2016 press release. Jon Isaac reviewed, edited, and approved the press release, and personally sent it to LIVE's public relations firm for release early in the morning on December 28, 2016.

50. At all times in connection with the release of the December 28, 2016 press release with the inflated earnings per share, Jon Isaac acted with scienter. Jon Isaac was LIVE's CEO and CFO, responsible for preparation of LIVE's financial statements and Form 10-K, and knew that the audited financial statements showed a lower earnings per share, but deliberately caused LIVE to issue a press release claiming that earnings per share were 40% higher than actual reported results. Jon Isaac deliberately used a lower share count, premised on the issuance of Series B shares that had not occurred even as of December 29, 2016, and he knew that using the lower share count would increase earnings per share.

51. Based on Jon Isaac's roles as CEO and CFO of LIVE, his scienter is imputed to LIVE.

### 4. Defendants LIVE, Jon Isaac, and Kingston Engaged in a Scheme to Defraud

52. In connection with LIVE's FY 2016 results, LIVE, Jon Isaac, and Kingston engaged in a scheme to defraud investors by creating a false appearance concerning LIVE's financial performance, and Jon Isaac tried to profit by selling LIVE stock after the false press release was issued on December 28, 2016.

53. The scheme involved a number of different actions by Jon Isaac, LIVE, and Kingston, as alleged below.

54. On or about November 21, 2016, LIVE and Jon Isaac issued a press release announcing "Better Than Expected" net profits for the fourth quarter of its fiscal year, and quoted Jon Isaac as saying that "we anticipate that our year-end financial results will be a record for the Company and will announce them toward the end of December."

11

55. On or about November 29, 2016, Jon Isaac's personal assistant sent a fax from Jon Isaac's office in San Diego to Kingston's brokerage firm, adding Yunis as an authorized individual to trade using Kingston's account.

56. On or around November 30, 2016, Jon Isaac and LIVE entered into an agreement with a stock promoter named Protrader Elite LLC ("Protrader"), a consultant in the business of preparing and disseminating promotional newsletters and advertisements to promote publicly-traded companies.

57. Also on or about November 30, 2016, Jon Isaac contacted Yunis about cancelling the 2014 Novalk agreement, as alleged above. On or about December 5, 2016, Jon Isaac informed LIVE personnel that he had instead obtained a discount price with an effective date of September 30, 2016.

58. On or about December 5, 2016, Jon Isaac caused LIVE to wire $60,000 to Protrader's account in New York.

59. On or about December 6, 2016, Jon Isaac contacted Kingston's brokerage firm on a recorded call, falsely identified himself as Yunis, and changed the account's electronic log in credentials. This gave Jon Isaac the ability to access Kingston's account electronically.

60. On December 14, 2016, Jon Isaac and LIVE issued a press release stating that it would announce FY 2016 financial results on December 28, 2016.

61. On or about December 14, 2016, Jon Isaac caused LIVE to wire $60,000 to Protrader's account in New York, for a total payment of $120,000.

62. On or about December 19, 2016, Jon Isaac circulated a signed copy of the Novalk Amendment to Defendant Johnson and others. Jon Isaac caused Johnson to include $915,500 of "other income" in LIVE's FY 2016 financial statements from the Novalk Amendment.

63. On or about December 23, 2016, Jon Isaac sent an email to the members of LIVE's board of directors with the subject: "Series B Resolution." In the email, Jon Isaac wrote that in "an effort to show my commitment to the 'street,' I have decided to lock up all of Isaac Capital Group's shares in LIVE for a period of 5 years. That means, I cannot sell any LIVE shares owned by ICG. This will make a good announcement, no doubt." Jon Isaac explained: "The other

advantage this share exchange brings is a reduced share count on the common shares. We go from about 2.8m shares to about 2m shares outstanding. A lower outstanding share count will make our EPS look even better." Jon Isaac informed the board members that the action will "be disclosed in the 10k."

64. On or about December 27, 2016, Jon Isaac advised LIVE's brokerage firm that LIVE would have "numbers coming out tomorrow" and it "could be a high volume day," according to an email between brokerage personnel. Another email in the chain reported: "Reasonable chance that he'll sell 250k shares or more this week."

65. After the market closed on December 27, 2016, two stock touts posted or sent alerts about LIVE's earnings announcement the next day. An article on the Internet site "Stock Market Leader," with the title "New Alert: LIVE Ventures Incorporated (NASDAQ: LIVE)," discussed LIVE's "strong potential," quoted Jon Isaac's statements from a November 21 press release, stated that FY 2016 results would be announced on December 28, and advised that they could "ignite a strong rally." The alert disclosed that Stock Market Leader had been compensated $15,000 by ProTrader Elite for an investor awareness campaign. Also on December 27, an email was sent from "info@ultimatestockalerts.com" that called LIVE a "potential new trade opportunity," recounted that the stock price had reacted to public announcements, and that LIVE "has a history of providing investors with incredible upside volatility." The email disclosed that the senders had been paid $40,000 "via bank wire" by Protrader for distribution of its opinions about LIVE.

66. Also on December 27, Jon Isaac sent the final version of a press release announcing LIVE's FY 2016 results, which fraudulently overstated earnings per share by 40%, and instructed LIVE's public relations firm to give it the widest possible distribution.

67. LIVE's false press release was issued at 7:00 am eastern standard time on December 28, 2016.

68. On December 28, 2016, Kingston's brokerage account was accessed repeatedly, and 28 "good till cancel" limit orders for the sale of a total of 10,674 shares were placed, which if executed, would have generated gross proceeds of over $383,000. Kingston's account was accessed from an IP address associated with Jon Isaac's Las Vegas residence. Kingston's account

was also accessed using a "TOR browser," which conceals the user's location and usage from anyone conducting network surveillance or traffic analysis.

69. On the morning of December 28, 2016, Jon Isaac instructed LIVE's brokerage firm to be prepared to sell at least 20,000 shares of stock, advising that "in case it goes busurk [sic], please sell up to 10,000 between 36 and 38.. [sic] another 10k between 40 and 42. I'll be on my computer so we will be chatting more closely." If executed, LIVE would have generated gross proceeds of about $760,000 from those sales.

70. LIVE's stock price reacted to all the hype. On the morning of December 28 in pre-market trading, LIVE's stock soared to almost $35 per share. LIVE's stock opened at $31.32 per share, for a 20% increase over its closing price on December 27 of $26.09 a share. LIVE's stock reached an intraday high of $32.98 a share, before closing at $27.68 per share on heavy volume.

71. LIVE's stock price did not reach the prices Jon Isaac set for the sale of LIVE's stock from its brokerage account, and none of LIVE's shares were sold.

72. Five of the limit orders to sell LIVE stock placed in the Kingston account were executed, and generated gross proceeds of about $48,000.

73. On December 28, 2016, Jon Isaac signed a management representation letter to LIVE's outside accountants that contained false and misleading statements and material omissions, as alleged above, concerning the timing of the negotiation of the Novalk Amendment.

74. On December 29, 2016, LIVE filed its Form 10-K for FY 2016 that announced earnings per share of $6.33.

75. LIVE did not issue a press release on December 29, 2016, when the Form 10-K with its audited financial results were filed. LIVE did not issue any public explanation for the discrepancy between the December 28, 2016 press release announcing earnings per share of $8.92, and the December 29, 2016 Form 10-K announcing earnings per share of $6.33.

76. LIVE's Form 10-K also disclosed the creation of the Class B shares, and in that regard stated: "Our Series B Convertible Preferred Stock, as of the date of this Report, has 0 shares issued and outstanding."

77. On December 29, 2016, after LIVE's Form 10-K was issued with audited financial

14

statements showing earnings per share of $6.33, LIVE's stock price closed at $23.92 per share, or over 8% lower than the December 27, 2016 closing price.

78. On or about January 6, 2017, SeekingAlpha.com published an article that, among other things, stated LIVE had hired a stock promoter to promote its securities.

79. Jon Isaac then took action to cover-up his fraudulent conduct.

80. On or about January 9, 2017, LIVE filed a Form 8-K with an attached "Letter to Stockholders" signed by Jon Isaac. Jon Isaac falsely denied that LIVE had engaged in promotional activity, and wrote that if LIVE had "truly engaged in any type of promotional activity, [LIVE and] its officers . . . would have sold shares." In fact, LIVE and Jon Isaac had hired Protrader to engage in promotional activity, and Jon Isaac had placed orders to sell 20,000 shares of LIVE stock on December 28, 2016, and orders to sell over 10,000 shares of LIVE stock in Kingston's account.

81. Jon Isaac continued to make false statements about Protrader. In March, FINRA sent a number of questions to Jon Isaac and LIVE, including whether Jon Isaac recognized the name "Protrader Elite LLC (a/k/a Pro Trader Elite LLC or ProTrader-Elite)." In an email response dated April 12, 2017, Jon Isaac stated: "No, Jon Isaac does not recognize the name."

82. In its list of questions, FINRA also asked Jon Isaac and LIVE about the use of $8.92 earnings per share in the December 28, 2016 press release, and the discrepancy with the audited earnings per share of $6.33 announced in the December 29, 2016 Form 10-K.

83. On or about April 4, 2017, Johnson emailed a draft response to Jon Isaac. In response to a question about the discrepancy in earnings per share, Johnson proposed as a response: "This was preliminary information and therefor and [sic] error, as there were additional accounting adjustments still to be recorded. The correct basic earnings per share of $6.33 in form 10-K is accurate."

84. Jon Isaac rejected this response in an email on or about April 12, 2017 to Johnson. Jon Isaac characterized Johnson's proposed answer as "we found an error and made adjustments," and rejected it. Instead, he proposed to respond that the $8.92 was correct based on a lower share count.

85. On or about April 12, 2017, Jon Isaac emailed his responses to FINRA. In response

15

to the question about the discrepancy in earnings per share, he explained:

> In the 10k, the outstanding share count was around 2.8m.  In the press release, since our CEO and President Jon Isaac converted his shares to preferred shares (a new class of shares that have the same economical interest as common shares but are restricted from any sales for 5 years), the 'denominator' was about 2m shares.  The use of the lower denominator was disclosed in the press release.

86.    In fact, the December 28, 2016 press release does not contain any disclosure that the share count used to calculate earnings per share was any different than the share count in the Form 10-K, or that the Form 10-K disclosed a substantially lower amount for earnings per share.

87.    No funds were disbursed from Kingston's brokerage account between December 2016 and November 2017.  On or about November 17, 2017, Kingston's brokerage account was accessed from an IP address associated with Jon Isaac's Las Vegas residence, and approximately $240,374.02 was wired from Kingston's brokerage account to its bank account, leaving a cash balance of $86.88 in the brokerage account.  On or about December 14, 2017, approximately $242,000 was transferred from Kingston's bank account to Novalk's bank account, leaving $1,518.87 in Kingston's bank account.  On or about December 14, 2017, Novalk wired $242,000 from its bank account to Jon Isaac's personal bank account, leaving just $2,292.98 in Novalk's bank account.

88.    At all times in connection with the scheme to defraud, Jon Isaac acted with scienter. Jon Isaac created the "other income" from the Novalk Amendment by negotiating the transaction after the close of FY 2016, but engineering it to look as if it had begun in FY 2016 to create a pretense for including the "other income" in LIVE's FY 2016 results.  Jon Isaac then lied to LIVE's outside accountants about the circumstances of the Novalk Amendment transaction, which created a basis for including $915,500 of "other income" in LIVE's FY 2016 results, and thus increasing pre-tax income by 20%.  At around the same time, Jon Isaac hired a stock promoter to hype LIVE's shares in advance of the December 28, 2016 announcement, and he arranged to access Kingston's trading account in advance of the December 28, 2016 announcement.  Jon Isaac then calculated and caused LIVE to issue the December 28, 2016 press release that falsely

16

announced earnings per share were $8.92, which was 40% higher than audited earnings per share of $6.33. As CFO and CEO, Jon Isaac knew or was reckless in not knowing that LIVE's audited financial statements announced the lower earnings per share. On December 28, Jon Isaac deliberately sold, and tried to sell, LIVE securities as the market reacted to the false press release. Jon Isaac used the Kingston account and tried to conceal the fact that he was selling, and trying to sell, LIVE shares on December 28. Jon Isaac also may have used a TOR browser in an effort to conceal his activities in Kingston's brokerage account. After the fact, Jon Isaac took steps to conceal his activities, including issuing a letter to shareholders attached to a Form 8-K that falsely claimed that neither he nor LIVE had hired a stock promoter, when he knew he had caused LIVE to pay Protrader $120,000 to promote LIVE's stock in advance of the December 28, 2016 press release. Jon Isaac continued to try to cover up his conduct in response to questions from FINRA, in which he lied when he said he had never heard of Protrader, and in which he provided a factually inaccurate statement concerning issuance of Series B shares to his company when, in fact, no such shares had been issued at the time of the press release. Jon Isaac took these actions in an effort to profit from sales of LIVE stock on December 28, 2016. The use of Kingston's brokerage account, Kingston's bank account, and Novalk's bank account as intermediary accounts to transfer funds from Kingston's brokerage account to his personal account, demonstrates a deliberate effort to conceal the source of the funds. Jon Isaac knew, or was reckless in not knowing, that he was engaging in a scheme to defraud, and was engaging in acts and a course of business which would operate as a fraud or deceit upon any person.

89. Jon Isaac's scienter is imputed to LIVE, of which he was then the CEO and CFO.

90. Jon Isaac's scienter is imputed to Kingston, which served as Jon Isaac's nominee in the sale of LIVE shares on December 28, 2016, and Jon Isaac was the principal beneficiary of the funds in Kingston's brokerage account that were transferred to his personal account, through intermediary accounts, in December 2017.

**B.      Fraud in Connection with JOI/ARCA's sale of ApplianceSmart to LIVE**

91. The management of LIVE and JOI/ARCA are intertwined. Jon Isaac's father, Tony Isaac, is the CEO of JOI/ARCA, and at the relevant time was a member of LIVE's board of

directors. JOI/ARCA and LIVE shared the same CFO, Johnson, and the same in-house legal counsel. Jon Isaac was the beneficial owner of 8.6% of the outstanding capital stock of JOI/ARCA.

92. In December 2017, LIVE and JOI/ARCA each had a financial problem. LIVE was facing a large tax hit that would impact its net profits for the quarter. JOI/ARCA had sold some real property at a gain during its fiscal year ending December 30, 2017 and was facing a large tax liability. The two companies and their subsidiaries entered into a Stock Purchase Agreement ("SPA"), with an effective date of December 30, 2017, in which JOI/ARCA sold 100% of the stock of its subsidiary ApplianceSmart, to a new subsidiary of LIVE, in exchange for $6.5 million in cash. The SPA required JOI/ARCA to transfer ApplianceSmart's stock certificate free of all liens and encumbrances.

93. At December 30, 2017, JOI/ARCA's ownership of ApplianceSmart was subject to a May 10, 2017 Credit and Security Agreement with MidCap Financial as lender, which among other things, gave MidCap a first lien security interest in all of ApplianceSmart's assets, gave MidCap possession of ApplianceSmart's stock certificate, and required MidCap's written approval prior to any sale of some or all of ApplianceSmart's assets ("MidCap Credit Agreement").

94. By creating the false appearance that December 30, 2017 was the "closing date" or "acquisition date," Defendants provided a basis for LIVE to recognize "other income" of $3,773,486 as a "bargain purchase gain on acquisition" of ApplianceSmart, and that income changed LIVE's unprofitable first quarter into a profitable quarter.

95. In fact, the transaction did not close on December 30, 2017, and LIVE did not attain effective control of ApplianceSmart until calendar year 2018. As a result, LIVE's Form 10-Q for the first quarter of FY 2018 contained false and misleading information about its results.

**1. LIVE's Form 10-Q for the First Quarter of FY 2018 Contained Materially False and Misleading Statements**

96. On February 14, 2018, LIVE filed its quarterly report on Form 10-Q for the first quarter of its FY 2018, ending December 31, 2017.

97. Jon Isaac and Johnson each signed and certified the contents of the Form 10-Q.

18

98. In LIVE's Consolidated Statements of Income (Unaudited) in the Form 10-Q, LIVE recognized and recorded as "other income" a "bargain purchase gain on acquisition" of ApplianceSmart of $3,773,486. LIVE's Form 10-Q falsely stated that the transaction had "closed" during the quarter.

99. The amount of the bargain purchase gain was devised by valuing ApplianceSmart's assets at $10,273,486, or approximately 58% more than the purchase price of $6.5 million. LIVE then deducted the $6.5 million purchase from the $10,273,486 asset value to arrive at a $3,773,486 bargain purchase gain.

100. The bargain purchase gain had a material impact on LIVE's first quarter results because it enabled LIVE to report a positive net income in what would have otherwise been an unprofitable quarter.

101. LIVE's use of December 30, 2017 as the "acquisition date" and recognition of income from the "bargain purchase gain" did not conform to GAAP. ASC 805-10-25-6 ("Identifying the Acquisition Date" for a business combination), identifies the "acquisition date" as "the date on which [the acquirer] obtains control of the acquiree." ASC 805-10-25-7 states that the acquisition date generally coincides with "the date on which the acquirer legally transfers the consideration, acquires the assets, and assumes the liabilities of the acquiree," referred to as the "closing date." While the acquirer "might obtain control on a date that is either earlier or later than the closing date" if, for example, "a written agreement provides that the acquirer obtains control of the acquiree on a date before the closing date," the acquirer shall "consider all pertinent facts and circumstances in identifying the acquisition date."

102. In fact, LIVE did not legally tender $6.5 million in consideration to JOI/ARCA on or before December 31, 2017.

103. In fact, JOI/ARCA did not deliver ApplianceSmart's assets, including the stock certificate representing 100% of ApplianceSmart's stock, on or before December 31, 2017. The stock certificate was in the possession of MidCap under the terms of the MidCap Credit Agreement and subject to its priority security interest, and was not in escrow.

104. In fact, the agreement between JOI/ARCA and LIVE did not contain an express

19

provision that control transferred from JOI/ARCA (or its subsidiary) to LIVE (or its subsidiary) on or before December 31, 2017.

105. In fact, ApplianceSmart's revenues and assets remained subject to and encumbered by the terms of the MidCap Credit Agreement, so that LIVE had no ability to control ApplianceSmart's revenues or its assets as of December 31, 2017.

106. LIVE did not have effective control of ApplianceSmart as of December 31, 2017, and the statements in its Form 10-Q were materially false and misleading, and omitted material information that it did not have effective control and it was not proper under GAAP for LIVE to include the bargain purchase gain in its first quarter results reported in its Form 10-Q.

107. Jon Isaac acted with scienter. Jon Isaac knew or was reckless in not knowing that LIVE did not have effective control of ApplianceSmart as of December 31, 2017, that consideration had not passed, that the stock certificate had not been delivered, and that LIVE had not closed or completed the acquisition of ApplianceSmart before the end of LIVE's first quarter. Jon Isaac knew or was reckless in not knowing that the MidCap Credit Agreement was in effect on December 31, 2017, so that the ApplianceSmart shares could not be transferred free of all liens and encumbrances.

108. Jon Isaac's scienter is imputed to LIVE, of which he was the CEO.

109. Johnson acted with scienter. Johnson knew or was reckless in not knowing that LIVE did not have effective control of ApplianceSmart as of December 31, 2017, that consideration had not passed, that the stock certificate had not been delivered, and that LIVE had not closed or completed the acquisition of ApplianceSmart before the end of LIVE's first quarter.

### 2. Jon Isaac and Johnson Lied to LIVE's Accountants

110. Jon Isaac and Johnson reviewed, approved, and signed a management representation letter dated February 14, 2018, addressed to LIVE's outside accountants, in connection with the interim review of LIVE's financial statements for the first quarter of FY 2018 (October 1, 2017 to December 31, 2017).

111. In that letter, Jon Isaac as LIVE's CEO and Johnson as LIVE's CFO represented that LIVE entered into the SPA on December 30, 2017 with JOI/ARCA to acquire ApplianceSmart for

$6.5 million, and then falsely represented:

> The shares of ApplianceSmart stock are in escrow and will be released upon payment of the purchase price to third-party lenders of ARCA and ApplianceSmart, which is expected to occur prior to March 31, 2018. Although consideration has not transferred at December 31, 2017, the Company has effective control over ApplianceSmart and has determined that the acquisition date is December 30, 2017.

112. This statement was materially false and misleading because LIVE did not acquire effective control of ApplianceSmart as of December 30, 2017 and ApplianceSmart's stock certificate had not been placed in escrow. In fact, JOI/ARCA continued to fund ApplianceSmart's operations after December 30, 2017 and into the first quarter of calendar year 2018 using funds provided under the MidCap Credit Agreement. As a result, ApplianceSmart's receipts continued to be deposited into "lockbox" accounts that were paid daily to MidCap. JOI/ARCA did not transfer control of any bank accounts or accounting systems to LIVE until after December 31, 2017.

113. Jon Isaac knowingly made misrepresentations about the ApplianceSmart transaction to LIVE's outside accountants. Jon Isaac knew that the stock certificate had not been placed in escrow, knew that ApplianceSmart's assets were still encumbered under the MidCap Credit Agreement, and knew that LIVE did not have effective control over ApplianceSmart as of December 31, 2017.

114. Johnson knowingly made misrepresentations about the ApplianceSmart transaction to LIVE's outside accountants. Johnson knew that the stock certificate had not been placed in escrow, knew that ApplianceSmart's assets were still encumbered under the MidCap Credit Agreement, and knew that LIVE did not have effective control over ApplianceSmart as of December 31, 2017.

### 3. The Scheme to Defraud Using the ApplianceSmart Transaction

115. LIVE, Jon Isaac, Johnson, and JOI/ARCA engaged in a scheme to defraud and engaged in a course of business that operated as a fraud and deceit by creating the false appearance that LIVE's acquisition of ApplianceSmart "closed" on December 30, 2017, and that the

"acquisition date" was December 30, 2017, for accounting purposes.

116. Johnson, as CFO of both LIVE and JOI/ARCA, came up with the idea for the purchase and sale of ApplianceSmart to address JOI/ARCA's tax liability and LIVE's unprofitable quarter.

117. Jon Isaac signed the SPA as President and CEO of LIVE's subsidiary created to acquire ApplianceSmart.

118. Johnson and Jon Isaac worked in concert to create the false appearance that LIVE had acquired ApplianceSmart effective December 30, 2017, to enable LIVE to recognize "other income" from the acquisition, and in so doing, turn an unprofitable quarter into a profitable quarter. Because LIVE did not attain effective control of ApplianceSmart as of December 30, 2017, it was not proper under GAAP for LIVE to recognize income from the transaction in its financial statements for the first quarter of its FY 2018, which ended on December 31, 2017.

119. On or about January 4, 2018, LIVE's board of directors was asked to approve the ApplianceSmart transaction, and the directors were asked to sign a "unanimous written consent" to that effect dated December 30, 2017. On January 5, 2018, LIVE filed a Form 8-K announcing the acquisition of ApplianceSmart, which stated that ApplianceSmart's stock certificate had been "delivered into escrow." In fact, ApplianceSmart's stock certificate remained in the possession of MidCap, and subject to the terms of the MidCap Credit Agreement.

120. On or about February 12, 2018, LIVE's outside accountants asked LIVE to confirm, given the timing of when consideration was expected to pass, "the date of acquisition and inclusion in the consolidated financial statements has been considered." Johnson responded that LIVE "has effective control over ApplianceSmart even though consideration in terms of $$$ have not passed as of yet."

121. Johnson prepared and signed LIVE's Form 10-Q for the first quarter of FY 2018, which falsely stated that LIVE had "closed" or otherwise completed the acquisition of ApplianceSmart effective December 30, 2017. The Form 10-Q also repeated the false statement that the ApplianceSmart stock certificate had been delivered into escrow.

122. Jon Isaac and Johnson lied to LIVE's outside accountants in a management

22

representation letter to support LIVE's recognition of "other income" in its first quarter of FY 2018.

123. After the SPA was executed, LIVE was unable to find financing to pay the $6.5 million cash purchase price to JOI/ARCA by March 31, 2018.

124. In April 2018, Johnson proposed that LIVE and JOI/ARCA treat ApplianceSmart's revenues, which had been paid to MidCap in consideration for credit provided to JOI/ARCA under the MidCap Credit Agreement, as cash paid from LIVE to JOI/ARCA. Jon Isaac agreed with this plan.

125. On or about April 26, 2018, LIVE filed a Form 8-K signed by Jon Isaac and issued a press release updating the status of LIVE's acquisition of ApplianceSmart.

126. LIVE's Form 8-K disclosed that between March 31 and April 24, 2018, JOI/ARCA and LIVE renegotiated the terms of the SPA. The Form 8-K further stated: "The remaining $2,580,505.54 of the Purchase Price was paid in cash by the Purchaser to the Seller." In fact, LIVE was unable to obtain $6.5 million in financing to pay JOI/ARCA the purchase price. Instead, on April 25, 2018, LIVE delivered to ARCA a promissory note in the original principal amount of $3,919,494.46, which matured on April 1, 2021.

127. In fact, LIVE had not made a $2,580,505.54 cash payment to JOI/ARCA during the first quarter of 2018.

128. The purported cash payment of $2,580,505.54 was an amount devised by Johnson, by taking the difference between (a) the total amount of ApplianceSmart's revenues that went directly to MidCap during January through March 2018, less (b) amounts JOI/ARCA obtained under the MidCap Credit Agreement and transferred to ApplianceSmart to fund its operations during January through March 2018.

129. In effect, Jon Isaac and Johnson claimed that ApplianceSmart's revenues obligated to MidCap, under an agreement between MidCap and JOI/ARCA, should be treated as a payment from LIVE, even though LIVE had no control over the payment of the revenues to MidCap and the revenues were never deposited into any LIVE bank account or otherwise under the control of LIVE.

130. Jon Isaac instructed that LIVE's Form 8-K should disclose that LIVE "paid $2.5m in cash," even though he knew that LIVE had not made any such payment.

131. In connection with the review of LIVE's financial statements for the second quarter of its FY 2018, on or about May 7, 2018, LIVE's outside accountants advised Johnson that it will "be important to make the final determination of the acquisition date for ApplianceSmart. If the acquisition date of [ApplianceSmart] is determined to not be 12/30/17, then we would need to assess the impact of this on the Q1 2018 10-Q for [LIVE]. If we file the Q2 2018 10Q without the final determination of ApplianceSmart, we would then be in the position of assessing the impact on two 10Q's [sic], which is not an ideal position to be in."

132. In furtherance of the scheme, LIVE's second quarter Form 10-Q for FY 2018 repeated the false claim that LIVE had made a cash payment to JOI/ARCA: "The remaining $2,580,505.54 of the Purchase Price was paid in cash."

133. In a memo to LIVE's outside accountants dated May 15, 2018, Johnson acknowledged that MidCap held the ApplianceSmart shares until March 22, 2018, at which time they were released to JOI/ARCA and then given to the buyer.

134. On or about May 23, 2018, Johnson sent Tony Isaac the corporate resolutions that needed to be signed by the members of JOI/ARCA's board of directors to approve the sale of ApplianceSmart to LIVE. Tony Isaac's executive assistant returned signed copies of the resolutions to Johnson on May 24, 2018.

135. Johnson prepared JOI/ARCA's Form 10-K for its FY 2017 ending December 30, 2017, and included the false statement that LIVE had paid $2,580,505.54 in cash to JOI/ARCA as partial payment for the acquisition of ApplianceSmart.

136. LIVE has acknowledged that prior to the ApplianceSmart transaction, ApplianceSmart was a "fully integrated subsidiary" of JOI/ARCA, which included sharing of facilities, back-office functions (HR, employee benefits, IT), systems (network, email, point of sale and general ledger), and lending vehicle (MidCap). After the transaction, ApplianceSmart spent the first nine months "uncoupling" from JOI/ARCA, such as setting up new banking relationships, new general ledger and point of sale systems, employee benefits, and seeking a new lending

24

vehicle separate from JOI/ARCA and only for ApplianceSmart. As LIVE described it, post-acquisition, "while still coupled, [ApplianceSmart] and [JOI/ARCA] shared the same lending facility until [ApplianceSmart] could establish its lending vehicle." In fact, LIVE needed JOI/ARCA's MidCap Financing Agreement to fund inventory purchases, store operations, payroll, and other day-to-day operating requirements. In this way, LIVE was dependent on JOI/ARCA to provide basic operating funds for ApplianceSmart into calendar year 2018.

137. At all times in connection with the scheme to defraud, Jon Isaac acted with scienter. Jon Isaac signed the SPA as president and CEO of LIVE's subsidiary. Jon Isaac knew or was reckless in not knowing that JOI/ARCA had not delivered the ApplianceSmart stock certificate into escrow and had not caused MidCap to release its encumbrances as of December 31, 2017. Jon Isaac knew or was reckless in not knowing that no consideration had been paid by either party as of December 31, 2017, and that LIVE did not have effective control over ApplianceSmart as of December 31, 2017. Jon Isaac knew or was reckless in not knowing that his statements to LIVE's outside accountants concerning the ApplianceSmart transaction were materially false and misleading, and omitted material information that LIVE did not have effective control over ApplianceSmart. Jon Isaac also knew or was reckless in not knowing that LIVE had not made a $2.58 million cash payment to JOI/ARCA during the first quarter of calendar year 2018, and that in fact LIVE had no control over the payment of those revenues to MidCap under the terms of the MidCap Credit Agreement. Jon Isaac knew or was reckless in not knowing that the false statements about the payment of $2.58 million created the false impression that LIVE had provided valuable consideration to JOI/ARCA in exchange for ApplianceSmart, when in fact no actual cash payment had been made from LIVE to JOI/ARCA.

138. Jon Isaac's scienter is imputed to LIVE.

139. At all times, Johnson acted with scienter. At the time, Johnson was the CFO of both LIVE and JOI/ARCA. Johnson knew or was reckless in not knowing that under GAAP the ApplianceSmart acquisition date was not December 30, 2017. Johnson knew that LIVE had not paid any portion of the purchase price before December 31, 2017. Johnson knew or was reckless in not knowing that the ApplianceSmart stock certificate was not delivered to escrow, and that it

25

was encumbered and in the possession of MidCap. Johnson knew or was reckless in not knowing that LIVE did not have effective control over cash flows from ApplianceSmart's operations, and in fact JOI/ARCA was continuing to fund ApplianceSmart's operation during the first quarter of calendar year 2018 under the terms of the MidCap Credit Agreement. Johnson also knew or was reckless in not knowing that LIVE did not make a $2.58 million cash payment to JOI/ARCA during the first quarter of calendar year 2018, and that LIVE had no control over the funds transferred from ApplianceSmart to MidCap or the amounts drawn by JOI/ARCA under the MidCap Credit Agreement. Johnson also knew or was reckless in not knowing that ApplianceSmart's bank accounts and accounting systems were not transferred to LIVE as of December 31, 2017.

140. Johnson's scienter is imputed to LIVE and JOI/ARCA, as at the time Johnson served as CFO of LIVE and as CFO of JOI/ARCA.

**C.      LIVE Failed to Disclose Executive Compensation Paid to Jon Isaac**

141. For the fiscal years 2016, 2017, and 2018, LIVE disclosed in its Forms 10-K and proxy statements for each fiscal year that Jon Isaac received, in aggregate, $162,000 of additional compensation. In reality, Jon Isaac actually received approximately $315,000 during that period, or approximately 94% more than the disclosed amount.

**1.      FY 2016 (October 1, 2015 to September 30, 2016)**

142. On or about August 8, 2016, LIVE created an internal accounting record that stated LIVE owed Jon Isaac $234,000 for "Temporary Living Expenses" dating back to 2012.

143. On or about August 9, 2016, LIVE wired $120,000 to Jon Isaac, with the notation "temp living reimb."

144. LIVE's Form 10-K for the FY 2016 filed on December 29, 2016, disclosed that LIVE did not have any written employment agreement with Jon Isaac.

145. LIVE's Form 10-K for FY 2016, Item 11, "Executive Compensation," disclosed that Jon Isaac was paid $200,000 as salary and $13,465 for an option award, for total compensation of $213,465. In Item 11, under the column for "All Other Compensation," LIVE's Form 10-K reported "0."

146. There was no disclosure in LIVE's Form 10-K for FY 2016 of the $120,000 payment to Jon Isaac made on August 9, 2016.

147. Jon Isaac signed and certified the FY 2016 Form 10-K.

148. On June 2, 2017, LIVE filed Schedule 14A, its Proxy Statement, for the Annual Meeting of Stockholders to be held on July 21, 2017. The Proxy Statement disclosed that Jon Isaac was paid total compensation of $213,465 during FY 2016. There was no disclosure in LIVE's Schedule 14A filed on June 2, 2017 of the $120,000 payment to Jon Isaac made on August 9, 2016.

149. Jon Isaac signed the Schedule 14A Proxy Statement.

**2.      FY 2017 (October 1, 2016 to September 30, 2017)**

150. On or about May 30, 2017, LIVE wired $30,000 to Jon Isaac, with the notation "temp living reimb."

151. On January 18, 2018, LIVE filed its Form 10-K for the FY 2017, and on January 19, 2018, LIVE filed an amended Form 10-K for FY 2017.

152. In the Form 10-K for the FY 2017, Item 11, "Executive Compensation," disclosed that Jon Isaac was paid $200,000 as salary and $54,000 in "All Other Compensation," for a total of $254,000. A note to the disclosure stated: "'All Other Compensation' for Mr. Isaac includes $54,000 for each of 2017 and 2016, which was accrued by us for the reasonable housing allowance to which Mr. Isaac is entitled under his employment agreement."

153. Jon Isaac signed and certified the FY 2017 Form 10-K and the amended Form 10-K.

154. On June 25, 2018, LIVE filed Schedule 14A, its Proxy Statement, for the Annual Meeting of Stockholders to be held on July 24, 2018. The Proxy Statement included the same disclosure about Jon Isaac's compensation as was in the Form 10-K.

155. Jon Isaac signed the Schedule 14A filed June 25, 2018.

**3.      FY 2018 (October 1, 2017 to September 30, 2018)**

156. On or about December 18, 2017, LIVE wired $165,000 to Jon Isaac with the notation "expense reimb."

157. On December 27, 2018, LIVE filed its Form 10-K for the FY 2018.

158. In the Form 10-K for the FY 2018, Item 11, "Executive Compensation," disclosed that Jon Isaac was paid $200,000 as salary and $54,000 in "All Other Compensation," for a total of $254,000. A note to the disclosure stated: "'All Other Compensation' for Mr. Isaac includes $54,000 for each of 2018 and 2017, which was accrued by us for the reasonable housing allowance to which Mr. Isaac is entitled under his employment agreement."

159. The Form 10-K did not disclose the $165,000 payment to Jon Isaac on December 18, 2017.

160. On June 25, 2019, LIVE filed Schedule 14A, its Proxy Statement, for the Annual Meeting of Stockholders to be held on July 24, 2019. The Proxy Statement made the same disclosures concerning Jon Isaac's compensation as were made in LIVE's FY 2018 Form 10-K.

161. Jon Isaac signed the Schedule 14A filed on June 25, 2019.

**D.** **LIVE Did Not Have Sufficient Internal Accounting Controls**

162. From at least 2016 through 2018, LIVE admittedly did not have sufficient internal accounting controls to provide accurate financial statements.

163. In Item 9A of LIVE's Form 10-K for FY 2016, "Controls and Procedures," LIVE disclosed that its "disclosure controls and procedures were not effective to ensure that information required to be disclosed in reports filed under the Securities Exchange Act of 1934."

164. LIVE's Form 10-K for FY 2016 was signed and certified by Jon Isaac as principal executive and financial officer of LIVE.

165. LIVE's Form 10-K for FY 2017, filed January 18, 2018, in Item 9A, "Controls and Procedures," also disclosed that LIVE's disclosure controls and procedures were "not effective," and that management had identified several material weaknesses:

(a) lack of sufficient controls around the financial reporting process; (b) lack of proper segregation of duties within the financial reporting process; (c) lack of adequate controls surrounding management's review of the income tax provision process; (d) lack of controls surrounding the assessment of certain cash flow and balance sheet classifications; and (e) lack of sufficient controls around the process for business combinations.

28

166. LIVE's Form 10-K for FY 2017 was signed and certified by Jon Isaac as principal executive officer of LIVE and by Johnson as principal financial officer of LIVE.

167. LIVE's Form 10-K for FY 2019, filed on February 10, 2020, stated that management believes LIVE's disclosure controls and procedures "were not effective," and that there are "deficiencies that management believes to be material weaknesses."

168. The Form 10-K for FY 2019 was signed and certified by Jon Isaac and principal executive officer and by Johnson as principal financial officer.

## FIRST CLAIM FOR RELIEF

### Materially False or Misleading Statements

### in Connection with the Purchase or Sale of Securities

### Violations of Section 10(b) of the Exchange Act and Rules 10b-5(b)

### (Against Defendants LIVE and Jon Isaac)

169. The SEC realleges and incorporates by reference paragraphs 1 through 168 above.

170. As alleged above in paragraphs 15 through 37, among other allegations, Defendants LIVE and Jon Isaac made a materially false and misleading statement, and omitted material information, concerning recognition of "other income" of $915,500 in LIVE's Form 10-K filed on December 29, 2016. LIVE and Jon Isaac failed to disclose that the Novalk Amendment had been negotiated entirely after the close of LIVE's fiscal year, and that Jon Isaac engineered the falsehood that LIVE and Novalk had agreed to the terms during LIVE's fiscal year 2016 so it could be included in FY 2016 results, increase LIVE's pre-tax income by 20%, and boost its fiscal year results. Defendants LIVE and Jon Isaac did not begin to negotiate the Novalk Amendment until November 30, 2016, months after LIVE's fiscal year had closed, and thus recognition of the income in FY 2016 was not in accordance with GAAP.

171. At all relevant times as alleged, Jon Isaac acted with scienter. Jon Isaac's scienter is imputed to LIVE.

172. By engaging in the conduct described above, Defendants LIVE and Jon Isaac, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of

29

transportation or communication in interstate commerce or by use of the mails directly or indirectly, made an untrue statement of material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

173. By engaging in the conduct described above, Defendants LIVE and Jon Isaac violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. §§ 240.10b-5(b).

## SECOND CLAIM FOR RELIEF

### Materially False and Misleading Statements

### in Connection with the Purchase or Sale of Securities

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)

### (Against Defendants LIVE and Jon Isaac)

174. The SEC realleges and incorporates by reference paragraphs 1 through 168 above.

175. As alleged above in paragraphs 43 through 51 above, among other allegations, Defendants LIVE and Jon Isaac made materially and false and misleading statements, and omitted material information, in LIVE's December 28, 2016 press release that falsely stated LIVE's earnings per share were $8.92, or 40% more than LIVE's audited earnings per share announced the next day in LIVE's Form 10-K.

176. In fact, this statement was materially false because LIVE's audited financial statements disclosed that earnings per share were actually $6.33.

177. At all relevant times and as described above, Jon Isaac acted with scienter. Defendant Jon Isaac's scienter is imputed to LIVE as its CEO.

178. By engaging in the conduct described above, Defendants LIVE and Jon Isaac, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly, made an untrue statement of material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading.

30

179. By engaging in the conduct described above, Defendants LIVE and Jon Isaac violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. §§ 240.10b-5(b).

**THIRD CLAIM FOR RELIEF**

**Fraud in Connection with the Purchase or Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b-5(c)**

**(Against Defendants LIVE, Jon Isaac, and Kingston)**

180. The SEC realleges and incorporates paragraphs 1 through 168 above.

181. As alleged above in paragraphs 52 through 95, and incorporating the allegations in paragraphs 15 through 51, Defendants LIVE and Jon Isaac engaged in a scheme to defraud by intentionally inflating LIVE's pre-tax income by 20% by improperly recognizing $915,500 of "other income" from the Novalk Amendment, lying to LIVE's outside accountants about the Novalk transaction, hiring a stock promoter to pump LIVE's stock in advance of the December 28, 2016 press release, and intentionally issuing the December 28, 2016 press release that overstated LIVE's earnings per share by 40%. Jon Isaac involved Kingston to sell LIVE stock after the market reacted to the false press release and inflated earnings. Defendants LIVE and Jon Isaac then engaged in a cover-up of their conduct by issuing a false and misleading letter to shareholders, and by lying to FINRA about knowing the stock promoter and the calculation of the inflated earnings per share.

182. At all relevant times and as alleged above, Jon Isaac acted with scienter.

183. Jon Isaac's scienter is imputed to LIVE in his role as its CEO.

184. Jon Isaac's scienter is imputed to Kingston, which acted as his nominee.

185. By engaging in the conduct described above, Defendants LIVE, Jon Isaac, and Kingston, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly, (a) employed a device, scheme, or artifice to defraud, and (c) engaged in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

31

186. By engaging in the conduct described above, Defendants LIVE, Jon Isaac, and Kingston violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a) & 240.10b-5(c).

### FOURTH CLAIM FOR RELIEF

**Materially False or Misleading Statements**

**in Connection With the Offer and Sale of Securities**

**Violation of Section 17(a)(2) of the Securities Act**

**(Against Defendant Jon Isaac)**

187. The SEC realleges and incorporates paragraphs 1 through 168 above.

188. As alleged above in paragraphs 43 through 95 above, Defendant Jon Isaac made materially and false and misleading statements, and omitted material information, in LIVE's December 28, 2016 press release that falsely stated LIVE's earnings per share were $8.92, or 40% more than LIVE's audited earnings per share announced the next day in LIVE's Form 10-K. In connection with that false press release, Jon Isaac sold LIVE shares through the nominee Kingston's brokerage account, and realized gross proceeds of approximately $48,000.

189. At all relevant times and as alleged above, Jon Isaac acted with scienter, or in the alternative, was negligent.

190. By engaging in the conduct described above, Jon Isaac directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails, obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

191. By engaging in the conduct described above, Defendant Jon Isaac violated, and unless restrained and enjoined will continue to violate, Section 17(a)(2) of the Securities Act, 15 U.S.C. §§ 77q(a)(2).

### FIFTH CLAIM FOR RELIEF

**Fraud in Connection With the Offer or Sale of Securities**

**Violation of Sections 17(a)(1) and 17(a)(3) of the Securities Act**

**(Against Defendants Jon Isaac and Kingston)**

192. The SEC realleges and incorporates paragraphs 1 through 168 above.

193. As alleged in paragraphs 52 through 95 above, and incorporating the allegations in paragraphs 15 through 51, Defendant Jon Isaac engaged in a scheme to defraud by intentionally inflating LIVE's pre-tax income by 20% by improperly recognizing $915,500 of "other income" from the Novalk Amendment and lying to LIVE's outside accountant about the Novalk transaction. Jon Isaac hired a stock promoter to pump LIVE's stock in advance of the December 28, 2016 press release, and intentionally issued the December 28, 2016 press release that overstated LIVE's earnings per share by 40%. Jon Isaac involved Kingston by using its brokerage account to sell LIVE stock after the market reacted to the false press release and inflated earnings. Defendant Jon Isaac then engaged in a cover-up of his conduct by issuing a false and misleading letter to shareholders, and by lying to FINRA about knowing the stock promoter and the calculation of the inflated earnings per share. In connection with the scheme, Jon Isaac and Kingston sold LIVE and realized gross proceeds of approximately $48,000.

194. At all relevant times, Jon Isaac acted with scienter, or in the alternative, was negligent.

195. Jon Isaac's scienter is imputed to Kingston, his nominee.

196. By engaging in the conduct described above, Defendants Jon Isaac and Kingston, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails employed devices, schemes, or artifices to defraud; or engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

197. By engaging in the conduct described above, Defendants Jon Isaac and Kingston each violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1) & 77q(a)(3).

**SIXTH CLAIM FOR RELIEF**

**False Statements to Accountants**

33

**Violations of Rule 13b2-2 of the Exchange Act**

**(Against Defendant Jon Isaac)**

198.     The SEC realleges and incorporates by reference paragraphs 1 through 168 above.

199.     As alleged above in paragraphs 38 through 42, and incorporating the allegations in paragraphs 15 through 37, on or about December 28, 2016, Jon Isaac, as LIVE's CEO and CFO, signed a management representation letter to LIVE's outside accountants in connection with the audit of LIVE's FY 2016.  In that letter, Jon Isaac represented that the Novalk Amendment was "effective September 15, 2016," but omitted material information that the Amendment had been negotiated after the close of LIVE's fiscal year, and that Jon Isaac had engineered the "effective date" from September 30 to September 15 to increase the amount of "other income" that LIVE recorded as a result of the transaction.

200.     By engaging in the conduct described above, Defendant Jon Isaac, directly or indirectly:  (1) made or caused to be made a materially false or misleading statement to an accountant in connection with:  (i) any audit, review or examination of the financial statements of the issuer required to be made under the federal securities laws; or (ii) the preparation or filing of any document or report required to be filed with the Commission; or (2) omitted to state, or caused another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with:  (i) any audit, review or examination of the financial statements of the issuer required to be made under the federal securities laws; or (ii) the preparation or filing of any document or report required to be filed with the SEC.

201.     Defendant Jon Isaac knew, or was reckless in not knowing, that his representations to LIVE's accountants were materially false and misleading, and omitted material information.  Jon Isaac acted unreasonably in making the foregoing statements, and omitting information, to LIVE's accountants.

202.     By engaging in the conduct described above, Defendant Jon Isaac violated, and unless restrained and enjoined will continue to violate Rule 13b2-2 of the Exchange Act, 17 C.F.R. § 240.13b2-2.

34

## SEVENTH CLAIM FOR RELIEF

### Aiding and Abetting Violations of Section 10(b)

### of the Exchange Act and Rule 10b-5(b)

### (Against Defendant Johnson)

203. The SEC realleges and incorporates by reference paragraphs 1 through 168 above.

204. As alleged above in paragraphs 15 through 37, Defendants LIVE and Jon Isaac improperly recognized $915,500 from the Novalk Amendment by intentionally creating the false appearance that the transaction occurred before the close of FY 2016, and made materially false and misleading statements, and omitted material information, in LIVE's Form 10-K for FY 2016 about the Novalk Amendment and recognition of $915,500 of other income.

205. Defendant Johnson drafted LIVE's Form 10-K for FY 2016 and helped prepare its financial statements, including drafting the disclosure in LIVE's Form 10-K about the Novalk Amendment. Jon Isaac's December 2016 emails to Johnson changing the effective date from September 30 to September 15, and thus increasing the amount of other income from the transaction, showed that Jon Isaac was manipulating the effective date to boost LIVE's pre-tax income.

206. By engaging in the conduct described above, Defendant Johnson knowingly and recklessly provided substantial assistance to, and thereby aided and abetted LIVE and Jon Isaac in their violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. §§ 240.10b-5(b).

207. By engaging in the conduct described above, Defendant Johnson aided and abetted, and unless restrained and enjoined, is reasonably likely to continue to aid and abet, violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. §§ 240.10b-5(b).

## EIGHTH CLAIM FOR RELIEF

### Materially False and Misleading Statements

### in Connection with the Purchase or Sale of Securities

### Violations of Section 10(b) of the Exchange Act

35

**and Rule 10b-5(b)**

**(Against Defendants LIVE, Jon Isaac, and Johnson)**

208. The SEC realleges and incorporates by reference paragraphs 1 through 168 above.

209. As alleged above in paragraphs 96 through 109, Defendants LIVE, Jon Isaac, and Johnson made materially false and misleading statements, and omitted material information, in LIVE's Form 10-Q for the first quarter of its FY 2018 in which it recognized other income of $3,773,486 as a bargain purchase gain from the acquisition of ApplianceSmart and reported a profitable quarter. The Form 10-Q was false and misleading because LIVE did not have effective control of ApplianceSmart, the transaction had not closed, consideration had not passed, and ApplianceSmart's stock had not been placed in escrow. The Form 10-Q omitted material information that using December 30, 2017 as the acquisition date was not in accordance with GAAP because LIVE did not have effective control of ApplianceSmart, and that the MidCap Credit Agreement effectively prevented LIVE from gaining effective control of ApplianceSmart.

210. At all relevant times, Defendant Jon Isaac acted with scienter.

211. Jon Isaac's state of mind is imputed to LIVE, of which he was CEO.

212. At all relevant times, Defendant Johnson acted with scienter.

213. Johnson's scienter is imputed to LIVE, of which he was CFO.

214. By engaging in the conduct described above, Defendants LIVE, Jon Isaac, and Johnson directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly, made an untrue statement of material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading.

215. By engaging in the conduct described above, Defendants LIVE, Jon Isaac, and Johnson violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. §§ 240.10b-5(b).

**NINTH CLAIM FOR RELIEF**

**Fraud in Connection with the Purchase or Sale of Securities**

36

**Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b-5(c)**

**(Against Defendants LIVE, JOI/ARCA, Jon Isaac, and Johnson)**

216. The SEC realleges and incorporates paragraphs 1 through 168 above.

217. As alleged above in paragraphs 115 through 140, and incorporating the allegations in paragraphs 96 through 114, LIVE, JOI/ARCA, Jon Isaac, and Johnson engaged in a scheme to create the false appearance that LIVE acquired ApplianceSmart on December 30, 2017, and that it was appropriate to use December 30, 2017 as the acquisition date for accounting purposes, so that LIVE could recognize $3,773,486 of other income from a bargain purchase gain and change an unprofitable quarter into a profitable quarter. In connection with the scheme, Jon Isaac and Johnson lied to LIVE's outside accountants concerning LIVE's effective control of ApplianceSmart. Johnson created a plan for LIVE and JOI/ARCA to claim that LIVE had made a cash payment of approximately $2,580,505.54 to JOI/ARCA, which in fact were payments made by ApplianceSmart to MidCap under the terms of the MidCap Credit Agreement. LIVE's January 5, 2018 Form 8-K falsely represented that the capital stock of ApplianceSmart had been delivered into escrow when in fact it was subject to the MidCap Credit Agreement and in the possession of MidCap, and that false statement was repeated in LIVE's Form 10-Q for the first quarter of it FY 2018. LIVE's Form 10-Q for the first quarter repeatedly referred to December 30, 2017 as the "closing date," although the transaction had not closed on that date. LIVE and JOI/ARCA each stated that LIVE had paid $2,580,505.54 in cash to JOI/ARCA, when in fact LIVE had not made such a cash payment, and this statement was repeated in JOI/ARCA's Form 10-K for its fiscal year ending December 30, 2017; in LIVE's Form 8-K filed April 26, 2018; and in LIVE's Form 10-Q for the second quarter of its FY 2018. The repeated misstatements about the stock being placed into escrow, the $2,580,505.54 cash payment, the closing of the transaction, and LIVE's effective control of ApplianceSmart were made to create the false appearance that LIVE had acquired ApplianceSmart on December 30, 2017, which did not occur until the MidCap Credit Agreement was terminated.

218. At all relevant times, Jon Isaac acted with scienter.

219. Jon Isaac's scienter is imputed to LIVE, of which he was the CEO.

37

220. At all relevant times, Johnson acted with scienter.

221. Johnson's scienter is imputed to LIVE and JOI/ARCA, in his role as CFO for each company.

222. By engaging in the conduct described above, Defendants LIVE, JOI/ARCA, Jon Isaac, and Johnson directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly: (a) employed devices, schemes, or artifices to defraud; and (b) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

223. By engaging in the conduct described above, Defendants LIVE, JOI/ARCA, Jon Isaac, and Johnson violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a) & 240.10b-5(c).

## TENTH CLAIM FOR RELIEF

### False Statements to Accountants

### Violations of Rule 13b2-2 of the Exchange Act

### (Against Defendants Jon Isaac and Johnson)

224. The SEC realleges and incorporates by reference paragraphs 1 through 168 above.

225. As alleged above in paragraphs 110 through 114, and incorporating the allegations in paragraphs 96 through 109, in connection with the ApplianceSmart transaction and the review of LIVE's first quarter financial statements for the quarter ending December 31, 2017, Jon Isaac and Johnson signed a management representation letter to LIVE's outside accountants which falsely stated that LIVE had effective control of ApplianceSmart, when in fact ApplianceSmart's assets were subject to the MidCap Credit Agreement, ApplianceSmart's revenues were subject to the MidCap Credit Agreement and not under LIVE's control, and JOI/ARCA still controlled ApplianceSmart's bank accounts and general ledger.

226. By engaging in the conduct described above, Defendants Jon Isaac and Johnson, directly or indirectly: (1) made or caused to be made a materially false or misleading statement to

38

an accountant in connection with: (i) any audit, review or examination of the financial statements of the issuer required to be made under the federal securities laws; or (ii) the preparation or filing of any document or report required to be filed with the SEC; or (2) omitted to state, or caused another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with: (i) any audit, review or examination of the financial statements of the issuer required to be made under the federal securities laws; or (ii) the preparation or filing of any document or report required to be filed with the SEC.

227. Defendant Jon Isaac knew, or was reckless in not knowing, his statements to LIVE's accountants were materially false and misleading, and omitted material information. Jon Isaac acted unreasonably in making the foregoing statements to LIVE's accountants.

228. Defendant Johnson knew, or was reckless in not knowing, his statements to LIVE's accountants were materially false and misleading, and omitted material information. Johnson acted unreasonably in making the foregoing statements to LIVE's accountants.

229. By engaging in the conduct described above, Defendants Jon Isaac and Johnson violated, and unless restrained and enjoined will continue to violate Rule 13b2-2 of the Exchange Act, 17 C.F.R. § 240.13b2-2.

## ELEVENTH CLAIM FOR RELIEF

### False Sarbanes-Oxley Certification

### Violation of Rule 13a-14 of the Exchange Act

### (Against Defendant Jon Isaac)

230. The SEC realleges and incorporates by reference paragraphs 1 through 168 above.

231. As alleged above in paragraphs 15 through 37, Defendant Jon Isaac signed certifications of LIVE's Form 10-K for its FY 2016 in accordance with Section 302 of the Sarbanes-Oxley Act of 2002 and Rule 13a-14 thereunder, one as LIVE's principal executive officer and one as LIVE's principal financial officer. That certification was false because the Form 10-K contained material misrepresentations and omissions about LIVE's recognition of "other income" from the Novalk Amendment.

39

232. By engaging in the conduct described above, Defendant Jon Isaac, as LIVE's principal executive officer in 2016, and as LIVE's principal financial officer in 2016, falsely certified a periodic report containing financial statements filed by an issuer in accordance with Section 13(a) of the Exchange Act.

233. By engaging in the conduct described above, Defendant Jon Isaac violated, and unless restrained and enjoined will continue to violate, Rule 13a-14 of the Exchange Act, 17 C.F.R. § 240.13a-14.

### TWELFTH CLAIM FOR RELIEF

**False Sarbanes-Oxley Certification**

**Violation of Rule 13a-14 of the Exchange Act**

**(Against Defendant Johnson)**

234. The SEC realleges and incorporates paragraphs 1 through 168 above.

235. As alleged above in paragraphs 110 through 114, and incorporating paragraphs 96 through 109, Defendant Johnson signed a certification of LIVE's Form 10-Q for the first quarter of its FY 2018 (ended December 31, 2017) in accordance with Section 302 of the Sarbanes-Oxley Act of 2002 and Rule 13a-14 thereunder. That certification was false because the quarterly report contained material misrepresentations and omissions about LIVE's recognition of a bargain purchase gain from the purported acquisition of ApplianceSmart.

236. By engaging in the conduct described above, Defendant Johnson, as LIVE's principal financial officer in 2018, falsely certified a periodic report containing financial statements filed by an issuer in accordance with Section 13(a) of the Exchange Act.

237. By engaging in the conduct described above, Defendant Johnson violated, and unless restrained and enjoined will continue to violate, Rule 13a-14 of the Exchange Act, 17 C.F.R. § 240.13a-14.

### THIRTEENTH CLAIM FOR RELIEF

**Failure to File Accurate Periodical Reports**

**Violations of Section 13(a) of the Exchange Act and**

**Rules 12b-20, 13a-1, and 13a-13 Thereunder**

**(Against Defendant LIVE, and**

**Against Defendants Jon Isaac and Johnson for Aiding and Abetting)**

238. The SEC realleges and incorporates by reference paragraphs 1 through 168 above.

239. As alleged above in paragraphs 15 through 37, and 96 through 109, LIVE failed to file with the SEC accurate annual reports on Form 10-K and quarterly reports on Form 10-Q, and the reports that LIVE filed contained material misstatements, and did not contain material information necessary to make the required statements in the reports not misleading.

240. By engaging in the conduct described above, LIVE violated, and unless restrained and enjoined will continue to violate Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1, and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-20, 240.13a-1, & 240.13a-13.

241. By engaging in the conduct described above, Defendants Jon Isaac and Johnson knowingly and recklessly provided substantial assistance to, and thereby aided and abetted LIVE, in its violations of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1, and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-20, 240.13a-1, & 240.13a-13

242. By engaging in the conduct described above, Defendants Jon Isaac and Johnson aided and abetted, and unless restrained and enjoined, are reasonably likely to continue to aid and abet, violations of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1, and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-20, 240.13a-1, & 240.13a-13.

## FOURTEENTH CLAIM FOR RELIEF

**Failure to Maintain Accurate Books and Records**

**Violations of Section 13(b)(2)(A) of the Exchange Act**

**(Against Defendant LIVE, and**

**Defendants Jon Isaac and Johnson for Aiding and Abetting)**

243. The SEC realleges and incorporates by reference paragraphs 1 through 168 above.

244. As alleged in paragraphs 15 through 42, and 52 through 95, LIVE failed to make and keep books, records, and accounts that, in reasonable detail, accurately and fairly reflected the Novalk Amendment.

245. As alleged in paragraphs 96 through 140, LIVE failed to make and keep books,

41

records, and accounts that, in reasonable detail, accurately and fairly reflected the ApplianceSmart transaction.

246. By engaging in the conduct described above, LIVE violated, and unless restrained and enjoined, will continue to violate Section 13(b)(2)(A) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(A).

247. By engaging in the conduct described above, Defendant Jon Isaac knowingly and recklessly provided substantial assistance to, and thereby aided and abetted LIVE in its violations of Section 13(b)(2)(A) of the Exchange Act, and unless restrained and enjoined, is reasonably likely to continue to aid and abet violations of Section 13(b)(2)(A) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(A).

248. By engaging in the conduct described above with respect to the ApplianceSmart transaction, Defendant Johnson knowingly and reckless provided substantial assistance to, and thereby aided and abetted LIVE in its violations of Section 13(b)(2)(A) of the Exchange Act, and unless restrained and enjoined, is reasonably likely to continue to aid and abet violations of Section 13(b)(2)(A) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(A).

### FIFTEENTH CLAIM FOR RELIEF

**Failure to Devise a System of Internal Accounting Controls**

**Violations of Section 13(b)(2)(B) of the Exchange Act**

**(Against Defendant LIVE, and**

**Against Defendants Jon Isaac and Johnson for Aiding and Abetting)**

249. The SEC realleges and incorporates by reference paragraphs 1 through 168 above.

250. As alleged in above in paragraphs 162 through 168, LIVE failed to maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparing of financial statements in conformity with generally accepted accounting principles, or any other criteria applicable to such statements, and to maintain accountability of assets.

251. By engaging in the conduct described above, LIVE violated, and unless restrained and enjoined will continue to violate, Section 13(b)(2)(B) of the Exchange Act, 15 U.S.C. §

78m(b)(2)(B).

252. By engaging in the conduct described above, Defendant Jon Isaac knowingly and recklessly provided substantial assistance to, and thereby aided and abetted LIVE's violation of Section 13(b)(2)(B) of the Exchange Act, and unless restrained and enjoined, is reasonably likely to continue to aid and abet violations of Section 13(b)(2)(B) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(B).

253. By engaging in the conduct described above, beginning as of January 2017, Defendant Johnson knowingly and recklessly provided substantial assistance to, and thereby aided and abetted LIVE's violation of Section 13(b)(2)(B) of the Exchange Act, and unless restrained and enjoined, is reasonably likely to continue to aid and abet violations of Section 13(b)(2)(B) of the Exchange Act, 15 U.S.C. §§ 78m(b)(2)(B).

**SIXTEENTH CLAIM FOR RELIEF**

**Falsifying Books and Records**

**Violations of Section 13(b)(5) of the Exchange Act and Rule 13b2-1 Thereunder**

**(Against Defendants Jon Isaac and Johnson)**

254. The SEC realleges and incorporates by reference paragraphs 1 through 168 above.

255. As alleged above in paragraphs 15 through 37 above, Jon Isaac and Johnson knowingly falsified a book, record, or account of an issuer that the Exchange Act requires an issuer to maintain by falsely recognizing "other income" of $915,500 from the Novalk Amendment in LIVE's financial statements for FY 2016.

256. As alleged in paragraphs 96 through 109 above, Jon Isaac and Johnson knowingly falsified a book, record, or account of an issuer that the Exchange Act requires an issuer to maintain by falsely recognizing a bargain purchase gain of $3,773,486 as other income in LIVE's financial statements for the first quarter of its FY 2018 (ending December 31, 2017).

257. By engaging in the conduct described above, Jon Isaac and Johnson violated, and unless restrained and enjoined, are reasonably likely to continue to violate, Section 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5) and Rule 13b2-1 thereunder, 17 C.F.R. § 240.13b2-1.

**SEVENTEENTH CLAIM FOR RELIEF**

## Solicitation of Proxies in Violation of Rules and Regulations

## Violations of Section 14(a) of the Exchange Act and Rule 14a-3 Thereunder

## (Against Defendants LIVE and Jon Isaac)

258. The SEC realleges and incorporates by reference paragraphs 1 through 168 above.

259. As alleged above in paragraphs 141 through 161, Defendants LIVE and Jon Isaac, directly or indirectly, in contravention of Section 14(a) and Rule 14a-3, solicited or permitted the use of their names to solicit proxies without furnishing information required by Schedule 14A, and specifically detailed disclosures of compensation paid to named executive officers, including CEOs and CFOs, including disclosure of the total value of all perquisites and other personal benefits provided to those officers who receive at least $10,000 worth of such items in a given year. The proxy statements that LIVE issued in connection with its 2017, 2018, and 2019 annual meetings failed accurately to disclose Jon Isaac's compensation.

260. By engaging in the conduct described above, LIVE and Jon Isaac acted at least negligently.

261. By engaging in the conduct described above, Defendants LIVE and Jon Isaac violated, and unless restrained and enjoined, are reasonably likely to continue to violate, Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-3 thereunder, 17 C.F.R. § 240.14a-3.

## **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

## I.

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

## II.

Issue orders, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendants LIVE, Jon Isaac, and Kingston, and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the orders by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act, 15 U.S.C. §77q(a).

**III.**

Issue orders, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendants LIVE, JOI/ARCA, Jon Isaac, and Johnson, and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the orders by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5

**IV.**

Issue orders, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendant LIVE from violating Sections 13(a), Sections 13(b)(2)(A), 13(b)(2)(B), and 14(a) of the Exchange Act, 15 U.S.C. §§ 78m(a), 78m(b)(2)(A), 78m(b)(2)(B), & 78n(q), and Rules 12b-20, 13a-1, 13a-13, and 14a-3 thereunder, 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-13, & 240.14a-3; and permanently enjoining Jon Isaac and Johnson from aiding and abetting LIVE's violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act, and Rules 12b-20, 13a-1, and 13a-13 thereunder, and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the orders by personal service or otherwise.

**V.**

Issue orders, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendant Jon Isaac from violation Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(q), and Rule 14a-3 thereunder, 17 C.F.R. § 240.14a-3, and his officers, agents, servants, employees, and attorneys and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise.

**VI.**

Issue orders, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently barring Jon Isaac and Johnson from acting as an officer or director of any issuer pursuant to Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2).

**VII.**

Order Defendants Jon Isaac and Kingston to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon.

**VIII.**

Order Defendants LIVE, JOI/ARCA, Jon Isaac, Johnson, and Kingston to pay civil penalties under Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

**IX.**

Order Defendants Jon Isaac and Kingston to pay civil penalties under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d).

**X.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**XI.**

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: August 2, 2021

/s/ John B. Bulgozdy
John B. Bulgozdy
Robert Stillwell
Wendy Pearson
Attorneys for Plaintiff Securities and
Exchange Commission

46