—————2:21-cv-01517-CDS-EJY—————

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

DANIEL E. SIEGGREEN,                )
Individually and On Behalf          ) Case No. 2:21-cv-01517-CDS-EJY
of All Others Similarly             )
Situated,                           ) Las Vegas, Nevada
                                    ) Monday, September 30, 2024
          Plaintiff,                ) 1:07 p.m. - 2:58 p.m.
                                    ) Courtroom 6B
      vs.                           )
                                    ) Motion Hearing
LIVE VENTURES                       )
INCORPORATED, JON ISAAC,            ) **C E R T I F I E D   C O P Y**
VIRLAND A. JOHNSON,                 )
                                    )
          Defendants.               )
                                    )
_____     )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE CRISTINA D. SILVA,
UNITED STATES DISTRICT JUDGE

APPEARANCES:       See next page

COURT REPORTER:    Samantha N. McNett, RMR, CRR, CCR
                   United States District Court
                   333 Las Vegas Boulevard South, Room 1334
                   Las Vegas, Nevada  89101
                   Samantha_McNett@nvd.uscourts.gov

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

2:21-cv-01517-CDS-EJY

**APPEARANCES**

For the Plaintiff:

**NATALIE S. PANG, ESQ.**
GLANCY PRONGAY & MURRAY, LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
310-201-9150

-AND-

**ANDREW R. MUEHLBAUER, ESQ.**
MUEHLBAUER LAW OFFICE, LTD.
7915 West Sahara Avenue, Suite 104
Las Vegas, Nevada 89117
702-330-4505

For the Defendants Live Ventures Incorporated and Jon Isaac:

**MARK FERRARIO, ESQ.**
GREENBERG TRAURIG
10845 Griffith Peak, Suite 600
Las Vegas, Nevada 89135
702-792-3773

For Defendant JanOne, Inc.:

**RANDOLF W. KATZ, ESQ.**
555 South Flower Street, 24th Floor
Los Angeles, California 90071
213-417-5310

-AND-

**JOHN HUNT, ESQ.**
CLARK HILL
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
702-862-8300

* * *

LAS VEGAS, NEVADA; MONDAY, SEPTEMBER 30, 2024; 1:07 P.M.

--oOo--

P R O C E E D I N G S

THE COURTROOM ADMINISTRATOR:  This is the time set for hearing on motions, Daniel Sieggreen versus Live Ventures Incorporated, case number 2:21-cv-01517-CDS-EJY.

Counsel, please note your appearance beginning with plaintiff.

MS. PANG:  Good afternoon, your Honor.  Natalie Pang on behalf of plaintiff.

THE COURT:  Good morning.

MR. MUEHLBAUER:  Good afternoon, your Honor.  Andrew Muehlbauer on behalf of plaintiff.

THE COURT:  Good afternoon.

MR. FERRARIO:  Good afternoon, your Honor.  Mark Ferrario on behalf of Live and Mr. Isaac.

THE COURT:  Good afternoon to you.

MR. KATZ:  Good afternoon.  Randy Katz on behalf of JanOne.

THE COURT:  Good afternoon.

MR. HUNT:  Good afternoon, your Honor.  Jon Hunt on behalf of JanOne.

THE COURT:  All right.  And good afternoon to you, as well.

Thank you all for being present this afternoon.  I

apologize for having to move the hearing.  I had trials back to back.  I'm not quite sure what happened to August and September, but if anyone can find those days for me, I'd appreciate it.  Nonetheless, I appreciate you being here and I know it was a lot to ask, so I'm very grateful.

We are here on the pending motions to dismiss.  And I felt that a hearing would be helpful for the Court to resolve a number of questions it has regarding the allegations set forth in the amended complaint.  The parties are familiar with the pleading standards when dealing with securities litigation.  So I'm going to just really dive right into my questions and then we can go from there.

So, I'm going to start with plaintiff.  And I want to focus, first, on the ApplianceSmart acquisition.

In a nutshell -- and I'm going to generalize this -- you are arguing that the financial disclosure that sets forth the ApplianceSmart transaction was false and misleading really given the timeline that is set forth therein.  And tell me why the information that was ultimately disclosed isn't sufficient for purposes of your scheme and false and misleading statements about the transaction itself.

MS. PANG:  Your Honor, would you like plaintiffs to stand or --

THE COURT:  It's up to you.  You're welcome to stand, sit.  You're also welcome to come to the podium.  It's up to

you.  I'm flexible.

MS. PANG:  Your Honor, for clarification, when you're referring to the information that was finally disclosed, can I ask for -- what you're referring to?

THE COURT:  Sure.  So they go -- let me see here.  Let me get to my notes here.

Are you asking questions because you're talking about the lack of disclosure for MidCap?  Is that what you're asking for in terms of the clarification?

MS. PANG:  Your Honor, you referred to the information being ultimately disclosed.  Were you referring to the attachment of the agreement itself to an SEC filing?

THE COURT:  Yes.

MS. PANG:  Okay.  Well, your Honor, the attachment of a contract to an SEC filing itself is not necessarily enough to dispel any false or misleading impressions about the contract.

THE COURT:  Okay.

MS. PANG:  And here, defendants made statements about the ApplianceSmart transaction, that it was effective as of December 30, 2017, that the stock certificate had been transferred into escrow, and that, effectively, the transaction had occurred and that ApplianceSmart could be acquired.  They made those statements starting in January of 2018.  The agreement itself was not attached to anything when they made those statements.  That was later attached to a quarterly

filing.

THE COURT:  A quarter?  All right.

And maybe a better question is:  At the time that it gets disclosed, why is it then material that the -- I'm going to call it the additional information was later disclosed?

MS. PANG:  The -- I'm sorry, your Honor.  The -- the information that was disclosed -- why was -- why were their misstatements material given the --

THE COURT:  Correct.

MS. PANG:  -- agreement?

Well, your Honor, the -- the agreement that's attached doesn't actually confirm that ApplianceSmart was subject to this credit agreement whereby it could not transfer any of its assets to another party without MidCap's written approval.

THE COURT:  Right.

MS. PANG:  So the agreement itself does not actually say anything to that effect.  So it would not have put a reasonable investor on notice that as of December 30, 2017 that agreement was not actually effective.

THE COURT:  And I understand.  And I understand that your argument is that makes it misleading, right?

MS. PANG:  Yes, your Honor.

THE COURT:  But why is it material?

MS. PANG:  Your Honor, materiality is a question of fact which is typically not appropriate for resolution on a

motion to dismiss.

I think that that information would have been material to a reasonable investor. It would have impacted the total mix of information available to them, that this transaction was not effective as of this date, that this entity could not be acquired at this time.

And further, your Honor, defendants did not disclose that the purpose of this agreement was to have Live avoid having to report an unprofitable quarter and for JanOne to be able to also avoid a tax liability.

THE COURT: All right. And I understand your argument regarding materiality.

I think, though, my question in terms of when I'm saying "material" kind of goes to the -- and I always say this, and I never know which way you're suppose to say this so feel free to correct me -- scienter regarding that.

And so it's your position that it would have impacted the total mix of information -- hold on one second.

So is it your position that having to report the unprofitable quarter and for JanOne to have to avoid a tax liability -- all right. So that is why it would have impacted investors' decisionmaking, if you will?

MS. PANG: Yes, your Honor. That information was not disclosed and that would have been material -- or there's at least a question of fact as to whether that information would

2:21-cv-01517-CDS-EJY

have been material.

THE COURT:  Would have been material.  All right.

Let me hear from defendants.  I'm focussed now on, obviously, the ApplianceSmart.  You hear my questions.  Address my questions.

MR. FERRARIO:  Thank you, your Honor.

And you don't mind if I sit here?

THE COURT:  Not at all.

MR. FERRARIO:  Because I think you're going to go back and forth.

THE COURT:  No.  No.  You're perfectly fine.  Some people are more comfortable at the podium.  Some people are happy sitting.

MR. FERRARIO:  I usually like to stand, but I'm going to sit today.

THE COURT:  I'm very flexible.  If I need you to stand, you'll know.  You'll be good.

MR. FERRARIO:  Okay.  Thank you.

Look, I -- I appreciate the tenor of your questions and I think they're spawned because of what's contained in the briefing.

The fact is there was no failure to disclose what was going on with the ApplianceSmart transaction.  It is clearly set forth in the 8-K.  It was then supplemented with the -- with the agreement.  The 8-K was filed January 5th.  It clearly

lays out the -- the -- the nature of the transaction.

And to get to the question that you asked counsel, it says in there that the shares of stock were delivered into escrow and will be released to the purchaser upon purchaser's receipt of third party financing in an amount sufficient to fund the purchase price. So it couldn't have been made any clearer that the shares were not being transferred.

Also, I think it bears mention that Live's auditors issued unqualified audit opinions concerning the financial statements that incorporated Live's December 30, 2017 acquisition of ApplianceSmart. So any -- and this kind of really is the tenor of our -- of our motion here. All of this stuff was disclosed. If we're trying to pull a fast one on an investor, you're not going to do it this way. Everything is out into the public domain. It's into the informational mix.

To the extent it is material, any -- any reasonable investor is on notice of what's going on and should have been able to inquire further if they had questions about this.

The fact is we couldn't have done more. They don't like the way that the accounting was done. And as we've said -- and I'm not going to regurgitate this in our pleadings -- a disagreement on GAAP isn't sufficient to state a claim for securities fraud. And that's --

THE COURT: No. And I agree with that. And I'll be candid. Resolving GAAP disputes would be improper at this

2:21-cv-01517-CDS-EJY

juncture.  So that isn't going to be sufficient for me to decide this motion to dismiss here today.  And I understand the tenor of your argument.

I think the -- as I understand the allegations set forth in the amended complaint, it's kind of like the devil's in the details.  And so your argument is that it was closed and their argument is it was disclosed but without enough detail.  And so to the extent plaintiff wants to interrupt me and say you disagree with me, you're welcome to do so.

But for purposes of my question to defendants, I agree with you that much of the information was disclosed.  But the fact that information about the transaction stated -- make sure I say it right-- that the -- would not be released to the purchaser upon the purchaser's receipt of third party financing in an amount sufficient to fund the purchase price.

Is that clear enough to tell investors the details of the agreement involved in the ApplianceSmart transactions?  And if yes, how and why?

MR. FERRARIO:  Your Honor, I think it is.

And again, if you go back to the 8-K and the fact that MidCap was in physical possession of the shares really is no -- is of no consequence, in my mind, to a reasonable investor. And the reason is, is for the statement that I read to you which is in the 8-K and it's at page 9 of our moving papers. "The shares of stock were delivered into escrow and will be

2:21-cv-01517-CDS-EJY

released to the purchaser upon purchaser's receipt of third party financing in an amount sufficient to fund the purchase price and the subsequent delivery of such funds to certain third party lenders of the seller at ApplianceSmart."

So they are being put on notice. The fact that we didn't say "MidCap" in there is of no consequence. We're describing the very nature of the transaction.

And your Honor used the phrase we always use, "devil in the details." Here's a situation where we have the details. We've given them to them. So isn't there anything to flesh out.

Look, I applaud counsel for trying to manufacture a claim and twist things around, but the fact is when you look at this, we disclosed everything a reasonable investor would need. It's -- it's clearly sufficient to go out into the marketplace so people can make intelligent choices.

And possession of a stock certificate in and of itself doesn't control ownership of the company. We've cited a case to that in our brief. The fact is the transaction was completed. There were some technical issues that had to occur in terms of transfer of funds before the shares were released because they were being held as security. All of that was disclosed.

I don't think this satisfies the requirements under the PSLRA.

THE COURT:  All right.  I'm going to allow plaintiff to respond.  Specifically, I want you to address their argument about the disclosure of the third party lender.

MS. PANG:  Your Honor, plaintiff's position is that just stating that there's a third party lender is not sufficient to let a reasonable investor know that the entire -- that this entity cannot be transferred without written approval of this third party lender, that this agreement could not be effective as of 12-30-17.

Further, your Honor, counsel for defendants noted that Live's auditors gave clean audit opinions, but a clean audit opinion is not enough to, itself, dispel the falsity of a statement.  And further, as the SEC detailed in its parallel action against defendants, defendants provided its auditors with false statements as well which would render any audit opinion, essentially, not something they can rely upon.

THE COURT:  I'll be honest.  I'm not relying too heavily on the audit opinions, but I do want to go back to the third party lender question.

So your argument is that it was insufficient to advise a reasonable investor that it could not be released without the -- or the -- couldn't happen or a full transaction couldn't occur without a written notice or written approval of MidCap. Again, as pled, it says the third party lender -- it was tied to the -- the need for a third party lender to, essentially,

release the transfer.

So whether it's by written form or not, how is that insufficient to put an investor on notice?

MS. PANG:  Your Honor, I think another key distinction, though, is that, again, defendants did not disclose the circumstances of the transaction.

So putting even aside the -- the mention of a third party creditor, the purpose of this transaction, it was created so that Live could avoid a negative tax liability -- or it could turn an unprofitable quarter into a profitable quarter and so that Joy Arka [phonetic] could avoid a large tax liability that it has incurred from selling real property at a gain that year.  That's information that at least there's a question of fact as to whether a reasonable investor would have found that material.

THE COURT:  Okay.  And do me a favor and point me to the paragraphs in the amended complaint that address that purpose.

MS. PANG:  One example, your Honor, is paragraph 15.

THE COURT:  Okay.  One second here.

MS. PANG:  But, your Honor, the -- this allegation, this section of allegations is flushed out more thoroughly starting at paragraph 76.

THE COURT:  Bear with me; I'm just going through those paragraphs again.

2:21-cv-01517-CDS-EJY

All right.  Well, I reviewed paragraphs 76 through 80 and I understand the allegations regarding at least to avoid the negative impact of these tax issues.

When I read this, I read these paragraphs as explaining MidCap's involvement in the transaction, if you will, not necessarily that it explained the purpose or at least, for example, for JanOne, why they would want to do it this way.

So let me ask this question:  Is it your theory of the case that the combination of the looming tax liability combined with the way the Apple Smart [sic] transaction was presented is what's false and misleading?

MS. PANG:  Yes, your Honor.

And I would also like to add that defendants made statements about an amendment to that agreement in April of 2018 where they stated that part of the purchase price had been paid for ApplianceSmart and the rest the parties had negotiated in good faith, had to pay the remainder of the purchase price.

But really, at that point, no part of the purchase price had been transferred because Live could not obtain the financing it needed for that purchase, which is another aspect that a reasonable investor would have found material to their investment.

THE COURT:  So just to follow up, it's also your position that they falsely claimed that the closing date or the

acquisition date was December 30th but that was an impossibility because they hadn't been able to secure the financing?

MS. PANG: It's more, your Honor, that when defendants represented that they had amended that agreement, that was false, misleading to state -- their statements about that amendment where they stated part of the purchase price had been transferred and then the parties had negotiated in good faith how to pay the remainder. And that -- that portion starts around paragraph 91 of the complaint.

THE COURT: Explain a little bit further to me how the amendment was false and misleading.

MS. PANG: Your Honor, so defendants previously represented that they expected the purchase price to be transmitted by March 31st of 2018.

What happened was Live could not obtain the money it needed to purchase ApplianceSmart. So defendants represented to investors that they -- that a part of the purchase price had been transferred and that the parties had negotiated in good faith how to pay the rest. But in actuality, none of the purchase price had been paid. The parties, I wouldn't say they negotiated in good faith how to pay the rest of it. None of it had been paid to begin with.

And the way that they came up with what should be paid as the, quote-unquote, remainder was they used the incomes that

had been paid to MidCap by ApplianceSmart under their agreement and they treated that number as the amount that Live had paid for the purchase price.

THE COURT:  All right.  Let me turn back to defendants.

If there hadn't been any payments made and then -- I'm looking at the statement that is issued, how is this statement not false and misleading if a purchase price -- it represents that a portion of the purchase price was delivered but it, in fact, was not?

MR. FERRARIO:  Well, your Honor, at the time this -- what -- what's happening here is I think plaintiff's counsel's conflating reporting and evolution -- the evolution of a transaction.  Okay?  And as the transaction evolved at the beginning -- they're -- they haven't pointed to one statement that was made -- okay? -- in that press release that was false. Not one.

When you asked her the direct question, she said, "Well, you have to look at the purpose of this statement.  The purpose was to save taxes."  Well, so now a business is not entitled to save taxes which would be accretive to the value of the business which would enhance the shareholder value?  I mean, that makes no sense to me.

And that's part of the problem with this complaint as a whole.  We disclosed things.  What we disclosed and when we

disclosed them were accurate.  They don't like the fact that because of certain GAAP principles, we were able to, for example, structure one transaction such that it enhanced a -- a previous quarter.  They don't like the fact that under this deal, which was fully disclosed -- okay? -- it -- there were some steps that had to be followed before the shares transferred.  But that doesn't mean that what we're saying is -- was false at any point in time.

And I don't know how you can hammer a company for putting out there in great detail the nature and substance of a transaction.  I -- it -- it just -- saying you don't like the purpose of it doesn't provide the foundation for a PSLRA action.

THE COURT:  Well, I understand that there are requirements and disclosures necessary.

I think the concern, or at least as I'm kind of going through this, is that there are still consequences to not putting all of the facts and information out there.  And if a party is able to just continuously amend the transaction, then at what point does those amendments become false and misleading?  I'm not making a finding on that.  I'm just having this conversation with you.  And I think that is, partially, part of plaintiff's concern.

MR. FERRARIO:  But the underlying substance of the transaction really didn't change.  Okay?

———2:21-cv-01517-CDS-EJY———

And -- and if you look at what we stated in the 8-K, which I've already referenced, which is at page 9 of our motion, and then you go to our reply which references -- let me get this -- Exhibit D, page F-15, we set out in great detail what is going on with the evolution of the ApplianceSmart transaction. Okay?

And if -- if two parties to a transaction -- we -- if you and I cut a deal today and I'm going to buy your car for X amount of dollars and you're going to hold onto it or I got to pay your lender off in -- in two months and it's up again -- I'm up against it and I don't have the money, or whatever reason, and you and I agree to go ahead and extend that performance state, we're entitled to do that. There's nothing fraudulent about that. There's nothing wrong with adjusting a transaction.

They don't allege that this was the plan at the very beginning and the initial disclosures were false. What they're saying is as the transaction evolved, that somehow that transmuted the original statements and made them false. That's not true. They don't have any proof of that and they haven't even alleged that.

THE COURT: So it's your position that because the transaction, quote-unquote, evolved, that doesn't necessarily make the statements at the time that they were initially made false and misleading?

2:21-cv-01517-CDS-EJY

MR. FERRARIO:  A hundred percent.

And we not only -- and then we go out and we tell them in great -- in greater detail in the document I just referenced exactly what's happening with the transaction.

I mean, running a business, I think everyone in this room would -- would agree, is not a static situation.  Things evolve.  You have to respond.  You have updated disclosures.  That's exactly what we did here.

THE COURT:  All right.  I'm going to allow plaintiff to respond.

MS. PANG:  Your Honor, I think that defense counsel hasn't answered the question of if no amount of money had been paid for the purchase price, then how was a representation that an amount had been paid for the purchase price not false or misleading.

THE COURT:  That's correct.  That question wasn't answered.  And A, it wasn't -- well, A, it wasn't answered and that, B, wouldn't be a reflection of a revolving business transaction, which I understand and appreciate because it was an affirmative representation that a purchase price had been made.

Can you address that for me?

MR. FERRARIO:  Okay.  I can -- I can't say this any better than what we said.  And I don't understand where there's an affirmative representation that the purchase price had been

2:21-cv-01517-CDS-EJY

paid.  We talked about what we did and then we adjusted the price.

So under her -- under that scenario, any time parties get together and adjust a purchase price or adjust a transaction, then the initial statements are false.

THE COURT:  Well, the --

MR. FERRARIO:  We --

THE COURT:  -- but not necessarily.  I'm not saying that definitively.

MR. FERRARIO:  Well, that's what -- that's what they're saying because they haven't pointed -- and I'm looking here -- and maybe I'm just missing it.  And it wouldn't be the first time.  They don't say that what we said here at the time we said it was false.  What they're complaining about is the adjustment to the transaction, then transmuting that statement and making it false.  That's the problem I have with their argument.

THE COURT:  Because you're saying that by January 5th, that had already -- that evolving transaction had already been clarified?

MR. FERRARIO:  No.  The tran -- we clarified the transaction with the amendments that take place in April.  And that's what's disclosed on page F-15 in Exhibit D to our motion.

THE COURT:  But if I'm looking at the January 5, 2018

statement, within days of closing --

MR. FERRARIO:  Right.

THE COURT:  -- Live filed a Form 8-K --

MR. FERRARIO:  Right.

THE COURT:  -- and therein, it says, the shares of stock were delivered into escrow.

MR. FERRARIO:  Right.

THE COURT:  And so where --

MR. FERRARIO:  The shares of stock are locked up.  We have to pay them to -- we have to satisfy a lender and then they're going to be unlocked.

THE COURT:  So you're saying the following statement that -- "and will be released to the purchaser" --

MR. FERRARIO:  Exactly.

THE COURT:  -- "upon purchaser's receipt"?

MR. FERRARIO:  One hundred percent.

THE COURT:  Okay.  So then I'm going to turn back to plaintiff.  How does that not fully explained the issue?

MS. PANG:  I think, your Honor, that the issue is getting a little confused where plaintiff's not alleging that statements made in April transmuted statements made in January to be false.

Statements made in April about an amendment, representations that part of the purchase price had been paid when no part of the purchase price had been paid because Live

2:21-cv-01517-CDS-EJY

could not obtain necessary financing.  These are -- this is a

separate -- it's a related but a separate false statement.

THE COURT:  All right.  And the April statement you're referring to is the April?

MS. PANG:  April 26th --

THE COURT:  26th.

MS. PANG:  -- 2018.

THE COURT:  One second.

MR. FERRARIO:  Your Honor, again, I -- you have to read the statement, "Upon receipt of third party financing."

THE COURT:  Hold on.  I'm reviewing the -- I'm looking for the April statement.  April 26th.  All right.

All right.  That statement says that, "Between March 31st and April 24th, the purchaser and the seller negotiated in good faith the method of payment of the remaining outstanding balance of the purchase price.

"On April 25th the purchaser delivered to the seller that certain promissory note in the original principle of 3 million"... and change.

Let me turn back to plaintiff.  What part of this statement are you specifically alleging is false and misleading?

MS. PANG:  So, your Honor, the section that says, "The purchaser was required to deliver the purchase price and a portion of the purchase price was delivered to the seller prior

to March 31, 2018."

THE COURT:  All right.

MS. PANG:  No portion had been delivered.

THE COURT:  Counsel?

MR. FERRARIO:  I'm going to read the -- the statement in total.  "The shares of stock were delivered into escrow and will be released to the purchaser upon purchaser's receipt of third party financing in an amount sufficient to fund the purchase price."  Theres the going out and getting financing. "And the subsequent delivery of the funds to certain third party lenders of the seller and ApplianceSmart, all of which the parties expect to occur prior to March 31, 2018."

THE COURT:  Are you reading from the January statement or the April statement?

MR. FERRARIO:  The January statement.

THE COURT:  All right.

MR. FERRARIO:  That's -- because that's the thrust of their -- their complaint.

THE COURT:  Well, as being argued here, it's the April statement, when looked at -- when looking at the January statement and they're saying it's an affirmative misrepresentation that a portion of the purchase price was delivered because it had not been delivered prior to March 31, 2018.

MR. FERRARIO:  And she's referring to what there?

2:21-cv-01517-CDS-EJY

Excuse me, Judge.  I'm trying to track.

THE COURT:  Sure.  It's paragraph 92.

MR. FERRARIO:  Of the complaint?

THE COURT:  Of the complaint.  Page 30.  The first sentence in bold.

FERRARIO:  Okay.

THE COURT:  "The purchaser was required to deliver the purchase price and a portion of the purchase price was delivered to the seller prior to March 31, 2018."

And if I understand correctly, Ms. Pang, tell me if I'm wrong, you're saying that no portion of the purchase price had been delivered prior to March 31, 2018?

MS. PANG:  Correct, your Honor.

MR. FERRARIO:  But what is she referring to?

And I'm sorry, Judge, in all the haste to get out of my office to get over here, the one thing I didn't bring is the amended complaint.  And I apologize.

THE COURT:  That's okay.

MR. FERRARIO:  I got everything else.  More financial disclosures than I need.

THE COURT:  She's saying that the press release issued on April 26, 2018 making that statement was false and misleading because at no time, as set forth in the press release, had a portion of the purchase price been delivered -- was delivered.

2:21-cv-01517-CDS-EJY

MR. FERRARIO:  Okay.

THE COURT:  So that's a false and misleading statement.

So if a reasonable investor is reading this and they first look at information about the transaction itself and then the January statement, even if I am to track your evolving business transaction argument, when you get to April and a press release states the purchaser was required to deliver the purchase price and a portion of the purchase price was delivered to the seller prior to March 31, 2018, and I couple that with the fact that no purchase price had been delivered to the seller by March 31, 2018, how is that statement not false and misleading?

MR. FERRARIO:  We were -- I think, your Honor, what we're doing -- and you got to go through the section that I gave to you in the more detailed explanation.  We were credited a portion of the money that we paid to MidCap.  So consideration was, in fact, paid.  I think that's where we're getting here.  And I should have picked up on that sooner, but counsel just reminded me.

Because -- and that's another thing they take issue with, but we were credited for a portion of the money we paid to MidCap.  So money was, in fact, transferred.

THE COURT:  All right.

MR. FERRARIO:  And consideration was, in fact, paid.

2:21-cv-01517-CDS-EJY

THE COURT:  All right.  And Ms. Pang, that statement is pretty broad.  It doesn't -- I mean, does that change your argument at all?

MS. PANG:  Oh.  Your Honor, our argument?

THE COURT:  Yes.

MS. PANG:  Well, your Honor, defense counsel earlier did mention that through the evolution of this agreement, that it's natural for a business to not be able to come up with the financing and that's what happened with Live.  So that seems to contradict now what's being said which is that they were able to pay a portion of the purchase price.

So your Honor, at the end of the day, I think we don't really know what they did, but we've alleged that they didn't make any payment and that allegation is based on the SEC's investigation over a four-year course where they stated as such.

THE COURT:  All right.  I am going to put a pin in that -- those questions regarding the ApplianceSmart transaction and move on -- I might come back to that, but I'm going to move on for now and turn to the accrual and housing expenses owed to Isaac.

Sieggreen alleges that the Live -- that the Live defendants, which I'm referring to them collectively, did not properly disclose Isaac's compensation when they wired him $120,000 reimbursement for temporary living expenses despite

—————2:21-cv-01517-CDS-EJY—————

expressly stating in the 2016 Form 10-K that it did not have a written employment agreement with Isaac and failing to include the $120,000 in a 14A proxy statement in connection with its annual shareholder meeting is part of the overall allegations.

In response, Live conceded that they did not disclose the, I'll call it, accrued expense reimbursements in fiscal year 2016 Form 10-K or in the proxy statement but that the following years, they did.

So I'm going to turn to Ms. Pang and ask:  If they've admitted the failure in fiscal year 2016 but then two -- you know, the following years, it's corrected, why should this information be included as part of the overall scheme when it was just one year?

MS. PANG:  Your Honor, plaintiff alleges that in 2017 and 2018, defendant also did not disclose the full amount that was paid to Isaac.

THE COURT:  In the fiscal year 2017 form, it states that all other compensation for Mr. Isaac includes 54,000 for each 2017 and 2016 which was accrued by us for a reasonable housing allowance.  And then in 2018, it provides under all other compensation 54,000 for 2018 and 2017 which, again, was part of the reasonable housing allowance.

And those statements were -- so it's your position that the 50 -- because the 54,000 wasn't the 120, it's incorrect?

MS. PANG:  Yes.  Yes, your Honor.  Ultimately, in sum, for fiscal years 2016, 2017, and 2018, Live claimed that Isaac had received a total of 162,000 of additional compensation beyond his $200,000 salary.  But he had actually received $315,000 of additional compensation for that time period --

THE COURT:  Okay.

MS. PANG:  -- which was not disclosed.

THE COURT:  I'm going to be honest.  I am not clear in the allegations in the amended complaint how it was false or misleading when it does allow for a reasonable housing allowance.  So just explain that to me a little further.

MS. PANG:  Yes, your Honor.

They -- defendants' disclosures stated that Isaac was entitled to a reasonable housing allowance of -- not to exceed $7,000 per month.

THE COURT:  Right.

MS. PANG:  So that would be about $84,000 a year, I guess, total.  For example, for -- but for fiscal year 2018, Isaac received $165,000 in expense reimbursements.

THE COURT:  All right.  So you're saying the amount he received above the 54,000 would be false and misleading in terms of what he actually received?

MS. PANG:  Yes, your Honor.

THE COURT:  All right.  Let me turn to defendants.  He certainly received more than he -- at least that was revealed

2:21-cv-01517-CDS-EJY

to investors.

MR. FERRARIO:  Well, actually, he was receiving less and they accrued it.  That's what happened.  So there was an accounting -- another accounting issue.  It was all fully disclosed.  And I don't -- I don't know that I have much more to add, Judge, than what we put in our -- in our motion and in our reply.

At the end of the day, these amounts are immaterial in the overall scheme of things.  And I don't think it could credibility be said that a -- a reasonable investor would have made a -- a significant decision based on these amounts of living expenses that weren't actually received but then were accrued and then ultimately paid.

I mean, I -- I don't have a whole lot to add to that.

THE COURT:  Well, the fact that it was accrued instead of actually -- or not actually -- the fact that it was accrued, what authority do you rely on in saying, well, that -- that makes it okay?  It's not false and misleading if it's accrued?

MR. FERRARIO:  We cited cases at page -- it's on page 6 of our -- of our reply.

And I guess the -- the key thing here, once you get above what was going on, is really the materiality argument.  And they don't allege that this amount was material.  They don't allege facts sufficient to show it was material in light of the -- the performance of the company.  And I think we

cited, at one point, it was 17 million and change in revenue versus, you know, $54,000.  I mean, I don't think it meets the materiality test, quite frankly.

THE COURT:  All right.  Let me turn back to plaintiffs.

They did make that allegation in terms of the overall money involved here.

In looking at *SEC versus Premier Holdings*, there, the court found that Premier had made materially false and misleading representations regarding one of their 10-Ks regarding the compensation of its chairman, president, CEO, and CFO.  The 10-K stated that the company did not have any employment agreements with the -- that individual.  But they did.  And they failed to disclose a provision of the compensation contract which provided a 10 percent increase in his annual salary, stock shares he'd receive each year, and 18,000 per year of -- for undocumented expenses.  And it failed to disclose that that individual was compensated for much more than $18,000 but was actually compensated in the amount of $93,000 in undocumented expenses.

And so in that case, kind of the details were not disclosed to investors, but there, there was a big disparity.  So the compensation received by that individual was about $93,000 but the assets of the company were just over half a million.  That's quite different here.

So tell me why this would be materially false and misleading in light of the -- kind of the numbers at issue versus Live's net income.

MS. PANG: Well, your Honor, in the *SEC versus Premier* case, I -- my understanding is, there, the Court did not necessarily find that a statement about compensation could not be deemed material.

THE COURT: They did not make that finding, but they did find that it was -- there was a lot more alleged and so that became kind of a larger picture.

MS. PANG: Yes, your Honor.

I would -- I would say that what's important to note is a court has -- a court in this district found that whether the compensation is actual or accrued and whether the amounts are material -- here, defendants had a duty to disclose all of the compensation because they spoke on that topic. And the question of materiality cannot be decided at this point.

So while the case -- while *SEC Premier* -- *versus Premier* might be distinct on those grounds, we do have a case where a court found that this exact failure to disclose was sufficient to state a claim.

THE COURT: All right. Let me think on that.

And let me turn -- I kind of went out of order here, so I apologize -- to the Novalk amendment. Am I saying that correctly? Essentially, what's at issue there is allegations

2:21-cv-01517-CDS-EJY

that backdating the agreement was improper and that the way the press release set forth the transaction and as set forth in the Form 10-K was false and misleading because it changed what the earnings per share were.

The plaintiff also alleges that there was no explanation provided to the investors regarding the discrepancy and it wasn't until a Seeking Alpha report was obtained that their -- that the inconsistency was revealed, and as a result of the release of that Seeking Alpha report, Live's stock dropped 12.7 percent.

Certainly, I'm not going to say that that stock drop was eye-catching for the Court.

Tell me -- let me turn to defendants.  Why wouldn't that information be considered, at least as presented first in the press release and then later in the 10-K, be false and misleading given the earnings per share change -- I'm sorry -- from $8.92 to $6.33, which is not necessarily a small amount of money?

MR. FERRARIO:  Your Honor, I think we started off talking about the Novalk amendment.  Then we went to the lockup.

THE COURT:  Well, the way I have them -- my notes started down.  They're kind of together, but if you want to -- so focus on -- I want to talk about the -- let's talk about what I just asked on.

MR. FERRARIO:  The lockup?

THE COURT:  Yes.

MR. FERRARIO:  Okay.  I mean, again, it's -- it's all detailed in -- in the disclosures.  Mr. Isaac locked up a substantial number of shares.  It changed the denominator when you were calculating earnings per share.  Some of that stock, you know, created a new class.  As counsel just reminded me, it was in a preferred class.

And again, when you're telling people what you're doing -- okay? -- and how -- how you're doing it, which is exactly what we did here -- if we're guilty of anything, we're guilty of over-disclosure.  How can that be false and misleading?  We told them what we were doing, when we were doing it, and how we were doing it.

THE COURT:  All right.  Let me turn --

MR. FERRARIO:  No, I mean -- yeah.  As he -- counsel said, we provided them the methodology.  We told them how we were doing it.  I mean, I -- I don't know what else you can say.  It wasn't illegal.  There wasn't anything wrong with it.

THE COURT:  All right.  So let me turn to plaintiff.

They're saying they disclosed everything and it -- you know, they were being transparent.  How do you respond?

MS. PANG:  Yes, your Honor.

Well, simply disclosing the way that something was calculated, again, does not necessarily dispel the false

2:21-cv-01517-CDS-EJY

impression that a reasonable investor might have received from a statement.

So for example, on December 28, 2016, the day before Live Ventures was going to release its fiscal year 2016 financial results, defendants released a press release touting their financial results for that year including their net profit figure for the fiscal year.  I think, at minimum, there's a question as to whether a reasonable investor would have assumed that this press release was referring to the fiscal year as typically press releases for a publicly-traded company would tout their fiscal year results, not the calendar year results.

So the disclosure of the manner of calculation isn't necessarily enough for a reasonable investor to know that these are not results applicable to that fiscal year.

THE COURT:  So it's your position that that lack of clarity is what renders it false and misleading?

MS. PANG:  Yes, your Honor.

And, you know, when a defendant chooses to speak on a topic, it owes a duty to speak the entire truth about that topic.  And here, Live Ventures did not speak the full truth about the EPS and that it was not a fiscal year calculation. It was a calendar year calculation.

THE COURT:  So they issue the press release.  And then when do they actually release their fiscal year numbers?

MS. PANG:  On December 29, 2016.

THE COURT:  So the very next day?

MS. PANG:  Yes, your Honor.

THE COURT:  And tell me what, if any, impact that has.

MS. PANG:  One thing that's significant about that timing, your Honor, is that on December 28, 2016 when defendants made this announcement about the EPS, Jon Isaac was attempting to sell shares of Live stock.  He'd instructed Live's brokerage to sell up to 20,000 shares of stock if the price hit certain price points during the day.  And then the next day, the real information was disclosed.  So the timing is indicative of scienter.

The falsity is further demonstrated by the 2016 fiscal year results which show the actual EPS for that fiscal year which contradict the 8.92 -- which contradicts the 8.92 figure that was provided the day before.

THE COURT:  All right.  Those allegations that you just argued are set forth in paragraph 208.

MS. PANG:  Yes, in part, your Honor.

THE COURT:  That paragraph ends with, "Had the various transactions occurred, defendants would have realized gross proceeds of over 1.1 million."  But how is that material to a reasonable investor?

MS. PANG:  I think what would have been material to a reasonable investor, your Honor, is that Live Ventures had

hired stock promoters to tout and then touted an EPS.

Again, also, Jon Isaac on December 23, 2016 e-mailed Live's board of director and stated that he would wind up his shares and that this would make a good announcement because it would lower the outstanding share count and increase the EPS which would then be disclosed in the 2016 10-K.

So the motive and the purpose for stating this EPS's 8.92 was to artificially inflate the price and then to have it revealed later the actual truth. This information was not disclosed in any manner to investors.

THE COURT: I guess my question is: What impact did it have on the investors once it was revealed the next day?

MS. PANG: What -- the corrective disclosure alleged was, as your Honor noted, the Seeking Alpha report which set forth the nature of the falsity.

THE COURT: And you're saying that's what caused the stocks to drop 12.7 percent?

MS. PANG: That, as well as -- that report didn't solely address the EPS. It also addressed that defendants had a history of hiring stock promoters, pumping the price, the stock would fall. And, thereafter, defendants denied having hired stock promoters despite having hired a stock promoter, which they paid throughout December.

THE COURT: I know I talked about the Novalk -- since we're on the stoke promoter, let's go ahead and talk about the

2:21-cv-01517-CDS-EJY

stock promoter.

I'll be candid with the defendants:  Why were there statements that there was no stock promoter used when there was?

MR. FERRARIO:  In what context, your Honor?  I guess I'm not -- I'm flipping back.  We're going to the stock promoter now?

THE COURT:  Yes.

MR. FERRARIO:  All right.  The -- what they're saying is we didn't disclose that there was a stock promoter.

THE COURT:  Correct.

MR. FERRARIO:  Okay?  First of all, there's nothing wrong with hiring a stock promoter.  Second of all --

THE COURT:  I don't think anyone disagrees with that.

MR. FERRARIO:  Huh?

THE COURT:  I don't think anyone disagrees with that.

MR. FERRARIO:  Right.  Okay?  So the question is would it be material.

THE COURT:  Right.

MR. FERRARIO:  And I'm -- and then the other thing we have here is nothing happened.

THE COURT:  Well, that's not what she was just argued.  She argued that the misrepresenting press release kind of pumping up the numbers together with the engagement of stock promoters and then lying about it, when all of that was

revealed via the Seeking Alpha report, that caused the stock to plummet.

MR. FERRARIO:  Well, here --

THE COURT:  So that would be material.

MR. FERRARIO:  Part of the -- part of the problem here is -- and again, this is -- this is the issue I have with their complaint.  They just -- they kind of weave things and conflate things.  Let -- you have to look at these statements independently.  Okay?

I went back when she was talking about the press release.  And then she mentions Seeking Alpha.  The Seeking Alpha author, obviously, understood what was going on because he reported on it.  How could that be misleading?  It couldn't be.

If you look at the press release, "Live Ventures Announces Biggest Year in Company History."  And then you turn to the second page of it, "In December, Isaac Capital Group, our largest stock holder, agreed to lockup all of their shares for five years through December 31, 2021."  Then he goes through, "To ensure the lockup arrangement" -- describes it, talks about the preferred class of stock.

And then it says it reduces the float on the common stock from 2.8 million to 2 million shares.  When you do that and you're calculating earnings per share, the earnings per share is going to go up.  That's what happened.  They reported

2:21-cv-01517-CDS-EJY

it.  It's accurate.

THE COURT:  But the Seeking Alpha report, as set forth in the amended complaint, provides -- well, I'm looking at paragraph 69 as alleged, that, "In addition to the 800,000 shares of which had supposedly been locked up, Isaac had access to 700,000 additional shares via warrants and options which average exercise price low as $4.14 which expired in less than two -- less than two years.  The warrants are excisable immediately meaning that Isaac can exercise and sell over 10 million stock anytime he wants.

"Live Ventures put out a press release claiming that the company achieved an EPS of $8.92 in 2016.  This is wrong and inconsistent with their SEC filings.  First off, the $8.92 was touted in Live Ventures's press release was calculated by subtracting the 800,000 shares that Isaac agreed to lock up.  This is wrong.  Even in their SEC 10-K filing, Live is not able to calculate EPS this way.  The number shown in a 10-K is actually $5.40 so Live Ventures already overstated their EPS in the press release by 65 percent."

MR. FERRARIO:  Okay.  So Seeking Alpha, obviously, did their homework and they did it from publicly-filed information from Live.

Just because somebody has an opinion about what is happening, a -- a person who actually I'm familiar with from another company, doesn't, A, mean it's true, doesn't -- B,

doesn't mean it's wrong.  And it's certainly not going to be enough to satisfy the requirements for pleading a PSLRA claim.

Nobody is saying what we -- nobody is saying that what we reported was false.  So he looks at it and he says, well there's other things that could happen and it might impact the earnings per share.  Great.

THE COURT:  Well, let's assume that it -- no one's saying that it was false, is it misleading?

MR. FERRARIO:  Well, if it's not false, then I don't know why we're here.

THE COURT:  Is it misleading?

MR. FERRARIO:  No.  I don't think -- I don't think it was misleading at all.

And I'll read it again in terms of what we're arguing, which was the reporting of earnings per share.  We can't lose sight of that.  That's what their complaint is.  And we -- and they have not come forward and demonstrated that the earnings per share as reported was wrong.

And you -- I don't know, again -- and this is part of the frustration the defendants have here.  If we're trying to perpetrate a scheme on investors or frauding the market, we're horrible at doing it because we're telling them every step of the way what we're doing.

And counsel hasn't answered one question and said "That's false.  That's misleading."  What she says is, "Well,

you know, it" --

THE COURT:  Well, no, the -- I'm going to correct you there.  For example, the representation that no stock promoters were employed or utilized was false.  They were utilized, correct?

MR. FERRARIO:  We didn't report that in the 8-K, you're correct.

THE COURT:  Right.

MR. FERRARIO:  We did not.

THE COURT:  So that's false?

MR. FERRARIO:  No.  We didn't report it.

THE COURT:  Okay.

MR. FERRARIO:  We didn't say --

THE COURT:  Okay.  I'll correct myself.  It was misleading?

MR. FERRARIO:  I don't agree it was misleading because we didn't have an obligation to report it.  But at the end of the day, it's a "so what" now because nothing happened.

And, again, the -- the underlaying transaction was appropriate.  They're not challenging that lockup.  And the calculations of earnings per share was accurate.

THE COURT:  "In January 9th -- on January 9, 2017, a press release disclaimed stock promotion efforts on Live's behalf.  The conclusion of that statement said, 'Had our company truly engaged in any kind of promotional activity, our

company, its officers, and our directors would have sold shares.'"

MR. FERRARIO:  Are you reading from the complaint? Because I do have a small copy of it --

THE COURT:  Yes.

MR. FERRARIO:  -- now on my phone.

THE COURT:  Yes.

MR. FERRARIO:  So which paragraph?

THE COURT:  Paragraph 157.  And good luck reading that on your phone.  I'll give you credit.

MR. FERRARIO:  I'm giving it a shot.  That's why you see my glasses come on and off.

THE COURT:  And the next paragraph goes on to allege that, "The statements were materially false or misleading because they misrepresented or failed to disclose that Live had hired stock promoters, including Protrader Elite, LLC, spent millions on stock promotions, had hired stock promoters to help pump Live's stock price in late December 2016."

MR. FERRARIO:  Well, I'm looking at the -- the allegation on page -- or on 157.  And --

THE COURT:  I'm looking at the last sentence of that paragraph.

MR. FERRARIO:  Yeah, "Had our company truly engaged in any type of promotional activity, our company's officers would have sold shares."  No shares were sold.

THE COURT:  I know.

MR. FERRARIO:  But I think --

THE COURT:  But the question was whether or not there was promoters engaged and you're like --

MR. FERRARIO:  Well, they didn't --

THE COURT:  -- "Oh, they never made a false statement."

MR. FERRARIO:  But I think that statement, if you read it in total, they truly engaged in -- they didn't truly engage in it because nothing was sold.  The promotion didn't happen.  And it was Kingston that was doing it at any rate.  And how is any of that material when nothing happened?  And we had already reported accurately the earnings per share number as a result of the lockup.

They would have to then say that statement in and of itself was material to an investor when what is happening here is management is commenting on the Seeking Alpha story.  So all of this is already out in the public.  It's already part of the mix of information.

THE COURT:  All right.

MR. FERRARIO:  So an investor would know this, know this debate is going on, and presumably make an intelligent choice at that point in time when that press release comes out as to whether to invest in the company or not.  How could they be -- how could they say they were mislead?  They've got

Seeking Alpha and they've got the management's response.

But that's not the thrust of their allegation. The thrust of their allegation is, back at the beginning, that we falsely stated our earnings per share or inaccurately stated them, however you want to phrase. And that's just not true.

THE COURT: All right. Well, I got us out of order and I was talking about the Novalk amendment --

MR. FERRARIO: No, that's okay.

THE COURT: -- and I got myself twisted. So let's go back to that. One moment here.

In a nutshell, this is a question as to whether or not backdating the amendment was improper allowing the defendants to realize -- or recognize just shy of million dollars of other income and increasing their pretax income for the year by 20 percent.

And Sieggreen alleges that Live did not actually begin negotiating the Novalk amendment until November 30th of 2016 which makes the September 30, 2016 date of the amendment, as set forth in their 2016 financial disclosure, false and misleading.

Defendants argue that none of this is a misrepresentation, that, essentially, plaintiff is arguing inappropriate -- or disagreements in terms of GAAP violations and that this is insufficient to state a claim under 10(b) -- Rule 10(b)(5)(A) or 10(b)(5)(C) because the disclosures or

recognitions were appropriate under GAAP.

So the question is really the -- kind of the backdating question.

Let me start with plaintiff.  What are you relying on in arguing that backdating the effective date of the contract is improper?

MS. PANG:  Well, your Honor, defendants' representations were that the Novalk amendment was contemplated during the fiscal year and then just signed and officially memorialized after.  But it's undisputed that it wasn't until November 30, 2016, two months after the end of fiscal year 2016, that defendants even started to contemplate and negotiate amending that agreement.

THE COURT:  And you say that's clear.  How is that clear:  They didn't start to contemplate it until November?

MS. PANG:  In e-mails.  That's when they first started to send e-mails about it.  And in an e-mail on November 30, 2016, Isaac e-mailed his friend, the CEO of Novalk, and said, "I don't think we're going to use the software and we want to cancel the deal.  Thoughts?"

And from there, Johnson, Isaac, and Novalk's CEO, Juan Yunis, engaged in a series of e-mails where then they decided to engage in this amendment whereby they would use the effect -- they would use the date of 9-15-16 as the date that they would value the shares that would form the consideration for

that purchase.

THE COURT:  But in that e-mail, if they're talking about "I don't think we're going to use the software and we want to cancel the deal," doesn't that itself suggest that there was a deal that was already in the works or had been contemplated or discussed?

MS. PANG:  The deal was that Live had entered an agreement in October 2014 with Novalk for a software purchase. That agreement sat dormant for two years.  Nothing happened.

On November 30, 2016 is when they started to discuss how would -- discuss the actual deal after entering it October of 2014.

THE COURT:  All right.  So let's -- you know, let's go with that timeline.  What are you relying on to say that that's improper to backdate that even if the negotiations didn't begin or weren't contemplated until November?

MS. PANG:  It was --

THE COURT:  Or is your argument not that it's a problem to backdate?  Your argument is that the representation is the issue?

MS. PANG:  It's -- they're tied in together, your Honor.

THE COURT:  Okay.  Let's focus first on the backdating.  What's improper about that?  Or what are you relying on to say it's improper?

2:21-cv-01517-CDS-EJY

MS. PANG:  What was improper is that they chose a date to -- they chose a date within the fiscal year knowingly but didn't start contemplating this agreement until after the end of the fiscal year.

THE COURT:  But what are you relying on to say that that's improper?  What authority?

MS. PANG:  I think it's the *Middlesex* case, your Honor, that we cite in our brief where the backdating of -- I think it was stock options in that case established scienter.

THE COURT:  Well, I was looking for some case law on backdating and I found a case, *United States v. Reyes*.  The cite is 577 F.3d 1069.  It's a Ninth Circuit case from 2009. In that case, that case held that backdating stock options -- this is, obviously, talking about stock options.  It's a little different, but helpful -- itself is not illegal as long as the benefit to the employee is properly recorded.

So, you know, obviously, we're not dealing with stock options here, but we are dealing with a contract.  That contract was backdated, but it was also documented.  So I'll be candid with you:  I'm not seeing why this, in particular, is a problem.

MS. PANG:  I think, your Honor, it was improper to recognize -- to create this transaction, to then recognize in fiscal year 2016 a figure that would have the impact of increasing Live's pretax income by over 20 percent.

2:21-cv-01517-CDS-EJY

THE COURT:  The *Middlesex* case that you relied on, it did involve backdating stock options but then they filed incorrect financial statements.  That didn't happen here, correct?

MS. PANG:  Well, your Honor, plaintiff is alleging that the financial statements were false and misleading as well and that the income recognized in the 2016 10-K should not have been.

THE COURT:  But the financial statements relating to the amendment weren't false -- weren't incorrect?

MS. PANG:  Well, your Honor, I would say that representations, for example, on February 9th of 2017 -- that's at paragraph 159 -- defendant stated as of September 15, 2016, the company was obligated to issue and certificate 58,334 shares of the company's common stock to Novalk.  This statement implies that this obligation arose on 9-15-16.  It doesn't make clear that this was not even contemplated at 9-15-16.

THE COURT:  Okay.  And my next question then would be: Why would that be material?

MS. PANG:  That would be material to a reasonable investor because the events that happened -- because events that happened after the end of the fiscal year were represented as having happened during the fiscal year.

THE COURT:  All right.  So I don't want to put words in your mouth, but is it fair to say that you're arguing that

it changed the whole picture of what happened at the end of fiscal year 2016?

MS. PANG:  It does, your Honor.

And I think also, your Honor, what this shows is this is part of a pattern of deceptive conduct in connection with the fiscal year 2016 results where there's this amendment engineered in November of 2016, there's the hiring of stock promoters, there's the winding up of the shares, there's the press release of the EPS's 8.92, attempting to sell shares of -- of Live during that day as that news hits the market, and then later denying that stock promoters were used, it all together informs a course of conduct which is, itself, deceptive.

THE COURT:  All right.  Let me turn to defendants to address -- you see where my questions are regarding the backdating.

MR. FERRARIO:  Correct, your Honor.

Again, we start from the premise that they haven't pointed to anything that we disclosed that was inaccurate. That's number one.

Number two, the thing that I really find confounding is the -- the company benefitted from picking -- you want to call it backdating or picking an effective date of September 15, 2016 because it resulted in a lower negotiated amount owed by Live to Novalk.  So I don't know why they would

be complaining about that.

And finally, probably most importantly, we would probably be -- if we didn't restate our fourth quarter or our 2016 financials because of the Novalk amendment, we probably would be getting sued for not restating it.

We had to go back after the deal was cut and it impacted that last quarter right before the issuance of the financial statements for the fiscal year.  We had to restate that because significant, subsequent events impacted that quarter.  And that's what we did and that's all we did.  And we reported everything meticulously and accurately to the market.

And I -- I can't say it any better than what we said in our pleadings.  And I'm -- I'm going to be quiet and not hopefully push you to a different result on this one, but I think you're leaning our way.  So...

THE COURT:  All right.  We've been going for an hour and a half.  I'm going to give my court reporter a break and I'm going to step off the bench.  I want to go back and review my notes and see if I have any additional questions and then we're going to go from there.

So we'll be in recess for 15 minutes and then I'll be back.

(Recess taken from 2:28 p.m. to 2:43 p.m.)

THE COURT:  All right.  I don't have any additional questions at this time.

2:21-cv-01517-CDS-EJY

I am going to make a decision here from the bench. And so my decision here -- or rather, the transcript of this proceeding will serve as the findings of fact and conclusions of law in resolving these motions to dismiss. There will not be an order that follows.

As I stated at the beginning, the parties are aware of the pleadings standards, but because this is a securities case, I'll just note Rule 9 applies because this is -- essentially, alleges fraud or sounds in fraud. And so in order to meet the Rule 9(b) standard, there has to be sufficient allegations constituting fraud so a defendant can adequately prepare an answer to the allegations.

It's been stated many times not only in the Ninth but in the Supreme Court that those allegations must set forth the who, what, when, where, and how. And of course, that was ultimately codified in the securities litigation pleadings standard.

So when looking at falsity, a statement, there can be a couple different ways to establish that. One, that the statement isn't actually believed or what's being representative isn't believed, that there's no reasonable basis for the belief, or at the time that certain disclosures are made or facts are represented, there's -- the person making the representations knows that there's facts that undermine the accuracy of that statement.

2:21-cv-01517-CDS-EJY

And so falsity is at issue here.  A statement must be false at the time it was made.  And the case law talking about false statements talks about the fact that hindsight isn't enough to render a statement untrue.

What I have in front of me is a complaint that alleges false statements or misrepresentations or a combination of both depending on how you look at it and how you argue it in that, when combined, that leads to an overall scheme to defraud.

I'll be candid, and in fairness to the defendant's argument that it was difficult to follow the complaint, I don't disagree.  I read the complaint multiple times.

And, Ms. Pang, you did a great job of explaining aspects of the complaint here in court to answer my questions. I think -- and I understand it's difficult to tell or set forth the allegations when there isn't always a clear timeline.  So that's not lost on the Court, but it does make it challenging to read.

And because of that, when I was reading through the allegations, a lot of the false statements -- I put that in quote, end-quote -- read as hindsight representations like, oh, they knew or, you know, now looking back at that, it was a false statement.  As an example, I'm talking about the ApplianceSmart transaction.

As argued here in court by defendants, the business transactions are evolving.  And I'm not going to make a

2:21-cv-01517-CDS-EJY

determination one way or the other as to whether or not that is a factual statement, a defense, etc., but I make that observation because I think it's important for the parties' understanding as to how I'm going to resolve these motions.

The parties -- that's because the parties know that in a motion to dismiss, or at this phase, I only consider the well-pleaded allegations. And of course, the allegations now are framed a little differently for the Court based on the arguments and responses to the questions the Court posed during this afternoon's hearing. We're staying within that framework in terms of a motion to dismiss as I don't want to convert this one motion into a motion for summary judgment.

But with all of that being stated, I'm granting the motions to dismiss. However, I'm granting the motions to dismiss without prejudice and with leave to amend because I don't believe amendment would be futile. There are inferences that could be drawn from the allegations set forth in the first amended complaint and, perhaps, with some additional clarity could answer -- or at least better answer some of the questions and meet the pleading requirement set forth under the PSLRA.

So I am going to allow the plaintiff to amend the complaint.

You have an idea of my concerns and the questions that I had based on this afternoon's hearing and as well as kind of the overall questions and challenges that both the Court and

2:21-cv-01517-CDS-EJY

defendants had.  That's important to note because, as stated, the pleading requirements require a defendant to be able to defend against the allegations.  And if it's challenging to read or to follow, that makes defending the allegations difficult to do.

So that is the decision of the Court.  The motions are granted without prejudice and with leave to amend.

I'm going to note that -- or make two observations.

One is about the Novalk amendment.  As set forth in the complaint and in opposition to the motion to dismiss, there really wasn't a lot explained about why what they did was an issue.  Again, there might be something there, which is why I'm giving leave to amend as I can draw an inference based on the argument presented, but that is a concern to me.

And then second, relating to compensation, I believe that there is case law out there that talks about -- and not only case law, but I believe it is, perhaps, a C.F.R.  Let me see.  One second.  It is a C.F.R. -- that talks about a company's requirement to disclose all compensation.  And so whether it was accrued or not seems to be irrelevant because, ultimately, all compensation earned or paid to must be disclosed.

So I did want to make those two observations based on the allegations set forth in the first amended complaint.

Before I set a briefing schedule, I did want to engage

the parties on a conversation about whether or not settlement would be a fruitful endeavor.

I'll start with plaintiffs.

MS. PANG: Your Honor, plaintiff is never opposed to engaging in good faith and formal attempts -- attempts at informal resolution.

My understanding was that defendants were in the process of attempting to informally resolve the parallel action brought by the SEC. We did inquire if defendants were interested in speaking -- including us in those discussions --

THE COURT: Right.

MS. PANG: -- but they were not.

THE COURT: Okay. Sure. And I understand. Sometimes that can be complicated with parallel actions, which is why I also asked the question because I don't know how that -- the parallel action would impact any settlement discussions.

Let me turn to defendants. Would you be open or would it be fruitful to direct the parties to settlement? I'll start with Live.

MR. FERRARIO: Your Honor, I, like plaintiff's counsel, am always open to that, but the parallel action aspect of this complicates things, I think.

I think what would be probably best, if we do set a briefing schedule and then I'll go back to the client and say that the Court inquired of this. If we can have some fruitful

settlement discussions while that other matter is -- is progressing, I'm all for it.  But I don't want to waste counsel's time if -- if -- and we have -- my partner's handling that aspect of the case.  I'd like to talk to him, as well.

THE COURT:  Sure.

MR. FERRARIO:  So I don't -- I don't want to waste anybody's time.  But that -- that is a complicating factor here.

THE COURT:  And I appreciate that.

MR. FERRARIO:  Yeah.

THE COURT:  Mr. Hunt, any -- anything else you'd like to add?

MR. HUNT:  Your Honor, I think that, obviously, the parallel case, if resolved, it's going to have a major impact.  And so, therefore, on the -- I apologize.

THE COURT:  That's okay.  You can sit.

MR. HUNT:  Based on the scheduling -- your scheduling order, I hope you would take that into consideration.

THE COURT:  Any idea of -- you know, without committing -- any idea how far along those negotiations are?  Like, is it -- has it just started?  Has there been offers made?  Or is it still very much in its infancy in, like, "Hey, let's talk negotiations"?  Do you know?

MR. FERRARIO:  I do.  Part of it.  We had a mediation probably -- was it a year ago?

MR. KATZ:  Yeah.

MR. FERRARIO:  About a year ago.

MR. KATZ:  Somewhere --

MR. FERRARIO:  We -- I don't want to disclose too much here, but --

THE COURT:  Yeah.

MR. FERRARIO:  -- you know.

THE COURT:  I don't want you to disclose too much here but --

MR. FERRARIO:  We had -- there was a -- a change in counsel at the SEC.

THE COURT:  Okay.

MR. FERRARIO:  I engaged her.  We set a mediation.  We thought we were on a path to get it resolved.  It didn't resolve.

THE COURT:  Okay.

MR. FERRARIO:  She is now not on the case.  There's another lawyer that's handling it.

They -- I just talked to my co-counsel last week. They're -- they went through a very aggressive period of discovery.  I think we're in the expert phase.  We got motions for summary judgment coming up.  We're hoping that the door will open again, you know, because we're looking for that. There were -- there was principally one major stumbling block and we just couldn't get over it.

THE COURT:  Sometimes summary judgment answers those questions.

MR. FERRARIO:  Yeah.

THE COURT:  Sometimes it doesn't.  Or it opens those doors or sometimes it doesn't.

MR. FERRARIO:  Yeah.  And so we're -- you know, we're -- we're always looking for that, but I -- you know, I talked to him, timing.  It looks like that case will probably get to trial, I think, towards the end of next year, the latter part, maybe the last two quarters of next year.

THE COURT:  All right.

MR. FERRARIO:  So, you know, I'll -- I'll get more info.  If -- if it looks like it's wise to do that, I'll certainly reach out to plaintiff's counsel.  But I -- I just -- I think right now is probably not the right time is what my gut is telling me based on where everything's at.

THE COURT:  And I appreciate that.  Certainly, the parallel action complicates things.  It most -- it always does --

MR. FERRARIO:  Yeah.

THE COURT:  -- whether it's civil, criminal, or criminal, administrative, etc.

MR. KATZ:  If --

THE COURT:  All right.

MR. KATZ:  Your Honor, if I -- if I could pipe in?

2:21-cv-01517-CDS-EJY

THE COURT:  Of course.

MR. KATZ:  As far as JanOne is concerned, it's no longer parallel, it's more oblique because we, as the commission, have settled out.

THE COURT:  I appreciate that.  And thank you.  That's an important point of the clarification.  So I don't know if y'all would want to separate in terms of settlement but something to think about.

So let's set a briefing schedule.  I'll encourage the parties to engage in settlement if possible and if it's going to be fruitful.  I don't like anyone's time to be wasted either.  So I appreciate that honesty.

Let me start with plaintiff.  How much time would be ideal -- not necessarily going to give it to you -- but what would be ideal for amending the complaint?

MS. PANG:  Your Honor, plaintiff would request 30 days.

THE COURT:  All right.  Any objection to 30 days?

MR. FERRARIO:  That's -- the -- that's fine.  Thirty days to amend?

THE COURT:  All right.  So 30 days --

MR. FERRARIO:  Yeah.  No problem.

THE COURT:  -- to file the second amended complaint.

And how much time would the defendants like to file an answer?

———2:21-cv-01517-CDS-EJY———

MR. FERRARIO:  What's 30 days?

THE COURT:  Thirty days, we're soon going to start pushing ourselves into the holidays.  That will be just before Halloween.

MR. FERRARIO:  I think -- can we have 30 days after we get that?

THE COURT:  I don't think that's an unreasonable request.  Any objection to that?

MS. PANG:  No, your Honor.

THE COURT:  All right.  So 30 days to file an answer.

MR. FERRARIO:  Well, your Honor, we -- it -- the complaint may trigger another motion to dismiss.

THE COURT:  I understand that.

MR. FERRARIO:  So a response -- okay.

THE COURT:  Yeah, no, I understand that.

MR. FERRARIO:  Okay.  Fine.  All right.

MR. HUNT:  So it would be to a file responsive pleading, not necessarily --

THE COURT:  A responsive pleading --

MR. HUNT:  Thank you.

THE COURT:  -- correct, under the rules.

MR. HUNT:  Right.

THE COURT:  Right.  All right.  Then we'll go from there.  We'll see what happens from there.

Any questions or any need for clarification from

2:21-cv-01517-CDS-EJY

either side?

MS. PANG:  No, your Honor.  Thank you.

MR. FERRARIO:  Thank you, your Honor.

MR. HUNT:  Thank you, your Honor.

THE COURT:  All right.  Thank you all very much.

And again, I appreciate you all moving your schedules around to accommodate the delay my trials caused.  So I appreciate it.  Have a good afternoon.  Take care.

(The proceedings concluded at 2:58 p.m.)

* * *

--o0o--

COURT REPORTER'S CERTIFICATE

I, SAMANTHA N. MCNETT, Official Court Reporter, United States District Court, District of Nevada, Las Vegas, Nevada certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Date:  October 8, 2024

/s/ Samantha N. McNett
Samantha McNett, RMR, CRR, CCR