MUEHLBAUER LAW OFFICE, LTD.
Andrew R. Muehlbauer, Esq.
Nevada Bar No. 10161
7915 West Sahara Ave., Suite 104
Las Vegas, Nevada 89117
Telephone: (702) 330-4505
Facsimile: (702) 825-0141
Email: andrew@mlolegal.com

GLANCY PRONGAY & MURRAY LLP
Robert V. Prongay
Natalie S. Pang (admitted *pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com
Email: npang@glancylaw.com

*Counsel for Lead Plaintiff Daniel E. Sieggreen*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| DANIEL E. SIEGGREEN, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>LIVE VENTURES INCORPORATED, JON ISAAC, and VIRLAND A. JOHNSON,<br><br>Defendants. | Case No. 2:21-cv-01517-CDS-EJY<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |

# TABLE OF CONTENTS


I. NATURE OF THE ACTION AND OVERVIEW .......... 1

II. JURISDICTION AND VENUE .......... 5

III. PARTIES AND RELEVANT NON-PARTIES .......... 6

- A. Plaintiff .......... 6
- B. Defendants .......... 6
- C. Relevant Non-Parties .......... 8

IV. SUBSTANTIVE ALLEGATIONS .......... 8

- A. Background Of Live's Business .......... 8
- B. The Live Defendants Engage In A Fraudulent Scheme To Boost Live's FY 2016 Financial Results And Profit Off Of Live's Artificially Inflated Share Price .......... 9
- C. SeekingAlpha Partially Reveals The Truth About Live's Year-End 2016 Fraudulent Scheme, Causing Live's Share Price To Drop .......... 13
- D. The Live Defendants And JOI/ARCA Engage In A Fraudulent Scheme To Avoid Negative Tax Implications And Boost Live's Q1 2018 And JOI/ARCA's FY 2017 Financial Results .......... 16
- E. Live Restates Its Q1, Q2, And Q3 2017 Financial Results, Causing Live's Share Price To Drop Again .......... 20
- F. The Live Defendants And JOI/ARCA Further Their Deceptive Scheme When Live Is Unable To Pay Any Portion Of The ApplianceSmart Purchase Price .......... 22
- G. The Risks Of Defendants' Fraudulent Conduct Further Materialize When Live Discloses An SEC Investigation, Causing Live's Share Price To Plummet Again .......... 23
- H. The Live Defendants Engaged In A Fraudulent Scheme Concerning Isaac's FY 2016-2018 Compensation .......... 23
- I. Live Continues To Face Setbacks For The Rest Of The Class Period .......... 25
- J. The SEC Files An Enforcement Action Against The Live Defendants And JOI/ARCA, Causing Live's Share Price To Plummet By *46%* .......... 27
- K. After The Class Period, The Risks Of Defendants' Fraud Continue To Materialize .......... 28

V. THE LIVE DEFENDANTS' DISCLOSURE OBLIGATIONS UNDER ITEMS 303 AND 105 OF REGULATION S-K ........ 30

VI. THE LIVE DEFENDANTS' EXECUTIVE COMPENSATION DISCLOSURE OBLIGATIONS UNDER ITEM 402 OF REGULATION S-K ........ 35

VII. THE LIVE DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD ........ 39

A. Statements Concerning Live's 2016 FY Financial Results ........ 39

B. Statements Concerning Stock Promotions ........ 40

C. Statements Concerning Live's Q1 2018 Financial Results ........ 42

D. Statements Concerning Live's Payment Of The Purchase Price For ApplianceSmart ........ 44

E. Statements Concerning Isaac's FY 2016-2018 Compensation ........ 46

F. Live's Financial Statements For The Quarters Ended December 31, 2016, March 31, 2017, And June 30, 2017 ........ 48

VIII. CLASS ACTION ALLEGATIONS ........ 50

IX. LOSS CAUSATION ........ 52

X. ADDITIONAL SCIENTER ALLEGATIONS ........ 53

A. Defendants Had The Motive And Opportunity To Engage In Their Fraudulent Schemes ........ 53

B. Live Had Substantial Debts And Could Not Maintain Compliance With Its Loan Covenants ........ 55

C. Live's Restated Quarterly Financial Results ........ 56

D. The SEC's Investigation And Enforcement Action ........ 57

E. Live Lacked Effective Internal Controls Over Financial Reporting ........ 59

F. Live Cycled Through Four Auditors During The Class Period ........ 63

G. The Simplicity Of The GAAP Provisions Defendants Violated ........ 66

XI. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) ........ 69

XII. NO SAFE HARBOR ........ 71

XIII. CAUSES OF ACTION ........ 71
XIV. PRAYER FOR RELIEF ........ 81
XV. DEMAND FOR A TRIAL BY JURY ........ 81

Lead Plaintiff Daniel E. Sieggreen ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Live Ventures Incorporated ("Live" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Live; (c) review and analysis of analyst reports regarding the Company; and (d) review of other publicly available information concerning Live, including transcripts of Live's investor calls. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION AND OVERVIEW

1. This is a class action on behalf of persons and entities that purchased or otherwise acquired Live securities between December 28, 2016 and August 3, 2021, inclusive (the "Class Period").

2. Plaintiff pursues claims against Defendants Live, Jon Isaac ("Isaac"), who was at all relevant times, Live's CEO, Virland A. Johnson ("Johnson"), who at all relevant times was Live's CFO (collectively, the "Live Defendants"), and Defendant JanOne Inc. ("JOI/ARCA" and together with the Live Defendants, "Defendants") for violations of the Securities Exchange Act of 1934 (the "Exchange Act").

3. During the Class Period, Defendants engaged in three deceptive courses of conduct, in violation of §10(b) of the Exchange Act and Rules10b-5(a) & (c) promulgated thereunder, and the Live Defendants made materially false and misleading statements and material omissions in violation of §10(b) of the Exchange Act and Rule10b-5(b) promulgated thereunder concerning their actions.

4. The first deceptive scheme occurred in late 2016, months after the end of Live's 2016 fiscal year, which ended September 30, 2016, in the run-up to Live reporting its fiscal year

("FY") 2016 financial results to the SEC on December 29, 2016. The Live Defendants sought to boost Live's FY 2016 financial results, drive up Live's share price, and then profit from sales of Live's artificially inflated stock price.

5. As part of the first scheme, the Live Defendants engineered an amendment to a software purchase agreement that Live had entered into with Juan Yunis, a close personal friend of Isaac's. The amendment consisted of Isaac's friend "discounting" the software purchase price from $1.5 million to $584,500 worth of shares and selecting September 15, 2016 as the "effective date" of the amended agreement, even though the parties had not even begun discussing a potential amendment to the agreement until November 30, 2016 – two months after the close of FY 2016. This allowed Live to create the misleading appearance that as a result of this "discount", Live had gained $915,500 in "other income", thus boosting Live's FY 2016 pre-tax income by over 20%. The Live Defendants then made materially false and misleading representations and/or omissions to investors about Live's FY 2016 financial results, the circumstances of the purported amendment, and Live's recognition of $915,500 in "other income" in its FY 2016 financial results.

6. In addition, as part of the first scheme, in December 2016, Isaac wound up 800,000 of his shares in Live, for the purpose of decreasing Live's outstanding share count and increasing Live's earnings per share to $8.92. Isaac then approved of a press release to be issued on December 28, 2016, which misleadingly claimed that Live's FY 2016 EPS was $8.92 – in actuality, Live's FY 2016 EPS was $6.33, or 40% less than that figure. Shortly before issuing the press release on December 28, 2016, Live paid stock promoters $120,000 to tout Live's FY 2016 results and Isaac instructed Live's brokerage to sell up to 20,000 shares throughout the day on December 28, 2016 depending on if the share price hit certain amounts. Throughout the day on December 28, 2016, Isaac also placed 28 "good till cancel" limit orders through Juan Yunis's brokerage account, which Isaac had access to. If all of these transactions were completed, Live would have realized profits of over $1.1 million.

7. SeekingAlpha published a scathing report about Live on January 6, 2017, which partially revealed the truth about Live's actions and caused Live's share price to drop by 12.7%.

SeekingAlpha reported that Live had lied about its 2016 financial results, including in Live's December 28, 2016 press release which falsely claimed that Live's EPS was $8.92, and that Live had a history of paying stock promoters large sums of money, then selling shares as Live's share price rose after the stock touts before Live's share price plummeted back down. The Live Defendants attempted to cover up their deceptive scheme by lying to Live's outside accountants and making materially false and misleading statements and omissions to investors, by, *inter alia*, denying that Live had ever paid stock promoters.

8. The second deceptive scheme began in late 2017. Live had had an unprofitable first quarter of 2018 and would have to recognize a $2.3 million non-cash charge due to a new U.S. tax reform in its Q1 2018 financial results. JOI/ARCA, whose CEO was Tony Isaac, Jon Isaac's father as well as a director of Live - was also facing a tax hit because it had sold real property at a gain during its FY 2017, which ended December 31, 2017. The Live Defendants and JOI/ARCA came up with a scheme which would boost each party's financial results. As part of this scheme, Live and JOI/ARCA engineered a transaction whereby the parties created the misleading appearance that Live had acquired ApplianceSmart, a subsidiary of JOI/ARCA, with the transaction closing on December 30, 2017 and then made materially misleading and/or false representations and/or omissions to investors about the transaction. By selecting the acquisition date as December 30, 2017, Live could turn what had been an unprofitable quarter into a profitable quarter, and JOI/ARCA could offset the negative tax implications from selling real property at a gain in its FY 2017 financial results. Defendants claimed that ApplianceSmart was worth over $10 million, but that Live only paid $6.5 million for it, so that Live could claim that it had gained $3.7 million in income (the difference between the purported value of the asset and the purchase price).

9. But unbeknownst to investors, Live did not, nor could it, take effective control of ApplianceSmart on December 30, 2017, because ApplianceSmart was encumbered by a credit agreement with its lender, MidCap. Under the credit agreement, MidCap had sole possession of ApplianceSmart's stock certificate and ApplianceSmart could not sell any of its stock or assets

without permission of MidCap – which ApplianceSmart had not obtained. Further, as part of this deceptive scheme, the Live Defendants lied to Live's outside accountants, and told them that Live had "effective control" of ApplianceSmart and represented to both Live's outside accountants and to Live's investors that ApplianceSmart had transferred its stock certificate into escrow as of December 30, 2017. In actuality, ApplianceSmart had not transferred its stock certificate into escrow, and it remained in sole possession of MidCap.

10. Later, when Live was unable to pay *any* portion of the purchase price for ApplianceSmart, Defendants came up with another plan to claim that Live *had* paid part of the purchase price in the amount of $2.6 million. Live then made materially false and misleading representations and omissions to investors that, *inter alia,* Live had paid $2.6 million in cash to JOI/ARCA as part of the purchase price. Defendants came up with the $2.6 million amount by treating revenues ApplianceSmart had paid to its lender as amounts paid by Live to JOI/ARCA for the purchase price. Unbeknownst to investors, MidCap maintained sole possession of ApplianceSmart's stock certificate until March 22, 2018 and it was not until May 24, 2018 that JOI/ARCA's board of directors executed the corporate disclosures approving the sale of ApplianceSmart to Live.

11. The third deceptive scheme occurred in connection with the compensation paid to Isaac and Live's disclosures concerning the same. Over the course of FY 2016-2018, Live paid Isaac a total of $315,000 in housing allowances. However, the total amount Live *reported* to investors as paid to Isaac for housing allowances for FY 2016-2018 was $162,000. The Live Defendants' statements regarding Isaac's FY 2016-2018 compensation were materially false and misleading because they materially understated by 94% the total compensation paid to Isaac during that time and misrepresented the terms of Isaac's employment agreement with Live.

12. During the Class Period, the Live Defendants effectively admitted that their financial statements for five quarters were materially false and misleading and for the entirety of the Class Period, Live lacked effective internal control over financial reporting. Live restated its financial statements for Q1, Q2, and Q3 2017 on February 14, 2018, which revealed that Live had

materially understated its debts and materially overstated its net cash provided by operations, which caused Live's share price to plummet by 15.5%. On August 14, 2020, Live restated its financial statements for the quarters ended December 31, 2019, and March 31, 2020. Further, throughout the Class Period, Live was subject to numerous credit agreements and struggled to maintain compliance with its various loan covenants; indeed, as of December 31, 2017, Live had fallen out of compliance under a $30 million loan agreement.

13. At the end of the Class Period, on August 3, 2021, following a nearly four-year investigation, the SEC announced that it had filed an enforcement action (the "SEC Action") against the Live Defendants and JOI/ARCA in the United States District Court for the District of Nevada. The SEC Action was assigned to the Honorable James C. Mahan (Case No. 2:21-cv-01433-JCM-VCF). The SEC alleged seventeen counts for violations of the Exchange Act against Defendants, and sought relief consisting of, *inter alia*, permanently barring Isaac and Johnson from acting as an officer or director of any issuer, ordering Isaac to disgorge all funds received from his illegal conduct, and ordering all Defendants to pay civil penalties. On this news, Live's share price plummeted by ***46%.***

14. After the Class Period, Defendants moved to dismiss the SEC Action pursuant to Fed. R. Civ. P. 12(b)(6). On November 28, 2022, Judge Mahan denied the Live Defendants and JOI/ARCA's motions to dismiss the SEC Action in their entirety. Judge Mahan found that the SEC had stated claims against Defendants for, *inter alia*, engaging in deceptive acts and for issuing materially false and/or misleading statements and/or omissions in violation of the Exchange Act. These same fraudulent courses of conduct and materially misleading statements and omissions are alleged in the instant action.

## II. JURISDICTION AND VENUE

15. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rules 10b-5(a), 10b-5(b), and 10b-5(c) promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

16. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

17. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are in this District.

18. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES AND RELEVANT NON-PARTIES

### A. Plaintiff

19. Plaintiff Daniel E. Sieggreen, as set forth in the previously-filed certification (ECF No. 1-2) incorporated by reference herein, purchased Live securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

### B. Defendants

20. Defendant Live is incorporated under the laws of Nevada with its principal executive offices located in Las Vegas, Nevada. Live's principal offices are located at 325 E. Warm Springs Road, Suite 102, Las Vegas, Nevada 89119. Live's common stock trades on the NASDAQ Stock Exchange ("NASDAQ") under the ticker symbol "LIVE." Live's fiscal year starts on October 1 and ends on September 30 of the following year.

21. Defendant Jon Isaac ("Isaac") was Live's CEO at all relevant times. Isaac has served as a director of Live since December 2011 and he became President and CEO of Live in January 2012. Isaac was also Live's Chief Financial Officer ("CFO") from February 2013 to

January 2017. Isaac studied Economics and Finance at the University of Ottawa. Isaac is the President and sole member of Isaac Capital Group LLC ("ICG"). Throughout the Class Period, ICG was the beneficial owner of between 43.1% and 49.5% of Live's outstanding shares of common stock. Thus, Isaac had significant influence over all of Live's business and operations.

22. Defendant Virland A. Johnson ("Johnson") joined Live in November 2016 as a consultant and was appointed as Live's CFO in January 2017. Johnson claims to have more than 25 years of experience in the areas of "process improvement, complex debt financings, SEC and financial reporting, turn-arounds, corporate restructuring, global finance, merger and acquisitions and returning companies to profitability and enhancing shareholder value." Johnson holds a Bachelor's degree in Accountancy from Arizona State University and is a certified public accountant in Arizona.

23. Defendants Isaac and Johnson (collectively the "Individual Defendants") possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are thus liable for the false statements pleaded herein.

24. Defendant JanOne Inc. ("JOI/ARCA") is a Nevada corporation, formerly known as Appliance Recycling Centers of America, Inc. JOI/ARCA's securities are registered with the SEC under Section 12(b) of the Exchange Act and are listed on the NASDAQ under the ticker symbol "JAN." During the Class Period, JOI/ARCA purported to be in the business of recycling and

selling household appliances. Jon Isaac has a beneficial ownership of 13.6% of JOI/ARCA's outstanding common stock. Johnson has served as the CFO of JOI/ARCA since August 2017.

### C. Relevant Non-Parties

25. Antonios "Tony" Isaac ("Tony Isaac") is Jon Isaac's father and is a Canadian citizen residing in Las Vegas, Nevada. Since December 2011, Tony Isaac has been a board member of Live. At all relevant times, Tony Isaac was the CEO of JOI/ARCA.

26. Juan Yunis ("Yunis") is a Colombian citizen residing in Barranquilla, Colombia. Yunis and Isaac are close personal friends who vacation together. Since at least October 2014, Yunis has been the CEO of Novalk Apps S.A.S. ("Novalk"), a Colombian corporation that is heavily involved with the Live Defendants. For example, at various times during the Class Period, funds from Novalk's or Yunis's bank accounts were wired to Isaac's personal bank account, including on September 17, 2018, in the amount of $128,781.564, and on December 14, 2018, in the amount of $500,000. In October 2014, Novalk entered into a purported software purchase agreement with Live under which Live agreed to purchase software from Novalk for either $1.5 million in cash, or 800,000 of Live's shares (the "Novalk Agreement"). However, between October 2014 and November 30, 2016, Live did not make any payment to Novalk under the terms of the agreement.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Background Of Live's Business

27. Live is a holding company formerly known under many different monikers, but originally named the Nuclear Corporation of New Mexico.

28. For decades, the Company racked up losses and lacked an executable business model. In late 2011, when Live faced being delisted from the NASDAQ and filing for bankruptcy, Canadian father and son duo Tony and Jon Isaac joined Live as members of the board of directors. In January 2012, the younger Isaac, then 28 years old, was appointed as Live's CEO and President.

29. Under Isaac, Live commenced a "strategic shift" to become a "diversified holding company" focused on acquiring "profitable companies in various industries". In connection with

this "strategic shift", Live acquired an 80% interest in July 2015 of Marquis, a carpet and yarn manufacturer, and in November 2016, Live acquired 100% of Vintage Stock, a brick-and-mortar chain store focused on selling vintage and pre-owned toys, music products and other collectibles.

30. Though Live's revenues increased as a result of this strategic shift, Live's debts far surpassed and extinguished its growth. Live's acquisitions of Marquis and Vintage Stock caused Live's debts to increase exponentially by the start of the Class Period. Indeed, between September 2016 and December 2016, Live's debts increased by nearly five times - from $15,886,186 to $75,042,413.

**B. The Live Defendants Engage In A Fraudulent Scheme To Boost Live's FY 2016 Financial Results And Profit Off Of Live's Artificially Inflated Share Price**

31. Live's fiscal year ("FY") ends on September 30 and begins on October 1 of each calendar year. Thus, Live's FY 2016 ended on September 30, 2016. However, Live was not required to report its FY 2016 results to the SEC until the end of the calendar year, on December 29, 2016.

32. Starting in late-2016, after the end of Live's FY 2016, the Live Defendants engaged in a deceptive scheme designed to create the appearance that Live's FY 2016 was more successful than it actually had been, thus artificially inflating Live's share price, with the goal of profiting off of Live's artificially inflated share price, and to cover up their actions by lying to Live's accountants and Live's investors.

33. As part of this deceptive scheme, the Live Defendants engineered an amendment to the Novalk Agreement, under which Live had agreed in October 2014 to purchase software from Novalk for $1.5 million in cash or 800,000 of Live's shares. Yunis, Isaac's close personal friend, was at all relevant times the CEO of Novalk.

34. After Live and Novalk entered into the Novalk Agreement, the agreement sat dormant for two years. Indeed, between October of 2014 and November 30, 2016, Live made zero payments to Novalk for software.

35. On November 30, 2016, two months after the close of Live's FY 2016, Isaac sent an email to Yunis stating, "We want to cancel the deal on the software we bought from you. the $1.5m. I don't think we will use it. Thoughts?" On that same day, Isaac and Live entered into an agreement with a stock promoter named Protrader Elite LLC ("Protrader").

36. On December 5, 2016, Isaac emailed Johnson and another Live employee, informing them that he had been able to get a "discount on the price [of the software from Novalk]. So let's proceed with the purchase of this asset, but, ***instead of paying him $1.5m cash or 800,000 shares, [the price will be 350,000 shares priced as of the] 9/30 closing date [when Live's] stock price was 1.91."*** On that same day, Live wired $60,000 to Protrader.

37. On December 14, 2016, Live wired another $60,000 to Protrader.

38. Ultimately, the Live Defendants selected the effective date of the Novalk Amendment as September 15, 2016, instead of September 30, 2016. Live's share price was only $1.67 on September 15, 2016, compared to the $1.91 share price on September 30, 2016. Thus, Live would be able to claim an even larger "discount" on the software by setting the "effective date" as September 15, instead of September 30, 2016.

39. On December 19, 2016, Isaac emailed the Novalk Amendment to Yunis and Yunis emailed back the signed document; Isaac forwarded the document to Johnson and Johnson forwarded the document to two Live employees with the note, "Here is the executed agreement …. ***the effective date is Sept 15th …. but the signature date is now."*** Johnson also forwarded the document to another Live employee with the instructions, "have Jon counter sign when he comes into the office this week. ***Deal valued at 350,000 shares @ $1.67 Closing price on 9/15/2016 (effective date) or $584,500."***

40. The Live Defendants intentionally selected September 15, 2016 as the "effective date" of the Novalk Amendment to boost Live's FY 2016 financial results. By creating the misleading appearance that the Novalk Amendment became effective before the end of Live's FY 2016, Live could claim to recognize the positive impact of the "discount" in its soon-to-be-filed FY 2016 financial results. By taking the "discounted" price of 350,000 shares on September 15,

2016, or $584,500, and subtracting that figure from the original $1.5 million purchase price, Live could claim a gain of $915,500 in "other income", which would in turn materially increase Live's FY 2016 pre-tax income by *20%*.

41. On December 23, 2016, Isaac emailed Live's board of directors, stating:

> I have decided to lock up all of my Isaac Capital Group's shares in LIVE for a period of 5 years. That means, I cannot sell any LIVE shares owned by ICG. ***This will make a good announcement no doubt. The other advantage this share exchange brings is a reduced share count on the common shares. We go from about 2.8m shares to about 2m shares outstanding. A lower outstanding share count will make our EPS look even better …. [This action] will be disclosed in the 10k.***

42. As of September 30, 2016, the close of Live's FY 2016, Live's outstanding share count was 2.8 million and its EPS was $6.33. Lowering Live's outstanding share count from 2.8 million to 2 million would increase Live's EPS to $8.92 but would not change the fact that Live's FY 2016 EPS was $6.33.

43. On December 27, 2016, Isaac emailed employees at Live's brokerage firm, stating that Live would have its FY 2016 "numbers coming out tomorrow" and that it "could be a high volume day." Employees at Live's brokerage firm remarked to one another over email that there was a "[r]easonable chance that [Isaac] [wi]ll sell 250k shares or more this week."

44. On December 27, 2016, after close of market, two stock promoters touted Live's soon-to-be-announced FY 2016 financial results, including Live's "strong potential" and Live's "history of providing investors with incredible upside volatility."

45. On December 28, 2016, at 7:00 a.m. EST, before the market opened, Live issued a press release entitled ***"Live Ventures Announces Biggest Year in Company History Achieving Record Earnings of $8.92 Per Share With Continued Growth Anticipated in 2017"*** (the "December 28, 2016 Press Release").

46. The December 28, 2016 Press Release stated:

> ***Reporting its most successful year in the Company's history, Live Ventures reported a record $79M in revenues, an increase of 136 percent over the previous year, and net profit of approximately $ 17.82M, representing earnings per share (EPS) of $8.92*** …. Management anticipates revenues to increase by well over 50

percent, easily surpassing $120M, and stockholders' equity to grow at a high double-digit rate.

47. At $6.33, Live's actual FY 2016 EPS was *40%* lower than the EPS touted in the December 28, 2016 Press Release.

48. Also on the morning of December 28, 2016, Isaac instructed Live's brokerage firm to be prepared to sell up to 20,000 shares of Live's stock, "in case [the stock price] goes busurk [sic]." Isaac instructed Live's brokerage firm to sell up to 10,000 shares if the price per share rose to between $36 and $38 that day, and to sell another 10,000 shares if the price per share rose to between $40 and $42. That same day, Isaac also placed 28 "good till cancel" limit orders for sales of up to 10,674 Live shares through the brokerage account for another of Yunis's businesses, which Isaac had access to.

49. In response to the paid stock touts and Live's misleading press release, Live's share price skyrocketed to nearly $35 per share on the morning of December 28, 2016. Live's share price did not increase enough to trigger the stock sales that Isaac had directed Live's brokerage to engage in that day, but had the transactions had occurred, Live would have generated proceeds of approximately $760,000. Five of the "good till cancel" orders Isaac had placed through the brokerage account for one of Yunis's businesses were completed, generating $48,000 in profits, but had all 28 of the orders been completed, the transactions would have generated over $383,000 of profits.

50. Had Isaac successfully sold all of the shares that he had endeavored to sell on December 28, 2016, together those transactions would have generated $1.1 million in profits.

51. As part of the Live Defendants' deceptive course of conduct, the Live Defendants also misled Live's outside accountants, Anton & Chia, about the circumstances of the Novalk Amendment. For example, Live stated in a management representation letter addressed to Anton & Chia dated December 28, 2016, which was signed by Isaac,

> ***On December 7, 2016, [LIVE] and Novalk memorialized an agreement which is effective September 15, 2016 that changes the terms and conditions relating to payment of the outstanding software license fee [to Novalk] of $1,500,000. The***

> ***software fee will be settled in exchange for 58,333 shares of [LIVE's] common stock which are to be issued and certificated subsequent to the year ended September 30, 2016.*** As a result of this agreement, [LIVE] recorded $915,500 of other income in September 2016 and maintained an accrued liability to Novalk for $584,500 to be settled when the common shares are issued to Novalk after the year-end, September 30, 2016.

52. Anton & Chia relied upon Live's misleading representations in issuing audit opinions of Live's financial statements.

53. On December 29, 2016, Live filed its 2016 Form 10-K with the SEC (the "2016 Form 10-K"). The 2016 Form 10-K reported Live's basic EPS as $6.33 and Live's diluted EPS as $5.40. The 2016 Form 10-K provided no explanation as to why Live's December 28, 2016 Press Release had reported Live's FY 2016 as $8.92.

54. The 2016 Form 10-K stated that with respect to the amendment of the Novalk Amendment:

> ***Effective September 15, 2016 the Company and the licenser and developer of the software reached agreement whereby the company would pay for the software by issuing to licensor 58,333 of the Company's common shares to settle the accrued but unpaid obligation.*** The shares were not issued prior to September 30, 2016, and the accrued obligation of $584,500 will remain in accrued expense until the shares are issued. ***As a result of this agreement, the Company recorded $915,500 of other income.***

55. Tellingly, the Live Defendants did not hold a public conference call to discuss Live's FY 2016 financial results.

### C. SeekingAlpha Partially Reveals The Truth About Live's Year-End 2016 Fraudulent Scheme, Causing Live's Share Price To Drop

56. On January 6, 2017, SeekingAlpha published a report entitled "Live Ventures Exposed: Massive Paid Promotions, Heavy Accounting Manipulation, Deficient Auditor And More."

57. SeekingAlpha reported the following about Live:

> Live Ventures states that Isaac Capital Group (which is solely controlled by Live Ventures' CEO Jon Isaac) has locked up "ALL" of their shares for 5 years, implying that the CEO cannot sell his shares.

Yet in addition to the 800,000 shares which have supposedly been locked up, Isaac has access to around 700,000 additional shares via warrants/options which have average exercise prices as low as $4.14 and which expire in less than 2 years. THE WARRANTS ARE EXERCISEABLE IMMEDIATELY – meaning that Isaac can exercise and sell over $10 million of stock any time he wants.

***Live Ventures put out a press release claiming that the company achieved EPS of $8.92 in 2016. This is WRONG and is inconsistent with Live Ventures' SEC filings.***

***First off, the $8.92 which was touted in Live Venture's press release was calculated by subtracting the 800,000 shares that Isaac agreed to lock up. This is wrong. Even in their own SEC 10K filing, Live is not able to calculate EPS this way.*** The number as shown in the 10K is actually $5.40. So Live Ventures has already overstated their EPS in the press release by 65%.

In fact, anyone running a text search on the 10K for the number "$8.92" will find no hits at all.

But then it gets better. Live Ventures didn't even realize a true profit at all.
**Live Ventures LOST MONEY.** ***The GAAP Net Income number provided [by] the company was $17.8 million. But to achieve this, the company added in almost $19 million of arbitrary one-time accounting adjustments, some of which appear to have no precedent in public company accounting. So in fact, Live Ventures did not post a true profit at all – instead, Live Ventures actually lost nearly $2 million.***

***

Live Ventures' stock has shown a repeated pattern over time. When the stock trades at a very low price, a reverse split occurs to raise the price up and reduce the float. At the same time, some new acquisition or corporate development is announced. ***Simultaneous paid promotions (which have now run into the millions of dollars) help to temporarily drive the stock up.*** But when the business fails to produce results, the stock price falls again and the process is repeated.

***The most recent promotion campaign saw the stock triple in November to December 2016. As in the past, there was a reverse split which coincided with some sort of "news". As in the past, there is the presence of heavily compensated stock promoters. And as in the past, the stock price quickly showed a reaction, tripling in a few weeks.***

58. On this news, Live's stock price dropped $2.62, or ***12.7%,*** to close at $18.05 on January 6, 2017.

59. On January 9, 2017, Live issued a press release in the form of a letter to its shareholders (the "January 9, 2017 Press Release") which refuted SeekingAlpha's report. Specifically, the January 9, 2017 Press Release stated:

> Stock Manipulation Stories
>
> With regard to any negative articles recently written about us by those attempting to manipulate our stock for their profit, we vehemently deny all of their false and misleading statements and allegations …. Contrary to the false and misleading information written about us, your current management has spent the last five years building our Company for you, our stockholders. ***Although we could have easily taken advantage of our stock price when we witnessed spikes and record peaks, no officer or director has sold any shares …. Had our company truly engaged in any type of promotional activity, our Company, its officers, and directors would have sold shares.***
>
> ***
>
> ***In December, [Live's] largest stockholder and a third party that for years had provided a large standby lending agreement, agreed to lock up all of their shares for five years*** …. ***Accordingly, the Company's common stock was reduced from approximately 2.8 million to 2.0 million shares.***

60. On February 9, 2017, Live also held a public conference call (the "Q1 2017 Call"), wherein Isaac reassured investors that ***"the information contained within Seeking Alpha's article is false"*** and assuaged concerns that he was going to try to sell his shares when Live's stock price was up. Specifically, Isaac stated:

> [A] lot of people had some concerns that when the stock is up, Jon is going to sell and he's going to exit and this and that. What I wanted to broadcast [by locking up ICG's shares] was that this is – to me this is not a trade by any means, this is a very long-term hold. I was considering a lot longer than five years to be honest with you, we said five years …. I just wanted to send this message out to all shareholders that this is definitely a long-term play for us and really it doesn't matter today for us. I mean, if we woke up today and the stock was at $18 or was at $35, it's really – we're still coming to work and we're still working for you guys, the shareholders to bring value to you. And to be quite frank with you, the most important metric here on our office is not really the stock price of the day, it's really the book value of our company…. So, we don't – although we'd like to look at the stock price and it's nice to look at, it gives that nice feeling when it's up. It really doesn't affect us greatly. And we feel that our theory on stock price is that, it will hover or dance around our shareholder equity. So, the higher the shareholder equity, the higher the stock price, and that's how we become more and more valuable year after year.

61. On May 1, 2017, the Live Defendants filed a Form 8-K with the SEC which disclosed that "[o]n April 27, 2017, Live … engaged BDO USA, LLP ('BDO') as its independent registered public accounting firm and dismissed Anton & Chia, LLP ('A&C') from that role."

**D. The Live Defendants And JOI/ARCA Engage In A Fraudulent Scheme To Avoid Negative Tax Implications And Boost Live's Q1 2018 And JOI/ARCA's FY 2017 Financial Results**

62. At year-end 2017, both Live and JOI/ARCA were facing negative tax implications. Due to the enactment of a new U.S. tax reform, Live would have to recognize a $2.3 million non-cash charge and report an unprofitable quarter for the period ended December 31, 2017, Live's Q1 2018. On the other hand, JOI/ARCA was facing a large tax liability as a result of selling sold real property at a gain in 2017, which would negatively impact JOI/ARCA's FY 2017 financial results for the fiscal year ended December 31, 2017.

63. To avoid the negative impacts of these tax issues and boost their respective financial results, Live and JOI/ARCA engineered a stock purchase agreement ("SPA") under which JOI/ARCA agreed to sell 100% of the stock of its subsidiary, ApplianceSmart, to Live for $6.5 million in cash. Under the terms of the SPA, JOI/ARCA was required to transfer ApplianceSmart's stock certificate to Live free of liens and encumbrances. The parties agreed to claim that the effective or closing date of the acquisition was December 30, 2017, which would allow Live to recognize the transaction in its Q1 2018 financial results and would allow JOI/ARCA to recognize the transaction in its FY 2017 financial results.

64. The Live Defendants then represented to investors that as of December 30, 2017, Live's acquisition of ApplianceSmart was effective and closed, and the shares of ApplianceSmart stock had been delivered into escrow to be released to Live upon Live's delivery of the $6.5 million purchase price which was expected to occur before March 31, 2018. For example, on January 18, 2018, the Live Defendants filed Live's FY 2017 Form 10-K with the SEC, which stated:

> ***On December 30, 2017 … the Company[] entered into a Stock Purchase Agreement (the "Agreement") with [JOI/]ARCA and ApplianceSmart, Inc.*** ("ApplianceSmart"), a subsidiary of [JOI/]ARCA …. ***Pursuant to the Agreement, the Purchaser purchased from [JOI/]ARCA all of the issued and outstanding***

> ***shares of capital stock (the "Stock") of ApplianceSmart in exchange for $6,500,000*** (the "Purchase Price").
>
> ***The shares of Stock were delivered into escrow*** and will be released to the Purchaser upon Purchaser's receipt of third-party financing in an amount sufficient to fund the Purchase Price … which the parties expect to occur prior to March 31, 2018.

65. Unbeknownst to investors, as of December 30, 2017, ApplianceSmart was still subject to a credit and security agreement with its lender, MidCap (the "MidCap Credit Agreement"), under which, *inter alia*, MidCap had a first lien security interest in *all* of ApplianceSmart's assets and MidCap had sole possession of ApplianceSmart's stock certificate. Further, under the MidCap Credit Agreement, ApplianceSmart was required to obtain MidCap's written approval prior to selling any of ApplianceSmart's assets, and ApplianceSmart had not obtained such approval. Thus, contrary to Defendants' representations, as of December 30, 2017, Live had not and could not take effective control of ApplianceSmart. And as of December 30, 2017, ApplianceSmart's stock certificate had not been and could not be transferred into escrow where it could be released to Live upon Live's payment of the purchase price, because MidCap had sole possession of ApplianceSmart's stock certificate.

66. The Live Defendants did not disclose to investors the real purpose of the ApplianceSmart transaction: to boost Live's quarterly financial results as well as JOI/ARCA's FY 2017 financial results. Instead, the Live Defendants led investors to believe that the purpose of the acquisition was to increase Live's growth and business opportunities. For example, on January 8, 2018, Live issued a press release entitled "Live Ventures Enters Into Agreement to Acquire $65M Per Year ApplianceSmart", which stated:

> [Live] has entered into an agreement to acquire 100 percent of the outstanding stock of ApplianceSmart, a 17-store chain specializing sales and service of new and out-of-the-box appliances …. ***It is estimated that Live Ventures['] revenues will rise approximately 42 percent on an annualized basis as a result of this acquisition.***

67. The Live Defendants further represented to investors that Live had generated $3.7 million in "other income" as a result of Live's "acquisition" of ApplianceSmart. For example,

Live reported in its Q1 2018 Form 10-Q filed with the SEC on February 14, 2018, that as a result of its "acquisition" of ApplianceSmart, which had "closed on December 30, 2017", Live had earned $3,773,486 in income in the form of a "bargain purchase gain on acquisition".

68. The Live Defendants came up with the "bargain purchase gain on acquisition" by assigning $10,237,486 as the value of ApplianceSmart's assets and subtracting Live's "purchase price" of $6.5 million from that figure to give the false impression that Live had paid much less for ApplianceSmart than what it was worth. For example, Isaac and Johnson engaged in the following exchange with an analyst on a February 14, 2018 public conference call:

> ANALYST: Can you tell me what a bargain purchase gain is? … I've been around 30 years, never heard that term before. And isn't that a onetime item, and should not be included with your income?
>
> JOHNSON: Bargain purchase gains are reported wins, assets are in excess of purchase price for those acquired assets.
>
> ANALYST: And who determines that?
>
> JOHNSON: A bargain purchase gain is a rare occasion. It doesn't happen very often….
>
> ANALYST: Right. So who determines that?
>
> ISAAC: In layman's terms, it's ***we bought something that's worth $10, but we paid $7 for it. So the $3 gets added back on to the balance sheet, and it has to go through our income statement for it to end up on the balance sheet.***
>
> JOHNSON: Correct.
>
> ANALYST: But who determines that? … And then why would that be included in [] ordinary income when it's really a special gain that's not -- what would the actual number be, around $0.20 or $0.25 without that, right?
>
> JOHNSON: It's typically included as other income when it does happen. And that's exactly how we called it out. And we've also specifically called it out as its own line item. Again, rare does happen, and it's a onetime event, but there is the ability for it to be adjusted sometime in the future within [a] 1 year period of time when we're actually doing the fair value analysis work on all of the assets that are related to the acquisition …. This has happened twice so far from what I remember with here at our company. And this -- as a shareholder, ***this is sort of an indicative of what management or how we negotiate our purchases. Many times we're buying things that's below their market value[.]***
>
> ANALYST: That's fine. It's just that it seems like it's not something that should be considered in a normal part of your profit.

69. Claiming a $3.7 million "bargain purchase gain on acquisition" allowed Live to turn what had otherwise been an unprofitable quarter into a profitable quarter and allowed Live to avoid the negative impact of a $2.3 million non-cash charge due to enactment of a new tax reform.

70. Unbeknownst to investors, at the time Live reported its Q1 2018 financial results, ApplianceSmart was still encumbered by the MidCap Credit Agreement, and Live thus could not and had not taken effective control of ApplianceSmart and ApplianceSmart's stock certificate had not been and could not be transferred into escrow to be released to Live upon payment of the purchase price because ApplianceSmart's stock certificate was in the sole possession of MidCap.

71. On February 2, 2018, Live filed a Form 8-K with the SEC which disclosed that on January 29, 2018, shortly before Live was required to report its Q1 2018 financial results, Live's independent public accountant, BDO had "informed Live [] that it will not stand for re-election for the audit of the Company's consolidated financial statements for the year ended September 30, 2018." On February 7, 2018, Live announced in a Form 8-K filed with the SEC that on February 6, 2018, Live had hired SingerLewak LLP as its new independent registered public accounting firm. SingerLewak would be Live's third auditor during the Class Period.

72. As part of the Live Defendants' deceptive course of conduct, Live also made material misrepresentations to its outside accountants, which its outside accountants relied upon in issuing audit opinions of Live's financial statements. For example, on February 12, 2018, SingerLewak asked Live to confirm, given that consideration for the ApplianceSmart acquisition was not expected to pass until March 31, 2018, that "the date of acquisition [of ApplianceSmart] and inclusion in the consolidated financial statements has been considered." Johnson responded by informing SingerLewak that ***Live has "effective control over ApplianceSmart*** even though consideration in terms of $$$ have not passed as of yet."

73. In a management representation letter from Live addressed to SingerLewak dated February 14, 2018, which was signed by Isaac and Johnson, the Live Defendants misleadingly stated:

> ***The shares of ApplianceSmart stock are in escrow*** and will be released upon payment of the purchase price to third-party lenders of ARCA and ApplianceSmart, which is expected to occur prior to March 31, 2018. Although consideration has not transferred at December 31, 2017, ***the Company has effective control over ApplianceSmart and has determined that the acquisition date is December 30, 2017.***

74. In connection with review of Live's financial statements for Q2 2018, SingerLewak advised Johnson on May 7, 2018, that "If the acquisition date of [ApplianceSmart] is determined to not be 12/30/17, then we would need to assess the impact of this on the Q1 2018 10-Q[.] If we file the Q2 2018 10Q without the final determination of ApplianceSmart, we would then be in the position of assessing the impact on two 10Qs[], which is not an ideal position to be in."

### E. Live Restates Its Q1, Q2, And Q3 2017 Financial Results, Causing Live's Share Price To Drop Again

75. On February 14, 2018, after close of market, Live filed a Form 8-K with the SEC (the "February 14, 2018 Form 8-K"), which disclosed that the Company had restated its financial results for the past three quarters.

76. The February 14, 2018 Form 8-K stated:

> ***On January 18, 2018, the Audit Committee of the Board of Directors (the "Committee") of Live Ventures Incorporated (the "Company"), in consultation with management, concluded that the Company's previously issued financial statements for the quarterly periods ended December 31, 2016, March 31, 2017 and June 30, 2017 (collectively, the "Restated Periods") should no longer be relied upon because of errors related to: (i) classification of certain debt of our subsidiaries Marquis Industries, Inc. ("Marquis") and Vintage Stock, Inc. ("Vintage Stock") as long-term debt when it should have been classified as short-term debt,*** (ii) characterization of deposits (advance payments) on the purchase of Marquis carpet manufacturing equipment and the related cash flow presentation (operating versus investing), (iii) accounting for the down round provisions contained in certain convertible notes and related warrants we issued in 2012, 2013 and 2014, which warrants were subsequently amended to remove such provisions in December 2014, (iv) classification of certain amounts relating to shares of our Series E Preferred Stock, (v) classification of certain prepaid expenses and other current assets as receivables, and (vi) classification of the seller financing provided by the sellers of Vintage Stock. The errors described above will result in the restatement of our financial statements for the Restated Periods.

77. On February 14, 2018, Live filed its restated Form 10-Qs for the quarters ended December 31, 2016, March 31, 2017, and June 30, 2017 with the SEC. The restated financial

statements revealed that Live had significantly overstated its net cash provided by operations by $1.8 million each quarter, or by 36% for the quarter ended December 31, 2016, by 35% for the quarter ended March 31, 2017, and by 21% for the quarter ended June 30, 2017.

78. The restated Form 10-Qs further revealed that Live had materially understated its debts maturing in the next fiscal year by 229% for Q1 2017, by 264% for Q2 2017, and by 297% for Q3 2017. For example, for Q1 2017, Live originally reported this figure as $6,226,454, but the restated figure was $20,505,143.

79. Further, while each of the original Form 10-Qs for the quarters ended December 31, 2016, March 31, 2017, and June 30, 2017 had included a list of "Risk Factors", the restated Form 10-Qs removed all of the original "Risk Factors" and instead stated, "We are a smaller reporting company as defined by Rule 12b-2 of the Securities Exchange Act of 1934 and are not required to provide the information under this item." The "Risk Factors" included in the original Form 10-Qs, stated that hypothetical risks to Live's business, financial condition and results of operations, cash flows and liquidity included, *inter alia*:

> Our results of operations may fluctuate from quarter to quarter depending upon several factors, some of which are beyond our control. These factors include, but are not limited to:
>
> - The timing and allocations of new product releases;
> - The timing of new store openings or closings;
> - Shifts in the timing or content or certain promotions or service offerings;
> - The effect of changes in tax rates in the jurisdictions in which we operating;
> - Acquisition costs and the integration of companies we acquire or invest in;
> - The costs associated with the exit of unprofitable markets or stores
>
> These and other factors could affect our business, financial condition and results of operations, cash flows and liquidity, and this makes the prediction of our financial results on a quarterly basis difficult. Also, it is possible that our quarterly financial results may be below the expectations of public market analysts.

80. On this news, Live's share price dropped by $2.44 per share, or ***15.5%,*** to close at $13.29 per share on February 15, 2018.

**F. The Live Defendants And JOI/ARCA Further Their Deceptive Scheme When Live Is Unable To Pay Any Portion Of The ApplianceSmart Purchase Price**

81. As of March 31, 2018, Live had not paid *any* portion of the purchase price to JOI/ARCA in connection with the acquisition of ApplianceSmart because Live had not been able to come up with the financing to pay the $6.5 million cash purchase price to JOI/ARCA.

82. Accordingly, in April 2018, Johnson came up with an idea to treat ApplianceSmart's revenues as cash paid from Live to JOI/ARCA for the purchase of ApplianceSmart. Johnson proposed to calculate this amount by taking ApplianceSmart's revenues from January through March 2018 - which had been paid directly to MidCap pursuant to the MidCap Credit Agreement, which ApplianceSmart was still encumbered by - and subtracting the amounts that JOI/ARCA had obtained under the MidCap Credit Agreement to fund ApplianceSmart's operations from January through March 2018. This figure amounted to $2,580,505.54.

83. Isaac agreed with Johnson's plan and stated that Live should issue an announcement that it had "paid $2.5m in cash" for ApplianceSmart.

84. On April 26, 2018, Live issued a press release, which stated in relevant part:

> …[O]n December 30, 2017 … the Company (the "Purchaser"), entered into a Stock Purchase Agreement (the "Agreement") with … ApplianceSmart, Inc.[.] Pursuant to the Agreement, the Purchaser purchased from the Seller all of the issued and outstanding shares of capital stock of ApplianceSmart in exchange for $6,500,000 (the "Purchase Price").
>
> The Purchaser was required to deliver the Purchase Price, and ***a portion of the Purchase Price was delivered, to the Seller prior to March 31, 2018.***
>
> ***Between March 31, 2018 and April 24, 2018, the Purchaser and the Seller negotiated in good faith the method of payment of the remaining outstanding balance of the Purchase Price. On April 25, 2018, the Purchaser delivered to the Seller that certain Promissory Note… in the original principal amount of $3,919,494.46***[.].

85. In a memo to Live's outside accountants dated May 15, 2018, and contrary to Live's representations to investors, Johnson confirmed that MidCap had had possession of

ApplianceSmart's stock certificate up until *March 22, 2018*, at which time the stock certificate was released to JOI/ARCA. Further, and contrary to the Live Defendants' representations to investors regarding the effective date of the ApplianceSmart SPA, it was not until *May 23, 2018* that Johnson even sent Tony Isaac the unexecuted copies of the corporate resolutions that JOI/ARCA's board of directors were required to sign to approve the sale of ApplianceSmart to Live, which JOI/ARCA's board members then signed on May 24, 2018. None of these facts were disclosed to investors.

**G. The Risks Of Defendants' Fraudulent Conduct Further Materialize When Live Discloses An SEC Investigation, Causing Live's Share Price To Plummet Again**

86. On August 14, 2018, after close of market, Live filed its Q3 2018 Form 10-Q for the quarter ended June 30, 2018 (the "Q3 2018 Form 10-Q"), which disclosed that the SEC had commenced an investigation into the Company starting nearly six months prior.

87. Specifically, the Q3 2018 Form 10-Q stated:

> ***On February 21, 2018, the Company received a subpoena from the Securities and Exchange Commission ("SEC") and a letter from the SEC stating that it is conducting an investigation. The subpoena requests documents and information concerning, among other things the restatement of the Company's financial statements for the quarterly periods ended December 31, 2016, March 31, 2017, and June 30, 2017, the acquisition of Marquis Industries, Inc., Vintage Stock, Inc., and ApplianceSmart, Inc., and the change in auditors.***

88. On this news, Live's share price dropped by $1.33 per share, or ***11.7%,*** to close at $10.02 on August 15, 2018.

**H. The Live Defendants Engaged In A Fraudulent Scheme Concerning Isaac's FY 2016-2018 Compensation**

89. On August 8, 2016, Live created an internal accounting record which stated that the Company owed Isaac $234,000 for "Temporary Living Expenses" going back to 2012. On August 9, 2016, Live wired $120,000 to Isaac, with the note "temp living reimb."

90. Live's 2016 Form 10-K stated that the Company ***"ha[s] no written employment agreement with … Jon Isaac."***

91. The 2016 Form 10-K stated that Isaac had received a salary of $200,000 and a $13,465 for an option award, for total FY 2016 compensation of $213,465. The 2016 Form 10-K did not disclose the $120,000 that Live had paid Isaac during the fiscal year. On June 2, 2017, Live filed a Schedule 14A, Proxy Statement with the SEC which was signed by Isaac and that repeated the same representations regarding Isaac's FY 2016 compensation and lack of written employment agreement with Live as in Live's 2016 Form 10-K.

92. On May 30, 2017, Live wired Isaac $30,000, with the note "temp living reimb."

93. On December 18, 2017, Live wired $165,000 to Isaac with the note "expense reimb."

94. On January 18, 2018, Live filed its Form 10-K with the SEC for FY 2017 signed by Isaac (the "2017 Form 10-K"). The 2017 Form 10-K stated that "'All Other Compensation' for Mr. Isaac includes $54,000 for … 2016, which was accrued by us for the reasonable housing allowance to which Mr. Isaac is entitled to under his employment agreement." Contrary to Live's representations about Isaac's employment agreement with Live in the 2016 Form 10-K, Live's 2017 Form 10-K stated:

> ***The Company entered into an employment agreement with Jon Isaac, its President and Chief Executive Officer, effective January 1, 2013, as amended on January 16, 2018 …. Mr. Isaac is entitled to reimbursement for all reasonable business expenses incurred by him in connection with his employment and the performance of his duties as our President and Chief Executive Officer, including a reasonable housing expense, not to exceed $7,000 per month.***

95. On June 25, 2018, Live filed a Schedule 14A, Proxy Statement with the SEC, which repeated the same representations about Isaac's compensation and employment agreement as Live's 2017 Form 10-K.

96. On December 27, 2018, Live filed its Form 10-K with the SEC for FY 2018 (the "2018 Form 10-K"). The 2018 Form 10-K stated that for FY 2018, Isaac was paid a salary of $200,000 and $54,000 in "All Other Compensation", for total compensation of $254,000. Given that Live had paid Isaac $165,000 during FY 2018 for housing expenses, it was inaccurate to report that Live had paid Isaac only $54,000 in all other compensation. On June 25, 2019, Live filed a

Schedule 14A, Proxy Statement with the SEC which was signed by Isaac and made the same disclosures about Isaac's FY 2018 compensation as stated in Live's 2018 Form 10-K.

97. In sum, Live reported that over the course of FY 2016-2018, Isaac was paid a total of $162,000 in all other compensation excluding Isaac's salary and options. But, in actuality, Live had paid Isaac $315,000, or about 94% more than the amount Live disclosed to investors.

**I. Live Continues To Face Setbacks For The Rest Of The Class Period**

98. On October 18, 2018, Live filed a Form 8-K with the SEC, which disclosed that on October 12, 2018, SingerLewak LLP had ***"informed Live [ ] that it resigned as the Company's independent registered public accounting firm."*** On October 26, 2018, Live announced that it had engaged WSRP, LLC as its new independent public accounting firm, effective immediately. WSRP, LLC was the Company's fourth independent accounting firm during the Class Period.

99. Contrary to the Live Defendants' claims that the ApplianceSmart acquisition would grow Live's business and revenues, the Live Defendants admitted on a public conference call on February 13, 2019, that ApplianceSmart had been contributing to the Company's losses. Specifically, Isaac stated:

> Marquis was profitable, Vintage was profitable, ApplianceSmart wasn't, so that's where the drag came. ***It was a hit to earnings and the earnings would have been higher had it not been for ApplianceSmart. But we have – we're confident that it will be turned around and it'll be a contributor in future quarters.***

100. On February 13, 2019, Live filed its Q1 2019 Form 10-Q (the "Q1 2019 Form 10-Q"), which disclosed that four months earlier,

> ***On October 1, 2018, the Company received a letter from the SEC requesting information regarding a potential violation of Section 13(a) of the Securities Exchange Act of 1934, based upon the timing of the Company's Form 8-K filed on February 14, 2018 [which disclosed that Live had restated its financial statements for Q1, Q2, and Q3 2017].***

101. Contrary to the Live Defendants' representations, ApplianceSmart's operations did not turn around. On December 13, 2019, ApplianceSmart filed a voluntary petition in the U.S. Bankruptcy Court for the Southern District of New York seeking relief under Chapter 11 of the Bankruptcy Code.

102. On January 24, 2020, Live issued a press release, which disclosed that Live had received a notification of deficiency from NASDAQ due to its inability to file its FY 2019 Form 10-K timely. Live belatedly filed its 2019 Form 10-K with the SEC on February 10, 2020, which disclosed that the Company lacked effective internal control over financial reporting, which the Company would seek to rectify, by *inter alia*, ***"implement[ing] sufficient segregation of duties within our accounting functions, so that one person cannot initiate, authorize and execute transactions, and so that one person cannot record transactions in the accounting records without sufficient review by a separate person."***

103. On February 24, 2020, Live disclosed in a press release that it had received a deficiency notice from NASDAQ due to its inability to timely file its Q1 2020 Form 10-Q. The Live Defendants stated that the reason they were unable to timely file Live's Q1 2020 Form 10-Q was "because we have not completed our financial statements, [thus] we are unable to provide a reasonable estimate of our operations for the quarter ended December 31, 2019."

104. On August 14, 2020, Live filed a Form 8-K with the SEC, announcing the second restatement of the Class Period, in which Live would restate two quarters of financial results. Specifically, the Form 8-K stated:

> ***On August 12, 2020, the Audit Committee of the Board of Directors (the "Committee") of the Company in consultation with management, concluded that the Company's previously issued financial statements for the quarterly periods ended December 31, 2019 (the "December 2019 Restated Period") and March 31, 2020 (the "March 2020 Restated Period", and together with the December 2019 Restated Period, the "Restated Periods") should no longer be relied upon because of errors related to (i) solely with respect to the March 2020 Restated Period, lease accounting at the Company's ApplianceSmart, Inc. ("ApplianceSmart") subsidiary, and (ii) with respect to both Restated Periods, accounting related to impairment charges associated with certain right of use assets which were written down due to the voluntary Chapter 11 filing by ApplianceSmart.*** The errors described above will result in the restatement of our financial statements for the Restated Periods.

105. On October 9, 2020, Defendants filed a Form 8-K with the SEC, which disclosed another adverse development in connection with the SEC's investigation, stating:

> On October 7, 2020, Live Ventures Incorporated (the "Company") received a "Wells Notice" from the Staff of the U.S. Securities and Exchange Commission (the "SEC") relating to the Company's previously-disclosed SEC investigation …. ***The Wells Notice informed the Company that the SEC Staff has made a preliminary determination to recommend that the SEC file an enforcement action against the Company that would allege certain violations of the federal securities laws.***

**J. The SEC Files An Enforcement Action Against The Live Defendants And JOI/ARCA, Causing Live's Share Price To Plummet By *46%***

106. On August 3, 2021, the SEC announced that it had filed an enforcement action (the "SEC Action") against the Live Defendants and JOI/ARCA (the SEC's initial complaint filed in the SEC Action is attached hereto as Exhibit A). The SEC Action was filed in the United States District Court for the District of Nevada and assigned to the Honorable James C. Mahan (Case No. 2:21-cv-01433-JCM-VCF).

107. Based on its nearly four-year investigation into Live's business and operations, the SEC alleged that the Live Defendants and JOI/ARCA engaged in three fraudulent schemes and made materially misleading representations and/or omissions in connection with: (i) the Live Defendants' attempts to boost Live's FY 2016 financial results by engineering and backdating the Novalk Amendment, which increased Live's pre-tax income by 20%; Isaac winding up his shares for the purpose of lowering Live's outstanding share count so that Live could tout a higher EPS, hiring stock promoters to tout Live's FY 2016 results, attempting to profit off of Live's inflated share price before the truth about Live's FY 2016 EPS was disclosed in Live's Form 10-K, and then trying to cover up their actions by making misleading representations to Live's outside accountants, and Live's investors; (ii) the Live Defendants and JOI/ARCA's engineering of the ApplianceSmart transaction to turn Live's unprofitable quarter into a profitable quarter and to help JOI/ARCA avoid a large tax hit and then engineering a further deceptive scheme and making materially misleading statements regarding Live's payment of the purchase price; and, (iii) the Live Defendants' payments to Isaac for housing expenses during FY 2016-2018, which Live failed to accurately disclose. The SEC sought civil penalties, disgorgement of all funds received from

Defendants' illegal conduct, and injunctive relief, including permanently barring Isaac and Johnson from serving as a director or officer of any issuer.

108. On this news, Live's share price dropped $29.08, or ***46%***, to close at $33.50 on August 4, 2021, on unusually heavy trading volume. Live's share price continued to decline $7.74, or ***23%***, over the next four consecutive trading sessions to close at $25.76 per share on August 10, 2021.

### K. After The Class Period, The Risks Of Defendants' Fraud Continue To Materialize

109. On October 1, 2021, Live filed a Form 8-K with the SEC, which stated that Live and Johnson had "mutually agreed that, effective October 1, 2021, we would cease all of our employment-based relationships."

110. On October 4, 2021, Live filed a Form 8-K with the SEC, which announced that WSRP, LLC, Live's fourth auditor during the Class Period, had "opted not to seek re-appointment as the Company's auditor."

111. On October 1, 2021, the Live Defendants and JOI/ARCA filed motions to dismiss the SEC Complaint pursuant to Fed. R. Civ. P. 12(b)(6). On November 28, 2022, the Honorable James C. Mahan of the United States District Court for the District of Nevada denied the Live Defendants and JOI/ARCA's motions to dismiss the SEC Action in their entirety. *See Sec. & Exch. Comm'n v. Live Ventures Inc.,* No. 221CV1433JCMVCF, 2022 WL 17253784, at *6 (D. Nev. Nov. 28, 2022) (*"SEC v. Live"* or the "Order"). Judge Mahan's Order noted that "defendants present essentially the same arguments to dismiss each claim. First, they argue that in each case there was never a material misrepresentation and therefore the violations fail as a matter of law. Second, they contend that even if the misrepresentations were material, the SEC does not sufficiently allege scienter …. [T]hese arguments fail at the dismissal stage." *SEC v. Live*, 2022 WL 17253784, at *4.

112. Judge Mahan's Order held that the SEC sufficiently alleged that the Live Defendants violated §10(b) and Rule 10b-5(b) promulgated thereunder by representing that for FY

2016, the Company had generated "other income" in the amount of $915,500 from the Novalk Amendment, and that the Novalk Amendment was "memorialized" on December 7, 2016 and had an "effective date" of September 15, 2016, and by representing that Live's 2016 EPS was $8.92. Judge Mahan's Order further noted,

> The [Live] defendants argue that the contract's backdating was immaterial. That is a question of fact not appropriate for adjudication on a motion to dismiss ….
>
> The complaint alleges that Isaac knew he did not negotiate the Novalk amendment until after the end of the fiscal year, but intentionally backdated it, and that false assertion was repeated to accountants and in a press release. *SEC v. Live*, 2022 WL 17253784, at *4, *6.

113. Judge Mahan's Order held that the SEC sufficiently alleged that Live and Isaac violated §10(b) and Rules 10b-5(a) & (c) promulgated thereunder (*see SEC v. Live*, 2022 WL 17253784, at *4, *6), as they had "engaged in a scheme to defraud by intentionally inflating LIVE's pre-tax income by 20% by improperly recognizing $915,500 of "other income" from the Novalk Amendment, lying to LIVE's outside accountants about the Novalk transaction, hiring a stock promoter to pump LIVE's stock in advance of the December 28, 2016 press release, and intentionally issuing the December 28, 2016 press release that overstated LIVE's earnings per share by 40%. Jon Isaac … [sold] LIVE stock after the market reacted to the false press release and inflated earnings. [Live] Defendants … then engaged in a cover-up of their conduct by issuing a false and misleading letter to shareholders[.]" Ex. A at ¶181.

114. Judge Mahan's Order held that the SEC sufficiently alleged the Live Defendants' and JOI/ARCA's violations of §10(b) and Rules 10b-5(a), (b) & (c) promulgated thereunder by engineering and misrepresenting the ApplianceSmart transaction, including by representing that Live recognized $3,773,486 as a bargain purchase gain from the acquisition of ApplianceSmart and had had a profitable quarter for Q1 2018, that the ApplianceSmart transaction had closed on December 30, 2017, that ApplianceSmart's stock certificate had been delivered into escrow as of December 30, 2017, and that Live had paid a portion of the purchase price by March 31, 2018. *SEC v. Live*, 2022 WL 17253784, at *5-*6. Judge Mahan noted,

> [T]he SEC alleges [the Live Defendants] and [JOI/ARCA] misrepresented the effective date of [Live]'s acquisition of ApplianceSmart, allowing [Live] to report a profitable quarter where it otherwise could not have …. The [Live] Defendants again claim that there was no material misrepresentation in the reporting, and this is once more a question of fact in appropriate for a motion to dismiss ….
>
> The SEC contends that the agreement between [JOI/ARCA] and [Live] did not contain a provision that transferred control of the acquiree as of December 31, 2017 …. All of the alleged parties either knew or were recklessly ignorant of the fact that [Live] did not control ApplianceSmart at the end of the quarter and thus any document reporting otherwise was false. *SEC v. Live*, 2022 WL 17253784, at *5.

115. Additionally, Judge Mahan's Order found that the SEC sufficiently alleged violations of §14(a) of the Exchange Act and Rule 14a-3 promulgated thereunder due to Live failing to accurately disclose all compensation paid to Isaac, including disclosure of all perquisites and other personal benefits paid to Isaac for each fiscal year during the Class Period and various violations of §13(a), §13(b)(2)(A), §13(b)(2)(B), §13(b)(5) of the Exchange Act, and §17(a)(2) of the Securities Act. *SEC v. Live*, 2022 WL 17253784, at *5 -*6.

116. On May 7, 2024, JOI/ARCA consented to entry of a proposed final judgment in the SEC Action, which waived findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52, and waived JOI/ARCA's right to a jury trial and its right to appeal from the entry of the proposed judgment. The proposed final judgment permanently restrained and enjoined JOI/ARCA from violating §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and ordered JOI/ARCA to pay a civil penalty in a total amount of $250,000. On May 24, 2024, Judge Mahan entered the proposed final judgment against JOI/ARCA.

## V. THE LIVE DEFENDANTS' DISCLOSURE OBLIGATIONS UNDER ITEMS 303 AND 105 OF REGULATION S-K

117. Regulation S-K required the Live Defendants to describe, in Live's financial statements filed with the SEC during the Class Period, "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii) ("Item 303").

118. Known as Management Discussion and Analysis ("MD&A") requirements, Item 303 is intended to provide "in one section of a filing, material historical and prospective textual disclosure enabling investors and other users to assess the financial condition and results of operations of the registrant, with particular emphasis on the registrant's prospects for the future." SEC Release Nos. 33-8056; 34-34-45321. Moreover, "Disclosure is ***mandatory*** where there is a known trend or uncertainty that is reasonably likely to have a material effect on the registrant's financial condition or results of operations." *Id.*

119. Item 303 imposes an affirmative duty on issuers to disclose "known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in a material way." S.E.C. Release No. 6835, 1989 WL 1092885, at *4; *see also* 17 C.F.R. § 229.303(a)(3). "Disclosure of known trends or uncertainties that the registrant reasonably expects will have a material impact on net sales, revenues, or income from continuing operations is also required. *Id.*

120. Pursuant to Item 303(a), for a fiscal year, a registrant thus has an affirmative duty to:

> i. Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which the income was so affected.
>
> ii. Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

17 C.F.R. § 229.303(a)(3)(i)-(ii) (emphasis added); *see also* S.E.C. Release No. 6835, 1989 WL 1092885, at *8 (May 18, 1989) ("Other non-recurring items should be discussed as unusual or

infrequent events or transactions that materially affected the amount of reported income from continuing operations.") (citation and quotation omitted).

121. Thus, even a one-time event, if "reasonably expect[ed]" to have a material impact of results, must be disclosed. Examples of such *required* disclosures include: "[a] reduction in the registrant's product prices; erosion in the r[e]gistrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract." S.E.C. Release No. 6835, 1989 WL 1092885, at *4 (May 18, 1989).

122. Accordingly, as the SEC has repeatedly emphasized, the "specific provisions in Item 303 [as set forth above] require disclosure of forward-looking information." *See Mgmt's Discussion and Analysis of Fin. Condition and Results of Operation*, S.E.C. Release No. 6835, 1989 WL 1092885, at *3 (May 18, 1989).

123. Indeed, the SEC has stated that disclosure requirements under Item 303 are "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company" and "a historical and prospective analysis of the registrant's financial condition . . . with particular emphasis on the registrant's prospects for the future." S.E.C. Release No. 6835, 1989 WL 1092885, at *3, *17. Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects." *See Comm'n Guidance Regarding Mgmt's Discussion and Analysis of Fin. Condition and Results of Operations*, S.E.C. Release No. 8350, 2003 WL 22996757, at *11 (December 19, 2003).

124. Here, Live's ongoing failures to disclose Isaac's compensation, GAAP violations, and attempts to artificially inflate Live's financial results and share price for purposes of the Live Defendants' financial gain during the Class Period were known trends or uncertainties likely to have a material unfavorable impact on Live's net revenues or income. Live had actual knowledge of these trends or uncertainties—indeed, for example, Isaac emailed Live's board in advance of issuing the fraudulent December 28, 2016 Press Release and advised its members that he was

converting his shares to a new series of stock for the purpose of boosting Live's earnings per share. As such, Live was required to include specific disclosures regarding the same in its MD&A in SEC filings during the Class Period. It did not.

125. In addition, Item 105 of Regulation S-K, 17. C.F.R. §229.105 ("Item 105") (as amended November 9, 2020) requires a company to provide a discussion of the material factors that make an investment in the registrant speculative or risky.

126. Item 105 provides that the discussion must be organized logically with relevant headings and each risk factor should be set forth under a caption that adequately describes the risk. Item 105 discourages the presentation of risks that could apply generically to any registrant.

127. In violation of Item 105, the Live Defendants' Class Period SEC filings omitted to disclose material facts, including:

a. The Live Defendants entered into and amended contractual agreements, including the Novalk Amendment and the ApplianceSmart SPA solely for the purpose of inflating Live's financial results and/or Live's stock price;

b. Live selected the purported effective dates of contractual agreements and amendments thereto, including the Novalk Amendment and the ApplianceSmart SPA, with the express purpose of inflating Live's financial results and/or Live's stock price;

c. Live engaged in systematic GAAP violations with the express purpose of inflating Live's financial results and Live's stock price;

d. Live misrepresented and failed to disclose Isaac's total compensation for FY 2016-2018.

128. Live failed to adequately disclose, and in fact, did not disclose at all, in the "Risk Factors" section of its SEC filings, the risks to Live's business, operations, and prospects, due to these factors. These risks were some of the most significant factors that made an investment in Live's securities speculative or risky. Instead, Live's Class Period SEC filings contained boilerplate discussions of hypothetical, future issues. For example, Live's 2016 Form 10-K

misleadingly discussed the risks that may occur if certain factors impacted the price of Live's common stock. Specifically, the 2016 Form 10-K stated:

> ***The trading price of our common stock has been highly volatile over the past few years and investors could experience losses in response to factors including the following, many of which are beyond our control:***
>
> - decreased demand in the internet services sector;
> - variations in our operating results;
> - announcements of technological innovations or new products or services by us or our competitors;
> - changes in expectations of our future financial performance, including financial estimates by securities analysts and investors;
> - our failure to meet analysts' expectations;
> - changes in operating and stock price performance of other technology companies similar to us;
> - conditions or trends in the technology industry, the online marketing industry or the mobile device industry;
> - additions or departures of key personnel or strategic partners; and
> - future sales of our debt or equity securities, including common stock.

129. Further, Live's 2016 Form 10-K disclosed the "hypothetical" risks of Live's concentrated stock ownership as follows:

> Isaac Capital Group LLC (ICG) is the beneficial owner of approximately 49.5% of our outstanding shares of common stock. Jon Isaac, our Chairman, CEO and President, is the President and sole member of ICG and accordingly has the sole power to vote the shares of our common stock owned by ICG, and as a result, is able to exercise significant influence over all matters that require us to obtain shareholder approval, including the election of directors to our board and approval of significant corporate transactions that we may consider, such as a merger or other sale of our company or its assets. Moreover, such a concentration of voting power could have the effect of delaying or preventing a third party from acquiring us at a premium. This significant concentration of share ownership may also adversely affect the trading price of our common stock because investors may perceive disadvantages in owning stock in companies with concentrated stock ownership.

130. These purported risk disclosures were themselves materially false and misleading by couching as "hypothetical" risks which they failed to disclose had *already* materialized.

## VI. THE LIVE DEFENDANTS' EXECUTIVE COMPENSATION DISCLOSURE OBLIGATIONS UNDER ITEM 402 OF REGULATION S-K

131. Regulation S-K required the Live Defendants to provide "clear, concise, and understandable disclosure of ***all*** plan and non-plan compensation awarded to, or earned by, or paid to the named executive officers … and directors" of Live. 17 C.F.R. § 229.402(a)(2) ("Item 402"). "Plan" compensation refers to "any bonus, profit-sharing, pension, retirement, thrift, savings, incentive, stock purchase, stock option, stock ownership, stock appreciation, dividend reinvestment, or similar plan; or any dividend or interest reinvestment plan or employee benefit plan." 17 C.F.R. § 242.100.

132. Item 402 further requires that "***All such compensation shall be reported pursuant to this Item***, even if also called for by another requirement, including transactions between the registrant and a third party where a purpose of the transaction is to furnish compensation to any such named executive officer or director." 17 C.F.R. § 229.402(a)(2).

133. Item 402 requires a registrant to disclose executive compensation in a specific table format, with columns indicating the amounts paid for that fiscal year in salary, bonus, stock awards, option awards, non-equity incentive plan compensation, and change in pension value and nonqualified deferred compensation earnings. "Each compensation item" that does not fall into those categories must be indicated in a separate column of the table titled "all other compensation", ***"regardless of the amount of the compensation item".*** 17 C.F.R. § 229.402(c).

134. The types of "all other compensation" that a registrant must report include, but are not limited to, ***"[p]erquisites and other personal benefits***, or property, unless the aggregate amount of such compensation is less than $10,000." 17 C.F.R. § 229.402(c)(ix)(A) & (D).

135. Item 402 further requires a registrant to "[p]rovide a narrative description of any material factors necessary to an understanding of the information disclosed in the [summary] tables", which should include, among other things, "[t]he material terms of each named executive officer's employment agreement or arrangement, whether written or unwritten". 17 C.F.R. § 229.402(e)(1)(i).

136. Live did not comply with its disclosure obligations pursuant to Item 402 in reporting Isaac's compensation for FY 2016-2018 and in its disclosures concerning Isaac's employment agreement with Live.

137. During FY 2016, on August 8, 2016, Live created an internal accounting record which stated that Live owed Isaac $234,000 for "Temporary Living Expenses" dating back to 2012. On August 9, 2016, Live wired $120,000 to Isaac for "temp living reimb."

138. Live's FY 2016 Form 10-K filed with the SEC on December 29, 2016 provided the following information regarding Isaac's compensation:

**SUMMARY COMPENSATION TABLE**

| **Name and principal Position** | **Year** | **Salary** | **Bonus** | **Stock Awards** | **Option Awards** | **All Other Compensation** | **Total** |
|---|---|---|---|---|---|---|---|
| Jon Isaac<br>*President and CEO* | 2016 | $200,000 | $0 | $0 | $13,465 | $0 | $213,465 |

139. Under Item 402, Live was required to disclose the housing reimbursement of $120,000 paid to Isaac during FY 2016 as "all other compensation", but Live made no such disclosure, and instead represented that it had paid $0 to Isaac in all other compensation that year.

140. Live's FY 2016 Form 10-K disclosed only the following information regarding Isaac's employment agreement: ***"We do not have a written Employment Agreement with [] Jon Isaac[.]"*** Accordingly, Live failed to comply with the requirement under Item 402 to describe "[t]he material terms of each named executive officer's employment agreement or arrangement, ***whether written or unwritten".***

141. Live reiterated these statements regarding Isaac's compensation and employment for FY 2016 in Live's Schedule 14A Proxy Statement filed with the SEC on June 2, 2017. The proxy statement stated that Isaac's compensation for FY 2016 consisted of a salary of $200,000, and $13,465 for an option award, again with no mention of the $120,000 that Live had paid Isaac

in FY 2016 for a housing reimbursement. The proxy statement also stated "[c]urrently, we do not have a written Employment Agreement with Mr. Jon Isaac[.]"

142. During FY 2017, on May 30, 2017, Live wired Isaac $30,000, for "temp living reimb".

143. On December 27, 2017, Live filed its FY 2017 Form 10-K with the SEC, which provided the following information regarding Isaac's compensation:

**SUMMARY COMPENSATION TABLE**

| **Name and principal Position** | **Year** | **Salary** | **Bonus** | **Stock Awards** | **Option Awards** | **All Other Compensation** | **Total** |
|---|---|---|---|---|---|---|---|
| Jon Isaac *President and CEO* | 2017 | $200,000 | $0 | $0 | $0 | $54,000 | $254,000 |

144. The 2017 Form 10-K stated that "'All Other Compensation' for Mr. Isaac includes $54,000 for [] 2017 … for the reasonable housing allowance to which Mr. Isaac is entitled under his employment agreement." However, Mr. Isaac was paid $30,000, not $54,000 during FY 2017 for his housing allowance. Thus, Live failed to accurately disclose the amount of "all other compensation" paid to Isaac for FY 2017.

145. In contrast to Live's 2016 Form 10-K, Live's 2017 Form 10-K stated that Isaac had an employment agreement with Live effective in January 2013, under which Isaac was entitled to reimbursement for all reasonable business expenses, including a housing allowance of no more than $7,000 per month, or $84,000 per year.

146. On June 25, 2018, Live filed a Schedule 14A Proxy Statement with the SEC, which reiterated that for FY 2017, Isaac had been paid $200,000 in salary, and $54,000 in all other compensation, and that "'All Other Compensation' for Mr. Isaac includes $54,000 for [] 2017 … for the reasonable housing allowance to which Mr. Isaac is entitled under his employment agreement."

147. During FY 2018, on December 18, 2017, Live wired $165,000 to Isaac for an "expense reimb".

148. On December 27, 2018, Live filed its FY 2018 Form 10-K with the SEC, which provided the following information regarding Isaac's compensation:

**SUMMARY COMPENSATION TABLE**

| Name and principal Position | Year | Salary | Bonus | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|
| Jon Isaac *President and CEO* | 2018 | $200,000 | $0 | $0 | $0 | $54,000 | $254,000 |

149. Live's 2018 Form 10-K stated that Isaac had an employment agreement with Live effective in January 2013, under which Isaac was entitled to reimbursement for all reasonable business expenses, including a housing allowance of no more than $7,000 per month, or $84,000 per year.

150. Live's 2018 Form 10-K further stated that "'All Other Compensation' for Mr. Isaac includes $54,000 for [] 2018… for the reasonable housing allowance to which Mr. Isaac is entitled under his employment agreement."

151. Under Item 402, Live was required to disclose the entirety of all other compensation paid to or earned by Isaac during FY 2018, which was $165,000, but instead only disclosed $54,000 in all other compensation. Thus, Live understated by $111,000 the amount paid to Isaac for FY 2018 in "all other compensation", in violation of Item 402. Further, though Live stated that Isaac was entitled to no more than $7,000 in a housing allowance per month, or $84,000 per year, under his employment agreement, Isaac was paid $165,000 in FY 2018 as a housing allowance, or $13,750 per month.

152. On June 25, 2019, Live filed a Schedule 14A Proxy Statement with the SEC, which reiterated that for FY 2018, Isaac had been paid a salary of $200,000, and $54,000 in all other compensation; the proxy statement also stated that "'All Other Compensation' for Mr. Isaac

includes $54,000 for [] 2018… for the reasonable housing allowance to which Mr. Isaac is entitled under his employment agreement." The June 25, 2019 Proxy Statement also stated that Isaac had an employment agreement with Live effective in January 2013, under which Isaac was entitled to reimbursement for all reasonable business expenses, including a housing allowance of no more than $7,000 per month, or $84,000 per year.

## VII. THE LIVE DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

### A. Statements Concerning Live's 2016 FY Financial Results

153. On December 28, 2016, at 7:00 a.m. EST, Live issued a press release entitled ***"Live Ventures Announces Biggest Year in Company History Achieving Record Earnings of $8.92 Per Share With Continued Growth Anticipated in 2017."*** The December 28, 2016 Press Release stated:

> ***Reporting its most successful year in the Company's history, Live Ventures reported a record $79M in revenues, an increase of 136 percent over the previous year, and net profit of approximately $ 17.82M, representing earnings per share (EPS) of $8.92***.

154. The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that: (a) Live had not achieved FY 2016 "earnings of $8.92 per share", instead, it had achieved an EPS that was *40%* lower, of $6.33, and; (b) Live misleadingly claimed an $8.92 EPS for the purpose of driving up Live's share price and profiting from sales of that artificially inflated share price before filing Live's 2016 Form 10-K, in which Live intended to disclose the true EPS of $6.33 – indeed, on the morning of December 28, 2016, Isaac had directed Live's brokerage to sell up to 20,000 shares of Live stock that day if the share price went up by certain amounts.

155. On December 29, 2016, Live filed with the SEC its 2016 Form 10-K, which made the following representations about the Novalk Amendment:

> ***On December 7, 2016, the Company and Novalk Apps S.A.S. ("Novalk") … memorialized an agreement which is effective September 15, 2016*** that changes the terms and conditions relating to payment of the outstanding software license fee of $1,500,000. The software fee will be settled in exchange for to be issued and

> certificated 58,333 shares of the Company's common stock subsequent to year ending September 30, 2016. ***As a result of this agreement, the Company is recording $915,500 of other income in September 2016***[.]

156. Live's Q1 2017 10-Q filed with the SEC on February 9, 2017 and Live's restated Q1 2017 10-Q filed with the SEC on February 14, 2018 similarly represented that ***"As of September 15, 2016 the Company was obligated to issue and certificate 58,334 shares of the Company's common stock to No[]valk S.A.S for software licensed to the Company."***

157. The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that: (a) the Live Defendants selected the "effective date" of the Novalk Amendment as September 15, 2016, effectively backdating the contract to FY 2016, for the express purpose of increasing Live's pre-tax income for FY 2016 by *20%;* (b) Live's "obligat[ion]" to "issue and certificate 58,334 shares of the Company's common stock to No[]valk" did not arise on September 15, 2016 because Live and Novalk did not even begin discussions about a possible amendment to the Novalk Agreement until November 30, 2016; (c) from the time Live and Novalk entered into the Novalk Agreement in October 2014 through November 30, 2016, the agreement had sat dormant and Live had not purchased any software from Novalk, and; (d) Live's recognition of $915,500 of "other income" as a result of the Novalk Amendment in FY 2016 violated GAAP, namely, ASC 855-10-25 and ASC 855-10-25-3, which govern the circumstances under which an entity should recognize events or transactions in its financial statements that occur subsequent to the balance sheet date, but before the financial statements are issued or available to be issued.

**B. Statements Concerning Stock Promotions**

158. After SeekingAlpha published a report about Live, which, among other things, stated that the Company had a history of paying stock promoters to pump up Live's share price, and had paid stock promoters to pump Live's share price in December 2016, on January 9, 2017, Live issued a press release in the form of a letter to investors which disclaimed that Live had engaged in any stock promotions. Specifically, the January 9, 2017 press release stated:

> <u>Stock Manipulation Stories</u>

> With regard to any negative articles recently written about us by those attempting to manipulate our stock for their profit, we vehemently deny all of their false and misleading statements and allegations …. ***Although we could have easily taken advantage of our stock price when we witnessed spikes and record peaks, no officer or director has sold any shares …. Had our company truly engaged in any type of promotional activity, our Company, its officers, and directors would have sold shares.***

159. On February 9, 2017, Live held a public conference call. On that call, Isaac reiterated that ***"the information contained within Seeking Alpha's article is false"***. Isaac also represented on the call that that the reason he had locked up ICG's shares in Live in December 2016 was to demonstrate his confidence in and long-term commitment to the Company and expressed his disinterest in the price of Live's shares: Specifically, Isaac stated:

> ***[A] lot of people had some concerns that when the stock is up, Jon is going to sell and he's going to exit and this and that. What I wanted to broadcast [by locking up ICG's shares] was that this is – to me this is not a trade by any means, this is a very long-term hold.*** I was considering a lot longer than five years to be honest with you, we said five years …. ***I just wanted to send this message out to all shareholders that this is definitely a long-term play for us and really it doesn't matter today for us. I mean, if we woke up today and the stock was at $18 or was at $35, it's really – we're still coming to work and we're still working for you guys, the shareholders to bring value to you.*** And to be quite frank with you, the most important metric here on our office is not really the stock price of the day, it's really the book value of our company.

160. The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that: (a) Live *had* paid stock promoters, including Protrader Elite, whom Live hired on November 30, 2016 and paid $120,000 to during December of 2016; (b) the Live Defendants paid stock promoters to tout Live's FY 2016 results shortly before Live issued the December 28, 2016 Press Release which falsely claimed Live's FY 2016 EPS was $8.92, with the intent of artificially inflating Live's share price and profiting from sales of Live's shares at those artificially inflated prices; (c) the Live Defendants *did* sell shares after paying stock promoters to tout the Company's 2016 financial results - on December 28, 2016, Isaac completed 5 "good till cancel" orders for sales of Live shares through Yunis's brokerage account, realizing profits of $48,000; (d) the Live Defendants had intended to and attempted to sell over 30,000 of Live's shares on December 28, 2016 after paying stock promoters to tout the Company's 2016

financial results– Isaac instructed Live's brokerage to sell up to 10,000 shares on December 28, 2016 if the stock price increased to between $36 and $38, and to sell another 10,000 shares if the stock price increased to between $40 and $42 and Isaac placed a total of 28 "good till cancel" limit orders for the sale of 10,674 Live shares through Yunis's brokerage account – if all of the transactions had been completed, the Live Defendants would have generated $1.1 million in profits, and; (e) the reason that Isaac had locked up ICG's shares was not because Isaac "wanted to send a message" that this was "a very long-term hold" – the reason was to increase Live's EPS to $8.92, misleadingly represent Live's 2016 EPS as $8.92 in Live's December 28, 2016 Press Release, then profit from sales of Live's shares sold at artificially inflated prices before the true EPS of $6.33 was disclosed in Live's 2016 Form 10-K on December 29, 2016.

**C. Statements Concerning Live's Q1 2018 Financial Results**

161. On January 5, 2018, Defendants filed a Form 8-K with the SEC, which described the sale of ApplianceSmart to Live as follows:

> ***On December 30, 2017, ApplianceSmart Holdings LLC (the "Purchaser"), a wholly owned subsidiary of Live Ventures Incorporated (the "Company"), entered into a Stock Purchase Agreement (the "Agreement") with Appliance Recycling Centers of America, Inc. (the "Seller") and ApplianceSmart, Inc. ("ApplianceSmart"), a subsidiary of the Seller.*** ApplianceSmart is a 17-store chain specializing in new and out-of-the-box appliances with annualized revenues of approximately $65 million. Pursuant to the Agreement, the Purchaser purchased from the Seller all of the issued and outstanding shares of capital stock (the "Stock") of ApplianceSmart in exchange for $6,500,000 (the "Purchase Price"). ***The shares of Stock were delivered into escrow and will be released to the Purchaser***[.]

162. Live's 2017 Form 10-K, which was filed with the SEC on January 18, 2018, similarly stated:

> ***On December 30, 2017, ApplianceSmart Holdings LLC (the "Purchaser"), a wholly owned subsidiary of the Company, entered into a Stock Purchase Agreement (the "Agreement") with ARCA and ApplianceSmart, Inc. ("ApplianceSmart"), a subsidiary of ARCA ….*** Pursuant to the Agreement, the Purchaser purchased from ARCA all of the issued and outstanding shares of capital stock (the "Stock") of ApplianceSmart in exchange for $6,500,000 (the "Purchase Price"). ***The shares of Stock were delivered into escrow[.]***

163. On February 14, 2018 Live issued a press release which touted Live's Q1 2018 financial results. Specifically, the press release stated:

> ***Despite a one-time, non-cash charge of $2.3 million associated with the enactment of U.S. tax reform, the company reported quarterly basic earnings per share of $0.95, an increase of 33.8 percent over last year.***
>
> ***
>
> Key highlights of the first fiscal quarter 2018 compared to 2017 include:
>
> - ***Revenues of $40.3 million, up 25.4 percent***
> - ***Gross profit of $16.4 million, up 29.6 percent***
> - ***Net Income of $1.8 million, up 31.4 percent***
> - Basic earnings per share of $0.95, up 33.8 percent
> - Total assets of $132 million
> - Net cash flow from operating activities totaled $6.3 million, up 98 percent
>
> ***
>
> ***The company recorded a one-time, non-cash bargain purchase gain related to its acquisition of ApplianceSmart of $3.7 million.***

164. On February 14, 2018, Live filed its Q1 2018 Form 10-Q with the SEC, which stated:

> ***The Appliancesmart acquisition closed on December 30, 2017.*** Appliancesmart had one day of revenues and associated cost of revenue and expenses in the fiscal quarter.

165. On the Q1 2018 Call, analysts inquired about the ApplianceSmart transaction, and Johnson and Isaac engaged in the following colloquy:

> ANALYST: Do you have estimates as far as, when you looked at it, what do we think [ApplianceSmart is] going to add to the company in the next -- this fiscal year? Do you have any estimates?
>
> JOHNSON: We want to be cautious, and we don't provide guidance. But we bought it at such a price that we feel that this is going to be accretive to earnings. How much it's going to be accretive to earnings, we don't want to say at this time, but we do feel it's going to be accretive.
>
> ISAAC: It was profitable. Can we say that?
>
> JOHNSON: It's been profitable, yes.
>
> ISAAC: …. ***[O]ur earnings for the quarter that we just announced don't really reflect any of the numbers that ApplianceSmart generated because we didn't own it that long.***

JOHNSON: ***We had it 1 day.***

ISAAC: ***Only for 1 day.***

166. The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that: (a) Live had not and could not take effective control of ApplianceSmart as of December 30, 2017 because ApplianceSmart was encumbered by the MidCap Credit Agreement, under which, *inter alia,* MidCap controlled all of ApplianceSmart's assets and revenues, and which required MidCap's written approval prior to a sale of any of ApplianceSmart's assets – accordingly, the ApplianceSmart transaction had not "closed" on December 30, 2017 and Live did not "own" ApplianceSmart starting on December 30, 2017; (b) ApplianceSmart's "shares of Stock were" not "delivered into escrow" and remained in the possession of MidCap; (c) the ApplianceSmart transaction was engineered by Live and JOI/ARCA with the purported effective date of December 30, 2017, for the purpose of allowing Live to recognize the impact of the transaction in Q1 2018, which would turn an otherwise unprofitable quarter into a profitable quarter for Live, and also help JOI/ARCA avoid the impact of a large tax liability resulting from the sale of real property at a gain during its fiscal year ended December 31, 2017; (d) Live's claim that the ApplianceSmart sale was effective on December 30, 2017 violated GAAP, namely, ASC 805-10-25-6 and ASC 805-10-25-7, which govern the appropriate identification of an "acquisition date", and; (e) Live's supposed $3,773,486 bargain purchase gain in connection with the acquisition of ApplianceSmart was devised by Johnson valuing ApplianceSmart's assets at $10,273,486, or approximately 58% more than the $6.5 million purchase price, and deducting the asset value from the purchase price.

### D. Statements Concerning Live's Payment Of The Purchase Price For ApplianceSmart

167. On April 26, 2018, Live issued a press release which provided an update about the ApplianceSmart acquisition. Specifically, the press release stated:

> [O]n December 30, 2017, ApplianceSmart Holdings LLC, a wholly-owned subsidiary of the Company (the "Purchaser"), entered into a Stock Purchase Agreement (the "Agreement") with Appliance Recycling Centers of America, Inc. (the "Seller") and ApplianceSmart, Inc. ("ApplianceSmart"), a subsidiary of the

> Seller …. ***The Purchaser was required to deliver the Purchase Price, and a portion of the Purchase Price was delivered, to the Seller prior to March 31, 2018. Between March 31, 2018 and April 24, 2018, the Purchaser and the Seller negotiated in good faith the method of payment of the remaining outstanding balance of the Purchase Price. On April 25, 2018, the Purchaser delivered to the Seller that certain Promissory Note (the "ApplianceSmart Note") in the original principal amount of $3,919,494.46***[.]

168. The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that: (a) *no* portion of the $6.5 million purchase price of ApplianceSmart had been paid as of March 31, 2018; (b) the purportedly paid amount of $2,580,505.54 had been devised by Johnson by taking the difference between the total amount of ApplianceSmart's revenues that were paid to MidCap during January through March 2018 pursuant to the MidCap Credit Agreement and the amounts JOI/ARCA obtained under the MidCap Credit Agreement, which it transferred to ApplianceSmart to fund ApplianceSmart's operations from January through March 2018; (c) MidCap had had possession of ApplianceSmart's stock certificate up until March 22, 2018, and; (d) as of the date of the press release on April 26, 2018, Live *still* did not have effective control of ApplianceSmart – Johnson had not even sent to Tony Isaac copies of the corporate resolutions that JOI/ARCA's board of directors were required to sign to approve the sale of ApplianceSmart to Live.

169. Both Live's Q2 Form 10-Q for the quarter ended March 31, 2018 and Live's Q3 2018 Form 10-Q for the quarter ended June 30, 2018 similarly misrepresented that part of the purchase price for ApplianceSmart had been paid by Live by March 31, 2018. Specifically, the Form 10-Qs stated:

> On December 30, 2017 ***(the "ApplianceSmart Closing Date"),*** the Company, through its newly formed, wholly-owned subsidiary, ASH, entered into a series of agreements in connection with its purchase of ApplianceSmart …. Total consideration was $6,500,000, with no liabilities assumed by ASH. On December 30, 2017, ASH agreed to pay the $6,500,000 no later than March 31, 2018. ***Effective April 1, 2018, ASH issued an interest bearing promissory note [to] the Seller, with interest at 5% per annum, with a three-year term in the original amount of $3,919,494 for the balance of the purchase price …. The remaining $2,580,506 was paid in cash by ASH to the Seller.***

170. The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that: (a) the "closing date" of ApplianceSmart transaction was not December 30, 2017, and Live did not have effective control of ApplianceSmart as of that date because ApplianceSmart was encumbered by the MidCap Credit Agreement; (b) the ApplianceSmart transaction was engineered by Live and JOI/ARCA, with the purported effective date of December 30, 2017, for the purpose of changing Live's unprofitable quarter into a seemingly profitable quarter, and for the purpose of helping JOI/ARCA avoid a tax liability in FY 2017; (c) no portion, let alone $2,580,506 of the $6.5 million purchase price of ApplianceSmart had been paid by Live by March 31, 2018; (d) the purportedly paid amount of $2,580,506 had been devised by Johnson by taking the difference between (i) the amount of ApplianceSmart's revenues that were paid to MidCap during January through March 2018 and (ii) the amounts JOI/ARCA obtained under the MidCap Credit Agreement, which it transferred to ApplianceSmart to fund ApplianceSmart's operations from January through March 2018, and; (e) MidCap had had possession of ApplianceSmart's stock certificate up until March 22, 2018.

**E. Statements Concerning Isaac's FY 2016-2018 Compensation**

171. Live's 2016 Form 10-K, which was filed with the SEC on December 29, 2016, and Live's Schedule 14A Proxy Statement filed with the SEC on June 2, 2017, each stated that for FY 2016, Isaac had received a salary of $200,000, $13,465 in option awards, and $0 in all other compensation, for total FY 2016 compensation of $213,465 and provided no explanation or description of what constituted "All Other Compensation".

172. Live's 2017 Form 10-K, which was filed with the SEC on January 18, 2018, stated that with respect to Isaac's compensation, for FY 2016, Isaac had received a salary of $200,000, option awards of $13,465, and $0 in all other compensation, for total FY 2016 compensation of $213,465. The 2017 Form 10-K also explained,

> ***"All Other Compensation" for Mr. Isaac includes $54,000 for … 2016, which was accrued by us for the reasonable housing allowance to which Mr. Isaac is entitled under his employment agreement.***

173. Live's 2017 Form 10-K stated that with respect to Isaac's employment agreement with Live:

> The Company entered into an employment agreement with Jon Isaac, its President and Chief Executive Officer, effective January 1, 2013, as amended on January 16, 2018 …. ***Mr. Isaac is entitled to reimbursement for all reasonable business expenses incurred by him in connection with his employment and the performance of his duties as President and Chief Executive Officer, including a reasonable housing expense, not to exceed $7,000 per month.***

174. On June 25, 2018, Live filed a Schedule 14A Proxy Statement with the SEC, which reiterated that for FY 2016, Isaac had received a salary of $200,000, option awards of $13,465, and $0 in all other compensation, for total FY 2016 compensation of $213,465. The June 25, 2018 Proxy Statement also stated:

> ***"All Other Compensation" for Mr. Isaac includes $54,000 for … 2016, which was accrued by us for the reasonable housing allowance to which Mr. Isaac is entitled under his employment agreement.***

175. The June 25, 2018 Proxy Statement reiterated that under Isaac's employment agreement with Live, Isaac was ***"entitled to reimbursement for all reasonable business expenses incurred by him … including a reasonable housing expense, not to exceed $7,000 per month."***

176. The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that: (a) during FY 2016, Live created an internal accounting record that stated Live owed Isaac about $234,000 for "Temporary Living Expenses" dating back to 2012, and during FY 2016, on August 9, 2016, Live wired $120,000 to Isaac, with the note "temp living reimb"; (b) Isaac did not receive $0, or $54,000 in all other compensation for FY 2016, and instead received $120,000 in all other compensation for FY 2016; (c) Isaac's total FY 2016 compensation was $333,465, not $213,465 – Live thus materially understated Isaac's total FY 2016 compensation by *56%*, and; (d) Isaac received more than the purported allowable reimbursement for housing expenses, which was "not to exceed $7,000 per month", or $84,000 per year – for FY 2016, Isaac received $120,000 in reimbursements for housing expenses, or $10,000 per month.

177. Live's 2018 Form 10-K, which was filed with the SEC on December 27, 2018, and Live's 2019 Form 10-K, which was belatedly filed with the SEC on February 10, 2020, and Live's Schedule 14A Proxy Statement filed with the SEC on June 25, 2019, each stated that Isaac's compensation for FY 2018 was comprised of $200,000 in salary, and $54,000 in all other compensation, for total FY 2018 compensation of $254,000.

178. The 2018 Form 10-K, the June 25, 2019 Schedule 14A, and the 2019 Form 10-K also each stated:

> ***"All Other Compensation" for Mr. Isaac includes $54,000 for [] 2018 … which was accrued by us for the reasonable housing allowance to which Mr. Isaac is entitled under his employment agreement …. Mr. Isaac is entitled to reimbursement for all reasonable business expenses incurred by him … including a reasonable housing expense, not to exceed $7,000 per month.***

179. The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that: (a) during FY 2018, on December 18, 2017, Live wired Isaac $165,000 for housing reimbursements; (b) Isaac did not receive $54,000 for FY 2018 for his housing allowance, instead he received $165,000; (c) Isaac's total FY 2018 compensation was not $254,000, instead it was $365,000 – Live thus materially understated Isaac's FY 2018 compensation by *44%;* (d) for FY 2016-2018, Isaac received a total of $315,000 in additional compensation, not the $108,000 that Live reported - Live thus materially understated Isaac's compensation during this time period by about *66%*; (e) Isaac was paid more than the purported reimbursement for reasonable housing expenses that he was entitled to, which was "not to exceed $7,000 per month[,]" or $84,000 per year – for example, for FY 2018, Isaac received $165,000 in reimbursements for housing expenses, or $13,750 per month, and; (f) Live materially understated the amount of all other additional compensation paid to Isaac for FY 2016-2018 by 94%.

### F. Live's Financial Statements For The Quarters Ended December 31, 2016, March 31, 2017, And June 30, 2017

180. On February 7, 2019, Live filed with the SEC its Form 10-Q for the quarter ended December 31, 2016 (Q1 2017). Live reported its debts maturing in the next fiscal year as $6,226,454 and reported its net cash earned provided by operations as $4,994,685.

181. On May 11, 2017, Live filed with the SEC its Form 10-Q for the quarter ended March 31, 2017 (Q2 2017). Live reported its debts maturing in the next fiscal year as $5,832,567 and reported its net cash earned provided by operations as $5,209,543.

182. On August 10, 2017, Live filed with the SEC its Form 10-Q for the quarter ended June 30, 2017 (Q3 2017). Live reported its debts maturing in the next fiscal year as $5,847,194 and reported its net cash earned provided by operations as $8,830,128.

183. Both Isaac and Johnson certified Live's Form 10-Qs for the quarterly periods ended December 31, 2016, March 31, 2017, and June 30, 2017 pursuant to the Sarbanes-Oxley Act of 2002 attesting to, *inter alia,* the accuracy of Live's financial reporting, the disclosure of any material changes to Live's internal controls over financial reporting, and to the statements that, "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and "I have disclosed … any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."

184. The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that: (a) Live materially understated its debts maturing in the next fiscal year by 229% for Q1 2017, by 264% for Q2 2017, and by 297% for Q3 2017; (b) Live materially overstated its net cash provided by operations by $1,816,855, or by 36% for Q1 2017, by 35% for Q2 2017, and by 21% for Q3 2017; (c) as the Live Defendants admitted in Live's Form 8-K filed with the SEC on February 14, 2018, which announced that Live would restate its financial statements for Q1, Q2, and Q3 2017, each of these Form 10-Qs contained "errors" and could not "be relied upon", and; (d) Isaac and Johnson knew, or at minimum recklessly disregarded, that the financial results Live initially reported for Q1, Q2, and Q3 2017 were inaccurate.

## VIII. CLASS ACTION ALLEGATIONS

185. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Live securities between December 28, 2016 and August 3, 2021, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers, and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

186. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Live's shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Live shares were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Live or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

187. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

188. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

189. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Live; and

(c) whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(d) whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and,

(e) to what extent the members of the Class have sustained damages and the proper measure of damages.

190. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

191. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) the Company's securities are traded in efficient markets;

(d) the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e) the Company traded on the NASDAQ, and was covered by market analysts;

(f) the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

(g) Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material

facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and;

(h) unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

192. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

193. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## IX. LOSS CAUSATION

194. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Plaintiff and the Class.

195. Throughout the Class Period, as detailed herein, Defendants made materially false and/or misleading statements and/or omissions and engaged in deceptive acts which caused the price of Live securities to be artificially inflated. But for Defendants' deceptive acts, and/or misrepresentations and/or omissions, Plaintiff and the other members of the Class would not have purchased Live securities or would not have purchased such securities at artificially inflated prices. Later, when Defendants' deceptive acts and/or prior misrepresentations and/or omissions were disclosed to the market, and/or when the concealed risks materialized, the price of Live shares fell significantly as the prior artificial price inflation was dissipated. As a result of their purchases and/or acquisition of Live securities during the Class Period, Plaintiff and other members of the Class suffered economic losses, *i.e.*, damages, under the Exchange Act. The timing and magnitude of the decline in the prices of the Company's shares negate any inference that the economic losses and damages suffered by Plaintiff and other members of the Class were caused by changed market conditions, macroeconomic factors, or Company-specific facts unrelated to Defendants' wrongful conduct.

196. As detailed *supra*, the truth regarding the Company's business, operations, and prospects, was partially revealed, and/or the concealed risks materialized, on January 6, 2017, February 14, 2018, August 14, 2018, and August 3-10, 2021. As a direct result of these partial disclosures, the price of Live's stock declined significantly, thereby damaging investors as the artificial inflation in Live's stock price was removed.

## X. ADDITIONAL SCIENTER ALLEGATIONS

197. As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Live, their control over, and/or receipt and/or modification of Live's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Live, participated in the fraudulent scheme alleged herein. Further, Isaac and/or Johnson signed and approved Live's statements during the Class Period, and certified pursuant to the Sarbanes-Oxley Act of 2002 that those statements contained no misrepresentations or omissions of material facts.

### A. Defendants Had The Motive And Opportunity To Engage In Their Fraudulent Schemes

198. The Live Defendants were motivated to issue misstatements regarding the Company's business, operations, and prospects and engage in deceptive courses of conduct for financial reasons. The Live Defendants had the motive to and attempted to take advantage of Live's artificially inflated stock price for financial gain.

199. For example, on December 28, 2016, Isaac instructed Live's brokerage to sell up to 20,000 shares if Live's share price rose to certain amounts in the wake of the hype generated by

Live's paid stock promotions and false and misleading December 28, 2016 Press Release. These sales were not completed only because Live's share price did not rise enough to trigger the sales Isaac had instructed Live's brokerage to make. Further, on December 28, 2016, Isaac placed 28 "good till cancel" orders for over 10,000 Live shares from Yunis's business brokerage account, which Isaac had access to. Five of the "good till cancel" limit orders were completed, generating profits of $48,000. Had all of these transactions been completed, the Live Defendants would have realized profits of over $1.1 million.

200. As part of the Live Defendants' scheme to boost Live's 2016 FY results and profit from sales of Live's artificially inflated share price, Isaac had the motive to wind up his shares through ICG, which would have the effect of increasing Live's EPS to $8.92 on December 28, 2016, and would allow Live to tout this increased EPS. Indeed, Isaac expressed this very motive in a letter to Live's board on December 23, 2016. Further, as part of this same scheme, the Live Defendants had the motive to engineer an amendment to the Novalk Agreement and select September 15, 2016 as the effective date; these actions allowed Live to artificially increase its pre-tax income for FY 2016 by 20%.

201. Defendants also had the motive and opportunity to issue misstatements and engage in a deceptive course of conduct in connection with the ApplianceSmart transaction, which would benefit both JOI/ARCA and Live. Tony Isaac – Jon Isaac's father and a director of Live - was the CEO of JOI/ARCA, and Johnson was the CFO of both Live and JOI/ARCA. Isaac also owned a significant percentage of JOI/ARCA's outstanding common stock.

202. At year-end 2017, Live and JOI/ARCA were both facing negative tax implications. Live had had an unprofitable first quarter of 2018 and would have to recognize a non-cash $2.3 million charge due to enactment of a new U.S. tax reform in its Q1 2018 financial results. Due JOI/ARCA's sale of real property at a gain during its FY 2017, which ended December 31, 2017, JOI/ARCA was facing a large tax liability that would negatively impact its FY 2017 financial results. Defendants selected December 30, 2017 as the effective date of the ApplianceSmart transaction to create the misleading appearance that the transaction had closed during Live's Q1

2018 and JOI/ARCA's FY 2017, which would allow Live to turn what had been an unprofitable Q1 2018 into a purportedly profitable quarter, and which would allow JOI/ARCA to avoid the negative impact on its FY 2017 financial results caused by selling real property at a gain during FY 2017.

203. Further, when Live could not come up with the financing for the purchase of ApplianceSmart, the Live Defendants and JOI/ARCA were motivated to deceptively treat ApplianceSmart's revenues paid to MidCap as part of the purchase price Live paid to JOI/ARCA, and to make materially misleading statements that Live had paid about $2.6 million in cash to JOI/ARCA as part of the purchase price by the March 31, 2018 deadline, and that the parties had negotiated in "good faith" about the "remaining" balance of the purchase price.

**B. Live Had Substantial Debts And Could Not Maintain Compliance With Its Loan Covenants**

204. In connection with Live's acquisitions of Marquis and Vintage Stock, Live incurred significant debts and obligations just before the start of the Class Period. Between September 2016 and December 2016, Live's debt increased by about $60 million—from $15,886,186 to $75,042,413.

205. On July 6, 2015, Marquis entered into a $15 million credit agreement with Bank of America, which was secured by "substantially all of Marquis assets", which as of December 31, 2016, had $2,791,005 outstanding, and was due in July 2020. On June 20, 2016 and August 5, 2016, Marquis entered into three equipment loans with Banc of America Leasing & Capital, LLC: (i) one for $5 million, which was due on September 23, 2021, (ii) one for $2,209,807, which was due on January 30, 2022, and (iii) one for $3,679,514, which had been funded but not yet executed as of December 31, 2016.

206. On November 3, 2016, in connection with Live's purchase of Vintage Stock, Live obtained $29,871,650 of financing from Capitala Private Credit Fund V, L.P. (the "Capitala Loan"), under which Live was required to pay $750,000 plus interest upon quarterly, and which would reach full maturity in November 2021.

207. Live also obtained $12 million of financing from Texas Capital Bank, which would reach full maturity in November 2020 and, Live and Vintage Stock entered into a seller financed loan in the amount of $10 million which was due to the previous owners of Vintage Stock.

208. Thus, the Live Defendants were motivated to issue misstatements and engage in a deceptive course of conduct to stay in compliance with the covenants under its multitude of financing agreements.

209. Further, the Live Defendants were motivated to issue misstatements during the Class Period to regain compliance with the terms of its nearly $30 million loan agreement with Capitala. On February 14, 2018, Live disclosed that it had not been in compliance with the covenant regarding total loan ratio since December 31, 2017, and stated that Live did "not anticipate that [it] will regain compliance with this covenant until sometime in fiscal year ended September 30, 2019, based upon our current operating forecast."

### C. Live's Restated Quarterly Financial Results

210. During the Class Period, Live restated five quarters of financial results.

211. The magnitude of Live's restated financial results for the quarters ended December 31, 2016 (Q1 2017), March 31, 2017 (Q2 2017), and June 30, 2017 (Q3 2017), which Defendants filed with the SEC on February 14, 2018, further supports their scienter.

212. Live's restated financial results for Q1, Q2 and Q3 2017 revealed that Live had greatly understated its debts as follows:

| **Period** | **Originally reported debts maturing in the next fiscal year** | **Restated debts maturing in the next fiscal year** | **$ Difference** | **% Difference** |
|---|---|---|---|---|
| Q1 2017 | $6,226,454 | $20,505,143 | $14,278,689 | 229% |
| Q2 2017 | $5,832,567 | $21,210,899 | $15,378,332 | 264% |
| Q3 2017 | $5,847,194 | $23,222,636 | $17,375,442 | 297% |

213. The restated Form 10-Qs for Q1, Q2, and Q3 2017 also revealed that Live had materially overstated its net cash provided by operations for each quarter as follows:

| **Period** | **Originally reported net cash provided by operations** | **Restated net cash provided by operations** | **$ Difference** | **% Difference** |
|---|---|---|---|---|
| Q1 2017 | $4,994,685 | $3,177,830 | $1,816,855 | -36% |
| Q2 2017 | $5,209,543 | $3,392,688 | $1,816,855 | -35% |
| Q3 2017 | $8,830,128 | $7,013,273 | $1,816,855 | -21% |

214. Live's financial statements for Q1, Q2, and Q3 2017 created a materially misleading positive impression about Live's business, operations, finances, and growth, which, as revealed by Live's restatement, differed significantly from actuality.

215. Further, on August 14, 2020, Live restated its financial statements for two more quarters - the quarters ended December 31, 2019 and March 31, 2020, admitting errors related to its accounting in connection with ApplianceSmart.

**D. The SEC's Investigation And Enforcement Action**

216. The SEC's nearly four-year investigation and filing of charges against Defendants for the deceptive courses of conduct and materially misleading statements and omissions which are also alleged in the instant action further supports Defendants' scienter.

217. Live disclosed on August 14, 2018 that *nearly six months prior*, on February 21, 2018, the SEC had issued a subpoena to Live and advised Live that it was commencing an investigation. Live disclosed that the SEC's subpoena requested documents and information concerning, "among other things, the restatement of the Company's financial statements for the quarterly periods ended December 31, 2016, March 31, 2017, and June 30, 2017, the acquisition of Marquis [], Vintage Stock [], and ApplianceSmart [], and the change in auditors."

218. On February 13, 2019, the Live Defendants disclosed that *four months prior*, on October 1, 2018, the SEC had sent Live a letter requesting information regarding a potential violation of Section 13(a) of the Securities Exchange Act of 1934, based on the timing of Live's

Form 8-K, filed on February 14, 2018, which had disclosed that Live's previously issued financial statements for the quarterly periods ended December 31, 2016, March 31, 2017, and June 30, 2017 should no longer be relied upon.

219. On October 9, 2020, the Live Defendants disclosed that on October 7, 2020, the Company received a "Wells Notice" from the SEC, which informed them that the SEC had made a preliminary determination to recommend filing an enforcement action against the Company alleging violations of the federal securities laws.

220. On August 3, 2021, the SEC announced that it had filed an enforcement action against the Live Defendants and JOI/ARCA, which alleged, *inter alia,* that Defendants had made materially false and misleading statements and omissions in connection with the fraudulent schemes described above.

221. As detailed above, on November 28, 2022, the Honorable Judge James C. Mahan denied the Live Defendants and JOI/ARCA's motions to dismiss the SEC Complaint in their entirety, finding that the SEC had alleged that, *inter alia*:

a. the Live Defendants made material misrepresentations and/or omissions by representing that for FY 2016, the Company had generated "other income" in the amount of $915,500 from the Novalk Amendment, that the Novalk Amendment was "memorialized" on December 7, 2016 and had an "effective date" of September 15, 2016, and by representing Live's 2016 EPS as $8.92.

b. the Live Defendants engaged in a deceptive course of conduct at year-end 2016 by intentionally inflating Live's FY 2016 pre-tax income by 20% by improperly recognizing $915,500 of "other income" from the Novalk Amendment, lying to Live's outside accountants about the Novalk transaction, hiring a stock promoter to pump Live's stock in advance of the misleading December 28, 2016 Press Release, intentionally issuing the December 28, 2016 Press Release that overstated Live's EPS by 40%, and selling and attempting to sell Live's shares after the market reacted to the false press release, and then engaging in a cover-up of their conduct, which included misleading investors about Live's paid stock promotions;

c. the Live Defendants and JOI/ARCA made material misrepresentations and/or omissions and engaged in a deceptive course of conduct in connection with the ApplianceSmart transaction by representing the effective or closing date of the ApplianceSmart transaction as December 30, 2017, recognizing a bargain purchase gain of $3.7 million as a result of the ApplianceSmart transaction in Live's Q1 2018 financial results, and representing that Live had paid a portion of the purchase price by March 31, 2018.

222. On May 7, 2024, JOI/ARCA consented to entry of a proposed final judgment in the SEC Action, which waived findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52, and waived JOI/ARCA's right to a jury trial and its right to appeal from the entry of the proposed judgment. The proposed final judgment permanently restrained and enjoined JOI/ARCA from violating §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and ordered JOI/ARCA to pay a civil penalty in a total amount of $250,000. On May 24, 2024, the Honorable James C. Mahan of the United States District Court for the District of Nevada entered the proposed final judgment against JOI/ARCA.

**E. Live Lacked Effective Internal Controls Over Financial Reporting**

223. Live had a history of severe material weaknesses in its internal controls over financial reporting, which it failed to remedy during the Class Period. Indeed, Live lacked effective internal controls over financial reporting for the entirety of the Class Period.

224. For example, Live's 2016 Form 10-K stated:

> Our management assessed the effectiveness of our internal control over financial reporting as of September 30, 2016 …. ***[O]ur management concluded that our internal control over financial reporting was not effective as of September 30, 2016 due to the lack of timely determination of the Marquis purchase price allocation and inconsistencies found with financial reporting.***

225. The 2016 Form 10-K did not describe what the "inconsistencies found with financial reporting" were.

226. Live's 2017 Form 10-K for the fiscal year ended September 30, 2017 stated:

> Our management assessed the effectiveness of our internal control over financial reporting as of September 30, 2017 …. [O]ur management concluded that our

> internal control over financial reporting was not effective as of September 30, 2017. Our assessment found the following material weaknesses. ***Management's assessment concluded that it has the following material weaknesses: (a) lack of sufficient controls around the financial reporting process; (b) lack of proper segregation of duties within the financial reporting process; (c) lack of adequate controls surrounding management's review of the income tax provision process; (d) lack of controls surrounding the assessment of certain cash flow and balance sheet classifications; and (e) lack of sufficient controls around the process for business combinations.***
>
> The Company is evaluating the material weaknesses and developing a plan of remediation to strengthen our overall internal control over accounting for business combinations, income tax provision process, the financial reporting process, the assessment of certain cash flow and balance sheet classifications and segregation of duties. ***The remediation plan will include the following actions: implement additional monitoring controls through revising and formalize the income tax review processes, enhance the formality and rigor of review and reconciliation procedures, and hire resources with specific tax, business combinations and financial accounting expertise whereby there can be effective segregation of duties.*** The Company is committed to maintaining a strong internal control environment and believes that these remediation efforts will represent significant improvements in our controls and processes. The Company has started to implement these steps, however, some of these steps will take time to be fully integrated and confirmed to be effective and sustainable. Additional controls may also be required over time. Until the remediation steps set forth above are fully implemented and tested, the material weakness described above will continue to exist.

227. Live's 2018 Form 10-K filed with the SEC on December 27, 2018, stated that Live *had* achieved effective internal control over financial reporting. Specifically, the 2018 Form 10-K stated:

> Our management assessed the effectiveness of our internal control over financial reporting as of September 30, 2018 …. ***[O]ur management concluded that our internal control over financial reporting was effective as of September 30, 2018.***

228. In a letter to Live dated March 5, 2019, the SEC questioned certain disclosures in Live's 2018 Form 10-K, including a request that Live "[p]lease explain to us why you believe that internal control over financial reporting was effective as of September 30, 2018[.]"

229. In Live's response to the SEC in a letter dated March 19, 2019, Live responded that "there was a typographical error in the Form 10-K for the fiscal year ended September 30, 2018

and [] the Company's internal control over financial reporting was <u>not</u> effective as of September 30, 2018."

230. On April 23, 2019, Live filed an amendment to its 2018 Form 10-K, which the Live Defendants explained was intended to ***"correct a typographical error and confirm that management concluded that the Company's internal control over financial reporting was <u>not</u> <u>effective</u> as of September 30, 2018[.]"*** Live's amended 2018 Form 10-K further stated:

> We carried out an evaluation, under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, of the effectiveness of our disclosure controls and procedures …. ***[O]ur management concluded that our internal control over financial reporting was not effective as of September 30, 2018.***
>
> ***The Company's management, including the Company's CEO and CFO, do not expect that the Company's disclosure controls and procedures or the Company's internal control over financial reporting will prevent or detect all error and all fraud.*** A control system, regardless of how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system will be met. ***These inherent limitations include the following: judgements in decision-making can be faulty,*** and control and process breakdowns can occur because of simple errors or mistakes***, controls can be circumvented by individuals, acting alone or in collusion with each other, or by management override,*** the design of any system of controls is based in part on certain assumptions about the likelihood of future events, and ***there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions, over time, controls may become inadequate because of changes in conditions or deterioration in the degree of compliance with policies or procedures.*** Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected.

231. Live's amended 2018 Form 10-K did not state that the Live Defendants had commenced or were planning to commence any efforts to remediate the material weaknesses in Live's internal control over financial reporting.

232. Live's 2019 Form 10-K, which was late-filed with the SEC on February 10, 2020 stated:

> Our management assessed the effectiveness of our internal control over financial reporting as of September 30, 2019 …. [O]ur management concluded that our internal controls over financial reporting were ineffective as of September 30, 2019.

> ***Management noted the following deficiencies that management believes to be material weaknesses:***
>
> - ***The Company does not have sufficient segregation of duties within its accounting functions, which is a basic internal control.*** Due to its size and nature, segregation of all conflicting duties may not always be possible and may not be economically feasible. However, ***to the extent possible, the initiation of transactions, the custody of assets and the recording of transactions should be performed by separate individuals.*** Management evaluated the impact of its failure to have segregation of duties on its assessment of its disclosure controls and procedures and has concluded that the control deficiency that resulted represented a material weakness.
> - ***The Company does not have written documentation of our internal control policies and procedures.*** Written documentation of key internal controls over financial reporting is a requirement of Section 404 of the Sarbanes-Oxley Act;
> - ***Management has not established appropriate and rigorous procedures for evaluating internal controls over financial reporting.*** Due to limited resources and lack of segregation of duties, documentation of the limited control structure has not been accomplished.
> - ***The Company employ[s] policies and procedures for reconciliation of the financial statements and note disclosures, however, these processes are not appropriately followed or documented.***
>
> In response to the above identified weaknesses in our internal control over financial reporting, ***we plan to work on documenting in writing our internal control policies and procedures and implement sufficient segregation of duties within our accounting functions, so that one person cannot initiate, authorize and execute transactions, and so that one person cannot record transactions in the accounting records without sufficient review by a separate person.***

233. Live's 2020 Form 10-K, which was late-filed with the SEC on January 13, 2021, stated that the Company lacked effective internal control over financial reporting and confirmed that the Live Defendants had failed to remedy the material weaknesses identified in Live's 2019 Form 10-K. Specifically, the 2020 Form 10-K stated:

> Our management assessed the effectiveness of our internal control over financial reporting as of September 30, 2020 …. [O]ur management concluded that our internal controls over financial reporting were ineffective as of September 30, 2020. ***Management noted the following deficiencies that management believes to be material weaknesses:***
>
> - ***The Company does not have written documentation of our internal control policies and procedures.*** Written documentation of key internal

> controls over financial reporting is a requirement of Section 404 of the Sarbanes-Oxley Act;
>
> - ***Management has not established appropriate and rigorous procedures for evaluating internal controls over financial reporting at all of its subsidiaries.*** Due to limited resources, documentation of the control structure has not been accomplished for all subsidiaries.
>
> In response to the above identified weaknesses in our internal control over financial reporting, ***we plan to work on documenting in writing our internal control policies and procedures and develop an internal testing plan to document our evaluation of effectiveness of the internal controls.***

**F. Live Cycled Through Four Auditors During The Class Period**

234. Live's first Class Period auditor was "dismissed" by Live, Live's second Class Period auditor resigned, Live's third Class Period auditor resigned, and Live's fourth Class Period auditor resigned shortly after the end of the Class Period, with the circumstances and timing of these events supporting the Live Defendants' scienter.

235. On May 1, 2017, Live filed a Form 8-K with the SEC which disclosed that on April 27, 2017, Live had "dismissed Anton & Chia, LLP" from its role as Live's independent registered public accounting firm and effective on that same day, Live had engaged BDO USA, LLP ("BDO") to replace Anton & Chia ("A&C").

236. Live thus "dismissed" Anton & Chia shortly before Live was required to file its Q2 2017 financial results with the SEC on May 11, 2017. As Live's restated Q2 2017 financial results would later reveal, Live's Q2 2017 Form 10-Q materially understated Live's debts maturing in the next fiscal year and materially overstated Live's net cash provided by operations.

237. Live further stated in its May 1, 2017 Form 8-K, "[d]uring the Company's two most recent fiscal years ended September 30, 2016 and 2015 and for the subsequent interim period through April 27, 2017, the Company had no "disagreements" (as described in Item 304(a)(1)(iv) of Regulation S-K) with A&C on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure, which disagreements, if not resolved to the satisfaction of A&C, would have caused it to make reference in connection with its opinion to the subject matter of the disagreements."

238. Unbeknownst to investors, in providing a clean audit opinion of Live's FY 2016 financial results, Anton & Chia had relied on Live's representations in a management representation letter addressed to Anton & Chia dated December 28, 2016. The December 28, 2016 management letter, which was signed by Isaac, stated:

> On December 7, 2016, [LIVE] and Novalk memorialized an agreement which is effective September 15, 2016 that changes the terms and conditions relating to payment of the outstanding software license fee [to Novalk] of $1,500,000. The software fee will be settled in exchange for 58,333 shares of [LIVE's] common stock which are to be issued and certificated subsequent to the year ended September 30, 2016. As a result of this agreement, [LIVE] recorded $915,500 of other income in September 2016 and maintained an accrued liability to Novalk for $584,500 to be settled when the common shares are issued to Novalk after the year-end, September 30, 2016.

239. On February 2, 2018, Live filed a Form 8-K with the SEC which disclosed that on January 29, 2018, Live's second Class Period independent public accountant, BDO "informed Live [] that it will not stand for re-election for the audit of the Company's consolidated financial statements for the year ended September 30, 2018." On February 7, 2018, Live filed a Form 8-K with the SEC which stated that effective February 6, 2018, Live had engaged SingerLewak LLP as its independent public accountant, making SingerLewak Live's third independent public accountant of the Class Period. These events occurred shortly before Live was required to report its Q1 2018 financial results on February 14, 2018, in which Live intended to report a profitable quarter due to the "bargain purchase gain" from the "acquisition" of ApplianceSmart.

240. During SingerLewak's short tenure as Live's auditor, SingerLewak questioned the details of the ApplianceSmart transaction, including the acquisition date. For example, on May 7, 2018, SingerLewak stated in correspondence to Johnson that "[i]f the acquisition date of [ApplianceSmart] is determined to not be 12/30/17, then we would need to assess the impact of this on the Q1 2018 10-Q[.] If we file the Q2 2018 10Q without the final determination of ApplianceSmart, we would then be in the position of assessing the impact on two 10Qs[], which is not an ideal position to be in." On May 15, 2018, Johnson acknowledged in correspondence to

SingerLewak that MidCap had maintained possession of ApplianceSmart's stock certificate until March 22, 2018.

241. On May 16, 2018, Live filed a Form 12b-25 notification of late filing with the SEC, which stated that Live needed "additional time to finalize its financial statements to be filed as part of the Form 10-Q [for the quarterly period ended March 31, 2018]. The delay is principally due to both the Company and the Company's independent registered public accounting firm's continued exchange of information in connection with the review of the Company's financial statements."

242. On October 18, 2018, Live filed a Form 8-K with the SEC, which disclosed that on October 12, 2018, SingerLewak had "informed Live [ ] that it resigned as the Company's independent registered public accounting firm." Live further stated that "SingerLewak did not audit nor provide an opinion on any of the Company's financial statements. During the Company's two most recent fiscal years ended September 30, 2018 and September 30, 2017, and for the subsequent interim period through October 12, 2018, the Company had no "disagreements" (as described in Item 304(a)(1)(iv) of Regulation S-K) with SingerLewak on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure."

243. Unbeknownst to investors though, during SingerLewak's tenure, Live had made numerous misleading representations to SingerLewak, which SingerLewak had relied on in its capacity as Live's independent public accountant.

244. For example, on February 12, 2018, SingerLewak asked Live to confirm, given that consideration for the ApplianceSmart acquisition was not expected to pass until March 31, 2018, that "the date of acquisition [of ApplianceSmart] and inclusion in the consolidated financial statements has been considered." Johnson responded by informing SingerLewak that ***Live has "effective control over ApplianceSmart*** even though consideration in terms of $$$ have not passed as of yet."

245. In a management representation letter from Live addressed to SingerLewak dated February 14, 2018, which was signed by Isaac and Johnson, the Live Defendants misleadingly stated:

> ***The shares of ApplianceSmart stock are in escrow*** and will be released upon payment of the purchase price to third-party lenders of ARCA and ApplianceSmart, which is expected to occur prior to March 31, 2018. ***Although consideration has not transferred at December 31, 2017, the Company has effective control over ApplianceSmart and has determined that the acquisition date is December 30, 2017.***

246. In connection with review of Live's financial statements for Q2 2018, SingerLewak advised Johnson on May 7, 2018, that "If the acquisition date of [ApplianceSmart] is determined to not be 12/30/17, then we would need to assess the impact of this on the Q1 2018 10-Q[.] If we file the Q2 2018 10Q without the final determination of ApplianceSmart, we would then be in the position of assessing the impact on two 10Qs[], which is not an ideal position to be in."

247. Johnson acknowledged in a memo to SingerLewak dated May 15, 2018 that MidCap had held ApplianceSmart's stock certificate until March 22, 2018, at which time it was released to JOI/ARCA.

248. On October 26, 2018, Live announced that it had engaged WSRP, LLC as its new independent public accounting firm, effective immediately. WSRP, LLC was the Company's fourth independent accounting firm during the Class Period. Shortly after the end of the Class Period, on October 4, 2021, Live filed a Form 8-K with the SEC, which disclosed that WSRP, LLC had "opted not to seek re-appointment as the Company's auditor." Live's disclosure was notably silent as to whether Live had had any "disagreements" as described in Item 304(a)(1)(iv) of Regulation S-K with WSRP, LLC on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure.

**G. The Simplicity Of The GAAP Provisions Defendants Violated**

249. Live's recognition of $915,500 in "other income" in its FY 2016 financial results as a result of the Novalk Amendment violated Generally Accepted Accounting Principles ("GAAP").

250. Accounting Standards Codification ("ASC") 855-10-25, Subsequent Events, governs the circumstances under which an issuer should recognize events or transactions in its financial statements that occur subsequent to the balance sheet date, but before the statements were available to be issued.

251. Under ASC 855-10-25-1, "An entity shall recognize in the financial statements the effects of all subsequent events that provide additional evidence about conditions that existed at the date of the balance sheet[.]".

252. Under ASC 855-10-25-3, ***"[a]n entity shall not recognize subsequent events that provide evidence about conditions that did not exist at the date of the balance sheet but arose after the balance sheet date but before financial statements are issued or are available to be issued."***

253. ASC 855-10-55-2 provides as "examples of nonrecognized subsequent events addressed in paragraph 855-10-25-3":

> a. "Sale of a bond or capital stock issued after the balance sheet date but before financial statements are issued or are available to be issued";
>
> b. "Changes in estimated credit losses on receivables arising after the balance sheet date but before financial statements are issued or are available to be issued", and;
>
> c. "Changes in the fair value of assets or liabilities (financial or nonfinancial) … after the balance sheet date but before financial statements are issued or are available to be issued[.]"

254. Here, the "conditions" – an amendment to the Novalk Agreement – did not exist as of the date of Live's balance sheet. Indeed, discussions about a potential amendment to the Novalk Agreement did not begin until November 30, 2016 - two months after the date of Live's balance sheet, prior to the time that Live filed its 2016 Form 10-K, and prior to the time that Live's financial statements were available to be issued - when Isaac told Yunis in an email that Live wanted to cancel the software purchase agreement. To recognize the Novalk Amendment in Live's FY 2016

financial results was an obvious violation of straightforward GAAP provisions, and at minimum, reckless.

255. In addition, Defendants' selection of December 30, 2017 as the acquisition date of ApplianceSmart, and their recognition of the transaction in Live's Q1 2018 financial results and JOI/ARCA's FY 2017 financial results also violated GAAP.

256. ASC 805-10-25-6 provides: "The acquirer shall identify the acquisition date, which is the date on which it ***obtains control of the acquiree***." ASC 805-10-25-7 provides: "The date on which the acquirer obtains control of the acquiree generally is the date on which the acquirer legally transfers the consideration, acquires the assets, and assumes the liabilities of the acquiree—the closing date. However, the acquirer might obtain control on a date that is either earlier or later than the closing date. For example, the acquisition date precedes the closing date if a written agreement provides that the acquirer obtains control of the acquiree on a date before the closing date. An acquirer shall consider all pertinent facts and circumstances in identifying the acquisition date."

257. Here, Live did not obtain control of ApplianceSmart by December 30, 2017. And, as of December 30, 2017, Live had not transferred any consideration for the purchase of ApplianceSmart, Live had not acquired any of ApplianceSmart's assets, and Live had not assumed any of ApplianceSmart's liabilities.

258. Further, the SPA did not have an express provision that transferred control of ApplianceSmart from JOI/ARCA to Live on or before December 30, 2017. As of December 30, 2017, ApplianceSmart remained encumbered by the MidCap Credit Agreement, and accordingly, ApplianceSmart's stock certificate was still in the sole possession of MidCap, as were ApplianceSmart's revenues and assets; moreover, ApplianceSmart could not sell any of its stock or assets without written permission from MidCap, which ApplianceSmart had not obtained.

259. As of March 31, 2018, Live still had not paid any portion of the purchase price to acquire ApplianceSmart because Live had been unable to come up with the funding. Johnson acknowledged in correspondence to Live's outside accountants that MidCap had sole possession

of ApplianceSmart's stock certificate until March 22, 2018. And it was not until May 23, 2018 that Johnson even sent copies of the corporate disclosures that JOI/ARCA's board of directors needed to sign in order to approve the sale of ApplianceSmart to Live, which JOI/ARCA's board signed on May 24, 2018.

260. To classify the acquisition date of ApplianceSmart as December 30, 2017 was an obvious violation of straightforward GAAP provisions, and at minimum, reckless.

## XI. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

261. The market for Live's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Live's securities traded at artificially inflated prices during the Class Period. On June 25, 2021, the Company's share price reached a Class Period high of $75.25 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Live's securities and market information relating to Live and have been damaged thereby.

262. During the Class Period, the artificial inflation of Live's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Live's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Live and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

263. At all relevant times, the market for Live's securities was an efficient market for

the following reasons, among others:

(a) Live's shares met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, Live filed periodic public reports with the SEC and/or the NASDAQ;

(c) Live regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) Live was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

264. As a result of the foregoing, the market for Live's securities promptly digested current information regarding Live from all publicly available sources and reflected such information in Live's share price. Under these circumstances, all purchasers of Live's securities during the Class Period suffered similar injury through their purchase of Live's securities at artificially inflated prices and a presumption of reliance applies.

265. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the

importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XII. NO SAFE HARBOR

266. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Live who knew that the statement was false when made.

## XIII. CAUSES OF ACTION

### FIRST CLAIM

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against The Live Defendants**

267. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

268. During the Class Period, the Live Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Live's securities at artificially inflated prices. In

furtherance of this unlawful scheme, plan and course of conduct, the Live Defendants, and each defendant, took the actions set forth herein.

269. The Live Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Live's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. The Live Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

270. The Live Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Live's financial well-being and prospects, as specified herein.

271. The Live Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Live's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Live and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

272. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the

creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

273. The Live Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Live's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by the Live Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, the Live Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

274. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Live's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Live Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by the Live Defendants, but not disclosed in public statements by the Live Defendants during the Class Period, Plaintiff and the other members of the

Class acquired Live's securities during the Class Period at artificially high prices and were damaged thereby.

275. At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Live was experiencing, which were not disclosed by the Live Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Live securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

276. By virtue of the foregoing, the Live Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

277. As a direct and proximate result of the Live Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act Against the Individual Defendants

278. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

279. The Individual Defendants acted as controlling persons of Live within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited

access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

280. In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

281. As set forth above, Live and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## THIRD CLAIM

### Violation of Section 10(b) of The Exchange Act and Rules 10b-5(a) and 10b-5(c) Promulgated Thereunder Against The Live Defendants

282. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

283. During the Class Period, the Live Defendants carried out a plan, scheme, and course of conduct that was intended to and throughout the Class Period, did: (a) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (b) artificially manipulate the price of Live's securities; and (c) cause economic harm to Plaintiff and other members of the Class.

284. The Live Defendants individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Live's financial well-being and prospects, as specified herein.

285. The Live Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Live's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Live and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

286. The Live Defendants' liability arises from the fact that they developed and engaged in a scheme to manipulate the price of Live's securities and were aware of the dissemination of the information to the investing public that they knew or recklessly disregarded was materially false and misleading. The Live Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on the Class members by disseminating materially false and misleading statements and/or concealing material information. The Live Defendants were culpable for this deceit insofar as they acted, or omitted to act, in furtherance of the scheme with scienter.

287. The Live Defendants engaged in a scheme to defraud by intentionally inflating Live's pre-tax income by 20% by improperly recognizing $915,500 of "other income" from the Novalk Amendment and selecting September 15, 2016 as the purported "effective date" of the Novalk Amendment, making misrepresentations to Live's outside accountants about the Novalk transaction, hiring a stock promoter to pump Live's stock in advance of the December 28, 2016 Press Release, intentionally issuing the December 28, 2016 Press Release that overstated LIVE's earnings per share by 40%. Isaac then sold and tried to sell Live stock after the market reacted to the false press release and inflated earnings per share statements before Live's 2016 Form 10-K was filed, which would disclose Live's true EPS. The Live Defendants then engaged in a cover-up of their conduct by, *inter alia*, issuing a false and misleading letter to shareholders. Further,

the Live Defendants engaged in a deceptive course of conduct by paying Isaac for purported housing reimbursements during the Class Period and misrepresenting and understating the amounts paid to Isaac as compensation for FY 2016-2018 as well as the existence and purported terms of Isaac's employment agreement with Live, such as that Isaac was entitled to $7,000 per month in housing reimbursements.

288. The Live Defendants engaged in the deceptive acts alleged herein knowingly or recklessly and for the purpose and effect of concealing Live's financial well-being and prospects from the investing public and supporting the artificially inflated price of Live's securities. As demonstrated by the Live Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects, the Live Defendants, if they did not have actual knowledge of the deceptive or fraudulent nature of their course of conduct, misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge.

289. As a result of the Live Defendants' deceptive acts, the market price of Live's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the Live Defendants' false and misleading representations, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by the Live Defendants, but not disclosed in public statements by the Live Defendants during the Class Period, Plaintiff and the other members of the Class acquired Live's securities during the Class Period at artificially high prices and were damaged thereby. The Live Defendants' scheme thus: (a) deceived the investing public regarding Live's operations and the true value of Live's stock, and (ii) caused Plaintiff and other Class members to purchase or otherwise acquire Live's securities at artificially inflated prices, which fell as the true condition of Live's business was revealed.

290. At the time of the Live Defendants' deceptive acts and misrepresentations about the same, Plaintiff and other members of the Class were ignorant of their falsity, and believed the Live Defendants' representations to be true. Had Plaintiff and the other members of the Class and

the marketplace known the truth regarding, *inter alia,* the problems that Live was experiencing, which were not disclosed by the Live Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Live securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

291. By virtue of the foregoing, the Live Defendants violated Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b-5(c) promulgated thereunder.

292. As a direct and proximate result of the Live Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## FOURTH CLAIM

### Violation of Section 10(b) of The Exchange Act and Rules 10b-5(a) and 10b-5(c) Promulgated Thereunder Against The Live Defendants and JOI/ARCA

293. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

294. During the Class Period, the Live Defendants and JOI/ARCA carried out a plan, scheme, and course of conduct that was intended to and throughout the Class Period, did: (a) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (b) artificially manipulate the price of Live's securities; and (c) cause economic harm to Plaintiff and other members of the Class.

295. The Live Defendants and JOI/ARCA, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Live's financial well-being and prospects, as specified herein.

296. The Live Defendants and JOI/ARCA employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Live's value

and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Live and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

297. The Live Defendants' and JOI/ARCA's liability arises from the fact that they developed and engaged in a scheme to manipulate the price of Live's securities and were aware of the dissemination of the information to the investing public that they knew or recklessly disregarded was materially false and misleading. The Live Defendants and JOI/ARCA are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on the Class members by disseminating materially false and misleading statements and/or concealing material information. The Live Defendants and JOI/ARCA were culpable for this deceit insofar as they acted, or omitted to act, in furtherance of the scheme with scienter.

298. The Live Defendants and JOI/ARCA developed and engaged in a scheme to create the false appearance that Live acquired ApplianceSmart on December 30, 2017, such that Live could use December 30, 2017 as the acquisition date for accounting purposes in connection with its financial results for the quarter ended December 31, 2017 and thus recognize $3,773,486 of "other income" from a "bargain purchase gain" to transform an unprofitable quarter into a profitable quarter.

299. Live's January 5, 2018 Form 8-K falsely represented that the capital stock of ApplianceSmart had been delivered into escrow when in fact, that was not true. Instead, ApplianceSmart's stock certificate was in the possession of MidCap and ApplianceSmart was still subject to the terms of the MidCap Credit Agreement. Similar false representations were repeated in Live's Q1 2018 Form 10-Q, which also stated that the ApplianceSmart acquisition had "closed" on December 30, 2017.

300. Further, when Live was unable to come up with the financing for the $6.5 million cash purchase price to acquire ApplianceSmart by March 31, 2018, Defendants, in furtherance of their deceptive course of conduct, came up with the idea to treat the revenues paid by ApplianceSmart to MidCap between January and March of 2018 pursuant to the MidCap Credit Agreement, as payment of the purchase price from Live to JOI/ARCA. This amount totaled $2,580,505.54. Defendants agreed to falsely represent in Live's public statements that Live had paid $2,580,505.54 in cash to JOI/ARCA by March 31, 2018 – though *none* of the purchase price had been paid by that time - and that the parties had thereafter negotiated in "good faith" regarding the form of payment for the remaining balance. Live made misleading statements about Live's supposed partial payment to JOI/ARCA in Live's 2017 Form 10-K, Live's April 26, 2018 Form 8-K and Live's Q2 2018 Form 10-Q.

301. Defendants engaged in the deceptive acts alleged herein knowingly or recklessly and for the purpose and effect of concealing Live's and JOI/ARCA's financial well-being and prospects from the investing public and supporting the artificially inflated price of Live's securities. As demonstrated by the Live Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects, the Live Defendants, if they did not have actual knowledge of the deceptive or fraudulent nature of their course of conduct, misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge.

302. As a result of Defendants' deceptive acts, the market price of Live's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on Defendants' false and misleading representations, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Live's securities during the Class Period at artificially high prices and were damaged thereby. Defendants' scheme thus: (a) deceived the investing public regarding Defendants' operations and the true value of Live's stock,

and (ii) caused Plaintiff and other Class members to purchase or otherwise acquire Live's securities at artificially inflated prices, which fell as the true condition of Live's business was revealed.

303. At the time of Defendants' deceptive acts and misrepresentations about the same, Plaintiff and other members of the Class were ignorant of their falsity, and believed Defendants' representations to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding, *inter alia,* the problems that Defendants were experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Live securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

304. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b-5(c) promulgated thereunder.

305. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

b) Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of the Live Defendants and JOI/ARCA's wrongdoing, in an amount to be proven at trial, including interest thereon;

c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d) Such other and further relief as the Court may deem just and proper.

## XV. DEMAND FOR A TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: October 30, 2024

GLANCY PRONGAY & MURRAY LLP

By: */s/ Natalie S. Pang*
Robert V. Prongay
Natalie S. Pang (admitted *pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com
Email: npang@glancylaw.com

*Lead Counsel for Lead Plaintiff Daniel E. Sieggreen*

Andrew R. Muehlbauer, Esq.
**MUEHLBAUER LAW OFFICE, LTD.**
Nevada Bar No. 10161
7915 West Sahara Avenue, Suite 104
Las Vegas, Nevada 89117
Telephone: (702) 330.4505
Facsimile: (702) 825.0141
Email: andrew@mlolegal.com

*Liaison Counsel for Lead Plaintiff Daniel E. Sieggreen*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 30, 2024, I electronically filed the foregoing document using the CM/ECF system which will send notification of such filing to the e-mail addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List.

*/s/ Natalie S. Pang*
Natalie S. Pang