GLANCY PRONGAY & MURRAY LLP
Robert V. Prongay
Natalie S. Pang (admitted *pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com
         npang@glancylaw.com

MUEHLBAUER LAW OFFICE, LTD.
Andrew R. Muehlbauer, Esq.
Nevada Bar No. 10161
7915 West Sahara Ave., Suite 104
Las Vegas, Nevada 89117
Telephone: (702) 330-4505
Facsimile: (702) 825-0141
Email: andrew@molegal.com

*Attorneys for Lead Plaintiff*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| DANIEL E. SIEGGREEN, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>LIVE VENTURES INCORPORATED, JON ISAAC, and VIRLAND A. JOHNSON,<br><br>Defendants. | Case No. 2:21-cv-01517-CDS-EJY<br><br>**LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>**ORAL ARGUMENT REQUESTED**<br><br>Judge:   Hon. Cristina D. Silva |

Case No. 2:21-cv-01517-CDS-EJY

## I.    **INTRODUCTION**

During the period of December 28, 2016 through August 3, 2021, Defendants[1] engaged in deceptive courses of conduct and made materially false and misleading statements in connection with and in addition to their deceptive acts in violation of §10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rules 10b-5(a), (b) & (c) promulgated thereunder.

First, at year-end 2016, Live Defendants engaged in a scheme to create a false appearance of Live's fiscal year 2016 financial results, including by inflating Live's pre-tax income by 20% and misrepresenting Live's EPS as 40% higher, with the aim of artificially driving up Live's share price and profiting from sales of Live's shares. Second, at year-end 2017, Live Defendants and JOI engaged in a scheme to create the false appearance that Live's Q1 2017 was profitable and to avoid negative tax impacts on both companies' financial statements. Third, Live Defendants engaged in a scheme whereby Live paid Isaac for purported "housing expenses" and underreported those payments as part of Isaac's FY 2016-2018 compensation. Further Live Defendants made materially false and misleading statements during the Class Period in furtherance of their deceptive courses of conduct and in their attempts to cover up their deception.

The SAC alleges a strong inference of Defendants' scienter. Defendants try to downplay Plaintiff's allegations, arguing that mere disagreements with their application of accounting rules do not support scienter. But Plaintiff's scienter allegations go far beyond the interpretation of accounting rules. Indeed, mere disagreements about accounting rules would not have resulted in the prosecution of claims against Defendants by the SEC for seventeen fraud-related causes of action

---

[1] "Live Defendants" refers to Live Ventures, Inc. ("Live" or the "Company"), Live's president and CEO, Jon Isaac ("Isaac"), and Live's CFO, Virland Johnson ("Johnson"). Together, Isaac and Johnson are referred to as the "Individual Defendants". "JOI" refers to JanOne, Inc. Live Defendants with JOI are referred to as "Defendants". Lead Plaintiff Daniel Sieggreen ("Plaintiff") responds to Live Defendants' (Dkt. No. 80) and JOI's (Dkt. No. 78) motions to dismiss together in this omnibus opposition, as JOI's motion incorporates and is "based on Live Defendants' [motion]" (Dkt. No. 78 at 1), and the motions are nearly identical to one another.

Citations to "¶__" refer to the Second Amended Class Action Complaint for Violations of the Federal Securities Laws (Dkt. No. 74, the "SAC"). Citations to "Mot., __" refer to Live Defendants' motion to dismiss and citations to "JOI Mot.,__" refer to JOI's motion to dismiss.

The "Class Period" is December 28, 2016 through August 3, 2021, both dates inclusive (¶1).

Unless otherwise indicated, all emphasis is added and all internal quotations and citations are omitted.

and a final judgment permanently restraining JOI from violating the Exchange Act. During the Class Period, the SEC conducted a nearly four-year investigation into Defendants' conduct described herein, which culminated in the SEC filing an enforcement action against Defendants in this district. The SEC's allegations, which are incorporated by reference in the SAC, provide extensive additional detail of Defendants' non-public statements, and show that Defendants had knowledge and/or access to information that undermined the accuracy of their public statements.

Further, Plaintiff alleges that Defendants had the motive and opportunity to conceal the truth due to Live's dire financial situation and mounting debts, and JOI's large tax liability. Due to material accounting errors, Live had to restate its financial statements for five quarterly periods, and Live admitted its lack of effective internal controls during the entire Class Period. Plaintiff's allegations raise an inference of scienter that is *at least* as cogent and compelling as any non-culpable inference.

In the SEC enforcement action, the Honorable James C. Mahan found that the SEC's allegations, which form the basis of Plaintiff's allegations here, stated claims for violations of §10(b) of the Exchange Act and Rules 10b-5(a), (b) & (c). Defendants offer no compelling reasons for this Court to hold differently. Defendants' motions should be denied in their entirety.

## II.    STATEMENT OF FACTS

### A.    Defendants' Background

Live, originally known as the Nuclear Corp. of New Mexico, purported during the Class Period to be a "diversified holding company" and dabbled in carpet, flooring, and vintage toy businesses. ¶¶27-29. During the Class Period, Jon Isaac was Live's President and CEO, and his father, Tony Isaac was a member of Live's board. ¶¶21, 24. Tony Isaac was also the CEO of JOI; Jon Isaac had a beneficial ownership of about 14% of JOI's outstanding common stock. ¶24. Johnson was the CFO of Live *and* JOI. ¶¶22, 24. During the Class Period, Isaac was the beneficial owner of between 43.1% and 49.5% of Live's outstanding shares of common stock. ¶21.

### B.    Live Defendants' Deceptive Scheme to Artificially Inflate Live's FY 2016 Results and Share Price

After the close of Live's fiscal year ("FY") 2016 on September 30, 2016, Live Defendants

sought to create the false appearance that Live had achieved a successful FY 2016 through legitimate business dealings with the purpose of artificially inflating Live's share price so that Defendants could then profit from sales of Live's shares.

To create the appearance that Live had achieved greater income, Isaac asked a close personal friend, Juan Yunis ("Yunis") for a favor. ¶5. Live had a $1.5 million outstanding liability under an agreement with Yunis's company, Novalk S.A.S. Apps ("Novalk"). ¶33. In October 2014, Live and Novalk entered an agreement for Live to purchase software from Novalk for $1.5 million in cash. ¶34. The agreement sat dormant for two years until November 30, 2016, two months after the close of Live's FY 2016, when Isaac reached out to Yunis to start negotiating an amendment. ¶35. Initially, they agreed to represent that the amendment had been entered into on September 30, 2016 and that the price would be lowered to 350,000 shares valued as of that date, when Live's share price was $1.91, but later decided to represent the effective date as September 15, 2016, and lower the price further, to 350,000 shares valued as of September 15, 2016, when Live's share price was $1.67. ¶¶36, 38. On December 19, 2016, Yunis signed the amendment. ¶39. Claiming the amendment became effective on September 15, 2016, during Live's FY 2016, allowed Live to report the effect of the amendment in its 2016 Form 10-K. Defendants took the difference between the $1.5 million original price and the "discount" price of $584,500 worth of shares, which amounted to $915,500, and reported it as "other income" in Live's FY 2016 financial statements, which had the effect of increasing Live's FY 2016 pre-tax income by a material 20%. ¶40.

Isaac also sought to create the appearance that Live had achieved a higher EPS, so that Live could tout this figure with the help of paid stock promotions to drive up Live's share price so Live Defendants could sell shares at artificially inflated prices before Live filed its 2016 Form 10-K, which would reveal that the true EPS was *40%* lower. Live hired a stock promoter on November 30, 2016, and paid the promoter $120,000 to promote Live in December 2016. ¶¶35-37. On December 23, 2016, Isaac emailed Live's board of directors, stating:

> I have decided to lock up all of my []² shares in LIVE …. ***This will make a good announcement no doubt.*** The other advantage this share exchange brings is a

reduced share count on the common shares.  We go from about 2.8m shares to about 2m shares outstanding.  *A lower outstanding share count will make our EPS look even better*[.] ¶41.

On December 27, 2016, after close of market, stock promoters touted Live's FY 2016 results. ¶44. On the morning of December 28, 2016, Isaac instructed Live's brokerage to sell up to 20,000 shares if the share price went "busurk [sic]", and Live issued a press release which stated, *"Live Ventures Announces Biggest Year in Company History Achieving Record Earnings of $8.92 Per Share".* ¶¶45-46, 48. Throughout the day on December 28, 2016, Isaac sold and attempted to sell over 10,000 shares of Live through Yunis' brokerage account. ¶¶48-49. On December 29, 2016, Live Defendants filed Live's 2016 Form 10-K, which reported an EPS of $6.33, and claimed that as a result of the Novalk Amendment, which was "effective September 15, 2016" Live recorded $915,000 in "other income." ¶¶53-54.

### C.    SeekingAlpha's Report Partially Reveals the Truth

On January 6, 2017, SeekingAlpha published a scathing report about Live, stating that the $8.92 EPS touted in Live's December 28, 2016 press release was "WRONG" and was calculated by improperly subtracting the 800,000 shares Isaac had agreed to lock up. ¶¶56-57. SeekingAlpha reported that Live's "Heavy Accounting Manipulation," allowed Live to claim a net profit for FY 2016, when in fact, Live "lost nearly $2 million." ¶57. SeekingAlpha reported that Live had a pattern of manipulating its share price, which consisted of a reverse split occurring, thus decreasing Live's outstanding shares, and at the same time, issuing a positive announcement about Live's business, and using paid stock promoters to tout the Company to artificially drive the share price up before it fell again when Live's business failed to produce results, noting the most recent example of this pattern had played out at year-end 2016. ¶57. On this news, Live's share price fell $2.62. or *12.7%,* to close at $18.05 on January 6, 2017. ¶58. Live Defendants then tried to cover up their deceptive year-end 2016 scheme by refuting SeekingAlpha's report and denying that they had ever paid stock promoters. ¶¶57, 60.

### D.    Defendants' Fraudulent Scheme Concerning the ApplianceSmart Transaction

At year-end 2017, Live was facing a major tax hit that would render its quarter unprofitable, and JOI was facing a large tax liability because it had sold real property at a gain during its FY 2017.

¶62. Defendants devised a plan to help both parties avoid these tax implications and create the false appearance that both had achieved successful financial results through legitimate business dealings. Live and JOI entered into a stock purchase agreement ("SPA"), whereby JOI sold the stock certificate of its wholly owned subsidiary, ApplianceSmart, free of liens and encumbrances, to Live for $6.5 million in cash, and the parties agreed to represent that the acquisition closed on December 30, 2017. ¶¶63-64. This allowed Live to create the false appearance that it had had a profitable quarter; Johnson selected a value for ApplianceSmart's assets of $10,237,486 to make it appear as if Live paid less than the asset's worth, then took the difference between ApplianceSmart's "value" and the $6.5 million purchase price, and recognized that $3,773,486 amount in Live's financial statements as other income due to a "bargain purchase gain". ¶68. But contrary to Defendants' representations, as of December 30, 2017, Live did not and could not take effective control of ApplianceSmart because ApplianceSmart was encumbered by a credit agreement under which MidCap had sole possession of ApplianceSmart's stock certificate. ¶65.

Under the SPA, Live was required to pay $6.5 million in cash to JOI by March 31, 2018, but Live was unable to come up with the financing and did not pay *any* portion of the purchase price by that time. ¶259. Accordingly, Johnson and Isaac came up with a plan to treat ApplianceSmart's revenues which had been paid to MidCap in 2018 as cash paid from Live to JOI under the SPA. ¶82. Live then misleadingly represented to investors that approximately $2.5 million had been timely paid by Live to JOI under the SPA. ¶84. Live Defendants further deceived Live's outside auditors about the ApplianceSmart acquisition. ¶¶72-74.

E.    **Live Restates Three Quarters of Financial Results, Revealing it had Materially Understated Debts and Overstated Net Cash Provided by Operations**

On February 14, 2018, after close of market, Live announced that on January 18, 2018, its Audit Committee, in consultation with management, concluded that the previously issued financial statements for the quarters ended December 31, 2016, March 31, 2017, and June 30, 2017 could no longer be relied upon due to material accounting errors, and on the same day, Live filed the restated Form 10-Qs for the aforementioned quarterly periods. ¶¶76-77. The restated financial statements revealed that Live had materially overstated its net cash provided by operations and had materially

understated Live's debts maturing in the next fiscal year. ¶¶77-78. On this news, Live's share price fell $2.44 per share, or *15.5%,* to close at $13.29 per share on February 15, 2018. ¶80.

### F.     The SEC Commences an Investigation

On August 14, 2018, Live disclosed that on February 21, 2018, the SEC had commenced an investigation into "among other things the restatement of the Company's financial statements for the quarterly periods ended December 31, 2016, March 31, 2017, and June 30, 2017 … and the change in auditors." ¶¶86-87. On this news, Live's share price dropped by $1.33 per share, or *11.7%,* to close at $10.02 on August 15, 2018. ¶88.

### G.     Live Defendants' Deceptive Scheme Concerning Isaac's Compensation

In total, for FY 2016-2018, Live paid Isaac $315,000 for purported living expenses, but disclosed only $162,000 for such expenses. ¶¶89-97. For example, in FY 2016, Live paid Isaac $120,000 for living expenses. ¶96. However, Live's 2016 Form 10-K and June 2, 2017 Proxy Statement stated that Isaac's FY 2016 compensation was comprised only of $200,000 in salary and $13,465 for an option award and stated that Live had "no written employment agreement" with Isaac. ¶¶90-91. Live's 2017 Form 10-K stated in contrast that Live had an employment agreement with Isaac, "effective January 1, 2013", pursuant to which Isaac had been compensated for his reasonable housing expenses, and Live's subsequent Class Period disclosures similarly represented that Isaac had been appropriately compensated in accordance with the terms of his employment agreement. ¶¶94-96.

### H.     The SEC Files an Enforcement Action Against Defendants

On August 3, 2021, the SEC announced that it had filed an enforcement action against Defendants in the U.S. District Court for the District of Nevada. ¶106. The SEC alleged 17 counts for violations of the federal securities laws against Defendants, including scheme liability in violation of §10(b) of the Exchange Act and Rules 10b-5(a) & (c), and material misstatement liability in violation of §10(b) of the Exchange Act and Rule 10b-5(b); the SEC's allegations are incorporated by reference into the SAC. ¶106 (Ex. A). On this news, Live's share price plummeted by $29.08 per share, or ***46%***, to close at $33.50 on August 4, 2021, on unusually heavy trading volume. ¶108. Live's share price continued to decline $7.74, or 23%, over the next four consecutive

trading sessions, to close at $25.76 per share on August 10, 2021. ¶108.

I.      **After the Class Period, the Risks of Defendants' Fraud Continue to Materialize**

In early October 2021, Johnson and Live agreed to "cease all of [their] employment-based relationships[,]" and Live's outside accountant resigned. ¶¶109-10. Defendants moved to dismiss the SEC's complaint under Rule 12(b)(6), asserting the same arguments as they raise herein, but the Honorable James C. Mahan denied Defendants' motions in their entirety, and held, *inter alia,* that the SEC's allegations (which are incorporated by reference herein) stated claims against Defendants for violations of §10(b) and Rules 10b-5(a)-(c). ¶¶111-15; *Sec. & Exch. Comm'n v. Live Ventures Inc.*, 2022 WL 17253784, at *4-6 (D. Nev. Nov. 28, 2022) (*"SEC v. Live"*).

On May 24, 2024, Judge Mahan entered a final judgment against JOI, which permanently restrained and enjoined JOI from violating §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and ordered JOI to pay civil penalties. ¶116. Pursuant to the final judgment, JOI agreed that it would not "take any action or make or permit to be made any public statement denying, directly or indirectly, any allegation in the complaint or creating the impression that the complaint is without factual basis" and would not "make or permit any public statement to the effect that Defendant does not admit the allegations" in the SEC's complaint. Dkt. No. 79 at 16.

III.    **APPLICABLE LEGAL STANDARDS DISFAVOR DEFENDANTS' MOTIONS**

Even in cases subject to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), when ruling on a Rule 12(b)(6) motion to dismiss, "courts must … accept all factual allegations in the complaint as true[,]" (*Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 322 (2007)), and "construe them in the light most favorable to the plaintiffs." *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1013 (9th Cir. 2005). Thus, a court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007).

IV.     **ARGUMENT: THE SAC ALLEGES EXCHANGE ACT VIOLATIONS**

Plaintiff has sufficiently alleged two claims under §10(b) of the Exchange Act: 1) scheme liability under Rules 10b-5(a) & (c) as to all Defendants, and 2) material misstatements under Rule 10b-5(b) as to the Live Defendants.

## A.   **PLAINTIFF STATES A SCHEME LIABILITY CLAIM**

To allege scheme liability under §10(b) of the Exchange Act and Rules 10b-5(a) & (c) promulgated thereunder, a plaintiff must allege: (1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) scienter, and (4) reliance. *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1192 (D. Or. 2015); 17 C.F.R. §240.10b-5(b). Scheme liability claims are ***not*** subject to the PSLRA's heightened pleading requirements. *Galena,* 117 F. Supp. 3d at 1193. Thus, "a plaintiff need not plead facts that reveal the scheme's particular mechanisms; rather, allegations of the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants are sufficient for alleging participation." *Borteanu v. Nikola Corp.,* 2023 WL 11017679, at *18 (D. Ariz. Dec. 8, 2023).

The SAC details Defendants' deceptive schemes in connection with (i) Live's FY 2016 results (¶¶31-60); (ii) the ApplianceSmart transaction (¶¶62-74), and (iii) Isaac's FY 2016-2018 compensation (¶¶89-97). Defendants solely challenge the SAC's scheme liability allegations as to the first scheme (Mot., 14-15) - and thus waive all other challenges to Plaintiff's scheme liability claim. *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 709 (9th Cir. 2021) (reversing district court dismissal of 10b-5(a) & (c) claims where "[defendant] had not targeted those claims in its motion to dismiss"); *In re Aqua Metals*, *Inc. Sec. Litig.,* 2019 WL 3817849, at *8 (N.D. Cal. Aug. 14, 2019) ("[d]efendants did not challenge the scheme liability claim in their opening brief, and for this reason alone the Court could deny their motion to dismiss this claim").

Defendants argue that the year-end 2016 scheme allegations fail because Plaintiff fails to allege material misrepresentations. However, "Rules 10b–5(a) and (c)…prohibit manipulative or deceptive *acts*, versus material misrepresentations or omissions." *Galena*, 117 F.Supp.3d at 1192-94. A deceptive "act is one that has the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme." *Burnett v. Rowzee*, 561 F. Supp. 2d 1120, 1125 (C.D. Cal. 2008). Thus, Defendants' challenges to Plaintiff's "deficient allegations of misrepresentations" are irrelevant to the scheme liability analysis (Mot., 14:12-25).

Further, the SAC details a compelling account of deceptive conduct. After the close of Live's FY 2016, and in the run-up to Live publicly reporting its FY 2016 results, Live Defendants sought

to, and did, artificially inflate Live's share price with the intent to profit from sales of Live's shares. Live Defendants engineered the Novalk Amendment to create the appearance that Live's FY 2016 pre-tax income was greater by 20%; paid stock promoters to tout Live's forthcoming FY 2016 results; Isaac locked up his shares of Live's common stock, for the stated purpose of increasing Live's EPS, which would "make a good announcement"; Live then made that "good announcement" in a press release which misleadingly touted Live's FY 2016 EPS as $8.92, when in fact, Live's EPS was 40% lower than that, and on the same day of the press release, Isaac instructed Live's brokerage to sell up to 40,000 shares of Live's shares and used Yunis' brokerage account to sell thousands more of Live's shares. Then, Defendants tried to cover up their deceptive scheme by denying they had ever paid stock promoters or tried to profit from Live's artificially inflated share price and by making misrepresentations to Live's auditors to obtain a clean audit opinion. Defendants' scheme created a false appearance of Live's financial condition (including EPS and income), the legitimacy of its contractual agreements and business, and "the appearance of [Live] [as] a viable investment". *Burnett,* 561 F. Supp. 2d at 1127-28.

Courts in the Ninth Circuit have held that allegations such as these – including the *same* allegations against the *same* defendants - state claims for scheme liability. *SEC v. Live*, 2022 WL 17253784, at *4 (allegations "that Isaac knew he did not negotiate the Novalk amendment until after the end of the fiscal year, but intentionally backdated it, and that false assertion was repeated to accountants and in a press release" stated a claim for scheme liability); *Galena*, 117 F.Supp.3d at 1193-94 (allegations that defendants engaged in a scheme to manipulate company's stock price, which included hiring authors to public promotional materials, "the planning and execution of well-timed social media posts", and the "attempted cover-up" of the relationship between defendants and its investor relations firms stated a claim for scheme liability).[3] Defendants' reliance on *In re*

---

[3] *In re McKesson HBOC, Inc. Sec. Litig.,* 126 F. Supp. 2d 1248, 1255-56, 1274 (N.D. Cal. 2000) ("the complaint adequately alleges the existence of a fraudulent scheme to inflate revenue", which included "encourag[ing] salespeople to backdate contracts by up to a week so as to include the sale in a quarter that had just ended."); *Sec. & Exch. Comm'n v. Sripetch,* 2024 WL 5126277, at *8 (S.D. Cal. Dec. 16, 2024) (deceptive course of conduct included funding promotional emails promoting company's stock without disclosing individual defendants' intent to pump and dump company's stock and timing issuance of company (footnote continued)

*Galectin Therapeutics, Inc. Sec. Litig.,* 843 F.3d 1257, 1271 (11th Cir. 2016) (Mot., 15) is misplaced, as *Galectin* is an Eleventh Circuit case.

Defendants' failure to challenge the remaining scheme claims is sufficient to sustain the claims, but Plaintiff has also sufficiently alleged those claims. At year-end 2017, Defendants engineered a transaction to create a false appearance of Live and JOI's financial results, and which allowed both to avoid negative tax consequences. Live purported to purchase ApplianceSmart, a subsidiary of JOI, and Defendants created the false appearance that the acquisition closed on December 30, 2017. But ApplianceSmart was encumbered and Live could not take effective control of ApplianceSmart or any of its assets as of December 30, 2017. When Live could not come up with the money to pay for ApplianceSmart, Defendants created the false appearance that Live had paid a portion of the purchase price by treating the consideration ApplianceSmart paid to its lender as part of the purchase price that Live had paid to JOI. *SEC v. Live,* 2022 WL 17253784, at *5-6. Finally, the SAC alleges that Live paid Isaac $315,000 for housing expenses from FY 2016-2018, but reported only $162,000 of that amount as Isaac's compensation, and then misrepresented the terms and existence of Isaac's employment agreement and that these were acts performed to create the false appearance that Live had fully disclosed Isaac's compensation; these allegations state a scheme liability claim.

### B.    PLAINTIFF ALLEGES MATERIALLY MISLEADING STATEMENTS

To state a claim under §10(b) of the Exchange Act and Rule 10b-5(b), a plaintiff must allege: (1) a material misrepresentation or omission (*i.e.*, "falsity"); (2) scienter; (3) the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Matrixx Initiatives, Inc. v. Siracusano,* 563 U.S. 27, 37-38 (2011); 17 C.F.R. §240.10b-5(b). Defendants challenge only falsity and scienter. As to these and all required elements, the SAC is sufficient.

To allege falsity, a plaintiff need only allege facts giving rise to a "reasonable inference" that the challenged statement was materially false or misleading. *In re Atossa Genetics Inc. Sec. Litig.*,

---

press releases to coincide with promotional emails).

868 F.3d 784, 797 (9th Cir. 2017). "Materiality is established when there is a substantial likelihood that disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered 'the total mix' of information made available." *Rabkin v. Lion Biotechnologies, Inc.,* 2018 WL 905862, at *8 (N.D. Cal. Feb. 15, 2018). However, "[b]oth the materiality and misleading nature of a misstatement or omission are usually questions for the trier of fact." *SEC v. Mozilo*, 2009 WL 3807124, at *9 (C.D. Cal. Nov. 3, 2009). Thus, a complaint cannot be dismissed on materiality grounds unless, as a matter of law, a misstatement or omission was "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance." *Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 967 (N.D. Cal. 2014).

### 1.    Statements About Live's FY 2016 Financial Results

Live Defendants' representations about Live's EPS (¶¶153, 159) and the Novalk Amendment (¶¶155-56) are actionable because they "affirmatively created an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *In re Intuitive Surgical Sec. Litig.,* 65 F. Supp. 3d 821, 832-33 (N.D. Cal. 2014).

Defendants argue that their disclosure of "the facts surrounding the outstanding share counts precludes liability" for their statements concerning Live's EPS. Mot., 13. Defendants are wrong. "[O]nce defendants [choose] to tout positive information to the market, they [are] bound to do so in a manner that wouldn't mislead investors, *including disclosing adverse information that cuts against the positive information*." *Khoja*, 899 F.3d at 1009. Live's statement at ¶153 was made in a press release stating Live "announces today financial results from its fiscal year-end 2016", which stated that Live had reported the "most successful year in the Company's history" with "earnings per share (EPS) of $8.92." However, Live's FY 2016 EPS was *40%* less than the EPS claimed in Live's press release, at $6.33. ¶154. Defendants do not dispute that Live's FY 2016 EPS was $6.33 and instead, argue that the press release was not misleading because it disclosed that Live's EPS was $8.92 "as of the date of the press release", which was "after the close of the 2016 fiscal year." Mot., 13. But *nowhere* in Live's press release were such disclosures made.

Further, contrary to Defendants' assertions, the disclosure that Isaac locked up 800,000 shares, thus reducing the outstanding share count to 2 million, does not "preclude[] liability." Mot.,

13. "[A] statement, though literally accurate, may possess by virtue of the context or manner of its presentation, the ability to mislead investors." *In re Iso Ray, Inc. Sec. Litig.,* 189 F. Supp. 3d 1057, 1067 (E.D. Wash. 2016); *U.S. v. Laurienti*, 611 F.3d 530, 539 (9th Cir. 2010) ("Rule 10b–5 … prohibits the telling of material half-truths, where the speaker omit[s] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."). Defendants' statements were actionable because they did *not* disclose that Isaac locked up his shares for the express purpose of increasing Live's EPS by 40%, touting the increased EPS to drive up Live's share price, and then profiting from sales of Live's shares at artificially inflated prices before Live revealed in its 2016 Form 10-K what its actual EPS was. For these same reasons, the statement at ¶159 was materially misleading.[4]

Defendants argue that statements about the Novalk Amendment are not actionable because an interpretation of GAAP does not establish falsity. While Live's recognition of $915,500 in other income violated GAAP ASC 855-10-25, Live's representations were misleading regardless of GAAP. Live represented to investors that the Novalk Amendment was effectuated during FY 2016, but simply had not been "*memorialized"* until after FY 2016, thus Live could recognize the transaction in its FY 2016 results. By choosing to speak on the topic of the Novalk Amendment, Live was "bound to do so in a manner that wouldn't mislead investors, including by disclosing" that Isaac did not even start discussing a possible amendment with Yunis until after FY 2016, and that the purpose and selection of the "effective date" was to inflate Live's pre-tax income by *20%* in its FY 2016 results. No such disclosures were made. *Khoja*, 899 F.3d at 1009; *SEC v. Live*, 2022 WL 17253784, at *4 (allegation that "Isaac knew he did not negotiate the Novalk amendment until after the end of the fiscal year, but intentionally backdated it, and that false assertion was repeated to [investors]" stated material misrepresentation claim).

Live Defendants' statements created a misleadingly positive impression about Live's

---

[4] Defendants state that another putative shareholder class action asserting claims based on Live's statements about EPS was dismissed during the pleadings stage. Mot., 5 n.4. While that action, *Kolish v. Live Ventures Inc.,* No. 2:17-cv-01258-RFB-GWF (D. Nev. Nov. 20, 2017), was dismissed at the pleading stage, significantly, the court did not make any decisions as to the sufficiency of the allegations – the matter was dismissed *voluntarily* by the parties before the court made any such determination.

financial condition, profitability, and prospects, which differed materially from Live's actual state of affairs. There is a substantial likelihood that a reasonable investor would have found that the undisclosed information altered the total mix of information available to them – indeed, "the materiality of information relating to financial condition, solvency and profitability is not subject to serious challenge." *U.S. v. Reyes*, 660 F.3d 454, 469 (9th Cir. 2011); *Galena,* 117 F. Supp. 3d at 1189 ("[t]here is a substantial likelihood that a reasonable investor would have found the fact that [Live] did not disclose that the Company and its officers were engaging in fraud or market manipulation to have significantly altered the 'total mix' of information.").

### 2.    Statements About Stock Promotions

Live Defendants do not, and cannot, dispute that their denials of engaging in paid stock promotions, and representations that if they had "truly engaged" in promotional activity, they would have sold shares at ¶¶158-59 were false. Live paid stock promoters to tout Live's purported financial results and growth in December 2016 (¶¶35-37), and Isaac sold and attempted to sell shares after using those paid stock promotions to artificially pump Live's share price (¶¶48-50). Instead, Defendants argue that because it is not illegal to pay stock promoters or sell shares, their statements are immaterial. Mot., 14:19-15:14. But under the federal securities laws, once a defendant chooses to speak on a topic, it has an affirmative duty to tell the whole truth about that topic, regardless of whether illegal conduct is involved. *In re Acadia Pharms. Inc. Sec. Litig.*, 2020 WL 2838686, at *7 (S.D. Cal. June 1, 2020) (defendant had no duty to accuse itself of wrongdoing, but where defendant spoke about its commercialization strategy, defendant had a duty to disclose that its strategy included giving kickbacks to physicians).[5] Further, "[t]here is a substantial likelihood that a reasonable investor would have found the fact that [Live] did not disclose that the Company and its officers were engaging in fraud or market manipulation to have significantly altered the 'total mix' of information." *Galena,* 117 F. Supp. 3d at 1189. To the extent there is any question about whether

---

[5] *In re Apollo Grp., Inc. Sec. Litig.,* 395 F. Supp. 2d 906, 920 (D. Ariz. 2005) ("even if Defendants were correct in their assertion that they had no duty to disclose the [department of education report], the Court finds that at the point Defendants chose to speak about the [department of education investigation], they had a duty to speak fully and truthfully [which would include disclosure of the report].").

a reasonable investor would have found the undisclosed information material, such questions are premature and inappropriately decided on a motion to dismiss. *SEC v. Live,* 2022 WL 17253784, at *5 (materiality of Live Defendants' misrepresentations was "a question of fact inappropriate for a motion to dismiss."); *Mozilo*, 2009 WL 3807124, at *9.

### 3.    Statements About the ApplianceSmart Transaction

The SAC alleges that the stock purchase agreement "between J[OI] and L[ive] did not contain a provision that transferred control of [ApplianceSmart] as of December 3[0], 2017, the end of the disputed quarter. Assuming that allegation is true, all of the alleged parties either knew or were recklessly ignorant of the fact that L[ive] did not control ApplianceSmart at the end of the quarter and thus any document reporting otherwise was false." *SEC v. Live,* 2022 WL 17253784, at *5 (holding that Defendants' statements about the ApplianceSmart transaction were materially misleading under §10(b)). Nonetheless, Defendants argue that they "fully disclosed all the circumstances surrounding the ApplianceSmart transaction" and thus are not liable for the alleged misstatements at ¶¶161-64. Mot., 15-16. At the very best, Defendants raise questions of fact "inappropriate for a motion to dismiss." *SEC v. Live,* 2022 WL 17253784, at *5.

Contrary to Defendants' assertions, attaching a copy of a contractual agreement to an SEC filing does not defeat "allegations that a company failed to disclose material facts relating to a contractual agreement[.]" *Nguyen v. Radient Pharms. Corp.,* 2011 WL 5041959, at *6-7 (C.D. Cal. Oct. 20, 2011) (defendant failed to show that the public disclosure of an agreement sufficiently informed investors of all material information about the agreement). Unlike *In re Merrill Lynch Auction Rate Sec. Litig.*, 704 F. Supp. 2d 378, 392 (S.D.N.Y. 2010), which Defendants rely upon (Mot., 16), neither the SPA nor any of Defendants' other statements disclosed that Defendants engineered the ApplianceSmart transaction so that Live and JOI could avoid negative tax implications, and so Live could report a profitable quarter instead of an unprofitable quarter, nor did they disclose that the acquisition had not, and could not, close on December 30, 2017. *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.,* 416 F.3d 940, 945 (9th Cir. 2005) (statement that "fund raising has been completed" was materially misleading where only partial payment had been made and additional payments were conditional).

Moreover, statements must be examined in context and in their entirety. Where Defendants' statements were accompanied by representations such as that they expected Live's revenues to increase by "42 percent … as a result of this acquisition" (¶66), Defendants created the materially misleading impression that the acquisition was a legitimate business venture, not a transaction engineered for the purpose of avoiding tax obligations. *Batwin v. Occam Networks, Inc.,* 2008 WL 2676364, at *5 (C.D. Cal. July 1, 2008) (statements were false and misleading because "they conveyed the false impression that [defendant]'s revenues derived from legitimate business operations, rather than from [its] improper recognition practices.").

Further, Defendants do not dispute that the statements at ¶¶167 and 169, which represented that Live had paid a portion of the ApplianceSmart purchase price by March 31, 2018, were false. Indeed, contrary to Defendants' statements, as of March 31, 2018, Live had not paid *any portion* of the purchase price because Live had not been able to come up with the money. The information omitted would certainly have altered the "total mix" of information available to a reasonable investor.

### 4.        Statements About Isaac's Compensation

Live Defendants materially understated Isaac's FY 2016-2018 compensation and misrepresented not just the terms, but the existence of Isaac's employment agreement. For FY 2016-2018, Live paid Isaac a total of $315,000 in housing reimbursements, but represented to investors that Isaac had been paid ***94%*** less than that in such reimbursements, or $162,000. Defendants concede at Mot., 17:6-8 that "L[ive] failed to disclose at least $54,000 for a housing reimbursement for Isaac in its 2016 Form 10-K[,]" and accordingly "L[ive] cannot claim it disclosed *all* of Isaac's compensation …. Whether the compensation is actual or accrued is irrelevant; L[ive] had a duty to disclose all compensation, which [Plaintiff] alleges it did not." *SEC v. Live*, 2022 WL 17253784, at *5 (emphasis in original) (noting that Rule 14a-3 requires disclosure of "all" compensation).

Defendants argue that they had no duty to disclose all of Isaac's compensation because the undisclosed amount was immaterial compared to Live's net income. Mot., 17. "But the test for materiality is factual … and Defendants fail to provide undisputed evidence that a reasonable investor would consider [the amount of undisclosed compensation] irrelevant[.]" *Smilovits v. First*

*Solar Inc.,* 119 F. Supp. 3d 978, 1002 (D. Ariz. 2015) (rejecting argument that undisclosed product defect was immaterial because it financially impacted less than 1% of company's net income); *Sec. & Exch. Comm'n v. Premier Holding Corp.*, 2020 WL 8099514, at *8 (C.D. Cal. Nov. 30, 2020) (failure to disclose reimbursements for personal expenses as compensation rendered statements about defendant's compensation materially false and misleading).

Defendants also assert that Live accurately disclosed the terms of Isaac's compensation under "Isaac's employment agreement" which "had been entered into in February 2013[.]" Mot., 17. Defendants thus effectively admit that Live's 2016 Form 10-K falsely represented that Live "ha[s] no written employment agreement with … Jon Isaac." *Premier,* 2020 WL 8099514, at *8 (representations that company had no employment agreement with defendant despite the existence of such an agreement were materially false and misleading).

**5.    Live's Restated Financial Statements Were Materially False And Misleading**

Previously issued financial statements are "restated only to correct material accounting errors that existed at the time the statements were originally issued …. [T]he mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made." *Sudunagunta v. NantKwest, Inc.*, 2017 WL 8810760, at *9 (C.D. Cal. Sept. 20, 2017). During the Class Period, Live Defendants restated Live's financial results for five quarterly periods. ¶¶75-76, 104. The SAC thus sufficiently alleges that Live's restated quarterly financial statements were materially false and misleading when made. *Sudunagunta*, 2017 WL 8810760, at *9.

**6.    Live Defendants Violated Their Disclosure Duties Under Reg. S-K**

Live Defendants do not dispute that they violated Items 303 and 105 of SEC Reg. S-K and have thus waived any challenge thereto.[6] Item 303 requires the disclosure of "any known trends of uncertainties that have or that [it] reasonably expects will have a material favorable or unfavorable impact on [its business]." 17 C.F.R. §229.303(b)(2)(ii). Live's practice of artificially inflating Live's financial results and share price, through undisclosed sham transactions, paid stock promotions,

---

[6] *West v. State Farm Mut. Auto. Ins. Co.*, 489 F. App'x 153, 154 (9th Cir. 2012) ("[i]ssues not raised in the opening brief usually are deemed waived.").

GAAP violations, and misrepresentations to Live's investors and/or auditors about the same, constituted trends or uncertainties that they were obligated to, and did not, disclose. *Pirani v. Slack Techs., Inc.*, 445 F. Supp. 3d 367, 386 (N.D. Cal. 2020). Live Defendants also violated Item 105, which requires an issuer to disclose "the most significant factors that make [an investment] speculative or risky." 17 C.F.R. §229.105. Live's boilerplate risk disclosures at ¶¶128-29 were insufficient under Item 105 because they failed to warn of the "specific risks" of the factors they purported to warn about. *Mingbo Cai v. Switch, Inc.*, 2019 WL 3065591, at *6 (D. Nev. July 12, 2019) ("boilerplate risk factors" that did not indicate "the specific risks arising from Switch's new sales strategy" violated Item 105).

Further, Live's warnings of *hypothetical* risks of Isaac's concentrated ownership of Live's shares (¶129) was themselves materially misleading because such risks had *already* materialized, where Isaac had locked up his shares to manipulate Live's share price for personal gain. *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."). Live's warning that the trading price of Live's common stock was highly volatile due to factors, "beyond our control" (¶128) was materially misleading because it "did not disclose that Defendant[s] had been manipulating the stock price with the help of the stock promoter." *Ansell v. Laikin*, 2011 WL 3274019, at *4 (C.D. Cal. Aug. 1, 2011).

### C.    PLAINTIFF ALLEGES SCIENTER

"Scienter can be established by direct or circumstantial evidence" that defendants "intentionally or with deliberate recklessness made false or misleading statements." *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1018, 1022 (S.D. Cal. 2005). "[T]he objective unreasonableness of a defendant's conduct may give rise to an inference of scienter." *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1024 (N.D. Cal. 2020). The scienter inference "need not be irrefutable, i.e., of the smoking-gun genre, or even the most plausible of competing inferences." *Tellabs*, 551 U.S. at 324. To determine scienter, a court "must ask: When the allegations are ***taken as true and taken collectively,*** would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Mulderrig*, 492 F. Supp. 3d at 1024. Defendants' attacks on

scienter are limited to the following categories of allegations, each of which Defendants argue, standing alone, does not show scienter: 1) accounting violations; 2) restatements; 3) motive, and; 4) the Individual Defendants' high-ranking positions. Mot., 18. However, "the [C]ourt's job is not to scrutinize each allegation in isolation but to assess **all** the allegations holistically." *Tellabs,* 551 U.S. at 310. Together, the SAC's allegations support an inference of Defendants' scienter that is at least as cogent and compelling as any non-culpable inference.

### 1. Plaintiff Alleges Strong Circumstantial Evidence that Defendants Knew or Had Access to Information that Contradicted Their Public Statements

"Circumstantial evidence can support an inference of scienter" where defendants "knew facts or had access to information suggesting that their public statements were not accurate." *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015). Circumstantial evidence supporting scienter may be alleged by "a combination of facts, none of which need to be from confidential witnesses, internal reports, or other specific sources." *Ohio Pub. Emps.' Ret. Sys. v. Meta Platforms, Inc.,* 2024 WL 4353049, *15 (N.D. Cal. Sept. 30, 2024). The SAC, which refers to and incorporates by reference the allegations in the SEC's enforcement action, provides strong circumstantial evidence of Defendants' scienter. *Ansell*, 2011 WL 3274019, at *3 (SEC complaint against defendant, which private plaintiff incorporated by reference into his complaint, sufficiently alleged defendant's violations of §10(b) and Rules 10b-5(a), (b) & (c)).

With respect to the Novalk Amendment, Isaac did not even start discussions with Yunis about the amendment until two months after the close of Live's FY 2016 when Isaac emailed Yunis and asked for his thoughts about canceling the deal. ¶35. Further, though Isaac informed Johnson that Yunis had agreed to change the consideration from $1.5 million in cash to 350,000 shares priced as of the "9/30 closing date", ultimately, Isaac and Johnson decided "the effective date is Sept 15th …. Deal valued at 350,000 shares @1.67 Closing price on 9/15/2016". ¶39. Changing the purported "effective date" from September 30 (when Live's share price was $1.91) to September 15, 2016 created the appearance of an even larger "discount" and would have the effect of increasing Live's FY 2016 pre-tax income by 20%. Then, Isaac provided false and misleading information about the Novalk Amendment to Live's outside accountants in order to obtain a clean audit opinion. ¶238.

Isaac and Johnson thus had access to information suggesting that Live's public statements about the Novalk Amendment were misleading because they engineered the terms of the amendment. *SEC v. Live,* 2022 WL 17253784, at *4 ("Isaac knew he did not negotiate the Novalk amendment until after the end of the fiscal year, but intentionally backdated it"). Further, as to Live's FY 2016 EPS, Isaac stated in an email to Live's board on December 23, 2016, that he had decided to lock up his shares because "[t]his will make a good announcement no doubt. The other advantage this share exchange brings is a reduced share count …. ***A lower outstanding share count will make our EPS look even better***." ¶41. Thus, Isaac knew facts that suggested Live's December 28, 2016 press release which represented Live's EPS as $8.92 were inaccurate.

Moreover, given that Live hired a stock promoter named ProTrader on November 30, 2016, and then paid ProTrader $120,000 in two installments in December 2016, Defendants cannot seriously dispute that they did not have access to information that suggested their denials of ever having paid stock promoters were inaccurate.

As to the ApplianceSmart transaction, it is significant that Johnson was the CFO of both Live *and* JOI and that Jon Isaac's father, Tony Isaac, was at all relevant times JOI's CEO and also a member of Live's board of directors and that Jon Isaac was a beneficial owner of both Live and JOI's outstanding stock. When Live could not come up with any of the purchase price by March 31, 2018, Johnson came up with a plan to treat the revenues paid by ApplianceSmart to MidCap as payment by Live to JOI – Isaac agreed with the plan and told Johnson that Live should issue an announcement that it had "paid $2.5m in cash" as part of the purchase price. ¶¶81-83. *SEC v. Live,* 2022 WL 17253784, at *5-6 ("allegation that the [SPA] between JanOne and L[ive] did not contain a provision that transferred control of the acquiree as of December 3[0], 2017, the end of the disputed quarter" showed that Defendants "either knew or were recklessly ignorant of the fact that L[ive] did not control ApplianceSmart at the end of the quarter"). That Live's outside accountants repeatedly questioned the acquisition date of ApplianceSmart, with Johnson finally admitting in an email to Live's outside accountants that MidCap had sole possession of ApplianceSmart's stock certificate up until March 22, 2018, further demonstrates scienter. ¶85.

**2.    The SEC's Investigation and Enforcement Action Support Scienter**

Government investigations contribute to the "circumstances that add up to a strong inference of scienter." *In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 820 (N.D. Ill. 2017) (SEC and DOJ investigations supported scienter). That the SEC conducted a nearly four-year investigation of Defendants for the conduct that forms the basis of Plaintiff's allegations bolsters the inference of scienter. *In re Toyota Motor Corp. Sec. Litig.*, 2012 WL 3791716, at *6 (C.D. Cal. Mar. 12, 2012) (National Highway Safety Traffic Safety Administration investigation during the class period supported scienter); *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp.3d 1029, 1043 (N.D. Cal. 2016) ("SEC's ongoing investigation" was "part of a broader picture from which a court may, at the initial pleading stage, infer a compelling claim of scienter."). That the SEC then brought a civil enforcement action against Defendants based on its investigation, which laid bare Defendants' fraudulent schemes and material misrepresentations, further supports scienter. *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 974 (N.D. Cal. 2009) (among "the most relevant allegations" supporting scienter was that "[i]n an independent investigation, the SEC concluded that" defendants had, *inter alia,* been on notice "of significant internal control weaknesses …. [yet] failed to implement and maintain adequate internal controls and falsely certified that [defendant]'s financial statements and books and records were accurate.").

**3.    The SAC's Motive Allegations Support Scienter**

While not required to allege scienter, "at the pleading stage," "motive and opportunity" may "be considered as circumstantial evidence" of scienter. *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000).

Live had taken on a tremendous amount of debt right before the start of the Class Period—between September and December of 2016, Live's debts increased from about $15.9 million to $75 million, including a $30 million loan from Capitala Private Credit Fund V, L.P. ("Capitala"). ¶¶204-09. Live was not in compliance with the terms of the Capitala loan as of December 31, 2017. ¶209. Live Defendants' motive to conceal the truth was not based on a generic desire of every company to raise capital —they were struggling to keep Live afloat. *Flynn v. Sientra, Inc.*, 2016 WL 3360676, at *15 (C.D. Cal. June 9, 2016) (that defendants "were motivated to conceal the contamination at

the Silimed plant from investors so that they could raise enough money in the SPO to keep Sientra afloat and prevent a default on its loan" supported scienter).[7] Similarly, with respect to the ApplianceSmart transaction, Live Defendants were motivated to turn what had been an unprofitable quarter into a profitable quarter and JOI was motivated to negate the impact on its financial statements of buying real property at a gain.

Live Defendants were motivated to make false statements about the Novalk Amendment to create the appearance that Live's FY 2016 pre-tax income was 20% greater, and were motivated to issue a misleading press release which created the appearance that Live's FY 2016 EPS was 40% greater to artificially inflate Live's share price and profit from sales of Live's shares. Indeed, Isaac stated that his intent in locking up his shares was because this would "make a good announcement", and "make our EPS look even better." ¶41. Upon the issuance of the press release, Isaac attempted to, and did, sell shares. ¶48. Had all the attempted transactions occurred, Live Defendants would have realized gross profits of over $1.1 million. ¶50. Live Defendants offer no "innocent explanations" as to why their "trading-related conduct [was] economically rational." *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1187 (C.D. Cal. 2008). At minimum, any "innocent explanations" of Live Defendants' attempts to sell Live's shares in the wake of issuing the false December 28, 2016 press release are "at least as cogent and compelling as inferences that encourage a scienter finding[.]" *Id.*

### 4.    Defendants' Accounting Violations and Restatements Support Scienter

Accounting violations "that have a significant impact on core business operations can lead to a strong[] inference" of scienter. *Magnachip*, 167 F. Supp.3d at 1042 (GAAP violations that impacted income and profits supported scienter); *Batwin*, 2008 WL 2676364, at *17 ("allegations of [GAAP] violations, coupled with allegations that significant red flags were ignored, can suffice

[7] *In re Portal Software, Inc. Sec. Litig.*, 2005 WL 1910923, at *12 (N.D. Cal. Aug. 10, 2005) ("plaintiffs' contention that defendants were motivated to inflate artificially Portal's stock price in the short term in order … and obtain much-needed capital does allege facts of a palpable motive for fraud" that was "stronger than the generic desire to raise capital which can be attributed to every company; *In re Am. Apparel, Inc. S'holder Litig.*, 2013 WL 10914316, at *30 (C.D. Cal. Aug. 8, 2013) ("The fact that [defendant] was in a period of turmoil … and may have needed outside capital is strong evidence that the company acted with fraudulent intent[.]").

to withstand a motion to dismiss."). Defendants' GAAP violations had the material impact of increasing Live's FY 2016 pre-tax income by 20%, and turning Live's quarter ended December 31, 2017 from an unprofitable quarter to a profitable quarter, and allowed JOI to avoid the impact of buying real property at a gain in FY 2017. ¶¶249-60; *Mulderrig*, 492 F.Supp.3d at 1014, 1025-26 (GAAP violations which allowed defendant to report quarterly revenue growth as 19% when revenue had declined supported scienter); *Baron v. Hyrecar Inc.,* 2022 WL 17413562, at *10-11 (C.D. Cal. Dec. 5, 2022) (holding allegations that GAAP violations rendered defendant's statements materially misleading, and rejecting defendant's arguments about GAAP interpretations and auditor's opinion as raising premature factual questions).[8]

Live's restated financial results also support scienter. *Commtouch Software Ltd. Sec. Litig.,* 2002 WL 31417998, at *9 (N.D. Cal. July 24, 2002 ("size and character of the restatement" supported scienter where defendant overstated revenue by over 20%). Live's restated financial results for Q1, Q2 and Q3 2017 revealed that Live Defendants materially understated debts maturing in the next fiscal year by 229% to 297% each quarter and materially overstated net cash provided by operations by $1.8 million per quarter, or by 21% to 36%. ¶¶211-13. The restated statements did not reveal "minor accounting errors. To the contrary, they dramatically affected [Live's] financial results, and in ways that a typical corporate executive should have noticed them." *Magnachip*, 167 F.Supp.3d at 1042; *Batwin*, 2008 WL 267364, at *6 (understating net loss by 9% supported scienter). Live also restated financial statements for the quarters ended December 31, 2019 and March 31, 2020. ¶215. That Live's accounting violations impacted its financial results at different points over the course of at least four fiscal years further supports scienter. *Magnachip,* 167 F.Supp.3d at 1042 (accounting errors that are "pervasive over a long period of time" support scienter).

Defendants argue that scienter is negated because "Live's outside auditors also reviewed the accounting treatment selected by Defendants and raised no concerns" Mot., 21. However, Live

---

[8] Further supporting scienter is that Johnson, who served as Live's and JOI's CFO, and helped engineer the Novalk Amendment and ApplianceSmart transaction, was at all relevant times a certified public accountant. *Richard v. Nw. Pipe Co.*, 2011 WL 3813073, at *4 (W.D. Wash. Aug. 26, 2011) ("defendants, who were both CPAs and had extensive accounting experience, should have known of the falsity of their statements.").

Defendants misrepresented the circumstances of the Novalk Amendment and ApplianceSmart transaction to Live's auditors, and Johnson even admitted to Live's auditor after repeated questioning, that ApplianceSmart's stock certificate had been in the sole possession of MidCap until March 22, 2018 (¶¶238, 240-47) – these allegations *support* scienter. *Am. Apparel*, 2013 WL 10914316, at *29 (allegations that defendant withheld financial information from auditor supported inference that auditor's "going concern analysis was incomplete and misleading."). Further, a clean audit opinion alone cannot negate scienter. *In re Ramp Networks, Inc. Sec.*, 201 F. Supp. 2d 1051, 1074 n.6 (N.D. Cal. 2002).

### 5.     Live Lacked Effective Internal Controls

Live Defendants admitted that Live lacked adequate internal control over its financial reporting for the entire Class Period. ¶¶223-33.[9] Due to Live Defendants' undisputed awareness of Live's ineffective internal controls, the inference of scienter as to statements about the Novalk Amendment, the ApplianceSmart transaction, and Live's financial statements for the five restated quarters, "is at least as compelling as inferring that [they] were simply unaware of [Live]'s practices when the statements were made[.]" *In re New Century*, 588 F. Supp. 2d 1206, 1230 (C.D. Cal. 2008) (defendant's "prior knowledge of problems with internal controls" supported scienter); *Stocke v. Shuffle Master, Inc.*, 615 F. Supp. 2d 1180, 1191 (D. Nev. 2009) (defendant's acknowledgment that "internal control deficiencies still existed, and among other things, that [defendant] lacked adequate resources in their accounting and finance departments" supported scienter).

### 6.     Live Cycled Through Four Auditors During the Class Period

"Courts have held the ending of a relationship between a company and its auditor, whether through termination by the company or resignation by the auditor, under similar circumstances, can support an inference of scienter." *Fryman v. Atlas Fin. Holdings, Inc.*, 2022 WL 11365777, at *27 (N.D. Ill. Apr. 18, 2022). During the Class Period, Live dismissed one auditor and three auditors resigned. ¶¶234-47. Notably, Live's fourth Class Period auditor, SingerLewak, repeatedly

---

[9] The sole instance during the Class Period that Live Defiants claimed Live had effective internal controls was later admitted by Live to be a "typographical error". ¶230.

questioned Live Defendants about the ApplianceSmart transaction (¶¶242, 244, 246), and Johnson ultimately admitted to SingerLewak that MidCap had sole possession of ApplianceSmart's stock certificate until March 22, 2018. ¶247. Subsequently, SingerLewak, which did not audit or provide an opinion on any of the Company's financial statements, resigned. ¶242. The multitude and timing of the changes in Live's Class Period auditors supports an inference that is at least as compelling as any non-culpable inference that rather than correct Live's accounting violations or make appropriate disclosures, Live kept its improper practices in place, prompting the dismissal and resignations of its auditors. *Batwin*, 2008 WL 2676364, at *13 (allegation that defendants terminated independent auditor and kept improper accounting practices in place supported scienter).

### D.    PLAINTIFF ALLEGES A VIOLATION OF §20(a)

"Section 20(a) provides derivative liability for those who control others found to be primarily liable under the [Exchange] Act." *Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1205 (N.D. Cal. 2012). Defendants argue that Plaintiff fails to a §20(a) violation because Plaintiff fails to plead an underlying primary violation (Mot., 22). As described above, Plaintiff has sufficiently alleged a predicate violation of §10(b) of the Exchange Act and thus has sufficiently alleged a violation of §20(a).

### V.    CONCLUSION

For the foregoing reasons, Defendants' motions should be denied in their entirety. In the alternative, should the Court grant any portion of Defendants' motions, Plaintiff respectfully requests leave to amend, as amendment would not be futile. *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052-53 (9th Cir. 2003) (noting leave to amend should be granted with particular liberality in PSLRA cases).

Respectfully submitted,

Dated: February 18, 2025                GLANCY PRONGAY & MURRAY LLP


By:   /s/ Natalie S. Pang
Robert V. Prongay
Natalie S. Pang (admitted *pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Tel. (310) 201-9150
Email: rprongay@glancylaw.com
        npang@glancylaw.com

*Attorneys for Lead Plaintiff*

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On February 18, 2025, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the District of Neveda, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on February 18, 2025, at Los Angeles, California.

/s/ Natalie S. Pang
Natalia S. Pang

1002691.2

Case No. 2:21-cv-01517-CDS-EJY