MARK E. FERRARIO
Nevada Bar No. 1625
JASON K. HICKS
Nevada Bar No. 13149
JERRELL L. BERRIOS
Nevada Bar No. 15504
**GREENBERG TRAURIG, LLP**
10845 Griffith Peak Drive, Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002
Email: ferrariom@gtlaw.com
       jason.hicks@gtlaw.com
       berriosj@gtlaw.com

*Attorneys for Defendants Live Ventures Incorporated,*
*Jon Isaac, and Virland A. Johnson*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| DANIEL E. SIEGGREEN, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>LIVE VENTURES INCORPORATED, JON ISAAC, and VIRLAND A. JOHNSON,<br><br>Defendants. | Case No.: 2:21-cv-01517-CDS-EJY<br><br><br>**REPLY IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT (ECF NO. 80)** |

The Live Defendants[1] submit their Reply in Support of Their Motion to Dismiss SAC filed by Sieggreen. This reply is based on the following memorandum of points and authorities, the papers on file, and any oral argument the Court may permit.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

The Court should dismiss the SAC because Sieggreen's opposition recycles the same arguments—arguments this Court already rejected—from the last motion to dismiss briefing. At

---

[1] Capitalized but undefined terms have the same meaning assigned to them in the motion.

Page **1** of **13**

their core, Sieggreen's claims have turned on, and continue to turn on, statements made in transparent, robust financial disclosures and press releases. These documents prove that the Live Defendants never made material misrepresentations. Sieggreen also pleaded insufficient facts to plead scienter. The SAC and Sieggreen's opposition cement that amendment is futile, as Sieggreen's claims do not suffer from a lack of detail. They are incurably defective because public documents belie their premise. The Court should thus dismiss Sieggreen's claims with prejudice.

## II. ANALYSIS

### A. The scheme liability claim depends on the same alleged misrepresentations that the Live Defendants contest.

As he did in the last briefing, Sieggreen again argues (while relying on the same citations) that the Live Defendants waived any argument about the insufficiency of his scheme liability claim because the Live Defendants argued that there are insufficient facts showing misrepresentations or omissions. *Compare* ECF No. 48, pp. 8:27 – 9:5 *and* pp. 15:17 – 18:6 *with* ECF No. 83, pp. 8:1 – 10:17. But nothing changed from the last round of briefing. While scheme liability claims need not plead misrepresentations, they are still subject to dismissal when the claim depends on the existence of false statements. *Kang v. PayPal Holdings, Inc.*, 620 F. Supp. 3d 884, 902 (N.D. Cal. 2022) (dismissing a scheme liability claim when the alleged scheme depends on alleged false statements that were inadequately pleaded).

Sieggreen failed to meaningfully distinguish any "deceptive conduct" apart from the alleged misrepresentations, so his scheme liability claim fails if he inadequately pleads misrepresentations. *See* ECF No. 83, pp. 8:27 – 10:17. Each of the "schemes" that Sieggreen identifies turn on making allegedly false statements through SEC financial reporting, press releases, letters to shareholders, or statements to auditors:

| Alleged scheme | Basis for the alleged deceptive conduct |
| --- | --- |
| Sieggreen argues that the Live Defendants artificially inflated "Live's share price with the intent to profit from sales of Live's shares." ECF No. 83, pp. 8:27 -9:1. | This argument hinges on the statements made in the December 28, 2016, press release and the December 29, 2016, FY2016 Form 10-K about the EPS value. SAC, ¶¶ 45-46, 53. |

Greenberg Traurig, LLP
10845 Griffith Peak Drive, Suite 600
Las Vegas, NV 89135
(702) 792-3773
(702) 792-9002 (fax)

| **Alleged scheme** | **Basis for the alleged deceptive conduct** |
|---|---|
| Sieggreen argues that the Live Defendants "engineered the Novalk Amendment to create the appearance that Live's FY2016 pre-tax income was greater by 20%." ECF No. 83, p. 9:2-3. | This argument hinges on a statement made in Live's FY2016 Form 10-K.  SAC, ¶ 54. |
| "Paid stock promoters to tout Live's forthcoming FY2016 results." ECF No. 83, p. 9:3-4.  This was done to sell stock when the stock price rose, despite the sale never happening. | Sieggreen alleges that Live made material misstatements about the stock promotion in its Form 8-k filed on January 9, 2017.  SAC, ¶¶ 59, 158. |
| Live Defendants "tried to cover up their deceptive scheme" by "making misrepresentations to Live's auditors to obtain a clean audit opinion." ECF No. 83, p. 9-11. | As argued, this hinges on alleged misrepresentations about the transactions. |
| The ApplianceSmart transaction created a false appearance of Live and JOI's financial results.  ECF No. 83, p. 10:3-12. | Sieggreen alleges that Live misrepresented the timing of its acquisition of ApplianceSmart in its Q1 2018 Form 10-Q.  SAC, ¶¶ 67-68. |
| Live misrepresented the amount it paid to Isaac and the terms of his employment. ECF No. 83, p. 10:12-17. | Sieggreen alleges that Live misrepresented Isaac's compensation in 10-K filings and proxy statements.  SAC, ¶¶ 11, 89-97. |

Thus, as shown below, Sieggreen's continued failure to plead false or misleading statements results in his scheme liability claim failing as well, as he fails to plead a viable scheme without them.

**B.    The Court should dismiss the SAC because Sieggreen failed to plead material misrepresentations or omissions.**

To adequately plead material misrepresentations, Sieggreen needed to plead the misleading statement with particularity, explain why it was misleading, then plead how the misrepresentation was objectively material to investors.  *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1274 (9th Cir. 2017).  Sieggreen failed to do so because Live disclosed all material facts related to each transaction, and the Court should thus dismiss his claims.

*1.    Live's 2016 EPS Disclosures.*

Just like in the previous briefing, Sieggreen does not dispute that the December 28, 2016 press release and the FY 2016 Form 10-K each disclosed the facts relating to how Live calculated EPS and why the calculations were different.  RJN, **Exs. A & C**.  Sieggreen now argues that the press release materially misstated EPS because it did not specify that its calculation was as of the

Greenberg Traurig, LLP
10845 Griffith Peak Drive, Suite 600
Las Vegas, NV 89135
(702) 792-3773
(702) 792-9002 (fax)

Greenberg Traurig, LLP
10845 Griffith Peak Drive, Suite 600
Las Vegas, NV 89135
(702) 792-3773
(702) 792-9002 (fax)

press release rather than at the close of the fiscal year. ECF No. 83, p. 11:23-26 ("But *nowhere* in Live's press release were such disclosures made."). But the press release explains that the lock up arrangement occurred two months after the close of Live's fiscal year. RJN, **Ex. C**, p. 2. And it explains that the arrangement reduced common stock "from approximately 2.8 million to 2.0 million shares." *Id.* Simple arithmetic—dividing 17.82 million (Live's net profit) by 8.92 (the calculated EPS)—reveals that this calculation was based on 2,000,000 shares. No reasonable investor could have assumed that an EPS calculation based on the number of outstanding shares existing *after* the lock up reduced the number of shares by 800,000 somehow signified an EPS existing at the end of the fiscal year *before* such a reduction occurred.[2] By calculating EPS using the number of outstanding shares as of the press release, Live accurately reported its current financial performance as of the press release (rather than the end of the fiscal year almost three months prior). Similarly, the Form 10-K disclosed that the EPS was based on a "[w]eighted average of common shares outstanding" at the end of the 2016 fiscal year of 2,815,072. *See* RJN, **Ex. A** at F-3. The Form 10-K also noted the lock-up arrangement that post-dated the close of the fiscal year and outstanding share count. *See* RJN, **Ex. A** at F-29. Thus, the press release allegations do not support a Rule 10b-5(b) violation.

### 2.    *The Novalk Amendment.*

The SAC continues to plead that Live's disclosure of the Novalk Amendment was a misrepresentation because it violated GAAP standards. *See* SAC, ¶¶ 157, 252 ("Live's recognition of $915,500 of 'other income' as a result of the Novalk Amendment in FY 2016 violated GAAP[.]"). But in opposition, Sieggreen appears to abandon his GAAP allegations, seemingly as a concession that he misinterpreted relevant accounting standards, by summarily arguing that "backdating" the Novalk Amendment "created a misleadingly positive impression about Live's financial condition, profitability, and prospects[.]" ECF No. 83, pp. 12:24 – 13:2. This is the same

---

[2] Sieggreen also argues that the press release was materially misleading based on Isaac's alleged motivation for locking up his shares. ECF No. 83, p. 12:6-10. But again, both the FY2016 Form 10-K and the press release disclosed why the EPS was different from the end of the 2016 fiscal year versus when the press release was issued: the lock up in shares, which occurred after the 2016 fiscal year. Because the statements are true, Isaac's alleged motivations, even if true, does not somehow make the statement false.

argument he made in the last round of briefing, and just like before, he cited no authority to support his position. *See* ECF No. 48, p. 9:15-25. He fails to do so, despite this Court advising that backdating is not inherently misleading, so long as it is properly recorded. *See* Sep. 30, 2024, Trans., p. 47:10-21 ("Well, I was looking for some case law on backdating and I found a case…It's a little different, but helpful – [backdating] itself is not illegal as long as the benefit to the employee is properly recorded…[The Novalk Amendment] was backdated, but it was also documented. So I'll be candid with you: I'm not seeing why this, in particular, is a problem.").

In opposition, Sieggreen appears to no longer contest that the Novalk Amendment was properly recorded, which, as the Court noted, is fatal to the claim. As explained in the motion, Live had to revise its Novalk accrual, and include the Novalk Amendment as a subsequent event for its FY2016 Financial Statements regardless of its effective date, because evidence about "the condition" (*i.e.*, the liability accrued for software purchased from Novalk) *did exist* at the balance sheet date (*i.e.*, September 30, 2016). Live previously accrued a $1.5 million liability in its balance sheet related to its purchase of software for Novalk. RJN, **Ex. H**, at 9. Live explained in Note 4 to its June 30, 2016 10-Q that the $1.5 million represented an estimated liability because Live "has the option to pay for the software in cash or in 800,000 shares of [Live] common stock" and does not have to decide how to pay "until December 31, 2016." *Id*. 10 (Note 4). Auditing standards required the Live Defendants to account for the Novalk Amendment in this manner regardless of its effective date. *See* PCAOB Auditing Standards AU 560.02-03; ASC 855-10-25. Had Live not disclosed the reported liabilities in this manner, its disclosures would not have been accurate. There was thus no material misrepresentation in Live's FY2016 Financial Statements about the Novalk Amendment and Sieggreen's claims predicated on these representations must be dismissed.

### 3. *Plaintiff's Allegations Regarding Stock Promotion Fail*

As he did previously, Sieggreen alleges that Defendants "falsely" denied "that they had engaged in any paid promotional activity" in a January 9, 2017 Letter to shareholders. *Compare* FAC, ¶¶ 14, 72, 157 *with* SAC, ¶¶ 158-60.[3] Such statements, even if false, could not be material

---

[3] The statement was not false. Taken in context of the entire letter, a more reasonable interpretation

Greenberg Traurig, LLP
10845 Griffith Peak Drive, Suite 600
Las Vegas, NV 89135
(702) 792-3773
(702) 792-9002 (fax)

to an investor because hiring a stock promoter does not violate securities laws. *See*, *e.g.*, *In re Galectin Therapeutics, Inc. Sec. Litig.*, 843 F.3d 1257, 1272 (11th Cir. 2016) ("[N]othing in the securities laws prohibits Galectin as a company (issuing a regulated security) from hiring analysts to promote Galectin, circulating positive articles about its drug development, or recommending the purchase of Galectin's stock."); *id.* at 1273 ("Galectin's engagement of third parties to promote awareness of its stock and to encourage investment in its business was legal and did not constitute stock-price manipulation.").

In response to materiality, Sieggreen makes exactly the same argument he did previously, while relying on the same cases. *Compare* ECF No. 48, p. 11:14-23 *with* ECF No. 83, p. 13:16-21. But as it was previously, Sieggreen's reliance on a case about kickbacks is misplaced. *See, e.g.*, *In re Acadia Pharms. Inc. Sec. Litig.*, 2020 WL 2838686, at *7 (S.D. Cal. June 1, 2020). The case does not support his theory that denial of an immaterial circumstance can somehow render the circumstance material to investors. And, as *Galectin* explains, there is "no duty to disclose their payments to the stock promoters." *Galectin*, 843 F.3d at 1273.

### 4. *The ApplianceSmart Transaction.*

In opposition, Sieggreen fails to point, with specificity, to the statements that were false or misleading and how they were material to investors, instead summarily claiming that the transaction was allegedly engineered to avoid tax implications, which "would certainly have altered the 'total mix' of information available to a reasonable investors." ECF No. 83, pp. 14:5 – 15:14. There was nothing false or misleading about the ApplianceSmart transaction's disclosures. The ApplianceSmart transaction's terms were fully disclosed in Live's Forms 8-K, 10-K, and 10-Q, while even disclosing the SPA itself. *See* RJN, **Ex. D** at 29; RJN, **Ex. E**; RJN, **Ex. F** at 16, 27 (Note 14), Ex. 10.1 (SPA). Live informed shareholders that (i) the parties executed the SPA on December 30, 2017; (ii) Live had not paid the $6.5 million purchase price as of December 30, 2017 and was not expected to do so until March 31, 2018; (iii) Live was expected

is that the company was denying the claims made in the press that it had engaged in stock promotion activity to sell stock at artificially high prices. That the company had not sold stock, but had purchased it, shows that any promotional activity was not for nefarious purposes. *See* RJN, **Ex. I**.

Greenberg Traurig, LLP
10845 Griffith Peak Drive, Suite 600
Las Vegas, NV 89135
(702) 792-3773
(702) 792-9002 (fax)

Greenberg Traurig, LLP
10845 Griffith Peak Drive, Suite 600
Las Vegas, NV 89135
(702) 792-3773
(702) 792-9002 (fax)

to satisfy the purchase price by delivering "funds to certain third-party lenders of [JanOne] and ApplianceSmart"; and (iv) ApplianceSmart's shares were held by a third party and would not be released to Live until it satisfied the purchase price. RJN, **Ex. D** at 29; RJN, **Ex. E**; RJN, **Ex. F** at 16, 27 (Note 14), Ex. 10.1 (SPA). Furthermore, Live's periodic reports to the SEC right after the transaction not only demonstrated how Live accounted for acquiring control over ApplianceSmart's revenues and assets on December 30, 2017, but they also attached the SPA, which specified that ApplianceSmart remained indebted to MidCap. RJN, **Ex. D** at 29; RJN, **Ex. E**; RJN, **Ex. F** at 16, 27 (Note 14), Ex. 10.1 (SPA). Additionally, Live periodically reported events related to the transaction—such as Live's issuance of a promissory note to JanOne that extended the time to satisfy the purchase price under the SPA. RJN, **Ex. D** at F-15.

Based on these disclosures, investors were fully aware that Live (i) did not receive ApplianceSmart's shares at execution of the SPA; (ii) would pay the $6.5 million consideration by March 31, 2018; and (iii) would pay monies owed under the SPA directly to "certain third-party lenders of the Seller and ApplianceSmart." RJN, **Ex. F** at 28 (Note 14). All material terms were disclosed, and there is no analysis in the opposition about how additional disclosures would have altered the "total mix" of information available to shareholders. And even it were true that the transaction had the effect of avoiding negative tax implications, Sieggreen makes no attempt at explaining how a disclosure about the same would have altered an objectively reasonable investor's decision-making.

In any event, Sieggreen again focuses on the acquisition's closing and MidCap's physical possession of the ApplianceSmart stock certificate. ECF No. 83, p. 14:6-15.[4] But this is legally irrelevant because possession of the stock certificate did not prevent Live from assuming control

---

[4] Sieggreen also misplaces reliance on various inapplicable cases. For example, in *Nguyen*, a court held that a press release about a joint clinical trial was materially misleading because it was contradicted by a contract's actual terms, and the conflicting information had to be resolved under a fact-intensive inquiry of a defendant's "truth-on-the-market" affirmative defense. *Nguyen v. Radient Pharms. Corp.*, 2011 WL 5041959, at *6 (C.D. Cal. Oct. 20, 2011). No such conflicting information appears here, as the terms of the ApplianceSmart transaction were fully disclosed. In *Livid Holdings*, a defendant issued a memorandum that misrepresented obtaining $25 million in fundraising, when it only received $2 million. *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 945 (9th Cir. 2005). Here, no similar misrepresentation occurred because Live disclosed all material terms that Sieggreen complains about relating to the acquisition's closing and MidCap's possession of stock certificate, as detailed above.

over ApplianceSmart and accruing its revenues and expenses. Possession of a stock certificate does not establish ownership or control of the stock. *Lucas v. Lucas*, 946 F.2d 1318, 1323–24 (8th Cir. 1991) (holding agent's possession a stock certificate did not alter fact that the shareholder still owns the security) (citing *Richardson v. Shaw*, 209 U.S. 365, 378 (1908)). Plaintiff's allegations cannot plead a viable securities fraud claim.

### 5.   Isaac's Compensation Disclosures.

Sieggreen alleges that Live did not properly disclose Isaac's compensation, despite Live fully disclosing accrued compensation and how it calculated it. *See* SAC, ¶¶ 94, 144-52 (quoting 2017 and 2018 Form 10-Ks); *see* RJN, **Ex. B** at 42 ("'All Other Compensation' for Mr. Isaac includes $54,000 for each of 2017 and 2016, which was accrued by us for the reasonable housing allowance to which Mr. Isaac is entitled under his employment agreement."); RJN, **Ex. D** at 49-50 (same for 2018 and 2017). In its FY2013 Form 10-K, Live disclosed Isaac's employment agreement entitling him to reasonable housing expenses and that his housing expenses have been accruing since then. RJN, **Ex. I** at 26-27 (FY2013 Form 10-K). And Live disclosed the accrued expense reimbursement for FY2016 in its FY2017 Form 10-K and its FY2018 Form 10-K.

In any event, the omission was immaterial given Live's financial performance. *SEC v. Premier Holding Corp.*, No. SACV 18-00813-CJC(KESx), 2020 U.S. Dist. LEXIS 247561, at *23-24 (C.D. Cal. Nov. 30, 2020); *cf.* Sep. 30, 2024, Trans., p. 30:4-25 (explaining that the compensation Isaac received was minor relative to the company's assets). In 2016, when Mr. Isaac received $120,000 in other compensation, Live reported a net income of over $17,800,000, which is less than 1% (.67%) of Live's reported net income. *See* RJN, **Ex. A** at 28. In other contexts, courts have held that misstatements about commission payments, where the difference of the misstated amount was less than 1% of the company's assets, is immaterial as a matter of law. Hoffman v. UBS-AG, 591 F. Supp. 2d 522, 536 (S.D.N.Y. 2008).[5] As Sieggreen failed to plead facts showing a material misrepresentation or omission, each of his claims fail and the Amended Complaint must be dismissed with prejudice.

---

[5] Sieggreen's reference to Judge Mahan's discussion of Isaac's compensation is unavailing because Judge Mahan did not analyze materiality. *See Sec. & Exch. Comm'n v. Live Ventures Inc.*, 2022 WL 17253784, at *5 (D. Nev. Nov. 28, 2022).

Greenberg Traurig, LLP
10845 Griffith Peak Drive, Suite 600
Las Vegas, NV 89135
(702) 792-3773
(702) 792-9002 (fax)

Sieggreen appears to argue that Live restating certain financial filings is sufficient to plead securities fraud claims, as restatement indicates error in the original filing. ECF No. 83, p. 16:12-20, citing *Sudunagunta v. Nantkwest, Inc.*, 2017 U.S. Dist. LEXIS 228534 (C.D. Cal. Sep. 20, 2017). But *Sudunagunta* construed the sufficiency of allegations under Sec. 11 of the Securities Act, which imposes strict liability for statements contained in registration statements. See 15. U.S.C. § 77k (a). As the *Sudunagunta* court acknowledges, it is not enough to merely show inaccurate statements existed; Plaintiff must plead facts showing the inaccuracies were material. *See Sudunagunta*, at *29 (noting that question is whether "the omitted information was material.").

### 6. *Regulation S-K allegations*

Sieggreen argues, as he did previously, that Live did not address allegations of violations of Regulation S-K. *Compare* ECF No. 48, pp. 14:20 – 15:16 *with* ECF No. 83, p. 16:21 – 17:18. Sieggreen's allegations of violations of Regulation S-K are all based and dependent on the sufficiency of his pleading of the purported misrepresentations and omissions. *See* ECF No. 56, p. 8:4-10. Because the Live Defendants repeatedly asserted that claims based on or related to Sieggreen's theories of substantive misconduct were insufficient, Sieggreen's claim that the Live Defendants did not challenge liability on the basis of violations of Regulation S-K is meritless.

### C. <u>Sieggreen's claims must be dismissed for failing to plead facts establishing a strong inference of scienter.</u>

Plaintiff failed to plead particular facts presenting a "cogent and compelling" case of scienter as to each particular defendant to survive a motion to dismiss with respect to each of his securities fraud claims. *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322, (2007). This required allegations showing the "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). A plaintiff must "plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *DSAM Glob. Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 388-89 (9th Cir. 2002). Plaintiff needed to allege facts showing what *each* defendant knew, *when* he knew it, and *how* he acquired the knowledge sufficient to support an intent to deceive or defraud. *In re*

Greenberg Traurig, LLP
10845 Griffith Peak Drive, Suite 600
Las Vegas, NV 89135
(702) 792-3773
(702) 792-9002 (fax)

*VerSign, Inc. Deriv. Litig.*, 531 F. Supp. 2d 1173, 1207 (N.D. Cal. 2007). Here, Plaintiff's scienter allegations do not address the "what, when and how" of each defendant's knowledge.

### 1. Sieggreen failed to plead strong circumstantial evidence of information contradicting public statements.

Sieggreen argues that he adequately pleaded a strong inference of scienter because he alleged circumstantial evidence contradicting Defendants' public statements. *See generally* ECF No. 83, pp. 18:18 – 19:27. General allegations about a defendants' involvement in the day-to-day workings of the business cannot by itself establish scienter. *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1068 (9th Cir. 2008); *In re Daou Sys., Inc.*, 411 F.3d 1006, 1022 (9th Cir. 2005). But in any event, each of the allegations identified in the opposition fail to give rise to a strong inference of scienter. As it relates to the Novalk Amendment, Sieggreen argues that a strong inference of scienter exists because "Isaac did not even start discussions with Yunis" until two months after FY2016. ECF No. 83, p. 18:18-21. But as discussed above in relation to the Novalk Amendment, when Isaac and Yunis discussed the Novalk Amendment is irrelevant because accounting standards required Live to identify the effective date the way it did. *See* Section (B)(2), *supra*.

As it relates to EPS, Sieggreen refers to an email from Isaac in which he says that "a lower outstanding share count will make our EPS look even better." ECF No. 83, p. 19:4-9. How this creates a strong inference of scienter is left to the imagination. That the lockup would reduce the total number of shares, thereby increasing EPS, does not show an intent to deceive—an increase in EPS is an obvious consequence for reducing the total number of shares.

As it relates to stock promotion, making payments to stock promoters is not circumstantial evidence of an intent to deceive when the Live Defendants have no duty to disclose that it paid stock promoters.

As it relates to the ApplianceSmart transaction, Sieggreen argues that Live did not control ApplianceSmart by December 30, 2017, and Johnson's admission that MidCap possessed ApplianceSmart's stock certificate demonstrates scienter. *Id.* at p. 20:17-27. It is again unclear how this creates a cogent and compelling inference of an intent to defraud, particularly as

Greenberg Traurig, LLP
10845 Griffith Peak Drive, Suite 600
Las Vegas, NV 89135
(702) 792-3773
(702) 792-9002 (fax)

Greenberg Traurig, LLP
10845 Griffith Peak Drive, Suite 600
Las Vegas, NV 89135
(702) 792-3773
(702) 792-9002 (fax)

MidCap's possession of stock certificate did not mean that Live could not assume control over ApplianceSmart and start accruing revenue and expenses.

### 2.    *The existence of an SEC investigation does not establish scienter.*

Sieggreen contends that the SEC's investigation supports scienter.  ECF No. 83, p. 20:1-17.  Yet courts have generally agreed that the mere existence of an SEC investigation cannot establish scienter.  *Zamir v. Bridgepoint Educ., Inc.*, 2018 U.S. Dist. LEXIS 40247, 2018 WL 1258108, at *17 (S.D. Cal. Mar. 12, 2018) (collecting cases).

### 3.    *Allegations of motive are insufficient.*

Sieggreen contends that he sufficiently pleaded scienter by pleading his motive theories.  ECF No. 83, pp. 20:18 – 21:18. But a "mere showing of motive and opportunity [does] not suffice to survive a motion to dismiss."  *Howard v. Everex Sys.*, 228 F.3d 1057, 1064 (9th Cir. 2000).

### 4.    *GAAP violations are insufficient.*

There were no departures from GAAP, as shown above, but even if there were, such departures are not enough to allege scienter.  *SEC v. Todd*, 642 F.3d 1207, 1218 (9th Cir. 2011) ("Generally, a GAAP violation is insufficient, without more, to support a finding of scienter.").  As he did before, Sieggreen argues that the alleged GAAP departures were of such great magnitude that it gives rise to scienter.  *See* ECF No. 83, pp. 21:20 – 22:9, citing *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029 (N.D. Cal. 2016).  But that case does not apply, as the result of the GAAP deviations alleged in *Thomas* inflated total revenue "by ***$121.7 million and total net income by almost 500%***."  *Id.* at 1042.  There are no comparable claims here, where the allegations are that the FY 2016 income was inflated by less than $1 million.

### 5.    *Inadequate control allegations are insufficient.*

As he did previously, Sieggreen argues that Live's disclosures of perceived ineffective controls over financial reporting in 2016-17 is evidence of scienter as to the alleged misrepresentations.  ECF No. 83, p. 23:9-19, citing *In re New Century*, 588 F. Supp. 2d 1206, 1215 (C.D. Cal. 2008).  But admitted inadequate internal controls are not evidence of scienter because they are indicative of error, not fraud.  *See, e.g.*, *Hansen Natural Corp. Sec. Litig.*, 527 F. Supp.

2d 1142, 1158 (C.D. Cal 2007) ("a lack of internal controls generally does not suffice to show scienter"). In the case Sieggreen relies on—*In re New Century*—the alleged misrepresentation at issue was about the company's internal controls, so a subsequent disclosure of ineffective internal controls was a red flag. *In re New Century*, 588 F. Supp. 2d at 1215.

### 6. Change in auditors is insufficient.

Finally, Plaintiff contends that the changes in auditors experienced by Live constituted "similar circumstances" to a case in which a change in auditors was deemed to support an inference of scienter. ECF No. 83, pp. 23:20 – 24:9, citing *Fryman v. Atlas Fin. Holdings, Inc.*, 2022 U.S. Dist. LEXIS 70597, at *78 (N.D. Ill. Apr. 18, 2022). Yet the "similar circumstances" described in the authority cited by Plaintiff consisted of allegations that the change in auditors had occurred three days *after* the auditor had informed the company that its FY financial reports were materially misleading. *Id.* No similar allegations are made here.

## III. CONCLUSION

Sieggreen's allegations cannot satisfy the heightened pleading standard under the PSLRA. Sieggreen failed to allege facts to show that material misrepresentations were made, or there was scienter, so his Rule 10b-5(b) claim and control liability claims fail. And, because Sieggreen's scheme liability claim depends on misrepresentations for the scheme to have been viable, the third cause of action should also be dismissed.

Dated this 11th day of April 2025.

GREENBERG TRAURIG, LLP

*/s/ Mark E. Ferrario*
MARK E. FERRARIO, ESQ.
Nevada Bar No. 1625
JASON K. HICKS, ESQ.
Nevada Bar No. 13149
JERRELL L. BERRIOS, ESQ.
Nevada Bar No. 15504
10845 Griffith Peak Drive, Suite 600
Las Vegas, Nevada  89135

*Attorneys for Defendants Live Ventures Incorporated, Jon Isaac, and Virland A. Johnson*

Greenberg Traurig, LLP
10845 Griffith Peak Drive, Suite 600
Las Vegas, NV 89135
(702) 792-3773
(702) 792-9002 (fax)

## CERTIFICATE OF SERVICE

Under Fed. R. Civ. P. 5(b), I hereby certify that on the 11th day of April 2025, a true and correct copy of the foregoing ***Reply in Support of Motion to Dismiss Second Amended Class Action Complaint [ECF 80]*** was filed electronically via the Court's CM/ECF system. Notice of filing will be served on all parties registered to this case by operation of the Court's CM/ECF system, and parties may access this filing through the Court's CM/ECF system.

/s/ Andrea Lee Rosehill
An employee of Greenberg Traurig, LLP

Greenberg Traurig, LLP
10845 Griffith Peak Drive, Suite 600
Las Vegas, NV 89135
(702) 792-3773
(702) 792-9002 (fax)