UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| Daniel E. Sieggreen, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff<br><br>v.<br><br>Live Ventures Incorporated, Jon Isaac, Virland A. Johnson, and JanOne Inc.<br><br>Defendants | Case No. 2:21-cv-01517-CDS-EJY<br><br>**Order Denying Defendants' Motions to Dismiss Plaintiff's Second Amended Complaint**<br><br>[ECF Nos. 78, 80] |

Plaintiff Daniel E. Sieggreen brings this class-action lawsuit against defendants Live Ventures Incorporated, two of its executive officers, and JanOne Inc., for alleged violations of the Securities Exchange Act of 1934. The defendants allegedly engaged in deceptive conduct between December 28, 2016, and August 3, 2021—violating the Act and causing harm to those who acquired Live's securities during that time. Sieggreen seeks compensatory damages from the defendants, jointly and severally, to remedy that harm.

At a hearing on the defendants' motions to dismiss Sieggreen's first amended complaint, I found that Sieggreen failed to meet the heightened pleading standards that govern securities class actions. Order, ECF No. 70. In turn, I granted the defendants' motions to dismiss the first amended complaint without prejudice and with leave to amend. *Id.* Sieggreen then filed a second amended complaint (ECF No. 74), which the defendants move to dismiss (ECF Nos. 78, 80) on the grounds that it too falls short of the heightened pleading standards that govern this action. For the reasons stated herein, I deny the defendants' motions to dismiss.

I.  **Background**

Sieggreen filed this class action on behalf of persons and entities that purchased or otherwise acquired Live Ventures securities between December 28, 2016, and August 3, 2021 ("class period"). Second am. compl., ECF No. 74 at ¶¶ 1–3. Sieggreen pursues claims against Live

Ventures Incorporated, Jon Isaac, Virland A. Johnson (collectively, "Live defendants") and JanOne Inc. under the Securities Exchange Act of 1934. *Id.* at ¶¶ 19–24. Isaac and Johnson served as Live's CEO and CFO, respectively, during the class period.

Sieggreen alleges that the defendants, in violation of the Exchange Act, engaged in three deceptive schemes to artificially inflate Live's stock. *Id.* at ¶¶ 261–64. Because the plaintiff's claims rest on a "fraud-on-the-market" theory, the changes in Live stock's price per share (PPS) during the class period are especially relevant.

Live PPS during the class period[1]

| Date | Live PPS |
|---|---|
| 09/16/2016 | $1.67 |
| 09/30/2016 | $1.91 |
| 12/29/2016 | $23.92 |
| 01/06/2017 | $18.05 |
| 02/15/2018 | $13.29 |
| 08/15/2018 | $10.02 |
| 06/25/2021 | $75.25 |
| 08/04/2021 | $33.50 |
| 08/10/2021 | $25.76 |

The second amended complaint divides the defendants' securities fraud into three deceptive schemes. Within those schemes, some of the misrepresentations that immediately precede the change in Live stock's PPS are as follows:

- The jump from $1.91 to $23.92 PPS on December 28, 2016, was allegedly due to a press release claiming that Live stock's EPS was $8.92, when in reality the EPS was $6.33. *Id.* at ¶¶ 45–47.

---

[1] This chart reflects the changes to Live stock's PPS during the class period, as alleged in the second amended complaint, ECF No. 74.

- The dip from $23.92 to $18.05 on January 6, 2017, was due to a SeekingAlpha report exposing Live's misrepresentations and fraudulent conduct, *id.* at ¶ 56–58.
- The dip from $18.05 to $13.29 on February 15, 2017, was due to the contents of Live's Form 8-K filed with the SEC the day prior, which restated Live's financial results for the past three quarters. *Id.* at ¶¶ 75–80.
- The dip from $13.29 to $10.02 on August 15, 2018, due to Live refiling its Q3 Form 10-Q for the quarter ended June 30, 2019, which disclosed that the SEC had commenced an investigation into Live. *Id.* at ¶ 86–88; *id.* at ¶¶ 261–265.
- The increase from $13.29 to $75.25 on June 25, 2021, was due to the defendants' fraudulent schemes that set out to artificially inflate Live's stock prices. *Id.* at ¶¶ 261–65.
- Live's stock dropped 46% to close at $33.50 on August 4, 2021, and then to $25.76 on August 10, 2021, due to the SEC action. *Id.* at ¶¶ 98–108.

The development of these facts within the framework of the defendants' three deceptive schemes is detailed below.

### A. First Deceptive Scheme

The first deceptive scheme allegedly occurred in late 2016, months after the end of Live's 2016 fiscal year, and ended September 30, 2016, in the run-up to Live reporting its fiscal year ("FY") 2016 financial results to the SEC on December 29, 2016. *Id.* at ¶ 4. Sieggreen alleges that the Live defendants sought to boost Live's FY 2016 financial results, drive up Live's share price, and then profit from sales of Live's artificially inflated stock price. *Id.* Thus, the plaintiffs allege that the defendants engineered an amendment to a software purchase agreement that Live had entered into with Juan Yunis, a close personal friend of Isaac's. *Id.* at ¶ 5. That amendment consisted of Isaac's friend "discounting" the software purchase price from $1.5 million to $584,500 worth of shares and selecting September 15, 2016, as the "effective date" of the amended agreement—even though the parties had not even begun discussing a potential

amendment to the agreement until November 30, 2016 (two months after the close of FY 2016). *Id.* This allowed Live to misrepresent this "discount" to be $915,500 in "other income," thus boosting Live's FY 2016 pre-tax income by over 20%. *Id.*

This in turn allowed the Live defendants to allegedly make material misrepresentations and omissions to investors about Live's FY 2016 financial results, the circumstances of the purported amendment, and Live's recognition of $915,500 in "other income" in its FY 2016 financial results. *Id.* The plaintiffs also allege that in December 2016, Isaac allegedly wound up 800,000 of his shares in Live for the purpose of decreasing Live's outstanding share count and increasing Live's earnings per share to $8.92. *Id.* at ¶ 6. Isaac then approved of a press release to be issued on December 28, 2016, which misleadingly claimed that Live's FY 2016 EPS was $8.92 rather than the true EPS of $6.33. *Id.*

Shortly before issuing the press release on December 28, 2016, Live allegedly paid stock promoters $120,000 to tout Live's FY 2016 results. *Id.* at ¶ 7. On that same day, Isaac allegedly instructed Live's brokerage to sell up to 20,000 shares throughout the day on December 28, 2016. *Id.* Throughout the day, Isaac is alleged to have placed 28 "good till cancel" limit orders through Juan Yunis's brokerage account, which Isaac had access to. *Id.* If all these transactions were completed, Sieggreen alleges that Live would have realized profits of over $1.1 million. *Id.*

SeekingAlpha published a scathing report about Live on January 6, 2017, which is alleged to have partially revealed the truth about Live's actions and caused Live's share price to drop by 12.7%. *Id.* SeekingAlpha reported that Live had lied about its 2016 financial results, including in Live's December 28, 2016 press release, which falsely claimed that Live's EPS was $8.92. *Id.* It also reported that Live had a history of paying stock promoters large sums of money, then selling shares as Live's share price rose after the stock touts before Live's share price plummeted back down. *Id.* The Live defendants allegedly attempted to cover up this deceptive scheme by lying to Live's outside accountants and making materially false and misleading statements and omissions to investors by denying that Live had ever paid stock promoters.

### B. Second Deceptive Scheme

Sieggreen alleges that the second deceptive scheme began in late 2017. *Id.* at ¶ 8. Live had had an unprofitable first quarter of 2018 and would have to recognize a $2.3 million non-cash charge due to a new U.S. tax law in its Q1 2018 financial results. *Id.* JanOne, whose CEO was Tony Isaac (Jon Isaac's father and a Live board of director), was also facing a tax hit because it had sold real property at a gain during its FY 2017, which ended December 31, 2017. *Id.* The Live defendants and JanOne came up with a scheme which would boost each party's financial results: Live and JanOne would engineer a transaction to create a misleading appearance that Live had acquired ApplianceSmart (a subsidiary of JanOne) with the transaction closing on December 30, 2017, and then disseminate misleading news about the "transaction" to investors. *Id.* By selecting the acquisition date as December 30, 2017, Live could turn what had been an unprofitable quarter into a profitable quarter, and JanOne could offset the negative tax implications from selling real property at a gain in its FY 2017 financial results. *Id.*

As part of the scheme, the defendants allegedly claimed that ApplianceSmart was worth over $10 million and that Live only paid $6.5 million for it. *Id.* This allegedly allowed Live to claim that it had gained $3.7 million in income (the difference between the purported value of the asset and the purchase price). *Id.* But unbeknownst to investors, Live allegedly could not—and did not—take effective control of ApplianceSmart on December 30, 2017, because ApplianceSmart was encumbered by a credit agreement with its lender, MidCap. *Id.* at ¶ 9. Under the credit agreement, MidCap had sole possession of ApplianceSmart's stock certificate, and ApplianceSmart could not sell any of its stock or assets without permission of MidCap—which ApplianceSmart had not obtained. *Id.* Further, the Live defendants allegedly lied to Live's outside accountants and told them that Live had "effective control" of ApplianceSmart, representing to both Live's outside accountants and to Live's investors that ApplianceSmart had transferred its stock certificate into escrow as of December 30, 2017. *Id.* But in reality,

ApplianceSmart had not transferred its stock certificate into escrow, and it remained in sole possession of MidCap. *Id.*

Later, when Live was unable to pay any portion of the purchase price for ApplianceSmart, the defendants allegedly came up with another plan to claim that Live had paid part of the purchase price in the amount of $2.6 million. *Id.* at ¶ 10. Live is alleged to have made materially false and misleading representations and omissions to investors that Live had paid $2.6 million in cash to JanOne as part of the purchase price. *Id.* The defendants came up with the $2.6 million amount by treating revenues ApplianceSmart had paid to its lender as amounts paid by Live to JanOne for the purchase price. *Id.* Unbeknownst to investors, MidCap maintained sole possession of ApplianceSmart's stock certificate until March 22, 2018, and it was not until May 24, 2018, that JanOne's board of directors executed the corporate disclosures approving the sale of ApplianceSmart to Live. *Id.*

### C. Third Deceptive Scheme

Sieggreen alleges that the third deceptive scheme occurred in connection with the compensation paid to Isaac and Live's disclosures concerning the same. *Id.* at ¶ 11. Over the course of FY 2016–2018, Live allegedly paid Isaac a total of $315,000 in housing allowances. *Id.* However, the total amount Live reported to investors as paid to Isaac for housing allowances for FY 2016–2018 was $162,000. *Id.* The Live defendants' statements regarding Isaac's FY 2016–2018 compensation are alleged to be material misrepresentations, as they understated the total compensation paid to Isaac during that time by 94% and misrepresented the terms of Isaac's employment agreement with Live. *Id.*

Sieggreen further alleges that the Live defendants effectively admitted that their financial statements for five quarters were materially false and misleading and that, for the entirety of the class period, Live lacked effective internal control over financial reporting. *Id.* at ¶ 12. Live restated its financial statements for Q1, Q2, and Q3 of 2017 on February 14, 2018, which allegedly revealed that Live had materially understated its debts and materially overstated its net cash

6

provided by operations, causing Live's share price to plummet by 15.5%. *Id.* On August 14, 2020, Live restated its financial statements for the quarters ended December 31, 2019, and March 31, 2020. *Id.* Throughout the class period, Live was subject to numerous credit agreements and struggled to maintain compliance with its various loan covenants. *Id.* As of December 31, 2017, Live had allegedly fallen out of compliance under a $30 million loan agreement. *Id.*

On August 3, 2021, following a nearly four-year investigation, the SEC announced that it had filed an enforcement action against the Live defendants and JanOne in the U.S. District Court for the District of Nevada. *Id.* at ¶ 13. The SEC action was assigned to the Honorable James C. Mahan (Case No. 2:21-cv-01433-JCM-VCF). *Id.* The SEC alleged seventeen counts for violations of the Exchange Act against the defendants and sought to (1) bar Isaac and Johnson from acting as an officer or director of any issuer permanently, (2) order Isaac to disgorge all funds received from his illegal conduct, and (3) order all the defendants to pay civil penalties. *Id.* On this news, Live's share price plummeted by 46%. *Id.*

After the class period, the defendants moved to dismiss the SEC action pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (FRCP). *Id.* at ¶ 14. On November 28, 2022, Judge Mahan denied the Live defendants' and JanOne's motions to dismiss the SEC action entirely. *Id.* Judge Mahan found that the SEC had stated claims against the defendants for engaging in deceptive acts and for issuing materially false and/or misleading statements and/or omissions in violation of the Exchange Act. *Id.* Sieggreen alleges that these same fraudulent courses of conduct and materially misleading statements and omissions in the instant action. *Id.*

**II.  Legal Standard**

**A.  Pleading Standard**

The court may dismiss an action when a plaintiff fails to state a claim upon which relief can be granted. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A plaintiff's complaint must include, at a minimum, "a short and plain statement of the claim showing that the [plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a)(2). In most cases, the complaint will survive a motion to

dismiss if its factual allegations, taken as true, "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). But if the plaintiff's claim involves fraud, then Rule 9(b)'s heightened pleading standard applies. Fed. R. Civ. P. 9(b); *see In re Cloudera, Inc.*, 121 F.4th 1180, 1186 (9th Cir. 2024).

Rule 9(b) of the FRCP requires the plaintiff to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The pleading must identify "the who, what, when, where, and how of the misconduct charged." *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 964 (9th Cir. 2018) (citation omitted). When a party is charged with misrepresentation, the pleading must describe the "time, place, and specific contents of the false representations as well as the identities of the parties to the misrepresentation." *In re Cloudera*, 121 F.4th at 1187. And it cannot rely on the benefit of hindsight in doing so. *Id.* Rather, the pleading must explain "why the statements were false or misleading at the time they were made." *Id.* (quoting *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012)).

In private securities fraud actions, the Private Securities Litigation Reform Act of 1995 (PSLRA) reinforces Rule 9(b) by imposing additional pleading requirements. *In re Rigel Pharm.*, 697 F.3d at 876. Congress enacted the PSLRA and its heightened pleading standards to tame abusive securities litigation by private parties. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007). Under the PSLRA, a private securities complaint must "state with particularity both the facts constituting the alleged violation" and the "facts evidencing scienter"—that is, "the defendant's intention 'to deceive, manipulate, or defraud.'" *Id.* (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 (1976)). If the complaint alleges that the defendant made a "false or misleading statement," then it must also (1) "specify each statement alleged to have been misleading," (2) detail the "reasons why the statement is misleading," and (3) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* (first quoting 15 U.S.C. § 78u-4(b)(1); and then quoting 16 U.S.C. § 78u-4(b)(2)).

8

### B. Exchange Act's Statutory Scheme

Section 10(b) of the Exchange Act prohibits the use "any manipulative or deceptive device or contrivance" in connection with "the purchase or sale of any security." 15 U.S.C. § 78j(b). SEC Rule 10b-5 implements that provision and creates a private right of action against those who make or disseminate material misrepresentations with the intent to defraud. 17 C.F.R. § 240.10b-5; *Lorenzo v. SEC*, 587 U.S. 71, 83 (2019).

A private right of action under Section 10(b) and Rule 10b-5 only extends to primary violators, not secondary violators. *Cent. Bank, N.A. v. First Interstate Bank, N.A.*, 511 U.S. 164, 191 (1994). Anyone who makes or disseminates a material misrepresentation can be a primary violator, "assuming all of the requirements for primary liability under Rule 10b-5 are met." *Id.*; *see also Janus Cap. Grp. v. First Derivative Traders*, 564 U.S. 135, 142 (2011) (identifying the primary violator of Rule 10b-5(b) to be the "maker" of the material misrepresentation); *Lorenzo*, 587 U.S. at 78 (identifying the primary violator of Rule 10b-5(a) and (c) to the "disseminator" of the material misrepresentation).

Even so, a person who does not meet all the requirements for primary liability can still be held vicariously liable for a Rule 10b-5 violation, per Section 20(a) of the Exchange Act. 15 U.S.C. § 78t(a). Section 20(a) imposes vicarious liability on any person who directly or indirectly controls the primary violator. *Id.* The controlling person is held "jointly and severally" liable with—and to the same extent as—the primary violator, "unless the controlling person acted in good faith and did not directly or indirectly induce" the primary violation. *Id.* And even if the requirements of Section 20(a) are met, the controlling person will not be vicariously liable if the controlled person's liability is not proven. *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 701–02 (9th Cir. 2021).

This contingency distinguishes Section 20(a) claims from Rule 10b-5 claims. A defendant who disseminates material misrepresentations may be liable under Rule 10b-5(a), regardless of whether the "maker" of that misrepresentation is liable under Rule 10b-5(b). But a controlling

9

person cannot be liable for the controlled person's 10b-5 violation if the plaintiff fails to prove that the controlled person was a primary violator. *See In re Alphabet*, 1 F.4th at 701–02.

### III. Discussion

Sieggreen asserts the following claims in its second amended complaint: violation of Exchange Act § 10(b) and SEC Rule 10b-5(b) against the Live defendants; violation of Exchange Act § 10(b) and SEC Rules 10b-5(a) and 10b-5(c) against the Live defendants and JanOne; and violations of Exchange Act § 20(a) against Isaac and Johnson. ECF No. 74. I find that Sieggreen meets the pleading threshold for all these claims and, in turn, deny the defendants' motions to dismiss.

#### A. Violation of Exchange Act § 10(b) and SEC Rule 10b-5

Section 10(b) of the Exchange Act prohibits the use "any manipulative or deceptive device or contrivance" in connection with "the purchase or sale of any security." 15 U.S.C. § 78j(b). SEC Rule 10b-5(b) implements that prohibition and bars "any person" from misrepresenting the material facts, whether by false statement or misleading omission, in connection with a securities transaction. 17 C.F.R. § 240.10b-5(b); *see Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 263 (2024). SEC Rule 10b-5(a) and (c) bars any person from disseminating those misrepresentations with the intent to defraud. *Lorenzo*, 587 U.S. at 78 . Even so, these provisions do not "create an affirmative duty to disclose any and all material information." *Macquarie*, 601 U.S. at 264. Rather, disclosure is required "only when necessary" to "ensure that statements already made are clear and complete." *Id.* at 264.

To plead a claim under § 10 and Rule 10b-5, the plaintiff must adequately plead six elements: (1) the defendant made or disseminated a material misrepresentation or omission; (2) scienter; (3) a connection between a private securities transaction and the misrepresentation or omission; (4) the plaintiff's reliance on the misrepresentation; (5) economic loss; and (6) loss causation. *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 157 (2008). Because the elements for a claim under Rule 10b-5(b) are the same as the elements for a claim under Rule

10b-5(a) and (c), I address all of Sieggreen's Rule 10b-5 claims against the Live defendants and JanOne in this discussion.

### 1. Make or disseminate a material misrepresentation

A misleading statement or omission is actionable if (1) the complaint pleads it with particularity and explains why it is misleading, and (2) a reasonable investor would consider it material to investment decisions. *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017). The first prong is met if the factual allegations meet the pleading standards of Rule 9(b) and the PSLRA. *Id.* The second prong is met if the misrepresentation is "capable of objective verification" and objectively false, and there is a "substantial likelihood" that a "reasonable investor" would view the misrepresentation as one that is objectively false and significantly alters the "total mix" of information made available for stockholders' investment decisions. *Id.* (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)).

Subsection (b) of Rule 10b-5 requires the defendant to be the "maker" of the material misrepresentation, while subsections (a) and (c) require the defendant to be the "disseminator" of the material misrepresentation. *See Lorenzo*, 587 U.S. at 78. The "maker" is the "the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus*, 564 U.S. at 142. The "disseminator" is the person who "employ[s] any device, scheme, or artifice to defraud" or "engage[s] in any act, practice or course of business" that "operates as a fraud or deceit." *Lorenzo*, 587 U.S. at 77 (citation modified) (quoting 15 C.F.R. § 240.10b-5).

Here, Sieggreen alleges with particularity that the defendants made or disseminated material misrepresentations. Live made and disseminated material misrepresentations in the statements concerning Live's 2016 FY financial results, ECF No. 74 at ¶¶ 153–57; the statements concerning Live's stock promotions, *id.* at ¶¶ 158–60; statements concerning Live's Q1 2018 financial results, *id.* at ¶¶ 161–66; the statements concerning Live's payment of the purchase price for ApplianceSmart, *id.* at ¶¶ 167–70; the statements concerning Jon Isaac's FY 2016–2018

compensation, *id.* at ¶¶ 171–79; and Live's financial statements for the quarters ended December 31, 2016, March 31, 2017, and June 30, 2017, *id.* at ¶¶ 180–84. Further, JanOne disseminated material misrepresentations with respect to the ApplianceSmart transaction and MidCap Credit Agreement. *Id.* at ¶¶ 166, 170. Sieggreen's second amended complaint identifies each misrepresentation and states with particularity the reasons why the misrepresentation is materially misleading. *See id.* at ¶¶ 158–88. Thus, the first element of Sieggreen's Rule 10b-5 claims against the Live defendants and JanOne meet the pleading threshold.

### 2. Made with scienter

To survive a motion to dismiss, the complaint's factual allegations must collectively create a "strong inference" of scienter that is not outweighed by "nonculpable explanations for the defendant's conduct. *Tellabs, Inc.*, 551 U.S. at 324. The Supreme Court has characterized "scienter" in a Section 10(b) claim as "a mental state embracing intent to deceive, manipulate, or defraud." *Lorenzo*, 587 U.S. at 76 (quotation omitted). The Ninth Circuit has added "deliberate recklessness" to that list. *In re Alphabet*, 1 F.4th at 701. Deliberate recklessness is "an extreme departure from the standards of ordinary care" that "presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016) (quotation omitted).

Here, Sieggreen meets the pleading threshold for the scienter element of his Rule 10b-5 claims against the defendants. When the allegations in the complaint are reviewed as a whole, and with nonculpable explanations for the defendants' conduct considered, there is a strong inference of scienter. The allegations create a consistent theme of hollow transactions and fraudulent reporting designed to save face with investors after a poor financial quarter. ECF No. 74 at ¶¶ 197–260. Because the allegations as a whole create a strong inference of scienter, Sieggreen's second amended complaint meets the pleading threshold for the scienter element of his Rule 10b-5 claims.

### 3. *In connection with a securities transaction*

SEC Rule 10(b) requires the deceptive act to be "in connection with the purchase or sale of any security." 15 U.S.C. 78j(b). This requirement concerns "the statute's coverage rather than causation." *Stoneridge*, 552 U.S. at 160. As for covered transactions, the statute only protects securities "listed on an American stock exchange" that are purchased or sold "in the United States." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 273 (2010). As for deceptive acts, the statute broadly covers fraudulent acts and schemes that "coincide" with a securities transaction. *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006).

Here, Sieggreen meets the pleading threshold for the "in connection with a securities transaction" element of his Rule 10b-5 claims against the defendants. The clearest way that Sieggreen shows this connection is by incorporating the SEC complaint and describing the proceedings. ECF No. 74 at ¶¶ 216–39; ECF No. 74-1. The SEC action, which was based on the same events and allegations that Sieggreen sets forth in his complaint, sets forth the alleged fraudulent misrepresentations that the defendants made or disseminated which coincided with securities transactions. ECF No. 74 at ¶¶ 216–39; ECF No. 74-1. And the securities at issue are listed on the NASDAQ exchange, which is an American stock exchange. *Id.* at ¶¶ 20, 24, 186. Thus, Sieggreen pleads this element with the requisite specificity.

### 4. *Reliance*

Reliance is the "causal connection between the alleged fraud and the securities transaction"—i.e., the defendant's fraudulent act "played a substantial part in the plaintiff's investment decision." *Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 939 (9th Cir. 2009). A plaintiff is said to have "relied" on the defendant's fraudulent act if it "played a substantial part in the plaintiff's investment decision." *Id.* Traditionally, plaintiffs show reliance by alleging that they were "aware of a defendant's misrepresentation and engaged in a transaction based on that misrepresentation." *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 118 (2021).

Alternatively, reliance may be presumed based on a breached duty to disclose or a fraud-on-the-market theory. *Stoneridge*, 552 U.S. at 169.

Here, Sieggreen alleges both presumptions, but explicitly devotes a part of the second amended complaint to articulating why the fraud-on-the-market theory creates a presumption of reliance in this case. *See* ECF No. ¶¶ 261–66. Sieggreen alleges that the defendants' misrepresentations artificially inflated Live's share price, which reached a class period high of $75.25 PPS on June 25, 2021. *Id.* at ¶ 261. He further alleges that the class relied upon the integrity of the market price of Live's securities and market information to buy the shares, and that the integrity of the market price was damaged by the defendants' fraud. *Id.* Specifically, Sieggreen alleges that Live securities were traded on the NASDAQ; Live filed periodic public reports with the SEC and NASDAQ; Live regularly communicated with public investors via established market communication mechanisms; and Live was followed by securities analysts who wrote and published reports about Live to the public. *Id.* at ¶ 263. I find that Sieggreen alleges a fraud-on-the-market theory with enough particularity to create a presumption of reliance that satisfies this element of his Rule 10b-5 claims against the defendants.

### 5. Economic Loss

A plaintiff must allege—but not necessarily prove—that he suffered an economic loss to support a securities fraud action. *See Stoneridge*, 552 U.S. at 157. Here, Sieggreen alleges that he and the class suffered economic harm due to the defendants' fraudulent actions and schemes. ECF No. 74 at ¶ 194–95, 264, 277. Specifically, he alleges that the defendants' fraud and material misrepresentations caused economic harm to him and the class, which includes those who purchased Live securities during the class period at artificially high prices. *Id.* Stated otherwise, Sieggreen alleges that he and other investors lost money because of they purchased stock at inflated values. These allegations as to the economic loss suffered by Seiggreen and the class satisfies the economic loss element of his Rule 10b-5 claims against the defendants.

### 6. Loss Causation

The Ninth Circuit requires the plaintiff in a private securities action to plead loss causation with the particularity required of Rule 9(b). *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014). Loss causation "requires a plaintiff to show that a misrepresentation that affected the integrity of the market price also caused a subsequent economic loss." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 812 (2011).

Here, Sieggreen alleges loss causation with the requisite specificity to support his Rule 10b-5 claims against the defendants. *See* ECF No. 74 at ¶¶ 194–96. He does so by alleging that the defendants' fraudulent misrepresentations and schemes directly and proximately caused economic harm to the class by artificially inflating Live securities. *Id.* at ¶¶ 194–95. Specifically, Sieggreen alleges that the defendants concealed the truth about Live's business, operations, and prospects, which materialized on January 6, 2017, February 14, 2018, August 14, 2018, and August 3–10, 2021. *Id.* at ¶ 196. He alleges that this caused the price of Live's stock to significantly decline, "thereby damaging investors as the artificial inflation in Live's stock price was removed." *Id.* at ¶ 196. I find that Sieggreen's allegations as to loss causation meet the pleading standard. And in turn, Sieggreen's Rule 10b-5 claims against the defendants survives the motions to dismiss.

**B. Violation of Exchange Act § 20(a) against the individual defendants**

A person who controls a primary violator of Rule 10b-5 may be vicariously liable for that violation under Section 20(a) of the Exchange Act. 15 U.S.C. § 78t(a). The SEC defines "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405. *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 765 (9th Cir. 2023). "Section 20(a) claims are derivative." *Id.* Thus, vicarious liability of Rule 10b-5 requires the plaintiff to show that there was a primary violation of that Rule and that the Section 20(a) defendant had "control" of the 10b-5 primary violator. *See In re Alphabet*, 1 F.4th at

702; *see also Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009) (to state a claim for control-person liability under Section 20(a), plaintiffs must allege a "primary violation of federal securities law" and that "the defendant exercised actual power or control over the primary violator" (quoting *No. 84 Emp.-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003))).

Here, Sieggreen sufficiently alleges that the individual defendants' vicarious liability of the Rule 10b-5 claims. As discussed above, Sieggreen sufficiently alleges that the Live defendants violated Rule 10b-5(b), and that the Live defendants and JanOne violated Rule 10b-5(a) and (c). Also, I find that Sieggreen sufficiently alleges control by the Isaac and Jonson, as they were Live's respective CEO and CFO during the class period. *See* ECF No. 74 at ¶¶ 21–23. Isaac was also the CFO and 13.6% owner of JanOne during the class period. *Id.* at ¶ 24. Sieggreen alleges that Isaac and Johnson "possessed the power and authority to control the contents of [Live's] reports to the SEC, press releases and presentation, to securities analysts, money and portfolio managers and institutional investors, i.e., the market. *Id.* at ¶ 23. I find that Sieggreen's allegations are sufficient to support the vicarious liability of Isaac and Johnson under Section 20(a).

## IV. Conclusion

IT IS HEREBY ORDERED that defendant JanOne Inc.'s motion to dismiss [ECF No. 78] is denied.

IT IS FURTHER ORDERED that the Live defendants' motion to dismiss [ECF No. 80] is denied.

Dated: September 30, 2025

_____
Cristina D. Silva
United States District